**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

ATLANTIC SPECIALTY INSURANCE
COMPANY,

        Plaintiff,

v.

LEXINGTON INSURANCE COMPANY
and BCS INSURANCE COMPANY,

        Defendants.

Court File No.:

**COMPLAINT FOR DECLARATORY
JUDGMENT AND EQUITABLE AND
CONTRACTUAL SUBROGATION**

---

Plaintiff Atlantic Specialty Insurance Company ("ASIC"), by and through its undersigned counsel, brings this action against defendants Lexington Insurance Company ("Lexington"), and BCS Insurance Company ("BCS") and alleges as follows:

## I.   INTRODUCTION

1.        ASIC seeks a judicial declaration pursuant to 28 U.S.C. §§ 2201 and 2202 and the Minnesota Uniform Declaratory Judgment Act, M.S.A. § 555.01, that Lexington and BCS had a duty to indemnify Premera Blue Cross ("Premera"), under excess managed care errors and omissions liability policies that Lexington and BCS issued to Premera (the "E&O Policies"), for Premera's settlements of data breach and breach of confidentiality claims asserted in: (i) *In re: Premera Blue Cross Customer Data Security Breach Litigation,* Case No. 3:15-md-2633 (D. Or.) (the "MDL Action") and (ii) actions filed by state Attorneys General (the "AG Actions").

2.        ASIC also seeks a judicial declaration pursuant to 28 U.S.C. §§ 2201 and 2202 and the Minnesota Uniform Declaratory Judgment Act, M.S.A. § 555.01, that ASIC did not have a duty to indemnify Premera, under Premera's commercial general liability and umbrella liability policies that ASIC issued to Premera (the "Commercial Policies"), for Premera's settlements of

data breach and breach of confidentiality claims asserted in the MDL Action and the AG

Actions.

3.      ASIC indemnified Premera for the settlements of the MDL Action and the AG

Actions under the Commercial Policies, pursuant to a reservation of ASIC's right to later

subrogate against Lexington and BCS.  ASIC indemnified Premera under the Commercial

Policies, because Lexington and BCS failed to indemnify Premera pursuant to the E&O Policies.

ASIC therefore seeks to recover from Lexington and BCS pursuant to theories of contractual and

equitable subrogation.

4.      The E&O Policies follow the form of the Ironshore primary managed care errors

and omissions liability policy which afforded coverage to Premera, subject to other terms and

conditions, for errors and omissions in the "failure to maintain confidentiality of information

regarding Medical Services or information obtained in the provision of Managed Care Service

and limiting the release or use of such information in conformance with the requirements of the

law."  Managed Care Service is defined by the E&O Policies to include Premera's "[c]reation,

operation, maintenance and use of the Insured Entity's [Premera's] website or network."

5.      The Commercial Policies afforded coverage to Premera, subject to other terms

and conditions, for "personal and advertising" injury, including "[o]ral or written publication of

material that violates a person's right to privacy," but they did not afford coverage for the errors

and omissions in the protection of confidential information obtained through the use and

maintenance of Premera's computer network and resulted in HIPAA violations.

6.      Premera settled the MDL Action for $32 million pursuant to a settlement

agreement (the "MDL Settlement") that received final approval by the U.S. Court for the District

of Oregon on March 2, 2020.  Premera settled the AG Actions for $10 million in or around July

2019 (the "AG Settlement").  Premera sought indemnification under both the E&O Policies and

the Commercial Policies for the MDL Settlement.  ASIC contributed approximately $12.2 million toward the MDL Settlement under the Commercial Policies pursuant to a reservation of its rights to later subrogate against Lexington and BCS.

7.      While ASIC made its contribution in order to protect Premera's interests, Lexington refused to contribute to the MDL Settlement, even after Ironshore, the underlying primary E&O carrier, contributed $10 million to the MDL Settlement and exhausted its policy limits.

8.      Premera likewise sought indemnification under the E&O Policies and the Commercial Policies for the AG Settlement.  ASIC contributed approximately $2.9 million toward the AG Settlement pursuant to a reservation of its rights to later subrogate against Lexington and BCS.

9.      ASIC made this contribution to protect Premera's interests even though the Commercial Policies did not cover the fines and penalties incurred by Premera due to the data breach.  Lexington only contributed $2.7 million to the AG Settlement and refused to fund the entire AG Settlement even though the Ironshore policy limits had been exhausted, and the Lexington Policy and BCS Policy specifically afforded coverage for the fines and penalties on which the AG Settlement was based.

10.      ASIC seeks to recover from Lexington and BCS up to $15.1 million that ASIC contributed to the MDL Settlement and the AG Settlement, because the E&O Policies specifically afforded coverage for claims arising from Premera's errors and omissions in maintaining the confidentiality of information that Premera obtained in the provision of Managed Care Service and Private Information Protection, including the maintenance of Premera's computer network, and from Premera's failure to limit the release or use of such information in conformance with the law.

11.     While the E&O Policies specifically provided coverage for the MDL Settlement and the AG Settlement, the Commercial Policies do not afford coverage for claims arising from Premera's failure to protect and properly maintain and secure its computer network, on which the MDL Settlement and AG Settlement were based.  The damages that were at issue in the MDL Action and the AG Actions are not "personal and advertising injury," as defined in the Commercial Policies, and were also otherwise precluded from coverage by other definitions and exclusions in the Commercial Policies.

## II.  PARTIES

12.     ASIC is incorporated under the laws of the State of New York and has its principal place of business in the State of Minnesota.  It is an insurance company authorized to do business in the State of Minnesota and elsewhere.

13.     Lexington Insurance Company is incorporated under the laws of the State of Delaware and has its principal place of business in the State of Massachusetts.  It is an insurance company authorized to do business in the State of Minnesota and elsewhere.

14.     BCS Insurance Company is incorporated under the laws of the State of Ohio and has its principal place of business in the State of Illinois.  It is an insurance company authorized to do business in the State of Minnesota and elsewhere.

## III.   JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

16.     An actual justiciable controversy exists between and among ASIC, BCS and Lexington within the meaning of 28 U.S.C. § 2201 regarding whether ASIC may recover from Lexington and BCS the amounts ASIC contributed to the MDL Settlement and the AG Settlement that should have been paid by Lexington and/or BCS.

4

17.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and the suit is between citizens of different states.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to this claim occurred in this judicial district, and the defendants do business in this judicial district.

## IV.  THE UNDERLYING ACTIONS

### A.     The MDL Action

19.     The MDL Action included a nationwide class and alternative statewide classes that asserted claims resulting from a data breach of Premera's computer network, which compromised the confidential information of approximately 10.4 million customers and employees (the "MDL Plaintiffs").  The breach allegedly resulted from malware installed by hackers on Premera's systems in May 2014.

20.     The MDL Plaintiffs alleged that in order to become a Premera member or receive healthcare services from a provider within the Premera network, they were required to give Premera their medical, financial, and/or personal information, including dates of birth, mailing addresses, telephone numbers, email addresses, social security numbers, medical claims information, financial information, and other protected health information as defined by the Health Insurance Portability and Accountability Act ("HIPAA").  *See* First Amended Consolidated Class Action Complaint ("FAC"), attached as Exhibit A hereto.

21.     The MDL Plaintiffs asserted that, based on Premera's collection of confidential medical, financial, or personal information from its customers and members, Premera had a duty to use reasonable means to safeguard and prevent disclosure of consumers' personal information in accordance with HIPAA and industry standards.

22.     The MDL Plaintiffs alleged that on May 5, 2014, hackers sent a "phishing" email to a Premera employee, who downloaded malware allowing hackers to access Premera's servers.

23.     The malware allegedly remained active on Premera's network through at least January 2015, when its presence was detected by Premera.  However, Premera's remediation of its network was not complete until the first week of March 2015.  The MDL Plaintiffs' confidential information continued to be stolen between January 2015 and March 2015.

24.     The MDL Plaintiffs also alleged that Premera's network-security procedures were easily exploited by hackers, and Premera knew or should have known that its deficient security and privacy practices would likely result in a data breach.

25.     Premera allegedly breached its duties by failing to use reasonable measures to protect consumers' confidential data from hackers and by failing to provide timely notice of the breach.  The MDL Plaintiffs alleged the following specific negligent acts or omissions by Premera:

   a.   Failing to adopt, implement, and maintain adequate security measures to safeguard confidential data;

   b.   Failing to monitor the security of its networks adequately;

   c.   Allowing unauthorized access to confidential data;

   d.   Failing to recognize in a timely manner that confidential data had been compromised; and

   e.   Failing to warn plaintiffs in a timely manner that their confidential information was likely to be and had been compromised.

26.     On May 30, 2019, the MDL Plaintiffs filed an unopposed motion for preliminary approval of the MDL Settlement.  The MDL Settlement (attached as Exhibit B hereto) sets forth terms pursuant to which Premera contributed $32 million toward a fund for the benefit of the members of the Settlement Class.

27.     On March 2, 2020, the Court granted final approval of the MDL Settlement.

**B.     The AG Actions**

28.     The AG Actions were based on Premera's alleged responsibility for the same data breach at issue in the MDL Action but were brought by Attorneys General of thirty states.

29.     The AG Actions alleged that Premera failed to safeguard its customers' personal, medical and financial information, resulting in the exposure of approximately 10.4 million customers' information to unauthorized parties between May 5, 2014 and March 6, 2015.  The AG Actions also alleged that Premera inadequately safeguarded against security breaches and failed to comply with security and privacy standards of HIPAA, which permitted unauthorized access to its customers' confidential information.

30.     Pursuant to a settlement totaling $10 million between Premera and a multistate committee of representatives, the Attorneys General filed complaints and consent judgments against Premera on or around July 11, 2019.  The complaints alleged violations of HIPAA and state consumer protection statutes, data safeguards, and unfair or deceptive practices of law.  For example, the State of Washington's complaint (attached as Exhibit C hereto) alleges the following:

> In the years leading up to the breach, Premera's own internal IT auditors and cybersecurity assessors identified multiple network vulnerabilities— such as inadequate safeguards against phishing attempts, inadequate network segmentation, ineffective password management policies, ineffectively configured security tools, and inadequate patch management—many of which Premera accepted without adequate remediation.  ¶ 3.3.

> For years leading up to the breach, Premera failed to comply with the security and privacy standards of HIPAA.  These include, failing to properly map ePHI on its networks, ensuring appropriate access privileges to ePHI based on job function, enforcing appropriate safeguards to secure physical access to data centers, regularly monitoring log in attempts, regularly and accurately assessing risks to ePHI, updating its security program to protect against known cybersecurity threats, and adequately mitigating identified risks.  ¶ 3.5.

31.     Each state's consent decree limits the Attorney General's use of Premera's

settlement payments.  For example, the State of Washington's Consent Decree provides the

following:

> No later than thirty (30) days after the EFFECTIVE DATE, PREMERA shall pay
> a total of $5,432,677.04 to the Attorney General's Office. The Attorney General
> shall use the funds for recovery of its costs and attorneys' fees in investigating
> this matter, future monitoring and enforcement of this Consent Decree, future
> enforcement of RCW 19.86, or for any lawful purpose in the discharge of the
> Attorney General's duties at the sole discretion of the Attorney General.

Exh. D ¶ 7.1.

## V.  THE INSURANCE POLICIES

### A.     The Commercial Policies

32.     ASIC issued @vantage for Financial Services Premier policy number 712-00-78-

31-0006 to Premera for policy period October 1, 2013 to October 1, 2014, with primary

commercial general liability limits of insurance of $1 million each occurrence, $1 million for

personal and advertising injury, and $2 million in the aggregate, subject to a $5,000 per

occurrence deductible for bodily injury liability and/or property damage liability (the "ASIC

Primary Policy").  A full and complete copy of the ASIC Primary Policy is included in

Exhibit E-1 hereto.

33.     The Commercial General Liability Coverage Form of the ASIC Primary Policy

provides that, subject to the policy's terms, conditions, definitions and exclusions, ASIC will pay

those sums that Premera becomes legally obligated to pay as damages because of "bodily

injury," "property damage," or "personal and advertising injury" to which the insurance applies.

The insurance applies to "bodily injury" and "property damage" caused by an "occurrence" in

the "coverage territory" during the policy period, and to "'personal and advertising injury'

caused by an offense arising out of your business but only if the offense was committed in the

'coverage territory' during the policy period."  Because the data breach took place on May 2014,

ASIC indemnified Premera under the ASIC Primary Policy with the policy period of October 1, 2013 to October 1, 2014.

34.     "Bodily injury" is defined in the ASIC Primary Policy as bodily injury, sickness or disease sustained by a person, "including death resulting from any of these at any time."

35.     "Property damage" is defined in the ASIC Primary Policy as follows:

    a.  Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.  Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Tangible property does not include money, currency, coin, bank notes, Federal Reserve notes, money orders, travelers checks, instruments or contracts that represent money or an interest in property, including but not limited to certificated and uncertificated securities, negotiable instruments, certificates of deposit, drafts, checks, acceptances, evidence of debt, security agreements, withdrawal orders, certificates of origin or title, letters of credit, warrants, scrip, contracts, bills of lading, insurance policies, abstracts of title, deeds and mortgages on real estate, revenue and other stamps, tokens, unsold State lottery tickets, books of account and other records, gems, jewelry, precious metals in bars or ingots, and all other property of a similar nature.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

36.     The ASIC Primary Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

37.     Coverage B, "Personal and advertising injury," is defined in relevant part as injury including consequential "bodily injury," arising out of one or more of the following offenses:

\*      \*      \*

**e.**     Oral or written publication of material that violates a person's right of privacy;

\*      \*      \*

38.     The ASIC Primary Policy contains the following Coverage B exclusion for

"personal and advertising injury:"

**2.  Exclusions**
  This insurance does not apply to:

\*      \*      \*

**p.        Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

\*      \*      \*

**(4)**        Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

39.     The ASIC Primary Policy also contains an endorsement, Form VCG 221 07 09—

Financial Institutions, with applicable exclusions as follows:

**A.  Additional Bodily Injury And Property Damage Exclusions**

In **Section I – Coverage A. Bodily Injury And Property Damage Liability 2. Exclusions and Coverage B. Personal and Advertising Injury 2. Exclusions,** the following exclusions are added.  These additional exclusions do not replace any other exclusions.
This insurance does not apply to:

\*      \*      \*

    **c.**    **Professional Services**

"Bodily injury," "property damage" or "personal and advertising injury" arising out of the rendering or failure to render professional services including but not limited to:

*      *      *

    **(4)**    Auditing or maintaining of accounts or records of others;

*      *      *

    **(6)**    Acting in any capacity as a fiduciary or trustee;

*      *      *

    **(8)**    Performing electronic data processing, systems analysis, design, programming or consulting or other similar services;

**d.**    **Fines and penalties**

Any obligation to pay fines and penalties.

40.    ASIC issued @vantage for Financial Services Premier policy number 712-00-78-31-0006 to Premera for policy period October 1, 2013 to October 1, 2014, with umbrella liability limits of insurance of $15 million each occurrence and in the aggregate (the "ASIC Umbrella Policy"). A full and complete copy of the ASIC Umbrella Policy is included in Exhibit E-2 hereto.

41.    The Umbrella Liability Coverage Form in the ASIC Umbrella Policy provides that ASIC will pay on behalf of the insured "Ultimate Net Loss" in excess of the "retained limit" because of "bodily injury," "property damage," or "personal and advertising injury" to which the insurance applies.  The ASIC Umbrella Policy contains the same definitions of "bodily injury," "property damage," or "personal and advertising injury" as the ASIC Primary Policy."  Because the data breach took place on May 2014, ASIC indemnified Premera under the ASIC Primary Policy with the policy period of October 1, 2013 to October 1, 2014.

42.     The ASIC Umbrella Policy defines "Ultimate Net Loss" as:  "the total amount of damages in excess of the 'retained limit' for which the insured is legally liable in payment of 'bodily injury,' 'property damage,' and 'personal and advertising injury.'  'Ultimate Net Loss' may be established by adjudication, arbitration, or a compromise settlement to which we have previously agreed in writing."

43.     The ASIC Umbrella Policy defines the "retained limit" as follows:

> "Retained limit" means the total of all insurance amounts available to the insured and applicable to any loss covered under this Coverage Part.
>
> All insurance amounts available to the "insured" as specified above shall include not only any insurance shown in Schedule of Underlying Insurance, of the Umbrella Declarations of this policy, but also any other valid and collectible insurance as specified in Condition 5, Other Insurance.

44.     The ASIC Umbrella Policy also contains an endorsement, Form VCU 284 05 09 —Recording and Distribution Of Material Or Information In Violation Of Law Exclusion, which excludes "bodily injury," "property damage," or "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

*     *     *

> **(4)**     Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

*     *     *

45.     The ASIC Umbrella Policy also contains an endorsement, Form VCU 212 07 09—Financial Institutions, with the applicable exclusions that read as follows:

> **Additional Bodily Injury And Property Damage Exclusions**
>
> In **Section I – Coverage A. Bodily Injury And Property Damage Liability 2. Exclusions and Coverage B. Personal and Advertising Injury 2. Exclusions,** the

following exclusions are added.  These additional exclusions do not replace any other exclusions.

This insurance does not apply to:

\*        \*        \*

**c.      Professional Services**

"Bodily injury," "property damage" or "personal and advertising injury" arising out of the rendering or failure to render professional services including but not limited to:

\*        \*        \*

**(4)**     Auditing or maintaining of accounts or records of others;

\*        \*        \*

**(6)**     Acting in any capacity as a fiduciary or trustee;

\*        \*        \*

**(8)**     Performing electronic data processing, systems analysis, design, programming or consulting or other similar services; . . .

**d.      Fines and penalties**

Any obligation to pay fines and penalties.

\*        \*        \*

**B.     The E&O Policies**

46.     Ironshore issued Managed Care Errors and Omissions Liability Policy No. 000728305 to Premera for the policy period October 1, 2014 to October 1, 2015, which affords coverage to Premera on a claims-made and reported basis (the "Ironshore E&O Policy," attached hereto as Exhibit F).  The Ironshore E&O Policy has a $10 million aggregate and each Claim or Related Claim liability limit, subject to a $1.5 million self-insured retention for each Class Action Claim.  The claims arising from the data breach were first made and reported to Ironshore during the October 1, 2014 to October 1, 2015 policy period.  Ironshore exhausted the liability limits of its E&O Policy with its $10 million contribution to the MDL Settlement.

47.    Insuring Agreement A of the Ironshore E&O Policy states:

    **(A)    Managed Care Errors and Omissions Insurance**

        The Underwriter will pay on behalf of the **Insured** any **Loss** which the **Insured** is legally obligated to pay as a result of any **Claim** that is first made against the **Insured** during the **Policy Period** and reported to the Underwriter either during the **Policy Period** or in any event within ninety (90) days after the end of the **Policy Period,** in accordance with CONDITION (B) of this Policy.

48.    The Ironshore E&O Policy defines "**Loss**" as follows:

(l)  "**Loss**" means any Private Information Protection Event Expenses, Defense Expenses and any monetary amount with an Insured is legally obligated to pay as a result of a Claim.

Moreover, "**Loss**" includes:

[F]ines and penalties imposed under the Health Insurance Portability and Accountability Act or any similar local, state or federal privacy statute or regulation or in Claims for Antitrust Activity, but only if such fines and penalties are insurable under applicable law most favorable to the insurability of such fines and penalties.

49.    The Ironshore E&O Policy defines "**Claim**" and "**Wrongful Act**" as follows:

               *        *        *

(C)    **"Claim"** means any written notice received by any **Insured** that a person or entity, including but not limited to any federal, state or local government in any capacity, intends to hold an **Insured** responsible for a **Wrongful Act** which was committed or allegedly committed on or after the Retroactive Date listed in ITEM 7 of the Declarations. In clarification and not in limitation of the foregoing, such notice may be in the form of an arbitration, mediation, judicial, declaratory or injunctive proceeding. A **Claim** will be deemed to be made when such written notice is first received by the President, Chief Executive Officer, Chief Financial Officer, member of the legal department, or member of the risk management department of the **Insured**.

               *        *        *

    "**Wrongful Act**" means:

(1) any actual or alleged act, error or omission in the performance of, or any failure to perform, a **Managed Care Service** by any **Insured Entity** or by any **Insured Person** acting within the course and scope of his or her duties or capacity as such;

(2) any actual or alleged act, error or omission in the performance of, or any failure to perform, **Private Information Protection** by any **Insured Entity** or by any **Insured Person** acting within the course and scope of his or her duties or capacity as such.

50.     The definition of "Managed Care Service" was amended in its entirety by

endorsement MC.End. 141 (2.15 ed.) to read as follows:

"**Managed Care Service**" means any services or activities performed in the administration or management of health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, automobile medical payment, or workers' compensation plans, whether provided on paper, in person, electronically, or in any other form and whether performed on behalf of the Insured or by the Insured for itself or on behalf of any other party for a fee.

It is understood and agreed that the definition of Managed Care Service includes but is not limited to the following services of activities: **Provider Selection; Utilization Review;** advertising, marketing, selling, or enrollment for health care or workers' compensation plans; **Claim Services;** establishing and maintaining health care provider networks; reviewing the quality of **Medical Services** or providing quality assurance; design and/or implementation of financial incentive plans and benefits plans; **Healthcare Consulting;** risk management services; management of independent agents; wellness or health promotion education; development or implementation of clinical guidelines, practice parameters or protocols; and triage of payment of **Medical Services**.

51.     The Amended Definition of "**Managed Care Service**" was further amended by

endorsement to specifically include the following:

In consideration of the premium charged, it is understood and agreed that the term "**Managed Care Service**," as defined in Section II DEFINITION (J) of this Policy, shall include:

(1) The creation, operation, maintenance and use of the **Insured Entity's** website or network;

(2) The maintenance of security mechanisms which are designed to control or restrict access to a computer network, or parts thereof, in order to prevent a breach of such computer network which results in either:

  a.   unauthorized access to, use of, or tampering with, a third party's computer network, or

  b.   the inability of an authorized third party to gain access to the **Insured's** services.

Such security mechanisms include hardware, software and firmware, including but not limited to firewalls, filters, routers, intrusion detection software, antivirus software and automated password management applications; and

\*       \*       \*

52.     The Ironshore E&O Policy defines "**Private Information Protection**" as follows:

(M) **"Private Information Protection"** means maintaining the confidentiality of information regarding **Medical Services** or information obtained in the provision of **Managed Care Services** and limiting the release or use of such information in conformance with requirements of the law.

53.     Lexington issued excess E&O insurance to Premera on a claims-made-and-reported basis under Managed Care Follow-Form Excess Policy No. 01-615-04-33 for the policy period October 1, 2014 to October 1, 2015 (the "Lexington Policy," attached hereto as Exhibit G).

54.     The Lexington Policy incorporates terms, conditions and definitions of the Ironshore E&O Policy, including but not limited to the definitions of "Wrongful Act," "Managed Care Service" and "Private Information Protection."

55.     Based on information and belief, Item 6 of the Lexington Policy Declarations page includes a typographical error in the policy number and policy period of the underlying Ironshore E&O Policy.  The Declarations page of the Lexington Policy identifies the Ironshore E&O Policy as the "Followed Policy:

\*       \*       \*

Item 6.   Followed Policy:
          Insurance Company:  Ironshore Specialty Insurance Company
          Policy Number:  001891400
          Policy Period:  From:  January 1, 2014      To:  January 1, 2015

Item 7.   **Underlying Limits** of All **Underlying Policies** in excess of which this
          policy applies:
          Total Aggregate Limits of Insurance:      $10,000,000
          Total Each Claim Limits of Insurance:     $10,000,000

(**Underlying Limits** may include additional amounts over which the Company is excess, including self-insured retentions, deductibles, and other insurance. See the definition of **Underlying Limits** in the policy form.)

\*      \*      \*

Based on information and belief, Item 6 of the Lexington Policy Declarations page includes a typographical error in the policy number and policy period for the underlying Ironshore E&O Policy.

56.     The Lexington Policy provides coverage as follows:

**I.      INSURING AGREEMENT**

A.     The Company will pay those sums that the **Insured** becomes legally obligated to pay as damages and/or **Defense Expenses** in excess of the **Underlying Limits** by reason of exhaustion of such limits and to which this insurance applies, subject to:

1.     the terms and conditions of the **Followed Policy**,

2.     the Limits of Insurance shown in the Declarations, and

3.     the Retroactive Date shown in Item 5 of the Declarations,

B.     Except with regard to any terms or conditions of this policy (or any endorsement modifying this policy) inconsistent with the **Followed Policy**, the provisions of the **Followed Policy** are incorporated as part of this policy.

**II.     SETTLEMENT AND DEFENSE**

Notwithstanding any provision of the **Underlying Policies** to the contrary, the Company shall not have the duty to defend any **Claim**, suit or proceeding against any **Insured**, whether within or in excess of the **Underlying Limits**. However, the Company shall have the right, at its own expense, to associate with the Insureds in the defense, negotiation and settlement of any **Claim**, suit or proceeding that might result in the Company's obligation to pay any amount of damages and/or **Defense Expenses** under this policy. The **Insureds** shall give the Company full cooperation and such information as the Company may reasonably require.

Upon reduction or exhaustion of the **Underlying Limits**, any **Defense Expenses** to be incurred by the **Insured** in the defense of any **Claim**, suit or proceeding shall be subject to the approval of the Company and the Company reserves the right to approve defense counsel, which shall not be unreasonably withheld.

The **Insured** must inform the Company of any offer to settle or compromise any **Claim**, suit or proceeding in excess of the **Underlying Limits**. The Company has a right to approve such settlement or compromise.

\*       \*       \*

The terms, conditions and definitions of the Ironshore E&O Policy are specifically incorporated into the Lexington Policy, including but not limited to the definitions for "Wrongful Act," "Managed Care," and "Private Information Protection."

57.     The Lexington Policy includes the following definitions, among others:

    C.    **Followed Policy** means the policy shown in Item 6 of the Declarations.

    D.    **Insured** means the First Named Insured and any other person or organization qualifying as a Named Insured or Insured under the Followed Policy [. . . .]

    F.    **Underlying Limits** means the sum of:

        1.    The Aggregate Limits of Insurance of All **Underlying Policies,**

        2.    All deductibles or self-insured retentions applicable to such **Underlying Policies**[.]

    G.    **Underlying Policies** means any underlying policies, including the **Followed Policy**.

58.     Item 3 of the Declarations to the Lexington Policy, "Limits of Insurance," provides for a $10 million limit of liability in the aggregate and for each claim. Item 6 of the declarations identifies the "Followed Policy" as Ironshore Specialty Insurance Policy No. 001891400, issued for policy period January 1, 2014 to January 1, 2015. Item 7 of the declarations identifies the "Underlying Limits" as $10 million in the aggregate and each claim.

59.     Section III.D of the Lexington Policy provides:

In the event of the reduction or exhaustion [of] the Underlying Limits under the Underlying Policies by reason of actual payment by the underlying insurers (and the Insured has paid the full amount of any applicable deductible or self-insured retention), then subject to the Limits of Insurance of this policy, the policy shall:

1.  In the event of reduction pay excess of the reduced Underlying Limits, or

2.  In the event of exhaustion, with respect to any subsequent Claim or suit, the policy shall become primary insurance; provided that, this policy shall only pay excess of the applicable Retention or applicable Self-Insured Retention of the Followed Policy (notwithstanding the exhaustion of the Followed Policy).

60.     BCS issued Managed Care Errors & Omissions Liability Insurance Policy No.—MCE4300002 to Premera for policy period October 1, 2014 to October 1, 2015, with a $10 million limit of liability in the aggregate per coverage period (the "BCS Policy," attached hereto as Exhibit H). The Declarations page of the BCS Policy identifies the Ironshore E&O Policy as underlying primary insurance and the Lexington Policy as underlying excess insurance, as follows:

\*          \*          \*

ITEM V.  **PRIMARY INSURER:**

| Company | Policy Period | Policy No. | Limit of Liability | Deductible |
|---|---|---|---|---|
| Ironshore Specialty Insurance Company | From: 10/1/2014 To:  10/1/2015 | 000728305 | $10,000,000 | $1,000,000 |

ITEM VI.  **UNDERLYING EXCESS INSURERS:**

| Company | Policy Period | Policy No. | Limit of Liability |
|---|---|---|---|
| Lexington Insurance Company | From: 10/1/2014 To:  10/1/2015 | 01-615-04-33 | $10,000,000 excess $10,000,000 |

\*          \*          \*

61.     The BCS Policy provides follow form coverage subject to the same conditions, representations, limitations, and other terms of the Ironshore E&O Policy, except as otherwise provided in the BCS Policy. The BCS Policy is a claims-made policy and affords follow-form coverage in excess of the Ironshore E&O Policy and the Lexington Policy as follows:

**Issued to the BCS PROFESSIONAL LIABILITY INSURANCE TRUST (BankNewport as Trustee)**

**This is a Claims Made Policy.**

In consideration of the premium paid and subject to the conditions, limitations and other terms of this Excess Policy, and in reliance on the statements made and information furnished by the Insureds in the Application or the underwriting of this Policy, BCS Insurance Company (hereinafter, the Company) agrees as follows:

1.  **INSURING CLAUSE:**  Subject to the terms and conditions of this Excess Policy, the Company shall provide to the Insureds insurance coverage for Claims first made during the Policy Period, including the Discovery Period if exercised.

2.  **FOLLOW FORM COVERAGE:**  Except as otherwise stated herein, this Excess Policy is subject to the same conditions, representations, limitations and other terms as are contained in the Primary Policy as of inception of this Excess Policy.  In the event of any conflict between the terms, conditions, and limitations of this Excess Policy and any Underlying Policy, the terms, conditions, and limitations of this Excess Policy shall control.

    To the extent the terms, conditions or limitations of the Followed Policy are changed to limit or restrict coverage, this Excess Policy shall become subject to such changes upon the effective date of the change in the Followed Policy. To the extent the terms, conditions or limitations of the Followed Policy are changed to expand or broaden coverage, this Excess Policy shall become subject to such changes only if and to the extent the Company agrees to such changes in writing and the Insureds pay any additional premium reasonably required by the Company for such changes.

    If any Underlying Policy(ies) contains a specific grant of coverage that is subject to a sublimit of liability, then coverage under this Excess Policy shall not apply to any Claim which is otherwise subject to such grant of coverage. However, any loss paid under the Underlying Policy(ies) on account of such Claim shall erode or exhaust the Underlying Limit for purposes of this Excess Policy.

*          *          *

**Endorsement No. 3**

**AMENDMENT TO THE PLANS' EXCESS LIABILITY INSURANCE POLICY, PARAGRAPH 3, ATTACHMENT OF LIABILITY ENDORSEMENT**

Issued to the
BCS PROFESSIONAL LIABILITY INSURANCE TRUST
(BankNewport as Trustee)

This Endorsement, effective at 12:01 a.m. on October 1, 2014, forms part of:

Excess Certificate No.:        MCE4300002
Issued to:                     Premera
Issued By:                     BCS Insurance Company

In consideration of the premium paid, BCS Insurance Company ("Company") and the Insureds agree that paragraph 3, ATTACHMENT OF LIABILITY, of the PLAN'S EXCESS LIABILITY INSURANCE POLICY is hereby deleted and replaced with the following:

3. **ATTACHMENT OF LIABILITY:** The Company's liability to pay under this Excess Policy shall attach only when (i) the insurers of the Underlying Policy(ies), the Insureds, and/or any other party shall have paid in legal currency the full amount of the Underlying Limit as described in Section 5 below, and (ii) the Insureds shall have paid in legal currency the full amount of the Underlying Limit as described in Section 5 below and the retention or deductible, if any, applicable under the Primary Policy.

This Excess Policy shall not drop down for any reason, including, but not limited to, uncollectability (in whole or in part) of any Underlying Policy(ies). The risk of uncollectability of the Underlying Polices(ies), whether because of financial impairment or insolvency of an underlying insurer or for any other reason, is expressly retained by the Insureds and is not in any way or under any circumstances insured or assumed by the Company.

Notwithstanding anything in this Excess Policy to the contrary, if with respect to any Claim the Underlying Limit is reduced or exhausted by payments by the Insureds or any party other than the insurers of the Underlying Policy(ies), then the Insured shall provide to the Company satisfactory evidence of the payments by the Insureds and such other party.

This endorsement forms a part of this Excess Policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

The terms, conditions and definitions of the Ironshore E&O Policy are specifically incorporated into the BCS Policy, including but not limited to the definitions for "Wrongful Act," "Managed Care," and "Private Information Protection."

62. The BCS Policy includes the following definitions:

*       *       *

11. **DEFINITIONS:**

Terms defined in the Followed Policy are used herein with the meaning assigned to them in the Followed Policy unless otherwise stated herein. Other capitalized words and phrases are defined below:

A. Followed Policy means the Primary Policy, unless otherwise provided by endorsement to this Excess Policy.

        \*      \*      \*

C.   Insured Plan means the entity named in Item I of the Declarations.

D.   Primary Policy means the policy described in Item V of the Declarations.

        \*      \*      \*

F.   Underlying Limit means the amount set forth in Item IV of the Declarations, plus the retention or deductible, if any, applicable under the Primary Policy.

        \*      \*      \*

## VI.  DEMANDS FOR COVERAGE AND RESERVATIONS OF RIGHTS

63.     Premera tendered the defense and indemnification of the MDL Action and the AG Actions to ASIC, Ironshore and Lexington.

64.     In or around February 2019, following a series of mediation sessions with the MDL Plaintiffs, Premera and its insurers agreed to settle the MDL Action for a combined payment of $32 million.  ASIC contributed $12.2 Million to the MDL Settlement pursuant to the ASIC Primary Policy and the ASIC Umbrella Policy, subject to a reservation of rights to subrogate against Lexington and BCS.

65.     ASIC contributed approximately $12.2 million to protect Premera's interests, while Lexington refused to contribute to the MDL Settlement, even after Ironshore exhausted its primary E&O Policy limits by contributing $10 million to the MDL Settlement.

66.     On or around April 3, 2019, the Office of the Attorney General of the State of Washington wrote to Premera on behalf of the Multistate Executive Committee of State Attorneys General regarding potential terms of a settlement of the AG Actions.  On July 11, 2019, following a series of negotiations and an agreement to settle the AG Actions for $10 million, the state Attorneys General filed their respective complaints and consent judgments against Premera.

67.     ASIC contributed approximately $2.9 million to the AG Settlement, pursuant to a reservation of ASIC's right to later subrogate against Lexington and BCS.

68.     ASIC contributed approximately $2.9 million to protect Premera's interests. Lexington contributed $2.7 million to the AG Settlement.  Lexington refused to fund the entire AG Settlement even though the Ironshore E&O Policy limits had been exhausted, and the Lexington Policy and the BCS Policy specifically afforded coverage for the fines and penalties on which the AG Settlement was based.

69.     The MDL Settlement and the AG Settlement were covered by the Lexington Policy and the BCS Policy, because the E&O Policies specifically afford coverage for Premera's alleged errors and omissions in maintaining and securing its computer network and for Premera's failure to use reasonable means to protect and safeguard the consumers' personal information. The ASIC Primary Policy and the ASIC Umbrella Policy do not provide coverage for such losses.

## COUNT I
### DECLARATORY JUDGMENT—LEXINGTON AND BCS HAVE A DUTY TO INDEMNIFY PREMERA FOR THE MDL SETTLEMENT AND THE AG SETTLEMENT

70.     ASIC repeats and realleges the allegations of paragraphs 1 through 69 as if set forth fully herein.

71.     Ironshore contributed $10 million to the MDL Settlement and exhausted the limit of liability of its E&O Policy.

72.     Lexington and BCS provided coverage for "Loss which the Insured is legally obligated to pay as a result of any Claim" first made against the Insured and reported during the policy period.

73.     The Lexington Policy and the BCS Policy incorporated the operative definitions from the Ironshore E&O Policy and likewise afforded coverage, subject to reduction or

exhaustion of the "Underlying Limits" for the same "Managed Care Service" and "Private Information Protection" covered by the Ironshore E&O Policy.

74.    The Lexington Policy provided follow-form coverage for sums that Premera became legally obligated to pay as damages in excess of the Underlying Limits of the Ironshore E&O Policy.

75.    The BCS Policy provided follow-form coverage for the sums Premera became legally obligated to pay as damages in excess of the liability limits of the Ironshore E&O Policy and the Lexington Policy.

76.    The MDL Settlement and the AG Settlement were based on claims first made against Premera and reported during the Lexington Policy and BCS Policy periods and based on allegations that Premera inadequately safeguarded against security breaches and failed to comply with security and privacy information regulations, which led to the unauthorized access of its customers' confidential information, in violation of HIPAA.

77.    The Ironshore E&O Policy expressly afforded coverage for the claims settled in the MDL Settlement and AG Settlement, because it covered errors and omissions in the "failure to maintain confidentiality of information regarding Medical Service or information obtained in the provision of Managed Care Service and limiting the release or use of such information in conformance with the requirements of the law."  Moreover, Managed Care Service is defined by the Ironshore E&O Policy to include Premera's "[c]reation, operation, maintenance and use of the Insured Entity's [Premera's] website or network".

78.    The Ironshore E&O Policy likewise expressly afforded coverage to Premera for the claims that were settled in the MDL Settlement and the AG Settlement, including any fines or penalties imposed under HIPAA or any similar local, state or federal privacy statute.  Because the MDL Settlement and AG Settlement were covered under the Ironshore E&O Policy, they

were also covered under the Lexington Policy and the BCS Policy subject to the reduction or exhaustion of each policy's Underlying Limits.

79.     An actual and justiciable controversy currently exists between ASIC, on the one hand, and Lexington and BCS, on the other hand, and pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. This Court is vested with the power to declare the rights and liabilities of the parties hereto with respect to the MDL Settlement and the AG Settlement and to grant such relief as it deems necessary and proper.

**COUNT II**
**DECLARATORY JUDGMENT—ASIC HAD NO DUTY TO INDEMNIFY PREMERA FOR THE MDL SETTLEMENT AND THE AG SETTLEMENT PURSUANT TO THE INSURING AGREEMENTS OF THE ASIC PRIMARY POLICY AND THE ASIC UMBRELLA POLICY**

80.     ASIC repeats and realleges the allegations of paragraphs 1 through 79 as if set forth fully herein.

81.     The MDL Settlement and the AG Settlement were based on claims that Premera inadequately safeguarded against security breaches and failed to comply with security and privacy laws, which lead to the unauthorized access of its customers' confidential information in violation of HIPAA.

82.     The AG Settlement was comprised of monetary penalties, fees and costs that were used by each respective Attorney General, such as Washington's Attorney General, for the investigation of the Premera data breach and for the future enforcement and investigation of unfair business practices.

83.     The ASIC Primary Policy and the ASIC Umbrella Policy did not provide coverage for the MDL Settlement and the AG Settlement because the damages, including monetary penalties, fees and costs, and other injuries caused by data breaches, are not for

damages because of "bodily injury," "property damage," or "personal and advertising injury" as defined by the ASIC Primary Policy and the ASIC Umbrella Policy.

84.    An actual and justiciable controversy currently exists between ASIC, on the one hand, and Lexington and BCS, on the other hand, and pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  This Court is vested with the power to declare the rights and liabilities of the parties hereto with respect to the MDL Settlement and to grant such relief as it deems necessary and proper.

## COUNT III
## DECLARATORY JUDGMENT—ASIC HAD NO DUTY TO INDEMNIFY PREMERA FOR THE MDL SETTLEMENT OR THE AG SETTLEMENT PURSUANT TO THE EXCLUSION FOR DISTRIBUTION OF MATERIAL IN VIOLATION OF LAW

85.    ASIC repeats and realleges the allegations of paragraphs 1 through 84 as if set forth fully herein.

86.    The claims at issue in the MDL Settlement and the AG Settlement were based on Premera's failure to safeguard its computer network, which resulted in the disclosure of customers' confidential information in violation of HIPAA and industry standards.

87.    The ASIC Primary Policy excluded coverage for "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate "any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003, FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information."

88.    Even if the MDL Settlement and the AG Settlement arose out of claims for damages because of "personal and advertising injury," the ASIC Primary Policy's exclusion for distribution of material in violation of law precluded coverage for the claims on which those

settlements were based, because they arose out of Premera's failure to safeguard its computer

network, resulting in the transmission of material and information in violation of HIPAA.

89.     The ASIC Umbrella Policy similarly excluded coverage for "personal and

advertising injury," "bodily injury" or "property damage" arising directly or indirectly out of any

action or omission that violates or is alleged to violate any federal, state or local statute,

ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003, FCRA and their

amendments and additions, that addresses, prohibits, or limits the printing, dissemination,

disposal, collecting, recording, sending, transmitting, communicating or distribution of material

or information.

90.     Even if the MDL Settlement and the AG Settlement arose out of claims for

damages because of "bodily injury," "property damage" or "personal and advertising injury," the

ASIC Umbrella Policy's exclusion for distribution of material in violation of law precluded

coverage for the claims on which those settlements were based, because they arose out of

Premera's failure to safeguard its computer network, resulting in the transmission of material and

information in violation of HIPAA.

91.     An actual and justiciable controversy currently exists between ASIC, on the one

hand, and Lexington and BCS, on the other hand, and pursuant to the Uniform Declaratory

Judgment Act, 28 U.S.C. §§ 2201 and 2202.  This Court is vested with the power to declare the

rights and liabilities of the parties hereto with respect to the MDL Settlement and the AG

Settlement and to grant such relief as it deems necessary and proper.

**COUNT IV**
**DECLARATORY JUDGMENT—ASIC HAD NO DUTY TO INDEMNIFY PREMERA**
**FOR THE MDL SETTLEMENT OR THE AG SETTLEMENT PURSUANT TO THE**
**PROFESSIONAL SERVICES EXCLUSION**

92.     ASIC repeats and realleges the allegations of paragraphs 1 through 91 as if set

forth fully herein.

93.     The claims at issue in the MDL Settlement and the AG Settlement arose out of Premera's failure to render professional services, including but not limited to Premera's failure to maintain its customers' confidential records; breach of fiduciary obligations to its customers; and the failure to design and maintain a computer network to maintain the security of its customers' confidential records.

94.     The ASIC Primary Policy and the ASIC Umbrella Policy excluded coverage for "bodily injury," "property damage," or "personal and advertising injury" arising out of professional services including: auditing or maintaining records of others; acting in any capacity as a fiduciary or trustee; and performing systems analysis, design and programming or consulting.

95.     Even if the MDL Settlement and the AG Settlement arose out of claims for damages because of "bodily injury," "property damage," or "personal and advertising injury," the ASIC Primary Policy and the ASIC Umbrella Policy's professional services exclusions precluded coverage for the claims, because they arose out of maintenance of the customers' confidential records; breach of fiduciary obligations to Premera's customers; and the failure to design and maintain a computer network to secure its customers' confidential records.

96.     An actual and justiciable controversy currently exists between ASIC, on the one hand, and Lexington and BCS, on the other hand, and pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  This Court is vested with the power to declare the rights and liabilities of the parties hereto with respect to the MDL Settlement and the AG Settlement and to grant such relief as it deems necessary and proper.

**COUNT V**

**DECLARATORY JUDGMENT—ASIC HAD NO DUTY TO INDEMNIFY PREMERA FOR THE MDL SETTLEMENT OR THE AG SETTLEMENT PURSUANT TO THE FINES AND PENALTIES EXCLUSION**

97.     ASIC repeats and realleges the allegations of paragraphs 1 through 96 as if set forth fully herein.

98.     The MDL Settlement and the AG Settlement included fines or penalties imposed under HIPAA or similar local privacy statutes.

99.     The ASIC Primary Policy and the ASIC Umbrella Policy excluded coverage for "bodily injury," "property damage," or "personal and advertising injury" for Premera's obligations to pay fines and penalties.

100.     Even if the MDL Settlement and AG Settlement arose out of claims for damages because of "bodily injury," "property damage," or "personal and advertising injury," the ASIC Primary Policy and the ASIC Umbrella Policy's fines and penalties exclusion precludes coverage for any portion of the MDL Settlement and the AG Settlement allocated to fines and penalties.

101.     An actual and justiciable controversy currently exists between ASIC, on the one hand, and Lexington and BCS, on the other hand, and pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  This Court is vested with the power to declare the rights and liabilities of the parties hereto with respect to the MDL Settlement and the AG Settlement and to grant such relief as it deems necessary and proper.

**COUNT VI**

**CONTRACTUAL AND EQUITABLE SUBROGATION**

102.     ASIC repeats and realleges the allegations of paragraphs 1 through 101 as if set forth fully herein.

103.     Premera sought indemnification for the MDL Settlement and the AG Settlement from its insurers.

104.    ASIC contributed $12.2 million toward the MDL Settlement under the ASIC Primary Policy and the ASIC Umbrella Policy, pursuant to a reservation of ASIC's right to later subrogate against Lexington and BCS.

105.    ASIC contributed approximately $12.2 million to protect Premera's interests, while Lexington refused to contribute to the MDL Settlement, even after Ironshore, the underlying primary E&O carrier, contributed $10 million to the MDL Settlement and exhausted the Ironshore E&O Policy limits of liability.

106.    Premera likewise sought indemnification for the AG Settlement under the E&O Policies and under the ASIC Primary Policy and the ASIC Umbrella Policy.

107.    ASIC contributed approximately $2.9 million toward the AG Settlement pursuant to a reservation of its rights to later subrogate against Lexington and BCS.

108.    ASIC contributed approximately $2.9 million to protect Premera's interests. Lexington contributed $2.7 million to the AG Settlement.  Lexington refused to fund the entire AG Settlement even though the Ironshore E&O Policy limits had been exhausted, and the Lexington Policy specifically afforded coverage for the fines and penalties on which the AG Settlement was based. ASIC seeks to recover from Lexington and BCS up to $15.1 million that ASIC contributed to the MDL Settlement and the AG Settlement, pursuant to common law theories of contractual and equitable subrogation.

109.    Because ASIC contributed to the MDL Settlement and the AG Settlement on Premera's behalf and indemnified Premera for amounts owed solely by Lexington and BCS under the Lexington Policy and the BCS Policy, ASIC is entitled to recover the entire $15.1 million that ASIC paid to protect the interests of Premera.

110.    An actual controversy exists between ASIC, on one hand and Lexington and BCS, on the other hand, pursuant to ASIC's common law contractual and equitable subrogation rights.

This Court is vested with the power to declare the rights and liabilities of the parties hereto and to grant such relief as it deems necessary and proper.

## VII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Atlantic Specialty Company prays as follows:

1.      For a declaration that Lexington Insurance Company and BCS Insurance Company had a duty to indemnify Premera for the payment of the MDL Settlement and the AG Settlement;

2.      For a declaration that Atlantic Specialty Insurance Company did not have a duty to indemnify Premera for the payment of the MDL Settlement and the AG Settlement;

3.      Monetary judgment for $15.1 million awarded against Lexington Insurance Company and BCS Insurance Company and in favor of Atlantic Specialty Insurance Company, pursuant to equitable principles of contractual subrogation and/or equitable subrogation; and

4.      All other relief deemed appropriate by this Court.


                                                  INTACT U.S. COVERAGE LITIGATION GROUP


 Dated: November 5, 2020              By: */s/ Matthew J. Gollinger*
                                                      Matthew J. Gollinger (#0327682)
                                                      605 Highway 169 North, Suite 800
                                                      Plymouth, MN 55441
                                                      952.852.0485
                                                      mgollinger@intactinsurance.com
                                                      *Attorneys for Plaintiff*