Christopher I. Brain
cbrain@tousley.com
Kim D. Stephens
kstephens@tousley.com
Tousley Brain Stephens PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
Tel: 206.682.5600
Fax: 206.682.2992

*Interim Lead Plaintiffs' Counsel*

Keith S. Dubanevich
kdubanevich@stollberne.com
Steve D. Larson
slarson@stollberne.com
Stoll Stoll Berne Lokting & Shlachter P.C.
209 SW Oak Street
Portland, Oregon 97204
Tel: 503.227.1600
Fax: 503.227.6840

*Interim Liaison Plaintiffs' Counsel*

[*Additional counsel appear on the signature page.*]

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| IN RE: PREMERA BLUE CROSS CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates to All Actions | Case No. 3:15-md-2633-SI<br><br>**PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**EXHIBIT A**

## TABLE OF CONTENTS

Page

I. NATURE OF THE CASE ..... 1

II. PARTIES ..... 3

III. JURISDICTION AND VENUE ..... 7

IV. FACTUAL BACKGROUND ..... 8

A. Premera Had A Duty And Contractual Obligation To Protect Its Members' Sensitive Information From Unauthorized Disclosures. ..... 8

B. Premera Failed To Properly Protect Consumers' Sensitive Information. ..... 13

C. Premera Violated HIPAA, Industry Standard Data Protection Protocols, And Its Own Representations Regarding Data Security. ..... 16

D. It Is Well Established That Security Breaches Lead To Instances Of Identity Theft. ..... 20

E. Plaintiffs' Experiences Underscore The Fact That All Class Members Are In Imminent Danger Of Identity Theft. ..... 23

ALASKA ..... 23

ARKANSAS ..... 24

CALIFORNIA ..... 25

IDAHO ..... 25

MARYLAND ..... 26

MASSACHUSETTS ..... 26

NEW JERSEY ..... 27

OREGON ..... 27

TENNESSEE ..... 28

TEXAS ..... 29

WASHINGTON ..... 29

V. CLASS ALLEGATIONS ..... 35

A. Nationwide Data Breach Class ..... 35

1. Nationwide Premera Policyholder and Plan Administration Subclass SHOULDN'T THIS INCLUDE THE FOLKS WHOSE PLANS PREMERA ADMINISTERED? ..... 36

B. Alternate Statewide Common Law Classes ..... 36



ASIC00002

**TABLE OF CONTENTS**
**(continued)**

**Page**


1. Statewide Premera Policyholder and Plan Administration Subclasses AND THOSE FOR WHOM PREMERA ADMINISTERED THEIR PLANS ........ 37

B. Alternate Statewide Statutory Classes ........ 37

C. Certification Of The Proposed Classes And Subclasses Is Appropriate. ........ 39

II. CAUSES OF ACTION ........ 42

**FIRST CLAIM FOR RELIEF**

Violation of the Washington Consumer Protection Act (On behalf of Plaintiffs, the Nationwide Data Breach Class, and the Nationwide Premera Policyholder and Plan Administration Subclass) ........ 42

**SECOND CLAIM FOR RELIEF**

Violation of Washington Data Breach Disclosure Law (On behalf of Plaintiffs and the Nationwide Data Breach Class) ........ 49

**THIRD CLAIM FOR RELIEF**

Negligence (On behalf of Plaintiffs and the Nationwide Data Breach Class or, alternatively, the Statewide Common Law Classes) ........ 50

**FOURTH CLAIM FOR RELIEF**

Breach of Express Contract (On behalf of Plaintiffs and the Nationwide Premera Policyholder and Plan Administration Subclass or, alternatively, the Statewide Premera Policyholder and Plan Administration Subclasses) ........ 55

**FIFTH CLAIM FOR RELIEF**

Breach of Contract Implied-In-Fact (On Behalf of Plaintiffs and the Nationwide Data Breach Class, or in the alterative, the Statewide Common Law Subclasses) (Plead in the Alternative to the Fourth Claim for Relief on Behalf of the Premera Policyholder and Plan Administration Subclasses) ........ 59

**TABLE OF CONTENTS**
**(continued)**

**Page**

**SIXTH CLAIM FOR RELIEF**

Quasi-Contract/Restitution/Unjust Enrichment (On behalf of Plaintiffs and the Nationwide Premera Policyholder and Plan Administration Subclass or, alternatively, the Statewide Premera Policyholder and Plan Administration Subclasses) ................................ 62

**SEVENTH CLAIM FOR RELIEF**

Violation of State Consumer Protection Laws *(In the Alternative to Count I)* (On behalf of Plaintiffs and the Statewide Statutory Classes) ........................................................................................ 63

**EIGHTH CLAIM FOR RELIEF**

Violation of State Data Breach Notification Laws *(In the alternative to Second Claim for Relief)* (On behalf of Plaintiffs and the Statewide Statutory Classes)............................................................ 73

**NINTH CLAIM FOR RELIEF**

Violation of the California Confidential Medical Information Act (On behalf of Plaintiff Hansen-Bosse and the Statewide California Statutory Class)......................................................................... 755

**TENTH CLAIM FOR RELIEF**

Misrepresentation by Omission (On behalf of Plaintiffs and the Nationwide Data Breach Class or, alternatively, the Statewide Common Law Classes) ............................................................. 76

III. REQUEST FOR RELIEF .................................................................... 79

IV. JURY DEMAND........................................................................................ 81

Plaintiffs Mary Fuerst, Ross Imbler, Anne Emerson, Debbie Hansen-Bosse, William Fitch, Eric Forseter, Anne Michelle Blackwolfe, Krishnendu and Madhuchanda Chakraborty, Howard Kaplowitz, Stuart and Ilene Hirsh, Darin Purcell, Kevin Smith and Catherine Bushman, Sharif Ailey, April Allred, Elizabeth Black, Ralph Christopherson, Robert and Theresa Foulon, Crystal Hayes, Barbara Lynch, Kevin McLallen, Surya Prakash, Gabriel and Laura Webster, and Joann Welch, individually and on behalf of the proposed Classes defined below, allege as follows upon personal knowledge, experience, information and belief, including investigation conducted by their attorneys.

## I. NATURE OF THE CASE

1. Plaintiffs bring this class action lawsuit against Premera because of its failure to protect the confidential information of millions of consumers-including their names, dates of birth, mailing addresses, telephone numbers, email addresses, Social Security numbers, member identification numbers, medical claims information, financial information, and other protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (collectively, their "Sensitive Information").

2. Premera is one of the largest healthcare benefits companies in the Pacific Northwest and is also a participant in the national Blue Cross Blue Shield Association (which offers healthcare to consumers throughout the United States and its territories, covering more than 105 million Americans). Premera's participation in the Blue Cross Blue Shield Association provides its members with access to healthcare providers throughout the country and provides non-Premera Blue Cross members (referred to as "Blue members") with access to its network.

3. In order to become a Premera member (or, for Blue members, receive healthcare services from a provider within the Premera network), an individual must give Premera his or her Sensitive Information. Plaintiffs and the putative class took reasonable steps

to preserve the confidentiality of their Sensitive Information in many ways, including protecting the Sensitive Information with confidential passwords and relying upon physician-patient privilege and confidentiality. Premera maintains this Sensitive Information in a centralized database.

4. As a healthcare benefits provider, Premera is required to protect both its members' and also Blue members' Sensitive Information, including by adopting and implementing specific data security regulations and standards set forth under HIPAA.

5. In addition to its implied statutory obligation, Premera expressly promises—throughout its Notice of Privacy Practices, Code of Conduct, public statements, and other written assurances—to safeguard and protect Sensitive Information in accordance with HIPAA regulations, federal, state and local laws, and industry standards.

6. Unfortunately, Premera's failure to protect the Sensitive Information in its control resulted in one of the largest healthcare data breaches in history. On March 17, 2015, Premera revealed that its computer network had been breached and the Sensitive Information of approximately 11 million of its former and current members, Blue members, and employees was compromised.

7. According to Premera, the breach started in May 2014 and went undetected for nearly one year. Worse yet, after discovering the breach, Premera waited months before notifying all affected individuals preventing Plaintiffs and the Class from taking steps to further prevent the misuse of their Sensitive Information.

8. The breach not only revealed that Premera failed to provide the level of data protection that it promised and that members paid for, it also exposed millions of individuals' Sensitive Information to an increased risk of misuse by unauthorized third parties (e.g., identity

Case 2:21-cv-00616-BJR Document 1-1 Filed 11/05/20 Page 7 of 458

theft). In fact, affected individuals face a particularly real risk of misuse here (i.e., to the extent their information hasn't been misused already) because their Sensitive Information was specifically targeted by hackers seeking to steal consumer data. Many of the class members have already suffered medical fraud, tax fraud, credit card fraud, and phishing scams, as a result of Premera's illegal conduct. All class members are in real and imminent danger of the same fate.

9. Had Premera informed Plaintiffs and other members of the Classes that it would use inadequate security measures—including by using data security practices at odds with its own affirmative representations—members would not have been willing to sign-up or pay for Premera's healthcare benefits at the price charged, if at all, and would not have been willing to provide their Sensitive Information to Premera.

10. Premera's failure to implement adequate security protocols jeopardized millions of consumers' Sensitive Information, fell well short of its statutory and professional standard obligations, fell short of Plaintiffs' and other Class members' reasonable expectations when they provided their Sensitive Information to Premera, and diminished the value of the services that Premera provided (in other words, because Premera failed to disclose its gross security inadequacies, it delivered a fundamentally less useful and less valuable service than the one members paid for).

11. Accordingly, Plaintiffs bring suit, on behalf of themselves and all others similarly situated, to seek redress for Premera's unlawful conduct.

## II. PARTIES

12. Plaintiff Mary Fuerst is a natural person and citizen of the State of Alaska. Plaintiff Fuerst brings this action on behalf of herself and the Nationwide and Alaska Classes, as defined below.

13. Plaintiff Ross Imbler is a natural person and citizen of the State of Alaska. Plaintiff Imbler brings this action on behalf of himself and the Nationwide and Alaska Classes, as defined below.

14. Plaintiff Anne Emerson is a natural person and citizen of the State of Arkansas. Plaintiff Emerson brings this action on behalf of herself and the Nationwide and Arkansas Classes, as defined below.

15. Plaintiff Debbie Hansen-Bosse is a natural person and citizen of the State of California. Plaintiff Hansen-Bosse brings this action on behalf of herself and the Nationwide and California Classes, as defined below.

16. Plaintiff William Fitch is a natural person and citizen of the State of Idaho. Plaintiff Fitch brings this action on behalf of himself and the Nationwide and Idaho Classes, as defined below.

17. Plaintiff Eric Forseter is a natural person and citizen of the State of Maryland. Plaintiff Forseter brings this action on behalf of herself and the Nationwide and Maryland Classes, as defined below.

18. Plaintiff Anne Michelle Blackwolfe is a natural person and citizen of the State of Massachusetts. Plaintiff Blackwolfe brings this action on behalf of herself and the Nationwide and Massachusetts Classes, as defined below.

19. Plaintiffs Krishnendu & Madhuchanda Chakraborty are natural persons and citizens of the State of Massachusetts. Plaintiffs Chakraborty bring this action on behalf of themselves and the Nationwide and Massachusetts Classes, as defined below.

20. Plaintiff Howard Kaplowitz is a natural person and citizen of the State of New Jersey. Plaintiff Kaplowitz brings this action on behalf of himself and the Nationwide and New Jersey Classes, as defined below.

21. Plaintiffs Stuart and Ilene Hirsh are natural persons and citizens of the State of Oregon. Plaintiffs Hirsh bring this action on behalf of themselves and the Nationwide and Oregon Classes, as defined below.

22. Plaintiff Darin Purcell is a natural person and citizen of the State of Oregon. Plaintiff Purcell brings this action on behalf of himself and the Nationwide and Oregon Classes, as defined below.

23. Plaintiffs Kevin Smith and Catherine Bushman are natural persons and citizens of the State of Tennessee. Plaintiffs Smith and Bushman bring this action on behalf of themselves and the Nationwide and Tennessee Classes, as defined below.

24. Plaintiff Sharif Ailey is a natural person and citizen of the State of Texas. Plaintiff Ailey brings this action on behalf of himself and the Nationwide and Texas Classes, as defined below.

25. Plaintiff April Allred is a natural person and citizen of the State of Washington. Plaintiff Allred brings this action on behalf of herself and the Nationwide and Washington Classes, as defined below.

26. Plaintiff Elizabeth Black is a natural person and citizen of the State of Washington. Plaintiff Black brings this action on behalf of herself and the Nationwide and Washington Classes, as defined below.

27. Plaintiff Ralph Christopherson is a natural person and citizen of the State of Washington. Plaintiff Christopherson brings this action on behalf of himself and the Nationwide and Washington Classes, as defined below.

28. Plaintiffs Robert & Theresa Foulon are natural persons and citizens of the State of Washington. Plaintiffs Foulon bring this action on behalf of themselves and the Nationwide and Washington Classes, as defined below.

29. Plaintiff Crystal Hayes is a natural person and citizen of the State of Washington. Plaintiff Hayes brings this action on behalf of herself and the Nationwide and Washington Classes, as defined below.

30. Plaintiff Barbara Lynch is a natural person and citizen of the State of Washington. Plaintiff Lynch brings this action on behalf of herself and the Nationwide and Washington Classes, as defined below.

31. Plaintiff Kevin McLallen is a natural person and citizen of the State of Washington. Plaintiff McLallen brings this action on behalf of himself and the Nationwide and Washington Classes, as defined below.

32. Plaintiff Surya Prakash is a natural person and citizen of the State of Washington. Plaintiff Prakash brings this action on behalf of himself and the Nationwide and Washington Classes, as defined below.

33. Plaintiffs Gabriel & Laura Webster are natural persons and citizens of the State of Washington. Plaintiffs Webster bring this action on behalf of themselves and the Nationwide and Washington Classes, as defined below.

34. Plaintiff Joann Welch is a natural person and citizen of the State of Washington. Plaintiff Welch brings this action on behalf of herself and the Nationwide and Washington Classes, as defined below.

35. Defendant Premera Blue Cross is a healthcare benefits provider existing under the laws of the State of Washington with its headquarters and principal place of business located at 7001 220th Street SW, Building 1, Mountlake Terrace, Washington 98043. Premera's relevant operations, including its primary marketing, administration and information security operations, as well as its vital employees (such as its Chief Information Security Officer) are all located in the State of Washington. Premera is also registered to conduct business in the State of Oregon (Oregon Secretary of State Registry Number 447360-80) and Alaska (Premera Blue Cross of Alaska, which is a trade name only).

## III. JURISDICTION AND VENUE

36. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (a) at least one member of the putative Classes is a citizen of a state different from Defendant, and (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

37. This Court has personal jurisdiction over Defendant because it is registered to and regularly does conduct business in this District, and the unlawful conduct alleged in this Complaint occurred in, was directed to, and/or emanated, in part, from this District.

38. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the unlawful conduct alleged in this Complaint occurred in, was directed to, and/or emanated from this District. Venue is additionally proper because Defendant is registered to and does conduct business in this District.

## IV. FACTUAL BACKGROUND

### A. Premera Had A Duty And Contractual Obligation To Protect Its Members' Sensitive Information From Unauthorized Disclosures.

39. Premera had a duty and obligation to keep confidential the Sensitive Information it obtained and to protect that information from unauthorized disclosures. Premera's duty and obligations are based on: 1) HIPAA; 2) industry standards; 3) specific governmental warnings to Premera about its failure to meet those obligations; and 4) the promises it made to its members. All Class members provided their Sensitive Information to Premera with the common sense and reasonable understanding that Premera would comply with its obligations to keep Sensitive Information confidential and secure from unauthorized disclosures.

40. HIPPA mandates that Premera provide to every insured and everyone whose plan Premera administers a privacy notice. In its HIPPA mandated privacy notice, Premera promises every insured and everyone whose plan Premera administers it will keep Sensitive Information confidential and protect it from unauthorized disclosure, even beyond Premera's regulatory obligations. In its Notice of Privacy Practices, Premera promises in relevant part:

> THE PRIVACY OF YOUR MEDICAL AND FINANCIAL INFORMATION IS VERY IMPORTANT TO US.
>
> At Premera Blue Cross, we are committed to maintaining the confidentiality of your medical and financial information, which we refer to as your "personal information," regardless of format: oral, written, or electronic.
>
> *     *     *
>
> OUR RESPONSIBILITIES TO PROTECT YOUR PERSONAL INFORMATION
>
> Under both the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Gramm-Leach-Bliley Act, Premera Blue Cross must take measures to protect the privacy of your

> personal information. In addition, other state and federal privacy laws may provide additional privacy protection. Examples of your personal information include your name, Social Security number, address, telephone number, account number, employment, medical history, health records, claims information, etc.
>
> We protect your personal information in a variety of ways. For example, we authorize access to your personal information by our employees and business associates only to the extent necessary to conduct our business of serving you, such as paying your claims. We take steps to secure our buildings and electronic systems from unauthorized access. We train our employees on our written confidentiality policy and procedures and employees are subject to discipline if they violate them. Our privacy policy and practices apply equally to personal information about current and former members; we will protect the privacy of your information even if you no longer maintain coverage through us.
>
> We are required by law to:
>
> protect the privacy of your personal information; provide this Notice explaining our duties and privacy practices regarding your personal information; notify you following a breach of your unsecured personal information; and abide by the terms of this Notice.

41. Premera posts the same Notice of Privacy Practices on its website, acknowledging its duty and promising to protect all Sensitive Information in its possession.

42. Premera admitted its duty and promised to keep the Sensitive Information confidential and secure in other ways. For example, all individuals who register on Premera's website must "accept" Premera's Terms and Conditions. These Terms and Conditions contain a section entitled "Security of Your Personal Information," in which Premera promises that "Premera.com takes precautions to protect users' personal information both online and offline."

43. Premera's policy booklets, which form its member contracts, contain a section on "Privacy Policies and Practices" or a "Notice of Information Use and Disclosure," which include promises such as:

> "We protect your privacy by making sure your information stays confidential. We have a company confidentiality policy and we require all employees to sign it."[1]
>
> "To safeguard your privacy, we take care to ensure that your information remains confidential by having a company confidentiality policy and by requiring all employees to sign it."[2]

44. Premera's website includes its Code of Conduct, which appears to include the "company confidentiality policy" referenced in the policy booklets.[3] On "Customer Privacy," Premera's Code of Conduct promises:

> We are committed to complying with federal and state privacy laws, including the HIPAA privacy regulations, that protect financial and health information of our customers. We use the following privacy principles to guide our actions:
>
> Customers – Customers should enjoy the full array of privacy protections afforded to them by law and routinely granted by their providers. This is a values-based approach whereby we are focused on two core values: Customer Care and Integrity.
>
> * * *
>
> Where appropriate, we use technical and/or physical security safeguards to ensure our privacy policies are followed.
>
> * * *
>
> We are committed to ensuring the security of our facilities and electronic systems to prevent unauthorized access to Premera's and our customers' protected personal information (PPI).
>
> We are expected to be aware of and follow established corporate policies, processes and procedures that are designated to secure our buildings and electronic systems in compliance with HIPAA Security requirements.

---

[1] *See, e.g.*, PBC00044925–44926, MSP Preferred Select Bronze 5250 HAS Benefit Booklet (2014).

[2] *See, e.g.*, PBC00046821, Premera Preferred Bronze 5250 HSA Benefit Booklet (2014).

[3] Premera, *Code of Conduct* 12 (2016), *available at* https://www.premera.com/documents/030553.pdf.

45. To further protect Sensitive Information from disclosure, Premera requires all vendors and contractors to sign Premera's Vendor/Contractor Privacy Basics,[4] which states:

> Our policies and procedures require compliance with federal and state privacy laws, including HIPAA privacy and security regulations. Contractors, too, must follow our policies and procedures and comply with all laws and regulations to which the Company is subject.

46. As demonstrated by these excerpts from Premera's Notice of Privacy Practices, contracts with Policyholder Plaintiffs (i.e., the policy booklets), Code of Conduct, and Vendor/Contractor Privacy Basics, Premera recognized the importance of keeping consumers' Sensitive Information private and repeatedly promised to protect that Sensitive Information and comply with the data security requirements mandated by, among other things, federal and state privacy laws.

47. Premera's data security obligations and promises were particularly important given the substantial increase in data breaches (particularly those in the healthcare industry) in the time period preceding Premera's data breach. Premera's failure to comply with those obligations and promises was particularly egregious in light of specific governmental warnings regarding the possibility of hacker attacks on companies like Premera. Such warnings further established Premera's duty to keep class members' Sensitive Information private and secure.

48. For example, on April 8, 2014—just one month before the Premera breach occurred—the Federal Bureau of Investigation's Cyber Division issued a Private Industry Notification to companies within the healthcare sector, stating that "the health care industry is not technically prepared to combat against cyber criminals' basic cyber intrusion tactics, techniques and procedures (TTPs), much less against more advanced persistent threats (APTs)"

---

[4] Premera, *Vendor/Contractor Privacy Basics* (2014), *available at* https://www.premera.com/documents/030628.pdf.

and pointed out that "[t]he biggest vulnerability was the perception of IT healthcare professionals' beliefs that their current perimeter defenses and compliance strategies were working when clearly the data states otherwise." The same warning specifically noted that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Health Information (PHI) and/or Personally Identifiable Information (PII)."[5]

49. Worse yet, a couple weeks before Premera's breach, the U.S. Office of Personnel Management directly notified Premera about its network security vulnerabilities.[6] The U.S. Office of Personnel Management's April 18, 2014 report revealed that Premera failed to implement adequate measures to secure its network. It found "several areas of concern related to Premera's network security controls" and noted that "patches are not being implemented in a timely manner," "a methodology is not in place to ensure that unsupported or out-of-date software is not utilized," and a vulnerability scan identified "insecure server configurations."[7]

50. Federal auditors notified Premera weeks before the breach that its network-security procedures were inadequate and informed it that some of the vulnerabilities could be exploited by hackers and expose sensitive information.[8]

---

[5] *(U) Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (Apr. 8, 2014), FBI Cyber Division Private Industry Notification, *available at* http://www.aha.org/content/14/140408--fbipin-healthsyscyberintrud.pdf.

[6] Mike Baker, Feds Warned Premera About Security Flaws Before Breach, Seattle Times, Mar. 18, 2015, *available at* http://www.seattletimes.com/business/local-business/feds-warned-premera-about-security-flaws-before-breach/ (last visited Oct. 6, 2015).

[7] U.S. Office of Personnel Management, Office of the Inspector General, Office of Audits, Audit of Information Systems General and Application Controls at Premera Blue Cross (Nov. 28, 2014), https://s3.amazonaws.com/s3.documentcloud.org/documents/1688453/opm-audit.pdf.

[8] Mike Baker, *Feds Warned Premera About Security Flaws Before Breach*, Seattle Times, *available at* http://www.seattletimes.com/business/local-business/feds-warned-premera-about-security-flaws-before-breach/ (Oct. 6, 2015).

**B. Premera Failed To Properly Protect Consumers' Sensitive Information.**

51. On May 5, 2014, hackers began the initial phase of their intrusion on Premera's servers. A "phishing" email was sent to a Premera employee falsely purporting to be from a Premera Information Technology (IT) employee. The email included instructions to download a "security update." Premera's employee downloaded this "update," which was actually malware that allowed hackers access to Premera's servers.

52. Notably, various internal security assessments that Premera had undertaken prior to this period confirmed that it was vulnerable to this exact type of attack.

53. The hackers used the domain name in their email of "premrera.com" (i.e., using an additional "r"). This wrong domain was visible in the email message. Around this same time, another phishing domain of "prennera.com" was also registered. Premera did not warn employees that scam domain names had been registered that were close to "Premera.com."

54. After the Premera employee downloaded the malware, hackers had access to at least two of Premera's servers for many months completely undetected.

55. In June of 2014, the U.S. Computer Emergency Readiness Team issued alerts regarding the danger of data hacking from a malware virus known as Gameover Zeus.

56. In July of 2014, an end user reported a Trojan message to Premera's IT department.

57. In August of 2014, a Premera virus scan detected a backdoor Trojan virus.

58. In September of 2014, Premera's IT department indicated it was concerned about a possible "Gameover Zeus" infiltration, the dangers of which the media and U.S. government had been reporting on for many months.

59. On September 8, 2014, Premera IT employee, Gabriel Bigger, sent malware byte logs to Mandiant based on these concerns over Gameover Zeus infiltration. Mandiant quickly informed Premera the virus looked like Gameover Zeus on September 9, 2014.

60. On September 23, 2014, Premera IT informed senior executives that Premera computers had been infected with a virus.

61. On October 10, 2014, Premera engaged Mandiant, a cyber-security firm, to perform an assessment of the security of its network. Mandiant provided its Mandiant Intelligent Response (MIR) agents (a tool to identify indicators of compromise and malware) to install on Premera's workstations and laptops for the purposes of scanning for malware and other infections.

62. On October 13, 2014, Jerry Vergeront provided a network status report that identified deficiencies in Premera's Intrusion Detection System, a repeat deficiency initially identified in 2007

63. The pilot phase of the Mandiant project did not begin until December 2014 and continued until early January 2015. Premera did not begin searching end-user work stations until January 8, 2015. Premera did not install network sensors until January 28, 2015.

64. On January 29, 2015, Mandiant discovered a signature for SOGU malware traffic on the Premera network, confirmed infection of two servers, and confirmed that the malware was "beaconing" to attacker sites. SOGU is a type of Trojan that has been around for years. By January 30, 2015, Premera had finally uncovered that the SOGU malware had been in its system since May 2014.

65. In February 2015, Mandiant continued to try to understand the full extent of the breach and whether and how much information had been removed from Premera's system.

At this time, Premera finally agreed to deploy Mandiant's agents on all Premera servers, workstations, and laptops in order to assess the scope of the breach. This installation was only complete in late February, nearly a month after Mandiant first confirmed that a breach had occurred.

66. On February 20, 2015, Premera notified the FBI of the data breach. On February 25, 2015, the FBI met with Premera and Mandiant. The FBI began its own investigation, as well.

67. Premera chose not to inform the public of the breach at this time although it had sufficient knowledge of the extent and scope of the breach, deciding instead to further investigate and attempt to remediate the breach before letting the public know that their Sensitive Information had been stolen (and was continuing to be stolen).

68. Premera further waited until the weekend of March 6-8 to perform the complete remediation of its network, during which time information was still being accessed and stolen. Mandiant continued to monitor the network for the following week to ensure Premera had completely cleansed its system.

69. It wasn't until March 17, 2015—over eight months after being warned of a Trojan virus and 46 days after confirming the data breach—that Premera finally revealed to the public and governmental authorities other than the FBI that a massive data breach had occurred.

70. In its notice, Premera revealed that its computer network was the target of "a sophisticated attack to gain unauthorized access to [its] Information Technology (IT) systems."[9] As a result, the Sensitive Information belonging to approximately 11 million consumers—including its current and former members, employees, and other Blue members—was

[9] *Premera Has Been The Target Of A Sophisticated Cyberattack*, Premera Blue Cross, *available at* http://premeraupdate.com/ (last visited Oct. 6, 2015).

compromised. The breach affected Premera Blue Cross, Premera Blue Cross Blue Shield of Alaska, and affiliate brands Vivacity and Connexion Insurance Solutions, Inc. The breach also affected members of other Blue Cross Blue Shield plans who sought treatment in Washington, Oregon or Alaska.

71. Premera eventually acknowledged that the breach actually started in May 2014 and went undetected by it for nearly one year.[10]

72. One month before Premera announced the Sensitive Information had been breached, another major healthcare provider reported that hackers had successfully taken sensitive information of approximately eighty million consumers. Security researchers believe that attackers initially gained access to the databases containing that information through phishing attempts (i.e., using legitimate-looking emails or websites to trick individuals into revealing confidential information, such as database login credentials) and linked malware[11] involved in those phishing attacks to Chinese hackers who authorities refer to as "Deep Panda."

73. Malware thought to have been authored by Deep Panda was later discovered in connection with the phishing website www.prennera.com.

### C. <u>Premera Violated HIPAA, Industry Standard Data Protection Protocols, And Its Own Representations Regarding Data Security.</u>

74. HIPAA requires that healthcare providers (like Premera) adopt administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of consumers' Sensitive Information.

75. Unfortunately, Premera's data breach resulted from a variety of failures to follow HIPAA mandated data-security protocols, many of which are also industry standard.

---

[10] *Id.*

[11] "Malware" refers to malicious software designed to infiltrate and damage computers or computer systems.

Among such deficient practices, Premera's breach shows that it failed to implement (or inadequately implemented) information security policies or procedures such as effective employee training on phishing attempts, adequate intrusion detection systems, regular reviews of audit logs and authentication records, and other similar measures designed to protect the confidentiality of the Sensitive Information it maintained in its data systems.

76. More specifically, Premera's security fiascos demonstrate that it failed to honor its duties and promises by not:

a. Maintaining an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Adequately protecting Plaintiffs' and the Classes' Sensitive Information;

c. Ensuring the confidentiality and integrity of electronic protected health information it created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

d. Implementing technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

e. Implementing policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

f. Implementing procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g. Protecting against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. § 164.306(a)(2);

h. Protecting against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

i. Ensuring compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4); and

j. Training all members of its workforce effectively on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. § 164.530(b).

77. Likewise, Premera's security lapses demonstrate that it failed to follow through on its own representations about its data security practices, including those discussed above. Specifically, Premera did not:

a. Take precautions to protect users information, whether online or offline;

b. Maintain the confidentiality or privacy of the personal information—as defined by its Notice of Privacy Practices—in its control, specifically including information stored in electronic form;

c. Take steps to secure its electronic systems from unauthorized access;

d. Train its employees on Premera's confidentiality policy and procedures and did not enforce its policy and procedures;

e. Timely or reasonably notify affected individuals following the breach of their personal information;

f. Protect individuals' privacy by making sure their information stayed confidential, including by failing to enforce or monitor employee compliance with its confidentiality policy or practices;

g. Ensure the security of its facilities and electronic systems to prevent unauthorized access to Premera's and its customers' protected personal information (PPI); and

h. Remain aware of or follow corporate policies, processes and procedures designated to secure electronic systems in compliance with HIPAA Security requirements.

78. Had Premera implemented the above-described data security protocols or policies, the consequences of the data breach could have been avoided, or at least significantly reduced (as the breach could have been detected nearly one year earlier, the amount of Sensitive Information compromised could have been greatly reduced or avoided entirely, and affected consumers could have been notified—and taken protective/mitigating actions—much sooner). For instance, had Premera (i) adequately trained its employees to protect themselves against phishing attempts (like those attempts described above), (ii) implemented adequate security protocols to detect breaches (i.e., detecting unauthorized access to its databases), or (iii) adequately reviewed authentication logs for anomalies (e.g., detecting abnormal access to its databases from unknown locations, or accessing or transferring large amounts of Sensitive Information), the breach could have been identified and thwarted before considerable amounts of Sensitive Information were compromised.

79. As discussed above, major healthcare entities (like Premera) have been targeted in damaging hacking attempts in recent years, and Premera was specifically warned that

its network-security procedures were inadequate and that some of the vulnerabilities could be exploited by hackers to expose sensitive information (as described above). Premera thus knew or should have known that a data breach would likely result from its deficient security and privacy practices described above. Despite these warnings—and Premera's own knowledge about the significant holes in its data security regime—Premera continued to assure its customers (and potential customers) that its data security systems were secure, including by making the express representations discussed above.

80. Even though Premera promised its members and Blue members the above-described security measures (i.e., that Premera's promises, as well as HIPAA-mandated and industry standards would be used to protect their Sensitive Information), they were not adequately implemented (if at all), which resulted in the unauthorized release of Sensitive Information.

### D. <u>It Is Well Established That Security Breaches Lead To Instances Of Identity Theft.</u>

81. The United States Government Accountability Office noted in a June 2007 report on Data Breaches ("GAO Report") that identity thieves use identifying data such as SSNs to open financial accounts, receive government benefits and incur charges and credit in a person's name.[12] As the GAO Report states, this type of identity theft is the most harmful because it may take some time for the victim to become aware of the theft, and the theft can impact the victim's credit rating adversely.

[12] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), United States Government Accountability Office, *available at* http://www.gao.gov/new.items/d07737.pdf.

82. In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records" and their "good name."[13]

83. According to the Federal Trade Commission ("FTC"), identity theft victims must often spend countless hours and large amounts of money repairing the impact to their credit.[14] Identity thieves use stolen personal information such as SSNs for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[15]

84. With access to an individual's Sensitive Information, criminals can do more than just empty a victim's bank account—they can also commit various types of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and SSN to obtain government benefits; or, filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house or receive medical services, prescription drugs and goods, and fraudulent medical billing in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the

---

[13] *Id.*

[14] *See Identity Theft*, Federal Trade Commission, http://www.consumer.ftc.gov/features/feature-0014-identity-theft (last visited Oct. 6, 2015).

[15] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

victim's name.[16] Further, loss of private and personal health information can expose the victim to loss of reputation, loss of job employment, blackmail and other negative effects.

85. Sensitive Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years. As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen credit card numbers, SSNs, and other Sensitive Information directly on various Internet websites making the information publicly available. In one study, researchers found hundreds of websites displaying stolen Sensitive Information. The study concluded:

> It is clear from the current state of the credit card black-market that cyber criminals can operate much too easily on the Internet. They are not afraid to put out their email addresses, in some cases phone numbers and other credentials in their advertisements. It seems that the black market for cyber criminals is not underground at all. In fact, it's very "in your face."[17]

86. A study by Experian found that the "average total cost" of medical identity theft to an individual is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[18] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third saw their insurance premiums rise,

---

[16] *See Identity Theft*, Federal Trade Commission, *available at* http://www.consumer.ftc.gov/features/feature-0014-identity-theft (last visited Oct. 6, 2015).

[17] *See The Underground Credit Card Blackmarket*, StopTheHacker, *available at* http://www.stopthehacker.com/2010/03/03/the-underground-credit-card-blackmarket/ (last visited Oct. 6, 2015).

[18] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), http://news.cnet.com/8301-27080_3-10460902-245.html (last visited Oct. 6, 2015).

and forty percent were never able to resolve their identity theft at all.[19] Indeed, data breaches and identity theft have a crippling effect on individuals and detrimentally impact the entire economy as a whole.

87. Further, medical databases are particularly high value targets for identity thieves. According to a 2012 Nationwide Insurance report, "[a] stolen medical identity has a $50 street value – whereas a stolen social security number, on the other hand, only sells for $1."[20] In fact, the medical industry has experienced disproportionally higher instances of computer theft than any other industry.

88. In fact, individuals whose information was compromised in a similar data breach by the same hackers—Deep Panda—have already fallen victims to identity theft, such as tax return fraud.[21]

89. Indeed, Premera's own data breach notification statements recognize the long-lasting harmful effects of its misconduct and recommends that affected individuals remain vigilant to the possibility of fraud and identity theft by indefinitely reviewing their credit card, bank, and other financial statements for unauthorized activity.

**E. Plaintiffs' Experiences Underscore The Fact That All Class Members Are In Imminent Danger Of Identity Theft.**

**ALASKA**

90. Plaintiff Mary Fuerst is a resident of Fairbanks, Alaska and was an Alaska resident during the period of the Premera Breach. Plaintiff Fuerst was a Premera policyholder from 2008 to 2013 and made partial premium payments under that policy through her employer.

---

[19] *Id.*

[20] *See Study: Few Aware of Medical Identity Theft Risk*, Claims Journal, http://www.claimsjournal.com/news/national/2012/06/14/208510.htm (last visited Oct. 6, 2015).

[21] *See* Jose Pagliery, *A Hacker Stole Our $3,500 Tax Refund*, CNN Money (Apr. 15, 2015), http://money.cnn.com/2015/04/15/technology/tax-hacker/ (last visited Oct. 6, 2015).

In or around March 2015, Plaintiff Fuerst received a letter from Premera notifying her that her personal information may be compromised. Starting around the same time, she began receiving phishing calls seeking her personal information. Prior to the Premera breach she had not received calls of this nature. Soon thereafter, a fraudulent international charge appeared on Plaintiff Fuerst's debit card. Although her bank ultimately reimbursed her for the fraudulent charge, Plaintiff Fuerst had to obtain a replacement card and complete a fraud affidavit. Plaintiff Fuerst has spent about 20 hours to date addressing issues arising from the Premera Breach.

91. Plaintiff Ross Imbler is a resident of Fairbanks, Alaska and was an Alaska resident during the period of the Premera Breach. Plaintiff Imbler has been a Premera policyholder since 2011 and makes partial premium payments through his employer. In or around March 2015, Plaintiff Imbler received three letters from Premera indicating that his, his wife's, and his then 2-year-old daughter's personal information may be compromised. Plaintiff Imbler is especially concerned about the long-term threat of identity theft to his daughter, as well as the immediate threat of fraud and identity theft for him and his wife. Plaintiff Imbler has spent about six hours to date addressing issues arising from the Premera Breach.

**ARKANSAS**

92. Plaintiff Anne Emerson is a resident of Little Rock, Arkansas and was an Arkansas resident during the period of the Premera Breach. Plaintiff Emerson has been an Arkansas Blue Cross Blue Shield ("AR BCBS") policyholder since 2004 and, until mid-2015, made partial premium payments under that policy through her spouse's employer. Since mid-2015, she has been insured with AR BCBS under an individual policy with respect to which she has been making premium payments. Plaintiff Emerson received medical treatment in Washington State between 2004 and 2007. In or around March 2015, Plaintiff Emerson received a letter from AR BCBS notifying her that her personal information may have been compromised

in the Premera Breach. Concerned that she would be the victim of fraud and/or identity theft, Plaintiff Emerson purchased credit monitoring and identity theft prevention that costs her approximately $100 annually. Plaintiff Emerson has spent about five hours to date addressing issues arising from the Premera Breach.

**CALIFORNIA**

93. Plaintiff Debbie Hansen-Bosse is a resident of San Clemente, California and was a California resident during the period of the Premera Breach. Plaintiff Hansen-Bosse and her two 14-year-old daughters have been Premera insureds since 2007. In or around March 2015, Plaintiff Hansen-Bosse received a letter from Premera notifying her that her and her daughters' personal information may have been compromised. In or around May 2015, while monitoring her credit, Plaintiff Hansen-Bosse discovered a hard inquiry for an auto loan on her credit report that she did not recognize and has been unable to verify as legitimate. Also in and around May 2015, Plaintiff Hansen-Bosse's checking account was fraudulently accessed, causing failed automatic payments for two months of credit card payments. Concerned that she would be the victim of fraud and/or identity theft, Plaintiff Hansen-Bosse purchased credit monitoring and identity theft prevention that costs her approximately $25 per month. Plaintiff Hansen-Bosse has spent about 30 hours to date addressing issues arising from the Premera Breach.

**IDAHO**

94. Plaintiff William Fitch is a resident of Rigby, Idaho and was an Idaho resident during the period of the Premera Breach. Plaintiff Fitch was a Blue Cross of Blue Shield of Idaho policyholder from 1995 to 2013 and made partial premium payments through his employer. In or around March 2015, Plaintiff Fitch received a letter from Premera notifying him that his personal information may have been compromised. Starting around the same time, he

began receiving phishing calls and emails seeking his personal information. Prior to the Premera breach he had not received these suspicious solicitations. Plaintiff Fitch has spent about 30 hours to date addressing issues arising from the Premera Breach.

**MARYLAND**

95. Plaintiff Eric Forseter is a resident of Bethesda, Maryland and was a Maryland resident during the period of the Premera Breach. Plaintiff Forseter was a Premera policyholder from 2008 to May 2015 and made partial premium payments through his employer. In or around March 2015, Plaintiff Forseter received a letter from Premera notifying him that his personal information may have been compromised. On or around May 1, 2015, a criminal fraudulently charged approximately $2,000 in airline tickets and office furniture on Plaintiff Forseter's credit card account. Although his financial institution ultimately reversed the fraudulent charges, Plaintiff Forseter had to wait for a replacement card and reset automatic bill payments for at least 25 accounts with the new card number. Plaintiff Forseter has spent about 20 hours to date addressing issues arising from the Premera Breach.

**MASSACHUSETTS**

96. Plaintiff Anne Michelle Blackwolfe is a resident of Shrewsbury, Massachusetts and was a Massachusetts resident during the period of the Premera Breach. Plaintiff Blackwolfe has been a Premera policyholder since 2009 and makes partial premium payments through her employer. In or around March 2015, Plaintiff Blackwolfe received a letter from Premera notifying her that her personal information may have been compromised. Plaintiff Blackwolfe has spent about 25 hours to date addressing issues arising from the Premera Breach.

97. Plaintiffs Krishnendu and Madhuchanda Chakraborty are residents of Burlington, Massachusetts and were Massachusetts residents during the period of the Premera Breach. Mr. Chakraborty was a Premera policyholder, with Mrs. Chakraborty as a dependent

insured, for approximately six months in 2012 and made partial premium payments through his employer. In or around March 2015, the Chakrabortys received a letter from Premera notifying them that their personal information may have been compromised. In and around June 2015, Mrs. Chakraborty had unauthorized online music charges on her credit card account. Although her bank ultimately reversed the fraudulent charges, she had to wait for a new credit card and temporarily lost access to her line of credit. The Chakrabortys have spent about fifteen hours to date addressing issues arising from the Premera Breach.

**NEW JERSEY**

98. Plaintiff Howard Kaplowitz is a resident of Livingston, New Jersey and was a New Jersey resident during the period of the Premera Breach. Plaintiff Kaplowitz has been a Premera policyholder since about 2012 and makes partial premium payments through his employer. In or around March 2015, Plaintiff Kaplowitz received a letter from Premera notifying him that his personal information may have been compromised. Plaintiff Kaplowitz has spent about ten hours to date addressing issues arising from the Premera Breach, including monitoring his credit report for fraudulent activity.

**OREGON**

99. Plaintiffs Stuart and Ilene Hirsh are residents of Salem, Oregon and were Oregon residents during the period of the Premera Breach. Mr. Hirsh was a Premera policyholder, with Mrs. Hirsh as a dependent insured, from approximately 1999 to 2006 and made partial premium payments through his employer. In or around March 2015, Mr. and Mrs. Hirsh received letters from Premera notifying them that their personal information may have been compromised. Mr. and Mrs. Hirsh have spent about six hours to date addressing issues arising from the Premera Breach, including monitoring their credit reports for fraudulent activity.

100. Plaintiff Darin Purcell is a resident of Milwaukie, Oregon and was an Oregon resident during the period of the Premera Breach. Plaintiff Purcell has been a Premera policyholder since 2013 and makes partial premium payments through his employer. In or around March 2015, Plaintiff Purcell received a letter from Premera notifying him that his personal information may have been compromised. Plaintiff Purcell has spent about three hours to date addressing issues arising from the Premera Breach, including monitoring his credit report for fraudulent activity.

**TENNESSEE**

101. Plaintiffs Kevin Smith and Catherine Bushman, husband and wife, are residents of Franklin, Tennessee and were Tennessee residents during the period of the Premera Breach. Plaintiffs Smith and Bushman were both Premera policyholders at various times from approximately 2005 to 2010, then approximately 2011 to 2013, and each made partial premium payments through their employer. In or around March 2015, Plaintiffs Smith and Bushman received letters from Premera notifying them that their personal information may have been compromised. Also in and around March 2015, Plaintiffs Smith and Bushman received a large IRS tax refund check despite having not yet filed their 2014 tax return. After contacting the IRS, they discovered that someone had filed a fraudulent tax return using their names and Social Security numbers. Plaintiffs Smith and Bushman then filed identity theft affidavits with the IRS and the FTC, a police report, and sought a credit watch with one of the credit bureaus. At an in-person appointment with the IRS in Nashville, they were informed that, going forward, they will have to manually submit their tax returns with a security PIN. The processing of their 2014 tax return and refund was delayed approximately four months. In or around July of 2015, a criminal attempted to fraudulently open a credit card in both of their names, but the bank called Plaintiffs Smith and Bushman and they were able to confirm the fraud and cancel the account. Plaintiffs

Smith and Bushman have spent about 30 hours each to date addressing issues arising from the Premera Breach.

**TEXAS**

102. Plaintiff Sharif Ailey is a resident of Keller, Texas and was a Texas resident during the period of the Premera Breach. Plaintiff Ailey has been a Premera policyholder since November 2011 and makes partial premium payments through his employer. In or around March 2015, Plaintiff Ailey received a letter from Premera notifying him that his personal information may have been compromised. In or around June 2015, Plaintiff Ailey discovered fraudulent credit accounts were being opened in his name. He has spent approximately $100 requesting credit reports, freezing his credit report, and attempting to remove the fraudulent activity from his credit report. As a result of these credit issues caused by the Premera Breach, Plaintiff Ailey was unable to refinance the mortgage on his house. Plaintiff Ailey has spent about 25 hours to date addressing issues arising from the Premera Breach.

**WASHINGTON**

103. Plaintiff April Allred is a resident of Washington and was a Washington resident during the period of the Premera Breach. Plaintiff Allred and her son were Premera insureds from 2007 to 2009 and from 2011 to 2012, and her husband, the policyholder, made partial premium payments through his employer. In or around March 2015, Plaintiff Allred received a letter from Premera notifying her that her and her family's personal information may have been compromised. On or about April 15, 2015, Plaintiff Allred's 2014 income tax return was rejected due to the use of her son's Social Security number in another fraudulently filed return. Plaintiff Allred had to take additional trips to her accountant's office, submit her tax return manually by mail, and wait several weeks longer to receive her tax refund. Plaintiff

Allred has spent about 25 hours to date addressing issues arising from the Premera Breach, including monitoring her credit report and bank accounts for fraudulent activity.

104. Plaintiff Elizabeth Black is a resident of Seattle, Washington and was a Washington resident during the period of the Premera Breach. Plaintiff Black was a Premera policyholder from 2000 to 2005 and made partial premium payments through her employer. On or about February 18, 2015, Plaintiff Black received a cellular phone that she never ordered, with an order date of February 13, 2015. On or about February 23, 2015, she learned that four additional cellular phones were fraudulently purchased in her name at two different retail locations in Oregon. On or about February 20, 2015, Plaintiff Black received a debit card for which she never applied. After speaking with the various vendors and indicating that these accounts were fraudulently opened, Plaintiff Black learned that the personal information used to open the accounts included her name, date of birth, mailing address, and Social Security number. After contacting the vendors multiple times, speaking with their fraud departments, and filing police reports, she was able to cancel the accounts. Plaintiff Black had to take time off from work without pay to tend to these problems, in addition to time spent at work on the phone trying to mitigate and resolve the identity theft and fraud. In or around March 2015, Plaintiff Black finally received a letter from Premera notifying her that her personal information may have been compromised. Plaintiff Black has spent about 25 hours to date addressing issues arising from the Premera Breach, including checking her credit report and bank accounts for fraudulent activity. In addition, Plaintiff Black also spent approximately $70 in unreimbursed overnight postage to place security freezes on her credit report.

105. Plaintiff Ralph Christopherson is a resident of Seatac, Washington and was a Washington resident during the period of the Premera Breach. Plaintiff Christopherson has been

a Premera policyholder since 2011 and makes partial premium payments through his employer. In or around March 2015, Plaintiff Christopherson received a letter from Premera notifying him that his personal information may have been compromised. On or about April 2, 2015, Plaintiff Christopherson was the victim of a phishing scam: a man called, claiming he could help fix his computer, and he already had Plaintiff Christopherson's Social Security number and some old credit card numbers. After getting remote access to Plaintiff Christopherson's computer, the criminal fraudulently accessed Plaintiff Christopherson's bank account to steal approximately $900 via Western Union. He is still in the process of seeking reimbursement for this fraud. Plaintiff Christopherson has spent about 80 hours to date addressing issues arising from the Premera Breach, including placing credit locks on his bank account and credit reports, attempting to resolve the fraudulent charges, and monitoring his accounts for additional fraud.

106. Plaintiffs Robert and Theresa Foulon are residents of Bellevue, Washington and were Washington residents during the period of the Premera Breach. Mr. Foulon has been a Premera policyholder, with Mrs. Foulon and their children as dependent insureds, from approximately 1992 to 2009, then 2010 to present. Mr. Foulon now makes premium payments through his self-employment; prior to 2009 he made partial premium payments through his employer. In or around March 2015, the Foulons received letters from Premera notifying them that their and their children's personal information may have been compromised. In or around April 2015, they then received a letter from the IRS indicating that their $9,539 tax refund was processing even though they had not yet filed a return. After logging into his tax account and seeing the bank account destination for the direct deposit was not theirs, Mr. Foulon contacted the IRS and reported that the tax return was fraudulent. The Foulons had to fill out the necessary forms to report the fraud and file their actual tax return manually, which they will always have to

do going forward. On or about September 14, 2015, they received another letter from the IRS verifying that the prior return was fraudulent and providing a PIN for future filings. Mr. Foulon is still attempting to sort out his family's 2014 tax return due to this attempted identity theft. The Foulons have spent about 30 hours to date addressing issues arising from the Premera Breach, including monitoring their credit reports for additional fraudulent activity.

107. Plaintiff Crystal Hayes is a resident of Lynnwood, Washington and was a Washington resident during the period of the Premera Breach. Plaintiff Hayes has been a Premera policyholder since 2012 and makes partial premium payments through her employer. In or around March 2015, Plaintiff Hayes received a letter from Premera notifying her that her personal information may have been compromised. Soon after the breach notification, her credit cards were cancelled and reissued due to fraudulent activity, but Plaintiff Hayes was unaware of the cancellation and her cards were declined when she attempted to use them. She had to reset her automatic bill payments with the reissued card information as well. Plaintiff Hayes has spent about five hours to date addressing issues arising from the Premera Breach, including requesting and checking her credit report and bank statements for fraudulent activity.

108. Plaintiff Barbara Lynch is a resident of Seattle, Washington and was a Washington resident during the period of the Premera Breach. Plaintiff Lynch has been a Premera policyholder for approximately 17 years and makes premium payments through her employer. Starting in and around January 2015, numerous fraudulent credit inquiries appeared on Plaintiff Lynch's credit report, causing her credit score to drop approximately 100 points. Soon thereafter, she received notification from three different financial institutions that fraudulent accounts were opened in her name. Concerned that she would be the victim of additional fraud and/or identity theft, Plaintiff Lynch immediately purchased credit monitoring

and identity theft protection, which costs her $30 per month. In or around March 2015, Plaintiff Lynch received a letter from Premera notifying her that her personal information may have been compromised. Plaintiff Lynch estimates that she has spent over 100 hours to date addressing issues arising from the Premera Breach, including aggressive remedial measures to restore her credit score. She continues to receive fraud alerts to the present day.

109. Plaintiff Kevin McLallen is a resident of Covington, Washington and was a Washington resident during the period of the Premera Breach. Plaintiff McLallen has been a Premera policyholder since approximately 2011 and makes partial premium payments through his employer (and now through COBRA). In or around March 2015, Plaintiff McLallen received a letter from Premera notifying him that his personal information may have been compromised. In or around April 2015, fraudulent charges appeared on Plaintiff McLallen's credit and debit cards for small charges in New Jersey and Michigan. Even more recently, Plaintiff McLallen has received phishing calls where the criminals already have many of his personal identifying information. Plaintiff McLallen has spent about ten hours to date addressing issues arising from the Premera Breach, including pulling credit reports and purchasing his credit scores - and unreimbursed expense - to ensure they were accurate. He also spent time calling his banks to notify them of the fraudulent activity and researching additional credit security services.

110. Plaintiff Surya Prakash is a resident of Seattle, Washington and was a Washington resident during the period of the Premera Breach. Plaintiff Prakash was a Premera policyholder from 2005 to 2012 and made partial premium payments through his employer. In or around December 2014, approximately $3,500 in fraudulent charges appeared on his bank account. Plaintiff Prakash immediately notified the bank and canceled the account, but was without access to the stolen funds for two weeks until reimbursement. In or around February

2015, he again experienced fraudulent activity totaling approximately $250 on different bank accounts. Again, Plaintiff Prakash canceled the cards and had to wait a few weeks for reimbursement of the stolen funds. In or around March 2015, Plaintiff Prakash received a letter from Premera notifying him that his personal information may have been compromised. In or around August 2015, Plaintiff Prakash received a letter from a collections company indicating he purchased over $2,000 in plane tickets that he never purchased. He has contacted all three credit bureaus to place alerts and freezes on his credit report. Plaintiff Prakash has spent about five hours to date addressing issues arising from the Premera Breach, including monitoring his bank accounts and credit report for additional fraud.

111. Plaintiffs Gabriel and Laura Webster are residents of Seattle, Washington and were Washington residents during the period of the Premera Breach. Mr. Webster has been a Group Health and Regence Blue Cross policyholder, with Mrs. Webster and their 12-year-old son as dependent insureds, from approximately 2009 to 2011 and 2012 to present, respectively. Mr. Webster made premium payments on these policies through his employer, and the Websters all received medical treatment in Washington State from 2009 to present. In or around November 2014, Mr. Webster had fraudulent charges on his credit card. Although these charges were ultimately reimbursed, he temporarily lost access to his line of credit. In or around February 2015, the Websters attempted to file their 2014 tax return but were prevented from doing so due to a fraudulent return already filed in their names. They had to pay their accountant an extra fee to submit an amended filing and had to manually file the tax return. Going forward, the Websters will have to file their taxes using a new security PIN provided to them by the IRS every year. In or around March 2015, the Websters received letters from Premera notifying them that their and their son's personal information may have been compromised. The Websters have

spent about 25 hours to date addressing issues arising from the Premera Breach, including numerous hours on the telephone attempting to resolve the fraudulent tax return.

112. Plaintiff Joann Welch is a resident of Moses Lake, Washington and was a Washington resident during the period of the Premera Breach. Plaintiff Welch has been a Blue Cross of Illinois policyholder for over a decade and makes partial premium payments through her former employer's retirement plan. She has received medical treatment in Washington State for the past 25 years. In or around March 2015, Plaintiff Welch received a letter from Premera notifying her that her personal information may have been compromised. Around the same time as the breach notification, she received an automated phishing call seeking her personal information and referencing her former employer. Prior to the Premera breach she had not received any such suspicious calls. Plaintiff Welch has spent about four hours to date addressing issues arising from the Premera Breach, including ordering and checking her credit report for fraudulent activity.

## V. CLASS ALLEGATIONS

### A. Nationwide Data Breach Class

113. Pursuant to Fed. R. Civ. P. 23(b)(1), (b)(2), and (b)(3), Plaintiffs assert statutory claims under the Washington Consumer Protection Act (First Claim for Relief) and the Washington data breach notification statute (Second Claim for Relief), and common law claims for negligence (Third Claim for Relief), contract implied-in-fact (Fifth Claim for Relief) and misrepresentation by omission (Tenth Claim for Relief) on behalf of a nationwide class defined as follows:

> **Nationwide Data Breach Class**: All persons in the United States whose Sensitive Information was maintained on Premera's database and compromised as a result of the breach announced by Premera on or around March 17, 2015.

**1. Nationwide Premera Policyholder and Plan Administration Subclass**

114. Plaintiffs Fuerst, Imbler, Emerson, Kunz, Fitch, Gregory, Forseter, Blackwolfe, Chakraborty, Kaplowitz, Hirsh, Purcell, Bushman, Ailey, Allred, Black, Christopherson, Foulon, Hayes, Lynch, McLallen, Prakash, Webster, and Welch assert their common law claims for breach of express contract (Fourth Claim for Relief), breach of implied contract (Fifth Claim for Relief), and unjust enrichment (Sixth Claim for Relief) on behalf of a nationwide subclass defined as follows:

> **Nationwide Premera Policyholder and Plan Administration Subclass**: All Nationwide Data Breach Class members who paid money to Premera prior to March 17, 2015 in exchange for health insurance or plan administration.

115. As alleged herein, Premera's headquarters are in Mountlake Terrace, Washington, its data centers and servers are located in Washington, and the Premera employees responsible for making decisions with respect to data security are based in Washington. Premera's conduct resulting in the data breach took place exclusively, or primarily, in Washington. Premera, being headquartered in Washington, would reasonably expect to be bound by the laws of Washington. Furthermore, the majority of the Nationwide Data Breach Class members are residents of the state of Washington. Accordingly, applying Washington law to the claims of the Nationwide Data Breach Class and Nationwide Premera Policyholder and Plan Administration Subclass is appropriate.

**B. Alternate Statewide Common Law Classes**

116. Pursuant to Fed. R. Civ. P. 23(b)(1), (b)(2), and (b)(3), and in the alternative to the common law claim for negligence asserted on behalf of the Nationwide Data Breach Class,

117. Plaintiffs assert their common law claim for negligence (Third Claim for Relief) on behalf of separate statewide classes defined as follows:

> **Statewide [name of State] Common Law Classes**: All residents of [name of State] whose Sensitive Information was maintained on Premera's database and compromised as a result of the breach announced by Premera on or around March 17, 2015.

**1. Statewide Premera Policyholder and Plan Administration Subclasses**

118. Plaintiffs Fuerst, Imbler, Emerson, Kunz, Fitch, Gregory, Forseter, Blackwolfe, Chakraborty, Kaplowitz, Hirsh, Purcell, Bushman, Ailey, Allred, Black, Christopherson, Foulon, Hayes, Lynch, McLallen, Prakash, Webster, and Welch assert their common law claims for breach of contract (Forth Claim for Relief), breach of implied contract (Fifth Claim for Relief), unjust enrichment (Sixth Claim for Relief), and misrepresentation by omission (Tenth Claim for Relief) on behalf of separate statewide subclasses defined as follows:

> **Statewide [name of State] Premera Policyholder and Plan Administration Subclasses**: All residents of [name of State] whose Sensitive Information was maintained on Premera's database and compromised as a result of the breach announced by Premera on or around March 17, 2015, and who paid money to Premera prior to March 17, 2015 in exchange for health insurance or plan administration.

**B. Alternate Statewide Statutory Classes**

119. Pursuant to Fed. R. Civ. P. 23(b)(1), (b)(2), and (b)(3), and in the alternative to the statutory claims asserted on behalf of the Nationwide Data Breach Class, Plaintiffs Emerson, Hansen-Bosse, Fitch, McKenzie, Gregory, Forseter, Blackwolfe, Kaplowitz, Hirsh, Purcell, Ailey, Black, Christopherson, Foulon, Hayes, Lynch, McLallen, Prakash, Webster, and Welch assert statutory claims for violation of state consumer protection statutes (Seventh Claim for Relief) and state data breach notification statutes (Eighth Claim for Relief) on behalf of separate statewide classes, defined as follows:

> **Statewide [name of State] Statutory Classes**: All residents of [name of State] whose Sensitive Information was maintained on Premera's database and compromised as a result of the breach announced by Premera on or around March 17, 2015.

120. Plaintiffs Emerson, Hansen-Bosse, Fitch, McKenzie, Gregory, Forseter, Blackwolfe, Kaplowitz, Hirsh, Purcell, Ailey, Black, Christopherson, Foulon, Hayes, Lynch, McLallen, Prakash, Webster, and Welch assert the state consumer protection statute claims (Seventh Claim for Relief) under the consumer protection laws of the following states: Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, Nevada, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Texas, Utah, Vermont, Washington, West Virginia, and Wyoming.

121. Plaintiffs Hansen-Bosse, Kaplowitz, Bushman, Ailey, Allred, Black, Christopherson, Foulon, Hayes, Lunch, McLallen, Prakash, Webster, and Welch assert the state data breach notification law claims (Eighth Claim for Relief) on behalf of separate statewide classes in and under the respective data breach statutes of the following states: California, Illinois, Iowa, Louisiana, Maryland, New Hampshire, New Jersey, North Carolina, South Carolina, Tennessee, Texas, Virginia, and Washington.

122. Plaintiff Hansen-Bosse also asserts claims for violation of the California Confidential Medical Information Act (Ninth Claim for Relief).

123. Excluded from the Classes and Subclass are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) governmental entities. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded, divided into further subclasses or modified in any other way.

**C. Certification Of The Proposed Classes And Subclasses Is Appropriate.**

124. Each of the proposed classes and subclasses meet the requirements for certification under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3).

125. **Numerosity**: The exact number of members of the Classes is unknown to Plaintiffs at this time, but on information and belief, there are approximately 11 million individuals in the Classes, making joinder of each individual member impracticable. Ultimately, members of the Classes will be easily identified through Premera's records.

126. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include:

a. Whether Defendant failed to safeguard Plaintiffs' and the Classes' Sensitive Information adequately;

b. Whether Defendant failed to protect or otherwise keep Plaintiffs' and the Classes' Sensitive Information secure, as promised;

c. Whether Defendant's storage of Plaintiffs' and the Classes' Sensitive Information in the manner alleged violated HIPAA, federal, state and local laws, or industry standards;

d. Whether Defendant engaged in unfair or deceptive practices by failing to safeguard Plaintiffs' and the Classes' Sensitive Information properly as promised;

e. Whether Defendant violated the consumer protection statutes applicable to Plaintiffs and each of the Classes;

f. Whether Defendant failed to notify Plaintiffs and members of the Classes about the security breach as soon as practical and without delay after the breach was discovered;

g. Whether Defendant acted negligently in failing to safeguard Plaintiffs' and the Classes' Sensitive Information;

h. Whether Defendant violated the California Confidential Medical Information Act;

i. Whether contracts existed between Defendant, on the one hand, and Plaintiffs and the members of the each of the Classes, on the other;

j. Whether Defendant's conduct described herein constitutes a breach of its contracts with Plaintiffs and the members of each of the Classes;

k. Whether Defendant should retain the money paid by Plaintiffs and members of each of the Classes to protect their Sensitive Information; and

l. Whether Plaintiffs and the members of the Classes are entitled to damages as a result of Defendant's conduct.

127. **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and the members of the Classes sustained damages as a result of Defendant's uniform wrongful conduct during transactions with them.

128. **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the members of the proposed Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

Case 2:21-cv-00616-BJR Document 1-1 Filed 11/05/20 Page 45 of 458

129. **Risks of Prosecuting Separate Actions**: This case is appropriate for certification because prosecution of separate actions would risk either inconsistent adjudications which would establish incompatible standards of conduct for the Defendant or would be dispositive of the interests of members of the proposed Classes.

130. **Policies Generally Applicable to the Classes**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Plaintiffs and proposed Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct towards members of the Classes, and making final injunctive relief appropriate with respect to the proposed Classes as a whole. Defendant's practices challenged herein apply to and affect the members of the Classes uniformly, and Plaintiffs' challenge of those practices hinges on Defendant's conduct with respect to the proposed Classes as a whole, not on individual facts or law applicable only to Plaintiffs.

131. **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the members of the Classes. The injuries suffered by each individual member of the Classes are relatively small in comparison to the burden and expense of individual prosecution of the litigation necessitated by Defendant's conduct. Absent a class action, it would be virtually impossible for individual members of the Classes to obtain effective relief from Defendant. Even if members of the Classes could sustain individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties, including the Court, and would require duplicative consideration of the legal and factual issues presented here. By contrast, a class action presents far fewer

management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court.

## II. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**Violation of the Washington Consumer Protection Act**
**(On behalf of Plaintiffs, the Nationwide Data Breach Class, and the Nationwide Premera Policyholder and Plan Administration Subclass)**

132. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

133. Plaintiffs and the Nationwide Data Breach Class are current and former members of Premera or those who received services from healthcare providers in the Premera network and who provided Premera with their Sensitive Information.

134. Defendant is headquartered in Washington; its strategies, decision-making, and commercial transactions originate in Washington; most of its key operations and employees reside, work, and make company decisions (including data security decisions) in Washington; and Defendant and many of its employees are part of the people of the State of Washington. The conduct that Plaintiffs challenge directly affects the people of the State of Washington.

135. Washington's Consumer Protection Act, RCW §§ 19.86.010, *et seq.* ("CPA"), protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

136. To achieve that goal, the CPA prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." RCW § 19.86.020.

137. Defendant expressly represented-including in its Notice of Privacy Practices, Code of Conduct, public statements, and other consumer-facing representations-that it would safeguard and protect Sensitive Information, including in accordance with HIPAA regulations,

federal, state and local laws, and industry standards. Premera's specific representations are set forth above in paragraphs 40-46. Premera made these representations available to the Nationwide Data Breach Class at all times (including through its website) and at the time that Class Members received services from its healthcare facilities. These representations were made to the Nationwide Premera Policy Holder and administration Subclass in the enrollment process.

138. Consistent with its representations, Defendant accepted responsibility for securing Plaintiffs' and the Nationwide Data Breach Class's Sensitive Information. Given that it was Defendant's responsibility for creating, overseeing, maintaining, and otherwise implementing its own data security practices, Defendant knew (or should have known) that it was not adequately protecting Plaintiffs' or the Nationwide Data Breach Class's Sensitive Information in accordance with its express guarantees. This is particularly true given the many warning signs that Premera's systems were at risk of a breach-including those affecting the larger healthcare industry (e.g., the many other medical data breaches and warning of the Federal Bureau of Investigation's Cyber Division) and those relating to Premera's own security (e.g., the findings of the U.S. Office of Personnel Management investigation of Premera's own systems). See especially paragraphs48-50 infra.

139. Despite this knowledge, Defendant failed to disclose that its data security systems and practices did not comport with the express representations set forth above in paragraph 40-46, and otherwise described herein. In sum, and as set forth specifically above in paragraphs 67-70, Defendant did not disclose that it did not take appropriate steps to secure electronic systems from unauthorized use, did not ensure that authorized personal had access to Sensitive Information only to the extent necessary to conduct their business, and did not meet its obligations under HIPAA and other state, local, and federal laws. Instead, Defendant continued

to represent that its data security system was secure, even though it knew (or should have known) that it was not.

140. Premera's conduct was deceptive. By failing to honestly disclose its true data security practices at the time that it accepted and maintained the Sensitive Information of Plaintiffs and members of the Nationwide Data Breach Class, Premera made affirmative misrepresentations and, thus, engaged in deceptive acts or practices.

141. Given that Defendant alone knew about the true state of its data security and privacy practices and Defendant also knew that no reasonable consumer would purchase insecure health insurance services (i.e., services that did not comport with a provider's own representations about its data security, or its other duties to comply with applicable law and/or industry standards), Defendant purposefully used its inflated representations of data security and privacy protocols, which it knew were false at the time they were made to consumers, to mislead Plaintiffs into using and/or paying for its insecure services. Premera's conduct therefore had the capacity to deceive a substantial portion of the public.

142. Prior to the Premera's public announcement of the data breach, neither Plaintiffs, nor members of the Nationwide Data Breach Class, nor the general public could have known that Defendant was not implementing the data security and privacy protocols in accordance with its own consumer-facing representations and applicable duties. Defendant knew that Plaintiffs and the Nationwide Data Breach Class would not allow Defendant access to their Sensitive Information-and thereby not give Defendant their business-if they knew Defendant could not and would not protect their Sensitive Information as it represented. And rather than implement the data security and privacy protocols it promised-including by timely notifying Plaintiffs and the Nationwide Data Breach Class promptly about the data breach-Defendant actively concealed its

true practices and protocols (which were of material concern to all of its customers) in order to lead consumers to give Defendant access to their Sensitive Data, while at the same time expressly promising that Sensitive Information would be protected as described above.

143. Premera's conduct was also unfair. By failing to disclose its compliance with its own data security representations and other obligations, Premera engaged in unfair acts or practices. Premera made the data security representations discussed above to attract consumers-including Plaintiffs and members of the Nationwide Data Breach Class-who were concerned about the privacy and security of their Sensitive Information.

144. Premera, however, failed to make good on its promises of data security by not investing the necessary resources in its cybersecurity program, not promptly notifying Plaintiffs and the Nationwide Data Breach Class promptly about the data breach, and otherwise not living up to the specific representations and obligations set forth above in paragraphs 40-46. Given the known risk of maintaining Sensitive Information with lax cybersecurity practices, Premera's conduct was likely to cause substantial injuries to consumers.

145. As set out above, because only Premera knew (or should have known) that it was not complying with its own data security representations and obligations, there was no way for members of the public, including Plaintiffs and members of the Nationwide Data Breach Class, to avoid the injury caused by Premera's conduct. Further, Premera's failure to live up to its data security representations and obligations did not create any countervailing benefits.

146. Consumers-like Plaintiffs and members of the Classes-value their privacy. Companies (such as health insurers) that offer adequate data security protections are more valuable to consumers than those with substandard security practices. As such, consumers will,

Case 2:21-cv-00616-BJR Document 1-1 Filed 11/05/20 Page 50 of 458

if given the choice between two otherwise identical services, choose one with adequate security practices over one with substandard security practices.

147. Because of this consumer preference for data security, a healthcare benefits company safeguarding and protecting Sensitive Information in accordance with HIPAA regulations, federal, state and local laws, and industry standards-in addition with its own affirmative representations of its data security practices-commands a higher market price for its coverage than a provider with substandard security.

148. Based on the representations made by Defendant, Plaintiffs and the Nationwide Premera Policyholder and Plan Administration Subclass believed Defendant would adequately protect their Sensitive Information, those security protections were valuable to them, and the protections formed the basis of their bargain inasmuch as Plaintiffs and the Nationwide Premera Policyholder and Plan Administration Subclass would not have purchased healthcare benefits from Defendant at the prices charged (if at all) had Defendant disclosed its substandard security practices. Accordingly, Defendant's omission regarding its true protection practices was material.

149. To Plaintiffs and the Nationwide Premera Policyholder and Plan Administration Subclass, Defendant's as-promised healthcare benefits offered significantly more utility or value than what was delivered, which lacked meaningful security protections. Thus, to Plaintiffs and the Nationwide Premera Policyholder and Plan Administration Subclass, Defendant's secured healthcare benefits-as promised and paid-for-was substantially more valuable than the unsecure insurance received.

150. Accordingly, had Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration Subclass known that Defendant did not actually implement its promised

data security and privacy protocols, they would not have been willing to purchase its healthcare benefits at the prices charged, if they would have paid money at all.

151. Likewise, had Plaintiffs and members of the Nationwide Data Breach Class known that Defendant did not actually implement its promised data security and privacy protocols, they would not have been willing to provide Defendant with their Sensitive Information.

152. Defendant's failure to disclose its actual (and substandard) security practices substantially injured the public because it caused millions of consumers to enter into transactions they otherwise would not have, and because it compromised the integrity of Plaintiffs' and the Nationwide Class's Sensitive Information. Further, Defendant's use of substandard security did not create any benefits sufficient to outweigh the harm it caused.

153. Defendant's deceptive and unfair acts or practices occurred in its trade or business and has proximately caused injury to Plaintiffs and the putative Nationwide Class. Defendant's general course of conduct is injurious to the public interest, and such acts are ongoing and/or have a substantial likelihood of being repeated inasmuch as the long-lasting harmful effects of its misconduct may last for years (e.g., affected individuals could experience identity theft for years). As a direct and proximate result of Defendant's unfair acts, Plaintiffs and members of the Nationwide Data Breach Class have suffered actual injuries, including without limitation investing substantial time or money in monitoring and remediating the harm inflicted upon them.

154. As a result of Defendant's conduct, Plaintiffs and members of the Nationwide Data Breach Class have suffered actual damages, including the lost value of their privacy, the lost value of their personal data and lost property in the form of their breached and compromised Sensitive Information (which is of great value to third parties); ongoing, imminent, certainly

impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the deep web black market; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

155. Further, as a result of Defendant's conduct, Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration Subclass have suffered actual damages in an amount equal to the difference in the market value of the secure healthcare benefits they paid for and the unsecured healthcare benefits they received.

156. Accordingly, Plaintiffs, on behalf of themselves and members of the Nationwide Data Breach Class and Nationwide Premera Policyholder and Plan Administration Subclass, seek to enjoin further violation and recover actual damages and treble damages (where applicable), together with the costs of bringing this suit, including reasonable attorneys' fees.

157. With respect to injunctive relief, Plaintiffs, on behalf of themselves and members of the Nationwide Data Breach Class and Nationwide Premera Policyholder and Plan Administration Subclass, seek an Order requiring Premera to: (1) engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Premera's systems on a periodic basis, and ordering Premera to correct any problems or issues detected by such third-party security auditors promptly; (2) engage third-party security auditors and internal personnel to run automated security monitoring; (3) audit, test, and train its security personnel regarding any new or

modified procedures; (4) segment data by, among other things, creating firewalls and access controls so that if one area of Premera's network is compromised, hackers cannot gain access to other portions of Premera; (5) curing checks; (6) routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and (7) meaningfully educate all class members about the threats they face as a result of the loss of their confidential financial, personal, and health information to third parties, as well as the steps affected individuals must take to protect themselves.

## SECOND CLAIM FOR RELIEF

### Violation of Washington Data Breach Disclosure Law
### (On behalf of Plaintiffs and the Nationwide Data Breach Class)

158. Plaintiffs incorporate all the foregoing factual allegations as if fully set forth herein.

159. Plaintiffs allege additionally and alternatively that RCW § 19.255.010(2) provides that "[a]ny person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." *See* RCW § 19.255.010(2) (2005).

160. The data breach described in Section II resulted in an "unauthorized acquisition of computerized data that compromise[d] the security, confidentiality, [and] integrity of personal information maintained by" Defendant and, therefore, experienced a "breach of [its] security of [its] system", as defined by RCW § 19.255.010(4) (2005).

161. Defendant failed to disclose the breach of its network immediately, after discovering the breach. Instead, it waited months before notifying all affected individuals. Defendant unreasonably delayed informing Plaintiffs and members of the Nationwide Data Breach Class about the data breach after it knew or should have known that the data breach had occurred.

162. Defendant's failure to provide notice immediately after discovering the breach is a violation of RCW § 19.255.010.

## THIRD CLAIM FOR RELIEF

**Negligence**
**(On behalf of Plaintiffs and the Nationwide Data Breach Class or, alternatively, the Statewide Common Law Classes)**

163. Plaintiffs incorporate all the foregoing factual allegations as if fully set forth herein.

164. Plaintiffs allege additionally and alternatively that Premera required Plaintiffs and Nationwide Data Breach Class members or alternatively, members of the Statewide Common Law Classes, to submit Sensitive non-public personal health and financial information in order to obtain coverage under a health insurance policy and/or receive treatment in the Blue Cross Blue Shield network.

165. By collecting and storing this data, Premera had a duty of care to use reasonable means to secure and safeguard this personal and health information, to prevent disclosure of the information, and to guard the information from theft. Premera's duty included a responsibility to implement a process by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give immediate notice in the case of a data breach.

166. Furthermore, given the other major data breaches affecting the healthcare industry and the warnings provided by federal auditors that Premera's network-security procedures were

inadequate and that the vulnerabilities could be exploited by hackers and expose sensitive information (as described above), Plaintiffs and the Nationwide Data Breach Class members or alternatively, members of the Statewide Common Law Classes, are part of a well-defined, foreseeable, finite, and discernible group that was at high risk of having their Sensitive Information stolen.

167. Premera owed a duty to Plaintiff and members of the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes, to provide security consistent with industry standards, statutory requirements, and the other requirements discussed herein, and to ensure that its systems and networks—and the personnel responsible for them—adequately protected its consumers' Sensitive Information.

168. Premera admitted and assumed its duty to implement reasonable security measures as a result of its general conduct, internal policies and procedures, its Privacy Policy, and its Code of Conduct, in which Premera states that it is "committed to ensuring the security of our facilities and electronic systems to prevent unauthorized access to Premera's and our customers' personal protected information (PPI)." Through these and other statements, Premera specifically assumed the duty to comply with industry standards and HIPAA in protecting confidential information.

169. Premera's duty to use reasonable security measures arose as a result of the special relationship that existed between Premera and the Plaintiffs and the members of the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes. The special relationship arose because Plaintiffs and the members of the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes, entrusted Defendant with their confidential data, as part of the health treatment process. Only Premera was in a

Case 2:21-cv-00616-BJR Document 1-1 Filed 11/05/20 Page 56 of 458

position to ensure that its systems were sufficient to protect against the harm to Plaintiffs and the members of the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes, from a data breach.

170. Premera's duty to use reasonable security measures also arose under HIPAA, pursuant to which Premera is required to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). The confidential data at issue in this case constitutes "protected health information" within the meaning of HIPAA.

171. In addition, Premera had a duty to use reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data by healthcare benefit providers like Defendant. The FTC publications and data security breach orders described above further form the basis of Premera's duty.

172. Premera's duty to use reasonable care in protecting confidential data arose not only as a result of the common law and the statutes and regulations described above, but also because it was bound by, and had committed to comply with, industry standards for the protection of confidential Sensitive Information.

173. Premera breached its common law, statutory and other duties—and thus, was negligent—by failing to use reasonable measures to protect consumers' confidential data from hackers and by failing to provide timely notice of the at-issue breach. The specific negligent acts and omissions committed by Premera include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and proposed Nationwide Data Breach Class members' or alternatively, members of the Statewide Common Law Classes', confidential data;

b. Failing to monitor the security of its networks adequately;

c. Allowing unauthorized access to Plaintiffs' and the proposed Nationwide Data Breach Class members' or, alternatively, members of the Statewide Common Law Classes', confidential data;

d. Failing to recognize in a timely manner that Plaintiffs' and proposed Nationwide Data Breach Class members' or alternatively, members of the Statewide Common Law Classes', confidential data had been compromised; and

e. Failing to warn Plaintiffs and the members of the proposed Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes, in a timely manner that their Sensitive Information was likely to be and had been compromised.

174. It was foreseeable that Premera's failure to use reasonable measures to protect confidential data, to disclose to Plaintiffs its inadequate security system, and to provide timely notice of a breach of such data would result in injury to Plaintiffs and the members of the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes. Further, the breach of security, unauthorized access, and resulting injury to Plaintiffs and the members of the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes were reasonably foreseeable, particularly in light of the other major data breaches affecting the healthcare industry and the warning provided by federal auditors (described in Section I, above) that Premera's network-security procedures were

inadequate and that the vulnerabilities could be exploited by hackers and expose sensitive information.

175. It was therefore reasonably foreseeable that the failure to adequately safeguard confidential data would result in one or more of the following injuries to Plaintiffs and the members of the proposed Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the deep web black market; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

176. Accordingly, Plaintiffs, on behalf of themselves and members of the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes, seek an order declaring that Defendant's conduct constitutes negligence, and awarding them damages in an amount to be determined at trial.

177. Washington law should apply to the negligence claim of the Nationwide Class, or, alternatively, the negligence claims of the Statewide Common Law Classes should be governed by the law of each state in which such state specific claims are brought.

Case 2:21-cv-00616-BJR Document 1-1 Filed 11/05/20 Page 59 of 458

## FOURTH CLAIM FOR RELIEF

**Breach of Express Contract**
**(On behalf of Plaintiffs and the Nationwide Premera Policyholder and Plan Administration Subclass or, alternatively, the Statewide Premera and Plan Administration Policyholder and Plan Administration Subclasses)**

178. Plaintiffs incorporate all foregoing factual allegations as if fully set forth herein.

179. Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration Subclass or alternatively, members of the Statewide Premera Policyholder and Plan Administration Subclasses, allege additionally and alternatively that they entered into valid and enforceable contracts with Defendant whereby Defendant promised to provide healthcare and to protect their Sensitive information. Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration Subclass or alternatively, members of the Statewide Premera Policyholder and Plan Administration Subclasses, agreed to, among other things, pay money in consideration for such services.

180. Both the provision of healthcare and the protection of Plaintiffs' Sensitive Information were material aspects of Plaintiffs' and the Nationwide Premera Policyholder and Plan Administration Subclass members' or alternatively, members of the Statewide Premera Policyholder and Plan Administration Subclasses', agreements with Defendant.

181. As alleged in Paragraphs 39-46, above, Premera sends its Notice of Privacy Policy and its policy booklets to all members of the Nationwide Premera Policyholder and Plan Administration Subclass, forming an express contract requiring Premera to implement data security adequate to safeguard and protect the confidentiality of Sensitive Information.

182. Premera's policy booklets incorporate by reference Premera's company confidentiality policy, Code of Conduct, and Vendor/Contractor Privacy Basics in each of which, as alleged in Paragraphs 40-45, above, Premera explicitly promised to implement data security

that would comply with federal and state laws, as well as industry standards, and that would safeguard and protect the confidentiality of Sensitive Information.

183. Alternatively, the express contracts between Premera and Plaintiffs and members of Nationwide Premera Policyholder and Plan Administration Subclass (or alternatively, members of the Statewide Premera Policyholder and Plan Administration Subclasses) included implied terms requiring Premera to implement data security adequate to safeguard and protect the confidentiality of their Sensitive Information, including in accordance with HIPAA regulations, federal, state and local laws, and industry standards. No member of the Subclass would have entered into contracts with Premera without understanding that their Sensitive Information would be safeguarded and protected; stated otherwise, data security—as set forth in Premera's Notice of Privacy Practices, Code of Conduct, and Vendor/Contractor Privacy Basics—was an essential implied term of the Parties' express contract.

184. These contracts required that Defendant protect Plaintiffs' and the Nationwide Premera Policyholder and Plan Administration Subclass members' or alternatively, members of the Statewide Premera Policyholder and Plan Administration Subclasses', Sensitive Information and to prevent unauthorized access to such information.

185. Unfortunately, Defendant did not safeguard Plaintiffs' and the Nationwide Premera Policyholder and Plan Administration Subclass members' or alternatively, members of the Statewide Premera Policyholder and Plan Administration Subclasses', Sensitive Information. Specifically, Defendant did not comply with its promises to abide by HIPAA, federal, state and local laws, or industry standards, or otherwise protect individuals' Sensitive Information, as set forth above in paragraphs 67-69.

186. The failure to meet these promises and obligations constitutes a breach of express contract.

187. Because Defendant allowed unauthorized access to Plaintiffs' and the Nationwide Premera Policyholder and Plan Administration Subclass members' or alternatively, members of the Statewide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclasses', Sensitive Information and otherwise failed to safeguard it as promised, Defendant breached its contracts with Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclass (or alternatively, members of the Statewide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclasses).

188. A meeting of the minds occurred, as Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclass or alternatively, members of the Statewide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclasses, agreed to, among other things, provide Defendant with their accurate and complete information (including their Sensitive Information) and to pay Defendant in exchange for its agreement to, among other things, protect their Sensitive Information.

189. Defendant breached these contracts by failing to implement (or adequately implement) sufficient security measures to protect Plaintiffs' and the Nationwide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclass members' or alternatively, members of the Statewide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclasses', Sensitive Information.

Case 2:21-cv-00616-BJR Document 1-1 Filed 11/05/20 Page 62 of 458

190. Defendant's failure to fulfill its data security and management promises resulted in Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclass or alternatively, members of the Statewide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclasses, receiving healthcare benefits that was of less value than they paid for (i.e., healthcare benefits coverage without adequate protection of Plaintiffs Sensitive Information).

191. Defendant's failure to fulfill its data security and management promises resulted in Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclass or alternatively, members of the Statewide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclasses, losing the value of their privacy.

192. Stated otherwise, because Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclass or alternatively, members of the Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclasses, paid for privacy protections (as part of, among other things, their premiums) they did not receive what they paid for— even though such protections were a material part of their contracts with Defendant— i.e. the full benefit of their bargain.

193. As a result of Defendant's conduct, Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclass or alternatively, members of the Statewide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclasses, have suffered

damages because they did not get the benefit of the bargain, including but not limited to the difference in the value of the secure healthcare benefits they paid for and the insecure healthcare benefits they received.

194. As a result of Defendant's conduct, Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclass or alternatively, members of the Statewide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclasses, have suffered actual damages in an amount equal to the value of their privacy.

195. Accordingly, Plaintiffs, on behalf of themselves and the other members of the Nationwide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclass, or alternatively, the Statewide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclasses, seek an order declaring that Defendant's conduct constitutes breach of express contract, and awarding them damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

**Breach of Contract Implied-In-Fact**
**(On Behalf of Plaintiffs and the Nationwide Data Breach Class, or in the alterative, the Statewide Common Law Subclasses) (Plead in the Alternative to the Fourth Claim for Relief on Behalf of the Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclasses)**

196. Plaintiffs incorporate all the foregoing factual allegations as if fully set forth herein.

197. In order to procure Defendant's health insurance and/or other benefits, Plaintiffs and all Class members provided Defendant with their Sensitive Information.

198. By providing their Sensitive Information, and upon Defendant's acceptance of such information, Plaintiffs and all Class members, on one hand, and Defendant, on the other

Case 2:21-cv-00616-BJR Document 1-1 Filed 11/05/20 Page 64 of 458

hand, entered into implied-in-fact contracts for the provision of data security, separate and apart from any express contracts concerning health insurance or other benefits that such Plaintiffs or Class members may have had with Defendant.

199. These implied contracts between Defendant and all Class members obligated Defendant to take reasonable steps to secure and safeguard Class members' Sensitive Information. The terms of these implied contracts are further described in the federal laws, state law, local laws, and industry standards alleged above, and Defendant expressly assented to these terms in its Notice of Privacy Practices, Code of Conduct, and public statements, also alleged above.

200. Under these implied contracts for data security, Defendant was further obligated to provide Plaintiffs and all Class members, with prompt and sufficient notice of any and all unauthorized access and/or theft of their Sensitive Information.

201. Without such implied contracts, Plaintiffs and all Class members would not have provided their Sensitive Information to Defendant.

202. As described throughout, Defendant did not take reasonable steps to safeguard Plaintiffs' and other Class members' Sensitive Information.

203. Because Defendant allowed unauthorized access to Plaintiffs' Sensitive Information and failed to take reasonable steps to safeguard that information, Defendant breached its implied contracts with Plaintiffs and all Class members.

204. Plaintiffs and all Class members suffered damages as a result of Defendant's breach of its implied contracts in the amount of the value of the privacy that was lost in Plaintiffs' and other Class members' Sensitive Information, which amount will be determined at trial.

205. With regard to members of the Nationwide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclass, members of the Statewide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclasses, and any other Class members who paid Defendant for health benefits, Defendant's failure to fulfill its data security and management promises also resulted in such Plaintiffs and Class members receiving less than the benefit of their bargain (e.g., treatment without adequate data security and management practices).

206. Stated otherwise, because such Plaintiffs paid for privacy protections (as part of, among other things, premiums or other payments for health treatment) they did not receive what they paid for—even though such protections were a material part of their contracts with Defendant—i.e. the full benefit of their bargain.

207. As a result of Defendant's conduct, members of the Nationwide Premera Policyholder and Plan Administration SubclassPolicyholder and Plan Administration Subclass, members of the Statewide Premera Policyholder and Plan Administration Subclasses, and any other Class members who paid Defendant for healthcare, suffered damages because they did not get the benefit of their bargain, including but not limited to the difference in the value of the secure health benefits for which they paid and the insecure health benefits they received.

208. As a result of Defendant's conduct, Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration Subclass or alternatively, members of the Statewide Premera Policyholder and Plan Administration Subclasses, have suffered actual damages in an amount equal to the value of their privacy.

209. Accordingly, Plaintiffs, on behalf of themselves and all Class members, seek an order declaring that Defendant's conduct constitutes breach of contract implied-in-fact, and awarding them damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Quasi-Contract/Restitution/Unjust Enrichment
### (On behalf of Plaintiffs and the Nationwide Premera Policyholder and Plan Administration Subclass or, alternatively, the Statewide Premera Policyholder and Plan Administration Subclasses)

210. Plaintiffs incorporate all foregoing factual allegations as if fully set forth herein.

211. Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration Subclass or alternatively, members of the Statewide Premera Policyholder and Plan Administration Subclasses, allege additionally and alternatively that they conferred a monetary benefit on Defendant in the form of fees paid for healthcare benefits. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration Subclass or alternatively, members of the Statewide Premera Policyholder and Plan Administration Subclasses.

212. The fees for healthcare benefits that Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration Subclass or alternatively, members of the Statewide Premera Policyholder and Plan Administration Subclasses, paid (directly or indirectly) to Defendant were supposed to be used by Defendant, in part, to pay for the administrative costs of data management and security.

213. Defendant did not use such fees to pay for the administrative costs of data management and security.

214. As a result of Defendant's conduct, Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration Subclass or alternatively, members of the

Statewide Premera Policyholder and Plan Administration Subclasses, suffered actual damages in an amount equal to the difference in the free-market value of the secure healthcare benefits for which they paid and the insecure healthcare benefits they received.

215. Under principals of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and members of the Nationwide Premera Policyholder and Plan Administration Subclass, or alternatively, the Statewide Premera Policyholder and Plan Administration Subclasses, because Defendant failed to implement (or adequately implement) the data management and security measures that they paid for and that were otherwise mandated by HIPAA regulations, federal, state and local laws, and industry standards.

## SEVENTH CLAIM FOR RELIEF

**Violation of State Consumer Protection Laws**
***(In the Alternative to Count I)***
**(On behalf of Plaintiffs and the Statewide Statutory Classes)**

216. Plaintiffs incorporate all the foregoing allegations as if fully set forth herein.

217. Plaintiffs allege additionally and alternatively that the consumer protection laws listed below were enacted to protect consumers by promoting fair competition in commercial markets for goods and services. Specifically, they prohibit unlawful, unfair, deceptive, or fraudulent business acts or practices.

218. As described herein, Defendant has engaged in unlawful, unfair, and deceptive business acts or practices.

219. Based on its statutory and common law obligations, and as admitted and assumed by its own statements, Defendant had a duty to safeguard and protect Sensitive Information. Defendant expressly represented—including in its Notice of Privacy Practices, Code of Conduct, public statements, and other consumer-facing representations—that it would safeguard and

protect Sensitive Information in accordance with HIPAA regulations, federal, state and local laws, and industry standards. Premera's specific representations are set forth above in paragraphs 40–46. Defendant made these misrepresentations to Plaintiffs and the Statewide Statutory Subclasses when they enrolled in Defendant's health plans or agreed to provide Sensitive Information to Premera in exchange for coverage of healthcare services.

220. Consistent with its representations, Defendant accepted responsibility for securing Plaintiffs' and the Statewide Statutory Classes' Sensitive Information. Given that it was Defendant's responsibility for creating, overseeing, maintaining, and otherwise implementing its own data security practices, Defendant knew (or should have known) that it was not adequately protecting Plaintiffs' or the Statewide Statutory Classes' Sensitive Information in accordance with its express guarantees. This is particularly true given the many warning signs that Premera's systems were at risk of a breach—including those affecting the larger healthcare industry (e.g., the many other medical data breaches and warning of the Federal Bureau of Investigation's Cyber Division) and those relating to Premera's own security (e.g., the findings of the U.S. Office of Personnel Management investigation of Premera's own systems).

221. In particular, Defendant failed to disclose that its data security systems and practices did not comport with the express representations set forth above in paragraph 40–46, and otherwise described herein. As set forth specifically above in paragraphs 67-70, Defendant did not disclose that it did not take appropriate steps to secure electronic systems from unauthorized use, did not ensure that authorized personal had access to Sensitive Information only to the extent necessary to conduct their business, and did not meet its obligations under HIPAA and other state, local, and federal laws. In other words, Premera's data security representations amounted to affirmative misrepresentations or, at least, were misleading because

of Premera's failure to disclose its actual data security practices. Its conduct was therefore unlawful.

222. Consistent with its representations, Defendant accepted responsibility for securing Plaintiffs' and the Statewide Statutory Classes' Sensitive Information. Given that it was Defendant's responsibility for creating, overseeing, maintaining, and otherwise implementing its own data security practices, Defendant knew (or should have known) that it was not adequately protecting Plaintiffs' or the Statewide Statutory Classes' Sensitive Information in accordance with its express guarantees.

223. By failing to disclose its compliance with its own data security representations and other obligations, Premera engaged in unfair acts or practices. Premera made the data security representations discussed above to attract consumers—including Plaintiffs and members of the Statewide Statutory Classes —who were concerned about the privacy and security of their Sensitive Information.

224. Premera, however, failed to make good on its promises of data security by not investing the necessary resources in its cybersecurity program, not promptly notifying Plaintiffs and the Statewide Statutory Classes promptly about the data breach, and otherwise not living up to the specific representations and obligations set forth above in paragraphs 40-45. Given the known risk of maintaining Sensitive Information with lax cybersecurity practices, Premera's conduct was likely to cause substantial injuries to consumers.

225. As set out above, because only Premera knew (or should have known) that it was not complying with its own data security representations and obligations, there was no way for members of the public, including Plaintiffs and members of the Statewide Statutory Classes, to

Case 2:21-cv-00616-BJR Document 1-1 Filed 11/05/20 Page 70 of 458

avoid the injury caused by Premera's conduct. Further, Premera's failure to live up to its data security representations and obligations did not create any countervailing benefits.

226. Consumers—like Plaintiffs and members of the Statewide Statutory Classes—value their privacy. Services (including healthcare benefits) that offer greater data security protections are more valuable to consumers than those with substandard security practices. Consumers will, if given the choice between two otherwise identical services, choose one with adequate security practices over one with substandard security practices.

227. Because of this consumer preference for data security, a healthcare benefits company safeguarding and protecting Sensitive Information in accordance with HIPAA regulations, federal, state and local laws, and industry standards commands a higher market price for its coverage than a provider with substandard security.

228. Prior to the breach, neither Plaintiffs, nor members of the Statewide Statutory Classes, nor the general public knew that Defendant was not implementing data security and privacy protocols in accordance with its own consumer-facing representations and applicable duties. Defendant knew that Plaintiffs and the Statewide Statutory Classes would not allow Defendant access to their Sensitive Information—and thereby not give Defendant their business—if they knew Defendant could not and would not protect their Sensitive Information as it represented. And rather than implement the data security and privacy protocols it promised, Defendant actively concealed its true practices and protocols (which were of material concern to all of its customers) in order to lead consumers to give Defendant access to their Sensitive Data, while at the same time expressly promising that Sensitive Information would be protected as described above.

229. Based on the representations made by Defendant, Plaintiffs and the Statewide Statutory Classes believed Defendant would adequately protect their Sensitive Information, those security protections were valuable to them, and the protections formed the basis of their bargain inasmuch as Plaintiffs and the Statewide Statutory Classes would not have purchased healthcare benefits from Defendant at the prices charged (if at all) had Defendant disclosed its substandard security practices. Accordingly, Defendant's omission regarding the true protection standard was material.

230. To Plaintiffs and the Statewide Statutory Classes, Defendant's as-promised healthcare benefits offered significantly more utility or value than what was delivered, which lacked meaningful security protections. Thus, to Plaintiffs and the Statewide Statutory Classes, Defendant's secured healthcare benefits—as promised and paid-for—was substantially more valuable than the unsecure insurance received.

231. Accordingly, had Plaintiffs and members of the Statewide Statutory Classes known that Defendant did *not* actually implement its promised data security and privacy protocols, they would not have been willing to purchase its healthcare benefits at the prices charged, if they would have paid money at all.

232. Likewise, had Plaintiffs and members of the Statewide Statutory Classes known that Defendant did *not* actually implement its promised data security and privacy protocols, they would not have been willing to provide Defendant with their Sensitive Information.

233. Defendant's failure to disclose its substandard security practices substantially injured the public because it caused millions of consumers to enter into transactions they otherwise would not have, and because it compromised the integrity of Plaintiffs' and the

Statewide Statutory Classes' Sensitive Information. Further, Defendant's use of substandard security did not create any benefits sufficient to outweigh the harm it caused.

234. Defendant's unfair acts or practices occurred in its trade or business and have injured a substantial portion of the public. Defendant's general course of conduct is injurious to the public interest, and such acts are ongoing and/or have a substantial likelihood of being repeated inasmuch as the long-lasting harmful effects of its misconduct may last for years (e.g., affected individuals could experience identity theft years later). As a direct and proximate result of Defendant's unfair acts, Plaintiffs and members of the Statewide Statutory Classes have suffered and will suffer actual injuries. Accordingly, Defendant's inadequate data security measure practices and/or omissions regarding its data security and privacy-related practices constitutes unlawful, deceptive, and unfair conduct in violation of the following State-specific consumer protection laws:

a. Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522;

b. Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-107–108;

c. California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*;

d. California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

e. Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1);

f. Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110b, *et seq.*;

g. Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, §§ 2513, *et seq.*;

Case 2:21-cv-00616-BJR Document 1-1 Filed 11/05/20 Page 73 of 458

h. Delaware Deceptive Trade Practices Act, Del. Code Ann. Tit. 6, §§ 2532(5) and (7);

i. Hawaii Consumer Protection Act, Haw. Rev. Stat. Ann. §§ 480-2(a), *et seq.*;

j. Hawaii Deceptive Trade Practices Act, Haw. Rev. Stat. Ann. §§ 481A-3(a)(5), (7), and (12), *et seq.*;

k. Idaho Consumer Protection Act, Idaho Code Ann. §§ 48-603, *et seq.*;

l. Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. §§ 505/2, *et seq.*;

m. Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. Ann. §§ 510/2, *et seq.*;

n. Indiana Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-3(a), (b)(1), and (2), *et seq.*;

o. Iowa Consumer Fraud Act, Iowa Code §§ 714H.3 and 714H.5, *et seq.*;

p. Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-626(a) and (b)(1)(A), (D) and (b)(3), *et seq.*;

q. Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.170(1) and (2), *et seq.*;

r. Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, § 207, *et seq.*;

s. Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. tit. 10, § 1212(1)(E) and (G), *et seq.*;

Case 2:21-cv-00616-BJR Document 1-1 Filed 11/05/20 Page 74 of 458

t. Maryland Consumer Protection Act, Md. Code Ann. Com. Law, § 13-301(1), (2)(i)-(ii),(iv), (5)(i), and (9)(i), *et seq.*;

u. Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 2(a), *et seq.*;

v. Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.903(1)(c), (e), (s), and (cc), *et seq.*;

w. Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1(5), (7), and (13), *et seq.*;

x. Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, and Minn. Stat. § 8.31, subd. 3(A);

y. Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. §§ 30-14-103;

z. Nebraska Consumer Protection Act, Neb. Rev. Stat. Ann. § 59-1602;

aa. Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. Ann. § 87-302(A)(5) and (7);

bb. New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2(V) and (VII);

cc. New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2;

dd. New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-2(D)(5)(7), (14), and 57-12-3;

ee. Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. § 598.0915(5) and (7);

ff. New York Business Law, N.Y. Gen. Bus. Law § 349(A);

gg. North Carolina Unfair Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1.1(A);

hh. North Dakota Unlawful Sales or Advertising Practices Law, N.D. Cent. Code § 51-15-02;

ii. Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.02(A) and (B)(1) and (2);

jj. Oklahoma Consumer Protection Act, Okla. Stat. Ann. § 753(5), (7), and (20);

kk. Oklahoma Deceptive Trade Practices Act, Okla. Stat. Ann. tit. 78, § 53(A)(5) and (7);

ll. Oregon Unfair Trade Practices Act, Or. Rev. Stat. § 646.608(1)(E), (G), and (U);

mm. Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-2(4)(V), (VII), (XXI), and 201-3;

nn. Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1(6)(V), (VII), (XII), (XIII), and (XIV);

oo. South Dakota Deceptive Trade Practices Act and Consumer Protection Act, S.D. Codified Laws § 37-24-6(1);

pp. Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.46(A), (B)(5) and (7);

qq. Utah Consumer Sales Practices Act, Utah Code Ann. § 13-11-4(1) and (2)(A), (B), and (I);

rr. Vermont Consumer Fraud Act, 9 Vt. Stat. Ann. Tit. 9, § 2453(A);

Case 2:21-cv-00616-BJR Document 1-1 Filed 11/05/20 Page 76 of 458

ss. Washington Consumer Protection Act, Wash. Rev. Code RCW §§ 19.86.010, *et seq.*;

tt. West Virginia Consumer Credit and Protection Act, W. Va. Code Ann. § 46A-6-104; and

uu. Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-105(a), (i), (iii), and (xv).

235. As a result of Defendant's conduct, Plaintiffs and members of the Statewide Statutory Classes have suffered actual damages, including from the lost value of their privacy, the lost value of their personal data and lost property in the form of their breached and compromised Sensitive Information (which is of great value to third parties); ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the deep web black market; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and other economic and non-economic harm. Plaintiffs also suffered damages because, among other things, Premera promised them one thing (health care with adequate identity protection), but provided them a different, less valuable thing (health care without it).

236. Accordingly, Plaintiffs, on behalf of themselves and members of the Statewide Statutory Classes, seek to enjoin further violation and recover actual damages (and treble damages where applicable).

237. With respect to injunctive relief, Plaintiffs, on behalf of themselves and members of the Statewide Statutory Classes, seek an Order requiring Premera to: (1) engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Premera's systems on a periodic basis, and ordering Premera to promptly correct any problems or issues detected by such third-party security auditors; (2) engage third-party security auditors and internal personnel to run automated security monitoring; (3) audit, test, and train its security personnel regarding any new or modified procedures; (4) segment data by, among other things, creating firewalls and access controls so that if one area of Premera's network is compromised, hackers cannot gain access to other portions of Premera's systems; (5) purge, delete, and destroy in a reasonably secure manner Sensitive Information not necessary for its provisions of services; (6) conduct regular database scanning and securing checks; (7) routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and (8) meaningfully educate all class members about the threats they face as a result of the loss of their confidential financial, personal, and health information to third parties, as well as the steps affected individuals must take to protect themselves.

## EIGHTH CLAIM FOR RELIEF

### Violation of State Data Breach Notification Laws
### *(In the alternative to Second Claim for Relief)*
### (On behalf of Plaintiffs and the Statewide Statutory Classes)

238. Plaintiffs incorporate all the foregoing factual allegations as if fully set forth herein.

239. Plaintiffs allege additionally and alternatively that the data breach notification laws listed below were enacted to protect (or at least mitigate damage for) consumers from the

consequences associated with data breaches. In relevant part, those laws require that businesses that maintain consumer data (including Sensitive Information) notify the owner of any breach of that data in the most expedient time and manner possible and without unreasonable delay.

240. The data breach described in Section II resulted in a breach of Plaintiffs' and the Statewide Statutory Class Members' Sensitive Information.

241. Defendant failed to disclose the breach of Plaintiffs' and the Statewide Statutory Class members' Sensitive Information in the most expedient time possible inasmuch as, after discovering the breach, it waited months before notifying all affected individuals. Defendant unreasonably delayed informing Plaintiffs and members of the Statewide Statutory Class about the data breach after it knew or should have known that the data breach had occurred.

242. Defendant's failure to provide timely notice of the data breach violated the following State-specific data breach notification laws:

a. Cal. Civ. Code § 1798.80, *et seq.*;

b. Ill. Comp. Stat. Ann. 530/10, *et seq.*;

c. Iowa Code Ann. § 715C.2, *et seq.*;

d. La. Rev. Stat. Ann. § 51:3074, *et seq.*;

e. Md. Code Ann., Commercial Law § 14-3504, *et seq.*;

f. N.H. Rev. Stat. Ann. § 359-C:20, *et seq.*;

g. N.J. Stat. Ann. § 56:8-163, *et seq.*;

h. N.C. Gen. Stat. Ann. § 75-65, *et seq.*;

i. S.C. Code § 39-1-90, *et seq.*;

j. Tenn. Code Ann. § 47-18-2107, *et seq.*;

k. Tex. Bus. & Com. Code Ann. § 521.053, *et seq.*; and

Case 2:21-cv-00616-BJR Document 1-1 Filed 11/05/20 Page 79 of 458

l. Va. Code Ann. § 18.2-186.6, *et seq.*;

243. As a result of Defendant's conduct, Plaintiffs and members of the Statewide Statutory Class have suffered actual damages, including from the lost value of their personal data and lost property in the form of their breached and compromised Sensitive Information (which is of great value to third parties); ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the value of their privacy and loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the deep web black market; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

244. Accordingly, Plaintiffs, on behalf of themselves and members of the Statewide Statutory Class, seek all remedies available under their state data breach statute, including but not limited to (a) damages suffered by Plaintiffs and the Statewide Statutory Class members as alleged above, (b) equitable relief, including injunctive relief, and (c) reasonable attorney fees and costs, as provided by law.

## NINTH CLAIM FOR RELIEF

### Violation of the California Confidential Medical Information Act
### (On behalf of Plaintiff Hansen-Bosse and the Statewide California Statutory Class)

245. Plaintiffs incorporate all foregoing factual allegations as if fully set forth herein.

246. Plaintiffs allege additionally and alternatively that California's Confidential Medical Information Act was enacted to protect, among other things, the release of confidential medical information without proper authorization. *See* Confidential Medical Information Act,

Cal. Civ. Code §§ 56, *et seq*. ("CMIA"). To that end, the CMIA prohibits entities from negligently disclosing or releasing any person's confidential medical information. *See* Cal. Civ. Code § 56.36 (2013). The CMIA also requires that an entity, such as Defendant, that "creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein." Civ. Code § 56.101(a).

247. As described throughout this Complaint, Defendant negligently disclosed and released Plaintiffs' and the Statewide California Subclass members' Sensitive Information inasmuch as it did not implement adequate security protocols to prevent unauthorized access to Sensitive Information, maintain an adequate electronic security system to prevent data breaches, or employ industry standard and commercially viable measures to mitigate the risks of any data breach or otherwise comply with HIPAA data security requirements.

248. As a direct and proximate result of Defendant's negligence, it disclosed and released Plaintiffs' and the Statewide California Statutory Class members' Sensitive Information to hackers.

249. Accordingly, Plaintiffs, on behalf of themselves and members of the Statewide California Statutory Class, seek to recover actual, nominal (including $1000 nominal damages per disclosure under § 56.36(b)), and statutory damages (including under § 56.36(c)) where applicable, together with reasonable attorneys' fees and costs.

## TENTH CLAIM FOR RELIEF

### Misrepresentation by Omission
### (On behalf of Plaintiffs and the Nationwide Data Breach Class or, alternatively, the Statewide Common Law Classes)

250. Plaintiffs incorporate all foregoing factual allegations as if fully set forth herein.

Case 2:21-cv-00616-BJR Document 1-1 Filed 11/05/20 Page 81 of 458

251. Premera knew or should have known that it failed to use sufficient measures to protect consumers' confidential data from hackers as described above.

252. Premera fraudulently, negligently, or recklessly concealed from, or failed to disclose to, the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes, the fact that the measures it employed to protect consumers' confidential data from hackers were insufficient because they did not comport with its affirmative representations and other legal obligations (specifically set out in ¶¶ 40-45) in the manner set forth above (specifically set out in ¶¶ 67-69).

253. Premera was under a duty to the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes, to disclose the insufficient nature of its security measures because: Premera was in a superior position to know the true state of the facts about the design of its security measures because the design of such security measures is not public and Premera made partial representations and disclosures about maintaining the confidentiality of confidential data without revealing that it had taken insufficient and incomplete measures to protect that information from hackers.

254. The facts not disclosed to the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes, are material facts in that a reasonable person would have considered those facts to be important in deciding whether or not to purchase insurance through Premera or otherwise allow Premera access to their Sensitive Information. Had the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes, known the insufficient nature of Premera's security measures, they would not have purchased insurance through Premera, would have paid less for it, or would not have permitted Premera to access their Sensitive Information in the first instance.

255. Premera intentionally, recklessly, or negligently concealed or failed to disclose the insufficient nature of its security measures for the purpose of inducing the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes, to act thereon, and the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes, justifiably relied to their detriment upon the truth and completeness of Premera's representations, including those set forth above in paragraphs 40-45. This is evidenced by the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes, purchase of insurance through Premera and their willingness to let their Sensitive Information enter Premera's systems.

256. In order to prevent its statements from being misleading or from being a half-truth, Defendant should have disclosed its true practices with regard to storing and safeguarding the Sensitive Information in its control. Specifically, Premera should have disclosed that it did not implement industry-standard access controls, that it did not fix known vulnerabilities in its electronic security protocols, failed to protect against reasonably anticipated threats, and otherwise did not comport with its public-facing representations and legal obligations as set forth above in paragraphs 67-69. Thus, even if Premera was in compliance with certain HIPAA regulations; applicable state, federal, and local laws; or representations it made to consumers and customers, including those described above in paragraphs 40-45, it still should have disclosed to consumers those regulations, laws, and representations that it did not follow or comply with, whether in whole or in part.

257. As a direct and proximate cause of Premera's misconduct, the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes, have suffered and will continue to suffer actual damages in ongoing, imminent, certainly impending threat of

identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the value of their privacy and loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the deep web black market; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and the difference in the free-market value of the secure healthcare benefits for which they paid and the insecure healthcare benefits they received.

258. Accordingly, Plaintiffs, on behalf of themselves and members of the Nationwide Data Breach Class or alternatively, members of the Statewide Common Law Classes, seek an order declaring that Defendant's conduct constitutes a misrepresentation, and awarding them damages in an amount to be determined at trial.

259. Washington law should apply to the misrepresentation claim of the Nationwide Class, or, alternatively, the claims of the Statewide Common Law Classes should be governed by the law of each state in which such state specific claims are brought.

## III. REQUEST FOR RELIEF

Plaintiffs, on behalf of themselves and the Classes, respectfully request that this Court enter an Order:

1. Certifying this case as a class action on behalf of Plaintiffs and the Classes defined above, appointing Plaintiffs as representatives of their respective Classes, and appointing Interim Lead Counsel as Class Counsel;

2. Declaring that Premera's actions, as described above, constitute violations of the Washington Consumer Protection Act and the Washington Data Breach Disclosure law; Negligence; Breach of Express Contract; Breach of Implied Contract; Restitution/Unjust

Enrichment; violations of the consumer protection laws of Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Kentucky, Maryland, Massachusetts, New Jersey, Oregon, and Texas; violations of the data breach notification laws of California, Illinois, Maryland, New Jersey, Tennessee, and Texas; and violations of the California Confidential Medical Information Act.

3. Awarding injunctive and other equitable relief as is necessary to protect the interests of the Classes, including an order (i) prohibiting Premera from engaging in the wrongful and unlawful acts described herein, and (ii) requiring Premera to protect all data collected through the course of its business in accordance with HIPAA regulations, federal, state and local laws, and industry standards; (iii) requiring Premera to engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Premera's systems on a periodic basis, and ordering Premera to promptly correct any problems or issues detected by such third-party security auditors; (iv) requiring Premera to engage third-party security auditors and internal personnel to run automated security monitoring; (v) requiring Premera to audit, test, and train its security personnel regarding any new or modified procedures; (vi) requiring Premera to segment data by, among other things, creating firewalls and access controls so that if one area of Premera's network is compromised, hackers cannot gain access to other portions of Premera's systems; (vii) requiring Premera to purge, delete, and destroy in a reasonably secure manner Sensitive Information not necessary for its provisions of services; (viii) requiring Premera to conduct regular database scanning and securing checks; (ix) requiring Premera to routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

(x) requiring Premera to meaningfully educate all class members about the threats they face as a result of the loss of their confidential financial, personal, and health information to third parties, as well as the steps affected individuals must take to protect themselves.

4. Awarding actual, statutory, exemplary and punitive damages to Plaintiffs and the Classes, where applicable, in an amount to be determined at trial;

5. Awarding restitution to Plaintiffs and the Classes in an amount to be determined at trial;

6. Awarding Plaintiffs and the Classes their reasonable litigation expenses and attorneys' fees;

7. Awarding Plaintiffs and the Classes pre- and post-judgment interest, to the extent allowable;

8. Permitting Plaintiffs and the Classes to amend their pleadings to conform to the evidence produced at trial; and

9. Awarding such other and further relief as equity and justice may require.

## IV. JURY DEMAND

Plaintiffs request a trial by jury.

Case 2:21-cv-00616-BJR Document 1-1 Filed 11/05/20 Page 86 of 458

Dated: September 30, 2016

Respectfully submitted,

**TOUSLEY BRAIN STEPHENS, PLLC**

By: s/ Kim D. Stephens

Kim D. Stephens, OSB No. 030635
Christopher I. Brain, admitted *pro hac vice*
Chase C. Alvord, OSB No. 070590
Jason T. Dennett, admitted *pro hac vice*
1700 Seventh Avenue, Suite 2200
Seattle, WA 98101
Tel: (206) 682-5600
Fax: (206) 682-2992
Email: cbrain@tousley.com
kstephens@tousley.com
calvord@tousley.com
jdennett@tousley.com

*Interim Lead Plaintiffs' Counsel*

**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**

By: s/ Keith S. Dubanevich

Keith S. Dubanevich, OSB No. 975200
Steve D. Larson, OSB No. 863540
209 SW Oak Street, Suite 500
Portland, OR 97204
Tel: (503) 227-1600
Fax: (503) 227-6840
Email: kdubanevich@stollberne.com
slarson@stollberne.com

*Interim Liaison Plaintiffs' Counsel*

Ari J. Scharg
ascharg@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Tina Wolfson
twolfson@ahdootwolfson.com
AHDOOT AND WOLFSON, PC
1016 Palm Avenue
West Hollywood, CA 90069
Tel: 310.474.9111
Fax: 310.474.8585

James Pizzirusso
jpizzirusso@hausfeld.com
HAUSFELD LLP
1700 K. Street NW, Suite 650
Washington, DC 20006
Tel: 202.540.7200
Fax: 202.540.7201

*Plaintiffs' Executive Leadership Committee*

# SETTLEMENT AGREEMENT

This Settlement Agreement, dated as of May 29, 2019, is made and entered into by and among the following Settling Parties (as defined below): (i) Elizabeth Black, Catherine Bushman, Krishnendu Chakraborty, Maduhchanda Chakraborty, Ralph Christopherson, Anne Emerson, William Fitch, Eric Forseter, Mary Fuerst, Debbie Hansen-Bosse, Stuart Hirsch, Ilene Hirsh, Howard Kaplowitz, Barbara Lynch, and Kevin Smith (collectively, the "Representative Plaintiffs"), individually and on behalf of the Settlement Class (as defined below), by and through Kim D. Stephens of Tousley Brain Stephens PLLC, James Pizzirusso of Hausfeld LLP, Tina Wolfson of Ahdoot & Wolfson, PC, Karen Hanson Riebel of Lockridge Grindal & Nauen PLLP, and Keith Dubanevich of Stoll Berne (together, "Class Counsel"); and (ii) Premera Blue Cross and its Related Entities, as set forth in ¶ 1.31 (collectively "Premera"), by and through its counsel of record, lead counsel Paul Karlsgodt of Baker & Hostetler LLP and Darin Sands of Lane Powell LLP. The Settlement Agreement and related letter agreement, dated as of May 29, 2019 (the "Letter Agreement") are subject to Court approval and are intended by the Settling Parties to resolve, discharge, and settle fully, finally, and forever the Released Claims (as defined below), upon and subject to the terms and conditions hereof.

## RECITALS

*Whereas*, Premera is a nonprofit corporation under Washington law. Premera and its direct and indirect subsidiaries provide health benefit policies and plans for individuals in Washington, Oregon, and Alaska and numerous companies headquartered in those same states that cover employees working in all fifty (50) states and U.S. territories;

*Whereas*, in March 2015, Premera publicly announced that its computer network system was the target of an external criminal-cyberattack that began in May 2014, which is believed to have been perpetrated by an Advanced Persistent Threat group originating from China (the "Security Incident");

**EXHIBIT B**

*Whereas*, since the time the Security Incident was first discovered, Premera worked closely with cybersecurity professionals and federal law enforcement officials to identify the scope of the Security Incident and to remediate Premera's computer network systems;

*Whereas*, during the forensic investigation Premera learned that certain data that could have been accessed by the cyberattackers included Personal Information for patients of Premera customers, including names, addresses, birthdates, Social Security numbers, protected health information, telephone numbers, and the names of employers;

*Whereas*, on March 17, 2015, Premera publicly announced the Security Incident and subsequently mailed individual notice regarding the Security Incident to affected customers;

*Whereas*, following public disclosure of the Security Incident plaintiffs filed numerous lawsuits against Premera and affiliated entities over the Security Incident, including:

| **Case Name** | **Case Number** |
|---|---|
| *Devine v. Premera Blue Cross* | 3:15-cv-01157-SI |
| *Colcord v. Premera Blue Cross* | 3:15-cv-00516-SI |
| *Cushnie v. Premera Blue Cross* | 3:15-cv-01101-SI |
| *Blackwolfe et al v. Premera Blue Cross* | 3:15-cv-01102-SI |
| *Guenser v. Premera Blue Cross* | 3:15-cv-01103-SI |
| *Hoirup et al v. Premera Blue Cross* | 3:15-cv-01104-SI |
| *Cossey et al v. Premera Blue Cross* | 3:15-cv-01105-SI |
| *Forseter et al v. Premera Blue Cross* | 3:15-cv-01106-SI |
| *Archibald v. Premera Blue Cross* | 3:15-cv-01107-SI |
| *Woodford et al v. Premera Blue Cross* | 3:15-cv-01115-SI |
| *Webb et al v. Premera Blue Cross* | 3:15-cv-01156-SI |
| *Surman et al v. Premera Blue Cross* | 3:15-cv-01092-SI |
| *Purcell v. Premera Blue Cross et al* | 3:15-cv-00572-SI |
| *Kaplowitz v. Premera Blue Cross* | 3:15-cv-01153-SI |
| *Burkhardt v. Premera Blue Cross et al* | 3:15-cv-01155-SI |
| *Welch v. Premera Blue Cross* | 3:15-cv-01158-SI |
| *Powers v. Premera Blue Cross* | 3:15-cv-01159-SI |
| *Olson v. Premera Blue Cross* | 3:15-cv-01160-SI |
| *Emerson v Premera Blue Cross* | 3:15-cv-01161-SI |
| *Facchinello v. Premera Blue Cross et al* | 3:15-cv-01162-SI |
| *Hardan et al v. Premera Blue Cross* | 3:15-cv-01163-SI |
| *Christopherson v. Premera Blue Cross* | 3:15-cv-01164-SI |
| *Prothero v. Premera Blue Cross* | 3:15-cv-01165-SI |
| *Astengo et al v. Premera Blue Cross* | 3:15-cv-01166-SI |
| *Lynch v. Premera Blue Cross* | 3:15-cv-01167-SI |

| **Case Name** | **Case Number** |
| --- | --- |
| *Miller v Premera Blue Cross* | 3:15-cv-01168-SI |
| *Eykel v. Premera Blue Cross* | 3:15-cv-01169-SI |
| *Fuerst v. Premera Blue Cross* | 3:15-cv-01170-SI |
| *Kaihoi v. Premera et al* | 3:15-cv-01171-SI |
| *Dudley v. Premera Blue Cross* | 3:15-cv-01172-SI |
| *Underwood v. Premera Blue Cross* | 3:15-cv-01154-SI |
| *Black v. Premera Blue Cross* | 3:15-cv-01262-SI |
| *Chakraborty et al v. Premera Blue Cross* | 3:15-cv-01263-SI |
| *Green v. Premera Blue Cross, et al* | 3:15-cv-01264-SI |
| *Fitch v. Premera Blue Cross* | 3:15-cv-01265-SI |
| *Flint v. Premera Blue Cross* | 3:15-cv-01266-SI |
| *Cummings v. Premera Blue Cross* | 3:15-cv-01267-SI |
| *Shores et al v. Premera Blue Cross* | 3:15-cv-01268-SI |
| *Danis et al v. Premera Blue Cross* | 3:15-cv-01392-SI |
| *Hansen-Bosse v. Premera Blue Cross* | 3:15-cv-01472-SI |
| *Imbler et al v. Premera Blue Cross* | 3:17-cv-01648-SI |

*Whereas*, on June 15, 2015, the United States Judicial Panel on Multi-District Litigation consolidated all pending and future federal court cases over the Security Incident for coordinated pretrial proceedings under 28 U.S.C. § 1407 in the District of Oregon before the Honorable Michael H. Simon, captioned as *In Re: Premera Blue Cross Customer Data Security Breach Litigation*, No. 3:15-md-2633-SI (D. Or.) (the "Multi-District Litigation" proceedings);

*Whereas*, over the course of numerous months the Settling Parties engaged in extensive and arm's length settlement negotiations, including in three formal sessions of mediation with the aid of the Honorable Jay C. Gandhi (Ret.) of JAMS on October 26, 2018, and with the aid of the Honorable Jay C. Gandhi (Ret.) and Peter K. Rosen, Esq. of JAMS on January 24, 2019 and January 25, 2019, as well as numerous informal in-person and phone discussions, and in May 2019 reached a preliminary agreement on terms for a nationwide class action settlement;

*Whereas*, this Agreement sets forth the final understanding of the Settling Parties regarding the settlement of the Multi-District Litigation proceedings against Premera over the Security Incident;

*Whereas*, pursuant to these terms, this Settlement Agreement provides for the resolution of all claims and causes of action asserted, or that could have been asserted against Premera and the

Released Persons relating to the Security Incident, by and on behalf of the Representative Plaintiffs and Settlement Class Members, including any and all appellate rights, against Premera relating to the Security Incident (collectively, the "Litigation");

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and among Representative Plaintiffs, individually and on behalf of the Settlement Class, Class Counsel, and Premera that, subject to the approval of the Court, the Litigation and the Released Claims shall be finally and fully compromised, settled, and released, and the Litigation shall be dismissed with prejudice as to the Settling Parties and the Settlement Class, except those members of the Settlement Class who properly opt out of the Settlement Agreement, upon and subject to the terms and conditions of this Settlement Agreement and related Letter Agreement, as follows:

## I. DEFINITIONS.

As used anywhere in the Settlement Agreement, including the Recitals, the following terms have the meanings specified below:

**1.1** "Administration Expenses" means any and all reasonable fees, costs, and charges incurred, charged, or invoiced by the Settlement Administrator relating to the administration and notice of the Settlement, including but not limited to: (i) the reasonable costs and expenses that are associated with disseminating the notice to the Settlement Class, including, but not limited to, the Class Notice and the performance of the Notice Plan; (ii) the reasonable costs and expenses that are associated with the maintenance of the Qualified Settlement Fund as provided in this Agreement; (iii) the payment of Taxes, if any; and (iv) the reasonable costs and expenses of reviewing Claims and distributing the Qualified Settlement Fund to Settlement Class Members.

**1.2** "Agreement" or "Settlement Agreement" or "Settlement" means this Settlement Agreement and the settlement embodied herein, including all attached Exhibits (which are an integral part of this Settlement Agreement and Release and are incorporated in their entirety by reference), including all subsequent written amendments executed by the Settling Parties and including exhibits to such amendments, and the terms of the related Letter Agreement.

**1.3** "Approved Claim" means a Claim in an amount approved by the Settlement Administrator, as set forth in this Agreement.

**1.4** "Claim Form" means the form made available to Settlement Class Members substantially in the form of Exhibit E hereto. The Claim Form must be submitted physically (via U.S. Mail) or electronically (via the Settlement Website) by Settlement Class Members who wish to file a Claim for their given share of the settlement benefits pursuant to the terms and conditions of this Agreement. The Claim Form shall be available for download and online submission on the Settlement Website and available in hard copy form upon written or telephonic request. The Claim Form may be utilized to submit a Claim for all benefits available to Settlement Class Members pursuant to this Agreement.

**1.5** "Claim" means a claim for settlement benefits made under the terms of this Settlement Agreement.

**1.6** "Claims Deadline" means the postmark deadline for valid Claims pursuant to ¶ 5.6.

**1.7** "Claims Period" means the period of time during which Settlement Class Members may submit Claims Forms to receive their given share of the Qualified Settlement Fund and shall commence on the Notice Date and shall end on the date one hundred fifty (150) days thereafter.

**1.8** "Class Counsel" means Kim D. Stephens of Tousley Brain Stephens PLLC, James Pizzirusso of Hausfeld LLP, Tina Wolfson of Ahdoot & Wolfson, PC, Karen Hanson Riebel of Lockridge Grindal & Nauen PLLP, and Keith Dubanevich of Stoll Berne.

**1.9** "Class Notice" means the notice provided to the Settlement Class of the class action status and proposed settlement of the Litigation, as set forth in this Agreement.

**1.10** "Credit Monitoring and Insurance Services" means the services to be provided to Settlement Class Members by Identity Guard, as further set forth in ¶ 4.6 of this Agreement.

**1.11** "Effective Date" means the first date by which all events and conditions specified in ¶ 12.1 herein have occurred and been met.

**1.12** "Final" means the occurrence of all of the following events: (i) the settlement pursuant to this Settlement Agreement is approved by the Court; (ii) the Court has entered a Final

Approval Order and Judgment (as that term is defined herein); and (iii) the time to appeal from the Final Approval Order and Judgment has expired or, if appealed, the appeal has been dismissed in its entirety, or the Final Approval Order and Judgment has been affirmed in its entirety by the court of last resort to which such appeal may be taken, and such dismissal or affirmance has become no longer subject to further appeal or review. Notwithstanding the above, any order modifying or reversing any attorneys' fee award or incentive award made in this case shall not affect whether the Final Approval Order and Judgment is "Final" as defined herein or any other aspect of the Final Approval Order and Judgment.

**1.13** "Final Approval Order and Judgment" means an order and judgment that the Court enters in this Litigation after the Final Fairness Hearing, which finally approves the Settlement Agreement and dismisses the Litigation with prejudice and without material change to a proposed Final Approval Order and Judgment to be agreed-upon by the Settling Parties.

**1.14** "Litigation" means the consolidated class action captioned *In re Premera Blue Cross Customer Data Security Breach Litigation*, Case No. 3:15-md-2633-SI, now pending before the Honorable Michael H. Simon, in the United States District Court for the District of Oregon.

**1.15** "Long Form Notice" means the long form notice of settlement, substantially in the form attached hereto as Exhibit C.

**1.16** "Net Qualified Settlement Fund" means the amount of funds that remain in the Qualified Settlement Fund after funds are paid from or allocated for payment from the Qualified Settlement Fund for the following: (i) Administration Expenses, (ii) the expenses associated with procuring Credit Monitoring and Insurance Services on behalf of the Participating Settlement Class Members, (iii) any service awards approved by the Court, and (iv) any Fee Award and Costs approved by the Court.

**1.17** "Notice Date" means sixty (60) days after the Class Notice is first disseminated pursuant to the Notice Plan, either by (i) the publication of the Publication Notice, or (ii) the commencement of mailing of the agreed-upon individual Summary Notice to Settlement Class

Members via U.S. Mail and via email for those Settlement Class Members where Premera has an existing email address, whichever is earlier.

**1.18** "Notice Plan" means the method and process of disseminating the Class Notice and notice of the Settlement as described in ¶ 6.2 herein.

**1.19** "Notice Specialist" means an individual designated by agreement of the Settling Parties with recognized expertise in class action notice generally and data security litigation specifically, subject to Court approval. The Settling Parties agree to recommend that the Court appoint Cameron Azari as the Notice Specialist.

**1.20** "Objection Deadline" means the date by which Settlement Class Members must file and postmark all required copies of any written objections, pursuant to the terms and conditions herein, to this Settlement Agreement and to any application or motion for (i) the Fee Award and Costs, or (ii) Service Awards.

**1.21** "Opt-Out Date" means the date by which Settlement Class Members must mail their requests to be excluded from the Settlement Class in order for that request to be effective. The postmark date shall be the date of mailing for these purposes.

**1.22** "Opt-Out Period" means the period of time between the publication of the Publication Notice and Opt-Out Date.

**1.23** "Participating Settlement Class Member" means a Settlement Class Member who submits an Approved Claim for their given share of the settlement benefits pursuant to the terms and conditions of this Agreement.

**1.24** "Person" means an individual, corporation, partnership, limited partnership, limited liability company or partnership, association, joint-stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity, and their respective spouses, heirs, predecessors, successors, representatives, agents, and/or assignees.

**1.25** "Personal Information" means confidential information, including name, date of birth, mailing address, telephone number, email address, Social Security number, member

identification number, medical claim information, financial information, or any other protected health information as defined by the Health Insurance Portability and Accountability Act of 1996.

**1.26** "Plaintiffs' Counsel" means Class Counsel and the other attorneys who have represented plaintiffs in the Multi-District Litigation.

**1.27** "Preliminary Approval Order" means the order preliminarily approving the Settlement Agreement and ordering that notice be provided to the Settlement Class, as described in ¶ 6.1. The Settling Parties' proposed form of Preliminary Approval Order is attached as Exhibit F.

**1.28** "Publication Notice" means the print notice substantially in the form attached hereto as Exhibit D.

**1.29** "Qualified Settlement Fund" means the Thirty-Two Million Dollars and No Cents ($32,000,000.00) cash consideration that Premera will pay, pursuant to ¶ 3.1 of this Settlement, as part of the consideration for the release of all claims as provided in this Agreement.

**1.30** "Reasonable Documentation" means documentation supporting a Claim for Out-of-Pocket Losses, including, but not limited to, credit card statements, bank statements, invoices, telephone records, and receipts. Out-of-Pocket Losses cannot be documented solely by a personal certification, declaration, or affidavit from the Claimant; a Settlement Class Member must provide supporting documentation, except as provided in ¶ 4.3.3(b).

**1.31** "Related Entities" means Premera's past or present parents, subsidiaries, divisions, and related or affiliated entities of any nature whatsoever, whether direct or indirect, as well as each of Premera's and these entities' respective predecessors, successors, directors, officers, employees, principals, agents, attorneys, insurers, and reinsurers, and includes, without limitation, any Person related to any such entity who is, was or could have been named as a defendant in any of the actions related to the Security Incident in the Litigation, other than any individual who is found by a court of competent jurisdiction to be guilty under criminal law of initiating, causing, aiding or abetting the criminal activity occurrence of the Security Incident or who pleads *nolo contendere* to any such charge.

**1.32** "Released Claims" shall collectively mean any and all claims and causes of action including, without limitation, any causes of action for or under 18 U.S.C. § 2701 *et seq.*, and all similar statutes in effect in any states in the United States as defined herein; the Fair Credit Reporting Act, and all similar statutes in effect in any states in the United States as defined herein; State Consumer Laws, as alleged in ¶ 217 of plaintiffs' First Amended Consolidated Complaint, and all similar statutes in effect in any states in the United States as defined herein; negligence; negligence *per se*; breach of contract; breach of implied contract; breach of fiduciary duty; breach of confidence; invasion of privacy; misrepresentation (whether fraudulent, negligent or innocent); unjust enrichment; bailment; wantonness; failure to provide adequate notice pursuant to any breach notification statute or common law duty; and including, but not limited to, any and all claims for damages, injunctive relief, disgorgement, declaratory relief, equitable relief, attorneys' fees and expenses, pre-judgment interest, credit monitoring services, the creation of a fund for future damages, statutory damages, punitive damages, special damages, exemplary damages, restitution, the appointment of a receiver, and any other form of relief that either has been asserted, or could have been asserted, by or on behalf of any Representative Plaintiff or Settlement Class Member against any of the Released Persons based on, relating to, concerning, or arising out of the Security Incident and alleged theft of Personal Information or the allegations, facts, or circumstances described in the Litigation. Released Claims shall include Unknown Claims, but shall not include the right of any Settlement Class Member or any of the Released Persons to enforce the terms of the settlement contained in this Settlement Agreement, and shall not include the Claims of Settlement Class Members who have timely and properly opted out of the Settlement Agreement and thus excluded themselves from the Settlement Class.

**1.33** "Released Persons" means Premera and its Related Entities.

**1.34** "Representative Plaintiffs" means: Elizabeth Black, Catherine Bushman, Krishnendu Chakraborty, Maduhchanda Chakraborty, Ralph Christopherson, Anne Emerson, William Fitch, Eric Forseter, Mary Fuerst, Debbie Hansen-Bosse, Stuart Hirsch, Ilene Hirsh, Howard Kaplowitz, Barbara Lynch, and Kevin Smith.

**1.35** "Security Incident" means the cyberattack against Premera's computer systems that was publicly disclosed on March 17, 2015, as further described in the Recitals.

**1.36** "Settlement Administration" means the processing and payment of Claims received from Settlement Class Members by the Settlement Administrator.

**1.37** "Settlement Administrator" means, an experienced class action settlement and claims administrator generally, and specifically those of the type provided for and made in data breach litigation, subject to agreement of the Settling Parties and Court approval. The Settling Parties agree to recommend that the Court appoint Epiq as the Settlement Administrator.

**1.38** "Settlement Class" means: All persons in the United States whose Personal Information was stored on Premera's computer network systems that was compromised in the Security Incident as publicly disclosed on March 17, 2015. Excluded from the Settlement Class are: (1) the Judge presiding over the Action, and members of his family; (2) the Defendant, its subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers and directors; (3) Persons who properly execute and submit a request for exclusion prior to the expiration of the Opt-Out Period; and (4) the successors or assigns of any such excluded Persons.

**1.39** "Settlement Class List" means the list generated by Premera containing the last known name and mailing address for all persons that fall under the definition of the Settlement Class, which Defendant will provide to the Settlement Administrator no later than thirty (30) days following the date of the Preliminary Approval Order.

**1.40** "Settlement Class Member(s)" means a Person(s) who falls within the definition of the Settlement Class and who do not submit a timely and valid request for exclusion from the Settlement pursuant to ¶ 7.1 of this Settlement Agreement.

**1.41** "Settling Parties" means, collectively, Premera and the Representative Plaintiffs, individually and on behalf of the Settlement Class.

**1.42** "Summary Notice" means the summary notice of the proposed class action settlement, substantially in the form attached hereto as Exhibit B. The Summary Notice which will

direct recipients to the Settlement Website and inform Settlement Class Members, *inter alia*, of the Claims Deadline, the Opt-Out Date and Objection Deadline, and the date of the Final Fairness Hearing. The Summary Notice will include a perforated tear off which Settlement Class Members may utilize to submit a Claim for the settlement benefits set forth in ¶¶ 4.4–4.6.

**1.43** "Taxes" means: (a) all federal, state, or local taxes of any kind on any income earned on the Qualified Settlement Fund; and (b) the reasonable expenses and costs incurred by the Settlement Administrator in connection with determining the amount of, and paying, any taxes owed on interest accrued on the Qualified Settlement Fund (including, without limitation, reasonable expenses of tax attorneys and accountants).

**1.44** "Unknown Claims" means any of the Released Claims that any Settlement Class Member, including any of the Representative Plaintiffs, does not know or suspect to exist in his/her favor at the time of the release of the Released Persons that, if known by him or her, might have affected his or her settlement with, and release of, the Released Persons, or might have affected his or her decision not to object to and/or to participate in this Settlement Agreement. With respect to any and all Released Claims, the Settling Parties stipulate and agree that upon the Effective Date, the Representative Plaintiffs expressly shall have, and each of the other Settlement Class Members shall be deemed to have, and by operation of the Final Approval Order and Judgment shall have, waived the provisions, rights, and benefits conferred by California Civil Code § 1542, and also any and all provisions, rights, and benefits conferred by any law of any state, province, or territory of the United States (including, without limitation, Montana Code Ann. § 28-1-1602; North Dakota Cent. Code § 9-13-02; and South Dakota Codified Laws § 20-7-11), which is similar, comparable, or equivalent to California Civil Code §1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Settlement Class Members, including the Representative Plaintiffs, may hereafter discover facts in addition to, or different from, those that they now know or believe to be true with respect to the subject matter of the Released Claims, but the Representative Plaintiffs expressly shall have, and each other Settlement Class Member shall be deemed to have, and by operation of the Final Approval Order and Judgment shall have, upon the Effective Date, fully, finally, and forever settled and released any and all Released Claims. The Settling Parties acknowledge, and Settlement Class Members shall be deemed by operation of the Agreement to have acknowledged, that the foregoing waiver is a material element of the Settlement Agreement of which this release is a part.

**1.45** "United States" as used in this Settlement Agreement includes the fifty states, the District of Columbia, and all United States territories.

**II. REQUIRED EVENTS AND COOPERATION BY PARTIES.**

**2.1** For purposes of this Settlement Agreement and the proceedings contemplated herein, the Settling Parties stipulate and agree that the Representative Plaintiffs shall be appointed to represent the Settlement Class and Class Counsel shall be appointed to represent the Settlement Class.

**2.2** Class Counsel shall submit this Settlement Agreement and the related Letter Agreement to the Court and shall move the Court to enter the Preliminary Approval Order, in the form attached as Exhibit F.

**2.3** The Settling Parties shall, in good faith, cooperate, assist, and undertake all reasonable actions and steps in order to accomplish all requirements of this Agreement on the schedule set by the Court and subject to the terms of this Settlement.

**2.4** If the Settlement set forth in this Settlement Agreement and the related Letter Agreement is not approved by the Court, or if the Settlement Agreement is terminated or cancelled pursuant to the terms of this Settlement Agreement, this Settlement Agreement, and the certification of the Settlement Class provided for herein, will be vacated and the Litigation shall proceed as though the Settlement Class had never been certified, without prejudice to any Person's

or Settling Party's position. The Settling Parties' agreement to the certification of the Settlement Class is also without prejudice to any position asserted by the Settling Parties in any other proceeding, case or action, as to which all of their rights are specifically preserved.

**2.5** Premera shall provide notice of the Settlement to appropriate state and federal officials pursuant to 28 U.S.C. § 1715 ("CAFA Notice"), and no party shall request that an order giving final approval of the settlement be issued prior to the expiration of the time set forth in 28 U.S.C. § 1715(d).

**2.6** Class Counsel shall move the Court for a Final Approval Order and Judgment of this Settlement, to be issued following the Final Fairness Hearing; within a reasonable time after the Objection Deadline and Opt-Out Period, and at least ninety (90) days after Premera executes CAFA Notice.

## III. SETTLEMENT CONSIDERATION.

**3.1** In consideration for the Dismissal and Release of Claims, Premera agrees, in addition to implementing the business practice commitments described below in ¶ 4.8 and Exhibit A, to make a payment of Thirty-Two Million Dollars and No Cents ($32,000,000.00), to establish and create the non-reversionary settlement fund for the benefit of Settlement Class Members pursuant to the terms of this Settlement. Premera shall deposit that payment into a Qualified Settlement Fund as follows: (i) Premera shall pay Five Million Dollars and No Cents ($5,000,000.00) into the Qualified Settlement Fund within ten (10) business days after the Court enters the Preliminary Approval Order to cover reasonable costs associated with the Notice Plan and any other Administrative Expenses incurred prior to the Effective Date; (ii) Premera shall pay an additional amount sufficient to fund the payment of an award of Class Counsel's attorneys' fees, expenses, and costs into the Qualified Settlement Fund within ten (10) business days after the Court enters an order awarding such amount; and (iii) Premera shall pay the remaining amount of the Thirty-Two Million Dollars and No Cents ($32,000,000.00) non-reversionary settlement fund still due, after the payments under subsections (i) and (ii) of this paragraph have been paid, into the Qualified Settlement Fund within ten (10) business days after the Effective Date.

**3.2** Premera shall make such payments into an account established by the Settlement Administrator to be established and maintained as a qualified settlement fund within the meaning of Treasury Regulation § 1.468 B-1, and the Settlement Administrator, within the meaning of Treasury Regulation § 1.468 B-2(k)(3), shall be responsible for filing tax returns and any other tax reporting for or in respect of the Qualified Settlement Fund and paying from the Qualified Settlement Fund any Taxes owed with respect to the Qualified Settlement Fund. The account shall be an interest-bearing bank account deposit with a commercial bank with excess capital exceeding One Hundred Million Dollars and No Cents ($100,000,000.00), with an S&P Global rating of "A" or higher and in an account that is fully insured, up to the amount of the Qualified Settlement Fund, by the United States Government or the Federal Deposit Insurance Corporation. The Settling Parties agree that the Qualified Settlement Fund shall be treated as a qualified settlement fund from the earliest date possible and agree to any relation-back election required to treat the Qualified Settlement Fund as a qualified settlement fund from the earliest date possible. The Settlement Administrator shall provide an accounting of any and all funds in the Qualified Settlement Fund, including any interest accrued thereon and payments made pursuant to this Agreement, upon request of any of the Settling Parties.

**3.3** All Taxes relating to the Qualified Settlement Fund shall be paid out of the Qualified Settlement Fund, shall be considered an Administrative Expense, and shall be timely paid by the Settlement Administrator without prior order of the Court. Further, the Qualified Settlement Fund shall indemnify, defend, and hold harmless the Settling Parties and their counsel for Taxes (including, without limitation, taxes payable by reason of any such indemnification payments). The Settling Parties and their respective counsel have made no representation or warranty with respect to the tax treatment by any Representative Plaintiff or any Settlement Class Member of any payment or transfer made pursuant to this Agreement or derived from or made pursuant to the Qualified Settlement Fund. Each Representative Plaintiff and Settlement Class Member shall be solely responsible for the federal, state, and local tax consequences to him, her or it of the receipt of funds from the Qualified Settlement Fund pursuant to this Agreement.

**3.4** No amounts from the Qualified Settlement Fund may be withdrawn unless (i) expressly authorized by the Settlement Agreement or (ii) approved by the Court. Class Counsel may authorize the periodic payment of actual reasonable Administration Expenses from the Qualified Settlement Fund as such expenses are invoiced, without further order of the Court. The Settlement Administrator shall provide Class Counsel and Premera with notice of any withdrawal or other payment the Settlement Administrator proposes to make from the Qualified Settlement Fund before the Effective Date.

**3.5** The Qualified Settlement Fund shall be deemed to be in the custody of the Court and shall remain subject to the jurisdiction of the Court until such time as the entirety of the Qualified Settlement Fund is distributed pursuant to this Settlement Agreement or returned to those who paid the Qualified Settlement Fund only in the event this Settlement Agreement is voided, terminated, or cancelled.

**3.6** In the event this Settlement Agreement is voided, terminated, or cancelled pursuant to any provision of this Agreement: (i) the Representative Plaintiffs and Class Counsel shall have no obligation to repay any of the Administrative Expenses that have been paid or incurred in accordance with this Agreement; (ii) any amounts remaining in the Qualified Settlement Fund after payment of Administrative Expenses paid or incurred in accordance with this Agreement, including all interest earned on the Qualified Settlement Fund net of any Taxes, if any, and any funds paid out as attorneys' fees pursuant to ¶ 9.4 shall be returned to Premera; and (iii) no other Person or entity shall have any further claim whatsoever to such amounts.

**3.7** This Settlement is not a reversionary settlement, meaning that no portion of the Qualified Settlement Fund shall revert back to Premera unless this Settlement is voided, cancelled, or terminated. As of the Effective Date, all rights of Premera in or to the Qualified Settlement Fund shall be extinguished and, no portion of the Qualified Settlement Fund shall be returned to Premera.

## IV. Settlement Benefits.

**4.1** Each Settlement Class Member may qualify for the following benefits and distributions from the Net Qualified Settlement Fund as described below in ¶¶ 4.3–4.5.

**4.2** From the Net Qualified Settlement Fund specified above, no less than Ten Million Dollars and No Cents ($10,000,000.00) shall be used to fund the settlement provisions described below in ¶¶ 4.3–4.5.

**4.2.1** If the total amount of all Approved Claims exceeds the sum of funds available for disbursement in the Net Qualified Settlement Fund, the per-Claim amount shall be reduced *pro rata*, based on the amount of all allowed Claims.

**4.2.2** Unclaimed funds in the Net Qualified Settlement Fund will be distributed in accordance with ¶ 4.7.

**4.3** **Reimbursement for Out-of-Pocket Losses:**

**4.3.1** The Settlement Administrator will use the Net Qualified Settlement Fund to compensate those Settlement Class Members who submit valid Claims for Out-of-Pocket Losses (as defined below) that are plausibly traceable to the Security Incident. Individual Out-of-Pocket Claimants will be subject to an overall Claims cap of Ten Thousand Dollars and No Cents ($10,000.00) paid directly from the Net Qualified Settlement Fund regardless of the number of Claims for Out-of-Pocket Losses submitted by the Claimant during the Claims Period.

**4.3.2** "Out-of-Pocket Losses" are verifiable unreimbursed costs or expenditures that a Settlement Class Member actually incurred and that are plausibly traceable to the Security Incident. Out-of-Pocket Losses may include, without limitation, the following, subject to the provisions of ¶ 4.2:

(a) unreimbursed costs, expenses, losses or charges incurred as a result of identity theft or identity fraud, health insurance fraud, falsified tax returns, or other alleged misuse of Settlement Class Members' Personal Information;

(b) costs incurred on or after May 5, 2014, associated with freezing or unfreezing credit with any credit reporting agency;

(c) other miscellaneous expenses incurred related to any Out-Of-Pocket Loss such as notary, fax, postage, copying, mileage, and long-distance telephone charges;

(d) credit monitoring costs that were incurred on or after May 5, 2014, through the date of the Settlement Class Member's Claim submission; and

(e) hours for time spent taking actions intended to remedy fraud, identity theft, or other misuse of a Settlement Class Member's Personal Information that is plausibly traceable to the Security Incident.

**4.3.3** Settlement Class Members with Out-of-Pocket Losses must submit Reasonable Documentation supporting their Claims, with the exception that Settlement Class Members claiming Out-of-Pocket losses for time under ¶ 4.3.2(e) can receive reimbursement for such time expenditures subject to the following provisions:

(a) Settlement Class Members may submit a Claim for up to twenty (20) hours of time under ¶ 4.3.2(e) to be compensated at Twenty Dollars and No Cents ($20.00) per hour, subject to the overall cap in ¶ 4.3.1**,** provided the Settlement Class Members can provide Reasonable Documentation related to the time they spent remedying the issues described in ¶ 4.3.2.

(b) Settlement Class Members with Reasonable Documentation of a fraud, identity theft, or other alleged misuse of the Settlement Class Member's Personal Information plausibly traceable to the Security Incident, but who do not provide Reasonable Documentation related to their lost time may self-certify the amount of time they spent remedying the foregoing and file a Claim for up to five (5) hours at Twenty Dollars and No Cents ($20.00) per hour.

**4.4 Default Settlement Payments:**

**4.4.1** All Settlement Class Members who do not submit a Claim for settlement payments under ¶ 4.3 may request alternative compensation of up to Fifty Dollars and No Cents ($50.00) as settlement compensation for claims in this litigation ("Default Settlement Payments"). If the settlement payments for compensation under this and other provisions exceed the overall

Net Qualified Settlement Fund, then Default Settlement Payments shall be distributed *pro rata* to those making all valid Claims for compensation.

**4.4.2** Settlement Class Members seeking compensation under ¶ 4.4 must submit a Claim and verify that they are not seeking additional compensation under ¶ 4.3 of the Settlement.

**4.5 California Payment:**

**4.5.1** All Settlement Class Members who, as of March 17, 2015, resided in California and who received notice from Premera that their information may have been compromised in the Security Incident may submit Claims for an additional compensation of up to Fifty Dollars and No Cents ($50.00) ("California Settlement Payments") under the California Confidentiality of Medical Information Act ("CMIA"). If the settlement payments for compensation under this and other provisions exceed the overall Net Qualified Settlement Fund, then California Settlement Payments shall be distributed *pro rata*.

**4.5.2** Settlement Class Members seeking compensation under ¶ 4.5 must submit a Claim seeking this compensation.

**4.6 Credit Monitoring and Insurance Services:**

**4.6.1** In addition to the benefits and distributions from the Net Qualified Settlement Fund as described above in ¶¶ 4.3–4.5, all Settlement Class Members will also be eligible to enroll in two years of Credit Monitoring and Insurance Services. Because some Settlement Class Members may have existing credit monitoring services, a Settlement Class Member may elect to delay the start of the Credit Monitoring and Insurance Services received under this section for up to two years after the Effective Date. The Credit Monitoring and Insurance Services will provide certain services to each Participating Settlement Class Member, including: (i) Up to One Million Dollars and No Cents ($1,000,000.00) in reimbursement insurance covering future losses due to identity theft, stolen funds, etc.; (ii) three bureau credit monitoring providing notice of changes to the Settlement Class Member's credit profile; (iii) real time instant authentication alerts when someone attempts to make a change to the Settlement Class Member's personal account information; (iv) Dark Web Monitoring providing notification if the Settlement

Class Member's information such as Social Security number, credit card numbers, financial account numbers, and health insurance number are found on the Dark Web; (v) threat alerts about potential threats relevant to the Settlement Class Member (such as breaches, phishing scams, and malware vulnerabilities); and (vi) customer support and victim assistance, among other features.

**4.6.2** Settlement Class Members seeking to enroll in the free credit monitoring offered under this Agreement must submit a Claim Form seeking to be enrolled in the service and provide a valid email address for enrollment.

**4.6.3** The Settlement Administrator will allocate up to Three Million Five Hundred Thousand Dollars and No Cents ($3,500,000.00) out of the Qualified Settlement Fund to provide for the wholesale purchase of two (2) years of Credit Monitoring and Insurance Services for all Settlement Class Members making Claims. Any funds remaining will go back to the Net Qualified Settlement Fund for distribution to Class Members.

**4.7 Use of Remaining Settlement Funds:**

**4.7.1** Any remaining funds in the Net Qualified Settlement Fund after payment of valid Claims submitted under ¶¶ 4.3–4.5 during the Claims Period will be used as follows:

(a) First, payments to Settlement Class Members with valid Claims under ¶¶ 4.3–4.5 will be proportionally increased and distributed on a *per capita* basis.

(b) Second, if payments made as described in ¶ 4.7.1(a) above do not exhaust the Net Qualified Settlement Fund, additional credit monitoring services will be provided to those who have filed a valid Claim for such services under ¶ 4.6, to the extent the purchase of additional credit monitoring services is economically feasible in light of the amount of funds remaining in the Net Qualified Settlement Fund.

(c) To the extent any monies remain in the Net Qualified Settlement Fund more than one hundred and eighty (180) days after the distribution of settlement payments to the Settlement Class Members from uncashed checks, and it is economically unviable to redistribute any remaining funds to Settlement Class Members, any such residual funds shall be

distributed to a 26 U.S.C. § 501(c)(3) recipient approved by the Court or as otherwise directed by the Court after considering proposals from the Settling Parties.

**4.8 Business Practice Commitments:**

**4.8.1** As additional consideration for the Dismissal and Release of Claims, Premera covenants, warrants, and agrees to provide equitable injunctive relief in the form described in Exhibit A to this Settlement Agreement. The obligations set forth in Exhibit A shall terminate three (3) years from the date of the execution of this Agreement, unless otherwise specified in Exhibit A.

**4.8.2** The Settling Parties agree that plaintiffs and Class Counsel were a catalyst in causing Premera to undertake remedial measures it will or has already undertaken. Included in this Agreement, as negotiated between the Settling Parties, are minimum budgetary requirements for Premera until 2022, which are contractually mandated by this Agreement. Premera agrees that the difference between its yearly 2012-2014 security budgets and its contractually agreed budgets of $14 million per year from 2019 through 2022 under Exhibit A is at least equal to the cost of implementing and maintaining the obligations set forth in Exhibit A. Plaintiffs have retained an expert who has placed a value on the proposed injunctive relief. Premera neither challenges nor accepts that valuation, but agrees that the security remediation measures obtained by plaintiffs are of substantial value to the Settlement Class.

**V. Settlement Administration**

**5.1** A Settlement Administrator shall be selected by the Settling Parties, subject to Court Approval. The Settling Parties agree to recommend that the Court appoint Epiq as the Settlement Administrator, subject to the Court's approval. The Settlement Administrator shall be responsible for administrative tasks, which shall include, without limitation, (a) arranging for distribution of the Class Notice and Claim Form to Settlement Class Members; (b) making any mailings to Settlement Class Members required under this Agreement; (c) forwarding written inquiries from Settlement Class Members to Class Counsel or their designee; (d) establishing and maintaining the Settlement Website, subject to review and approval by the Settling Parties;

(e) qualifying Claims submitted by Settlement Class Members; (f) distributing cash payments to Settlement Class Members; (g) assisting Settlement Class Members in enrolling in Credit Monitoring and; (h) otherwise assisting with implementing and administering this Agreement.

**5.2** The Settlement Administrator shall make all reasonable efforts to administer the Settlement efficiently and to minimize and to avoid unnecessary Administration Expenses. The Settlement Administrator shall provide a detailed written accounting of all Administration Expenses on a regular basis to Class Counsel and Premera's counsel, and shall respond promptly to inquiries by any of them with respect to this Agreement and the Settlement.

**5.3** The Settlement Administrator shall administer and calculate the Claims submitted by Settlement Class Members under the terms described in Section IV - Settlement Benefits. Class Counsel and Premera shall be given reports as to both Claims and distribution and have the right to review and obtain supporting documentation and challenge such reports if they believe them to be inaccurate or inadequate. The Settlement Administrator's determination of the validity or invalidity of any such Claims shall be binding, subject to the dispute resolution process set forth in Section V - Settlement Administration.

**5.4 Submission of Claims.**

**5.4.1** Settlement Class Members may submit electronically verified Claim Forms and any documentation to the Settlement Administrator through the Settlement Website or may download Claim Forms to be filled out and submitted physically with documentation by mail to the Settlement Administrator. Claim Forms must be submitted electronically or postmarked during the Claims Period and on or before the Claims Deadline.

**5.4.2** The Settlement Administrator will review Claim Forms submitted by Settlement Class Members to determine whether they are eligible for settlement payment.

(a) The Settlement Administrator shall evaluate Claims for Out-of-Pocket Losses and determine whether the Claims are valid and plausibly traceable to the Security Incident. Out-of-Pocket Losses shall be deemed plausibly traceable to the Security Incident if (i) they were incurred on or after May 5, 2014, through the date of the Settlement Class Member's

Claim submission; (ii) the Settlement Class Member certifies that they incurred such Out-of-Pocket Losses as a result of the Security Incident; and (iii) the Settlement Class Member has Reasonable Documentation to support the Claims.

(b) If the Settlement Administrator rejects a Settlement Class Member's claims for Out-of-Pocket Losses, the Settlement Class Member shall automatically qualify for a Default Settlement Payment, and the Settlement Administrator shall automatically determine whether the Settlement Class Member is eligible for a Default Settlement Payment.

**5.4.3** The Settlement Administrator shall reject any Claim Forms that are incomplete, inaccurate, or not timely received, and is not required to, but may first request additional information. To the extent the Settlement Administrator determines a Claim for Out-of-Pocket Losses is deficient, within ten (10) days of making such a determination, the Settlement Administrator shall notify the Settlement Class Member of the deficiencies and give the Settlement Class Member thirty (30) days to cure the deficiencies. The Settlement Administrator shall have the sole discretion and authority to determine whether the Settlement Class Member has cured the deficient Claim.

**5.4.4** Information submitted by Settlement Class Members pursuant Section IV - Settlement Benefits of this Settlement Agreement shall be deemed confidential and protected as such by the Settling Parties and the Settlement Administrator.

**5.5** Settlement Class Members will be provided the option to receive any settlement payment due to them pursuant to the terms of this Agreement by check or by either PayPal, eCheck, as a credit to the Participating Settlement Class Member's Amazon account, or Venmo, to the extent payment by these methods is possible. In the event Settlement Class Members do not exercise this option, they will receive their given settlement payment via a physical check sent by U.S. Mail. Initial payments for Approved Claims shall be sent to Participating Settlement Class Members within sixty (60) days of the Effective Date or sixty (60) days after the end of the Claims Period, whichever is latest.

**5.6** Claim Forms must be postmarked or submitted electrically via the Settlement Website within one hundred fifty (150) days of the Notice Date.

**5.7** All Settlement Class Members who fail to submit a Claim for any benefits within the time frames set forth in this Agreement, or within such other period as may be ordered by the Court, shall be forever barred from receiving any payments or benefits pursuant to the Settlement, but will in all other respects be subject to, and bound by, the provisions of the Settlement, the Releases contained herein, and the Final Approval Order and Judgment.

**5.8** No Person shall have any claim against the Settlement Administrator, Premera, Class Counsel, Plaintiffs' Counsel, Premera's counsel, and/or the Representative Plaintiffs based on distributions of benefits to Settlement Class Members.

**5.9** The Settling Parties and the Settlement Administrator shall keep the Settlement Class List confidential and not use it for any purpose, other than to effectuate the terms of this Agreement.

**5.10 Settlement Administrator's Duties.**

**5.10.1** The Settlement Administrator will review Claim Forms submitted by Settlement Class Members to determine whether they are eligible for a settlement payment.

**5.10.2** The Settlement Administrator shall, under the supervision of the Court, administer the relief provided by this Agreement by processing Claim Forms in a rational, responsive, cost effective and timely manner, and calculate settlement payments in accordance with this Agreement.

**5.10.3** The Settlement Administrator shall disseminate the Settlement Class Notice as provided for in this Agreement.

**5.10.4** The Settlement Administrator shall maintain reasonably detailed records of its activities under this Agreement. The Settlement Administrator shall maintain all such records as required by applicable law in accordance with its business practices and such records will be made available to Class Counsel, Premera, and Premera's counsel upon request. The Settlement Administrator shall also provide reports and other information to the Court as the Court may

require. Upon request, the Settlement Administrator shall provide Class Counsel, Premera, and Premera's counsel with information concerning notice, administration, and implementation of the Settlement. Without limiting the foregoing, the Settlement Administrator shall:

(a) Receive Requests for Exclusion from Settlement Class Members and provide Class Counsel and Premera's counsel a copy thereof no later than five (5) days following the deadline for submission of the same. If the Settlement Administrator receives any Requests for Exclusion or other requests from Settlement Class Members after expiration of the Opt-Out Period, the Settlement Administrator shall promptly provide copies thereof to Class Counsel and Premera's counsel.

(b) Provide weekly or other periodic reports to Class Counsel and Premera's counsel that include, without limitation, reports regarding the number of Claim Forms received, the number of Claim Forms approved by the Settlement Administrator, and the categorization and description of Claim Forms rejected by the Settlement Administrator. The Settlement Administrator shall also, as requested by Class Counsel or Premera's counsel and from time to time, provide the amounts remaining in the Qualified Settlement Fund.

(c) Make available for inspection by Class Counsel and Premera's counsel the Claim Forms and any supporting documentation received by the Settlement Administrator at any time upon reasonable notice.

(d) Cooperate with any audit by Class Counsel or Premera's counsel, who shall have the right but not the obligation to review, audit, and evaluate all Claim Forms for accuracy, veracity, completeness, and compliance with the terms and conditions of this Agreement.

**5.10.5** The Settlement Administrator shall create the Settlement Website, described in ¶6.2.9.

**5.10.6** In the reasonable exercise of its duties outlined in this Agreement, the Settlement Administrator shall have the right to request additional information from the Settling Parties or any Participating Settlement Class Member.

**5.11** The Settlement Administrator shall comply with ¶ 5.4 herein and shall make all settlement payments contemplated in ¶¶ 4.3–4.5 of this Agreement by check or by either PayPal, eCheck, as a credit to the Participating Settlement Class Member's Amazon account, or Venmo, to the extent payment by these methods is possible, and send them to Participating Settlement Class Members within sixty (60) days of the Effective Date and/or sixty (60) days of the end of the Claims Period, whichever is later.

## VI. PRELIMINARY APPROVAL AND SETTLEMENT CLASS NOTICE.

**6.1** As soon as practicable after the execution of the Settlement Agreement, Class Counsel and Premera's counsel shall jointly submit this Settlement Agreement to the Court and file a motion for preliminary approval of the settlement with the Court requesting entry of a Preliminary Approval Order requesting, *inter alia:*

**6.1.1** preliminary approval of the settlement memorialized in this Agreement as being within the range of reasonableness such that notice to the Class should be provided pursuant to this Agreement;

**6.1.2** certification the Settlement Class as defined herein for settlement purposes only;

**6.1.3** approval of a date for a Final Fairness Hearing;

**6.1.4** approval of (i) the Summary Notice (with Claim Form attached) to be mailed and emailed to Settlement Class Members in a form substantially similar to the one attached hereto as Exhibit B; (ii) the Long Form Notice in a form substantially similar to the one attached hereto as Exhibit C; and (iii) the Publication Notice in a form substantially similar to the one attached hereto as Exhibit D, which together shall include a fair summary of the Settling Parties' respective litigation positions, the general terms of the settlement set forth in the Settlement Agreement, instructions for how to object to or opt out of the Settlement, the process and instructions for making Claims to the extent contemplated herein, and the date, time and place of the Final Fairness Hearing;

**6.1.5** approval of a Claims Deadline through which Settlement Class Members shall be able to submit to submit valid and completed Claim Forms;

**6.1.6** specified dates by which objections shall be heard and any papers submitted in support of said objections shall be considered by the Court at the Final Fairness Hearing only if, on or before the date(s) specified in the Preliminary Approval Order, such objector submits to the Court a written objection and otherwise complies with the requirements in Section VIII - Objection Procedures below;

**6.1.7** specified dates by which Class Counsel shall file and serve all papers in support of the application for final approval of the settlement and by which the Settling Parties shall file and serve all papers in response to any valid and timely objections and by which Class Counsel shall file their motion for fees and expenses as provided in Section IX - Service Awards to Representative Plaintiffs; Plaintiffs' Counsel's Attorneys' Fees, Costs, and Expenses;

**6.1.8** that all Settlement Class Members will be bound by the Final Approval Order and Judgment;

**6.1.9** that Persons in the Settlement Class wishing to exclude themselves from the Settlement will have until the date specified in the Preliminary Approval Order to submit to the Settlement Administrator a valid written request for exclusion or opt out;

**6.1.10** a procedure for Persons in the Settlement Class to object or opt out from the Settlement;

**6.1.11** deadlines consistent with this Agreement for mailing of notice to the Settlement Class, opting out of or objecting to the settlement, and filing papers in connection with the Final Fairness Hearing;

**6.1.12** appointment of Representative Plaintiffs as Settlement Class Representatives and Class Counsel as counsel for the Settlement Class;

**6.1.13** appointment of Epiq as the Settlement Administrator as jointly agreed to by the Settling Parties; and

**6.1.14** appointment of a Notice Specialist as jointly agreed to by the Settling Parties.

**6.2** Following the entry of the Preliminary Approval Order, the Settlement Administrator shall provide timely Class Notice in the manner and form approved and directed by the Court. The Class Notice and Claim Form shall be reviewed by the Notice Specialist and Settlement Administrator and may be revised as agreed upon by the Settling Parties prior to such submission to the Court for approval. The Settling Parties agree that the dissemination of the Class Notice and Claim Form by mail, publication, and by posting them on the Settlement Website, in the manner specified in ¶ 6.1.4 and ¶ 6.2 and its subparts, satisfies the notice requirements of due process and Rule 23 of the Federal Rules of Civil Procedure.

**6.2.1** As soon as practicable following the entry of the Preliminary Approval Order, but in no event later than thirty (30) days following the date of the Preliminary Approval Order, Premera shall provide (i) a list in electronic form of persons that, according to its records, may be Settlement Class Members to the Settlement Administrator, including to the extent available in Premera's records each Settlement Class Member's most current email and mailing address (the "Settlement Class List"), and (ii) a list in electronic form of persons that, according to its records, previously received written notice of the Security Incident, along with the email and mailing address used at the time such notice was sent. Premera represents and warrants the information provided in the Settlement Class List it provides is true and correct to the best of Premera's knowledge. The Settlement Administrator shall perform any further investigations deemed appropriate by the Settlement Administrator, including using the National Change of Address ("NCOA") database maintained by the U.S. Postal Service, in an attempt to identify current mailing addresses for individuals whose names are on the Settlement Class List.

**6.2.2** Because the Settlement Class List will be provided to the Settlement Administrator solely for purposes of providing the Class Notice and Settlement benefits and processing opt-out requests, the Settlement Administrator will execute a Business Associate Agreement with Premera and will ensure that any information provided to it by Settlement Class

Members, Premera's Counsel, or Premera, including the Settlement Class Members' Personal Information, will be secure and used solely for the purpose of effecting this Settlement.

**6.2.3** Within forty-five (45) days following entry of the Preliminary Approval Order, or at such other time or as may be ordered by the Court, the Settlement Administrator shall commence the mailing of the agreed-upon individual Summary Notice to Settlement Class Members via U.S. Mail and via email for those Settlement Class Members where Premera has an existing email address, and shall have thirty (30) days to complete that process. Settlement Class Members may simply mail the Claim Form attached to the Summary Notice or may use the unique class member identifier contained in the notice to log onto the Settlement Website described in ¶ 6.2.9 and either download a Claim Form or submit the Claim Form online. Settlement Class Members may also request a written Claim Form from the Settlement Administrator. The Settlement Administrator shall use reasonable fraud-prevention mechanisms to prevent (i) submission of Claim Forms by persons other than potential Settlement Class Members, and (ii) submission of more than one Claim Form per Person. In the event a Claim Form is submitted without a unique class member identifier, the Settlement Administrator shall employ reasonable efforts to ensure that the Claim is valid.

**6.2.4** If any notice that has been postmarked is returned by the U.S. Postal Service as undeliverable because the address of the recipient is no longer valid, and the envelope contains a forwarding address, the Settlement Administrator shall re-send the Summary Notice to the forwarding address within seven (7) days of receiving the returned Summary Notice.

**6.2.5** In the event that subsequent to the first mailing of a Summary Notice, and at least fourteen (14) days prior to the Opt-Out and Objection Deadline, a Summary Notice is returned to the Settlement Administrator by the U.S. Postal Service because the address of the recipient is no longer valid and does not contain a new forwarding address, the Settlement Administrator shall perform a standard skip trace, in the manner that the Settlement Administrator customarily performs skip traces, in an effort to attempt to ascertain the current address of the particular Settlement Class Member in question and, if such an address is ascertained, the

Settlement Administrator will re-send the Class Notice within seven (7) days of receiving such information.

**6.2.6** If an email sent to a Settlement Class Member bounces back (as opposed to being returned as undeliverable), the Settlement Administrator will make up to two (2) additional email attempts on days and times chosen by Settlement Administrator as reasonably likely to achieve delivery. If the email notice is bounced back on the third attempt, the email notice will be treated as undeliverable.

**6.2.7** For any Settlement Class Member for whom the Settlement Administrator has an email address, and who has not submitted a valid Claim Form, the Settlement Administrator shall transmit periodic email reminders of the opportunity to file a Claim Form prior to the Claims Deadline.

**6.2.8** As soon as practicable, but no later than thirty (30) days after the Court's entry of the Preliminary Approval Order, the Settlement Administrator shall cause the Publication Notice (attached hereto as Exhibit D) to be published, pursuant to the Preliminary Approval Order. Before publication, the Settlement Administrator shall provide the Settling Parties with the opportunity to review and approve the Publication Notice plan, consistent with the Preliminary Approval Order.

**6.2.9** Prior to the dissemination of the Class Notice, the Settlement Administrator shall establish a dedicated Settlement Website and shall maintain and update the website throughout the Claims Period. The Settlement Website shall inform Settlement Class Members of the terms of this Agreement, their rights, applicable dates and deadlines, and related information. The Settlement Website shall include, and make available for download in .pdf format, the following: (i) the Long Form Notice; (ii) the Claim Form; (iii) the Preliminary Approval Order; (iv) this Agreement (including all of its Exhibits), (v) the operative Class Action Complaint filed in the Litigation; and (vi) any other materials agreed upon by the Settling Parties and/or required by the Court. The Settlement Website shall provide Settlement Class Members with the ability to (i) complete and submit the Claim Form electronically; and (ii) submit requests for exclusion or

opt out electronically using the unique Settlement Class Member identifier referenced in ¶ 6.2.3. No later than twenty (20) days before the Final Fairness Hearing, the Settlement Administrator will cause proof of the establishment and maintenance of the Settlement Website and the telephone assistance program described in ¶ 6.2.9 and ¶ 6.2.11 to be filed with the Court.

**6.2.10** The Summary Notice, Long Form Notice, and Claim Form approved by the Court may be adjusted by the Notice Specialist and/or Settlement Administrator, respectively, in consultation and agreement with the Settling Parties, as may be reasonable and not inconsistent with such approval.

**6.2.11** Prior to the dissemination of the Class Notice, the Settlement Administrator shall establish a toll-free telephone number, supported by a reasonable number of live operators to promptly respond to Settlement Class Member inquiries, through which Settlement Class Members may obtain information about the Action and the Settlement and request a mailed copy of the Long Form Notice and/or the Claim Form, pursuant to the terms and conditions of this Agreement. The toll-free number will be staffed by the Settlement Administrator with bilingual operators who speak both English and Spanish, to assist in answering questions from Settlement Class Members. The toll-free number shall provide access to live-support, a voice response unit ("VRU"), or a combination of live-support and VRU. It shall also offer a Spanish language alternative number and VRU. Any scripts, FAQs, or other materials for such purpose shall be made available for review and comment by Class Counsel and Premera's counsel prior to their use. Class Counsel and Premera's counsel shall confer and assist the Settlement Administrator as it reasonably requests. At the end of every call, the live operators will inform the caller that if they have questions they can call Class Counsel, and will inform the caller of the toll-free number where Class Counsel can be reached. Any VRU message will end with the same message.

**6.2.12** Within sixty (60) days after the Notice Date, the Settlement Administrator shall file with the Court proof of the emailing or post mailing of the individual notices.

**6.2.13** The Settlement Administrator will provide weekly reports to Class Counsel stating the number of notices sent to Settlement Class Members that have been returned as

undeliverable. The Representative Plaintiffs and Class Counsel may engage the Settlement Administrator, at their sole cost, to locate Settlement Class Members whose notices were returned as undeliverable.

**6.2.14** Prior to the Final Fairness Hearing, Class Counsel and Premera shall cause to be filed with the Court an appropriate affidavit or declaration with respect to complying with this provision of notice. The Class Notice and Claim Form approved by the Court may be adjusted by the Notice Specialist and/or Settlement Administrator, respectively, in consultation and agreement with the Settling Parties, as may be reasonable and necessary and not inconsistent with such approval.

**6.2.15** The Settlement Administrator shall terminate the Settlement Website two hundred seventy (270) days after (1) the later of the Effective Date or the end of the Claims Period, or (2) the date on which the settlement is terminated or otherwise not approved by the Court. The Settlement Administrator shall then transfer ownership of the URL of the Settlement Website to Premera.

## VII. OPT-OUT PROCEDURES.

**7.1** Each Person wishing to opt out of the Settlement Class shall individually sign and timely submit written notice of such intent to the designated Post Office box established by the Settlement Administrator. The written notice must clearly manifest a Person's intent to be excluded from the Settlement Class. To be effective, written notice must be postmarked by a date certain to be ordered by the Court in its Preliminary Approval Order, which date is no later than ninety (90) days after the Notice Date.

**7.2** All Persons who submit valid and timely notices of their intent to be excluded from the Settlement Class, as set forth in ¶ 7.1 above, referred to herein as "Opt-Outs," shall not receive any benefits of and/or be bound by the terms of this Settlement Agreement. All Persons falling within the definition of the Settlement Class who do not request to be excluded from the Settlement Class in the manner set forth in ¶ 7.1 above shall be bound by the terms of this Settlement Agreement and Final Approval Order and Judgment entered thereon.

**7.3** Within seven (7) days after the Opt-Out Date, the Settlement Administrator shall furnish to Class Counsel and to Premera's counsel a complete list of all timely and valid requests for exclusion (the "Opt-Out List").

## VIII. OBJECTION PROCEDURES.

**8.1** Each Settlement Class Member desiring to object to the Settlement Agreement or to the attorneys' fees, costs and expenses, shall submit a timely written notice of his or her objection. Such notice shall state: (i) the objector's full name, address, telephone number, and email address (if any); (ii) information identifying the objector as a Settlement Class Member, including proof that the objector is a member of the Settlement Class (e.g., copy of settlement notice, copy of original notice of the Security Incident); (iii) a written statement of all grounds for the objection, accompanied by any legal support for the objection the objector believes applicable; (iv) the identity of all counsel representing or assisting the objector, if any; (v) the identity of all counsel representing the objector who will appear at the Final Fairness Hearing, if any; (vi) a list of all persons who will be called to testify at the Final Fairness Hearing in support of the objection, if any; (vii) a statement confirming whether the objector intends to personally appear and/or testify at the Final Fairness Hearing; (viii) the objector's signature and the signature of the objector's duly authorized attorney or other duly authorized representative (along with documentation setting forth such representation), if any; (ix) a list, by case name, court, and docket number, of all other cases in which the objector (directly or through counsel) has filed an objection to any proposed class action settlement within the last three (3) years; (x) a list, by case name, court, and docket number, of all other cases in which the objector's counsel (on behalf of any Person) has filed an objection to any proposed class action settlement within the last three (3) years; and (xi) a list, by case name, court, and docket number, of all other cases in which the objector has been a named plaintiff in any class action or served as a lead plaintiff or class representative. To be timely, written notice of an objection in the appropriate form must be filed with the Clerk of the Court by the date certain as ordered by the Court in the Preliminary Approval Order, which date shall be no later than ninety (90) days after the Notice Date, and served concurrently therewith upon Class Counsel, Kim D.

Stephens, Tousley Brain Stephens PLLC, 1700 Seventh Avenue, Suite 2200, Seattle, WA 98101, and Premera's counsel, Paul Karlsgodt, Baker & Hostetler LLP, 1801 California Street, Suite 4400, Denver, CO 80202.

**8.2** Any Settlement Class Member who fails to comply with the requirements for objecting in ¶ 8.1 shall waive and forfeit any and all rights he or she may have to appear separately and/or to object to the Settlement Agreement and shall be bound by all the terms of the Settlement Agreement and by all proceedings, orders and judgments in the Litigation. The exclusive means for any challenge to the Settlement Agreement shall be through the provisions of ¶ 8.1. Without limiting the foregoing, any challenge to the Settlement Agreement, the Final Approval Order and Judgment to be entered upon final approval shall be pursuant to appeal under the Federal Rules of Appellate Procedure and not through a collateral attack.

**8.3** The Settling Parties shall file their responses to objections, if any, to the settlement no later than ten (10) days prior to the Final Fairness Hearing.

**8.4** Any Settlement Class Member who wishes to appear at the Final Fairness Hearing, whether pro se or through counsel, must, within the time set by the Court, (a) mail or hand-deliver to the Court a notice of appearance; (b) provide copies of any exhibits or other documents that the Settlement Class Member intends to present or use as evidence at the hearing; (c) provide a list of all witnesses that the Settlement Class Member intends to call to give evidence at the hearing; (d) take all other actions or make any additional submissions as may be ordered by the Court; and (e) mail or hand-deliver any notice and any such exhibits, lists, or other documents to Class Counsel and Counsel for Defendant as provided in the individual or publication notices such that receipt of same by Class Counsel and Counsel for Defendant has occurred no later than fourteen (14) days prior to the Final Fairness Hearing. Any Settlement Class Member who wishes to appear at the Final Fairness Hearing must provide dates at least seven (7) days in advance of the Final Fairness Hearing when the Settlement Class Member will be available for a deposition. Failure by an objector to make himself or herself available for a deposition may result in the Court striking the objection. The Court may tax the costs of any such discovery to the objector or the objector's

counsel if the Court determines that the objection is frivolous or made for an improper purpose. Unless so permitted by the Federal Rules of Civil Procedure or the Court's local rules, no Settlement Class Member shall be permitted to raise matters at the Final Fairness Hearing that the Settlement Class Member could have raised in an objection, but failed to do. Any Settlement Class Member who fails to comply with this Agreement, the individual notice, and any other order by the Court shall be barred from appearing at the Final Fairness Hearing.

## IX. Service Awards to Representative Plaintiffs; Plaintiffs' Counsel's Attorneys' Fees, Costs, and Expenses.

**9.1** Class Counsel may apply to the Court for service awards to be paid from the Qualified Settlement Fund of up to Five Thousand Dollars and No Cents ($5,000.00) each to Sharif Ailey, April Allred, Elizabeth Black, Catherine Bushman, Krishnendu Chakraborty, Maduhchanda Chakraborty, Ralph Christopherson, Anne Emerson, William Fitch, Eric Forseter, Mary Fuerst, Debbie Hansen-Bosse, Stuart Hirsch, Ilene Hirsh, Ross Imbler, Howard Kaplowitz, Barbara Lynch, Kevin Smith, Gabriel Webster, and Laura Webster for their time, effort, and risk in connection with the Action. No amount has been guaranteed or promised to tthe indivduals listed in ¶ 9.1. If the Court allows service awards, each recipient shall provide to the Settlement Administrator a completed W-9 form within twenty (20) days after the Effective Date.

**9.1.1** Within thirty (30) days after the Effective Date, the Settlement Administrator shall pay any service awards, as awarded by the Court, to an account established by Class Counsel. Class Counsel shall thereafter distribute the service awards to the to the individauls identified in ¶ 9.1.

**9.1.2** Service Awards are not conditioned on support of the Settlement. The allowance or disallowance by the Court of an award of Service Payments will be considered and determined by the Court separately from the Court's consideration and determination of the fairness, reasonableness, and adequacy of the Settlement.

**9.2** Class Counsel may submit a request to the Court for their attorneys' fees, reasonable costs, and expenses to be paid from the Qualified Settlement Fund. Premera does not

and will not object, appeal, or otherwise comment upon any such attorneys' fee and expense request that does not exceed an amount equal to Fourteen Million Dollars and No Cents ($14,000,000.00). Premera hereby authorizes the Settlement Administrator to pay the amount awarded by the Court to Class Counsel for their attorneys' fees, reasonable costs and expenses, up to and including Fourteen Million Dollars and No Cents ($14,000,000.00), and no more than that amount. Class Counsel, in their sole discretion, shall allocate and distribute that amount of attorneys' fees, costs, and expenses awarded by the Court among Plaintiffs' Counsel.

**9.3** The Settling Parties negotiated the maximum amount of the attorneys' fees, costs, and expenses to be sought by Class Counsel, as provided for in ¶ 9.2, under the supervision of the Honorable Jay C. Gandhi and Peter Rosen of JAMS, after all monetary relief terms of the settlement had been agreed upon.

**9.4** Within ten (10) business days of an Order in which the Court awards attorneys' fees, expenses, and costs ("Fee Award and Costs") to Class Counsel, Premera shall deposit the amount of the Fee Award and Costs into the Qualified Settlement Fund. The Fee Award and Costs shall be paid from the Qualified Settlement Fund to Class Counsel immediately following transfer of such payment into the Qualified Settlement Fund, notwithstanding the existence of any timely filed objections thereto, or potential for appeal therefrom, or collateral attack on the settlement or any part thereof, subject to Class Counsel's joint and several obligation to repay those amounts to the Qualified Settlement Fund, plus accrued interest at the same net rate as is earned by the Qualified Settlement Fund, if and when, as a result of any appeal and/or further proceedings on remand, or successful collateral attack, the Fee Award and Costs is reduced or reversed, or return of the Qualified Settlement Fund is required consistent with the provisions of this Agreement. In such event, Class Counsel shall, within ten (10) business days from the event which requires repayment of the Fee Award and Costs, refund to the Qualified Settlement Fund the Fee Award and Costs paid to them.

**9.5** The amount(s) of any award of attorneys' fees, costs, and expenses, and the service awards to the plaintiffs, are intended to be considered by the Court separately from the Court's

consideration of the fairness, reasonableness, and adequacy of the settlement. No order of the Court, or modification or reversal or appeal of any order of the Court, concerning the amount(s) of any attorneys' fees, costs, expenses, and/or service awards ordered by the Court to Class Counsel or the Representative Plaintiffs shall affect whether the Final Approval Order and Judgment is Final or constitute grounds for cancellation or termination of this Settlement Agreement.

**X. Final Approval.**

**10.1** If the Court preliminarily approves the settlement, Class Counsel and Premera's counsel shall request that the Court hold a hearing and grant final approval of the settlement set forth herein (the "Final Fairness Hearing") on a date after notice and opt-out procedures are substantially completed and, pursuant to 28 U.S.C. § 1715(b) & (d), no earlier than one hundred twenty (120) days after the Notice Date.

**10.2** Representative Plaintiffs shall submit a motion for final approval of the settlement, including a memorandum in support of the motion, and shall seek entry of an order and final judgment, at least ten (10) days prior to the Final Fairness Hearing.

**10.3** Such Final Approval Order shall specifically include provisions that: (a) the Court has personal jurisdiction over all Settlement Class Members, the Court has subject matter jurisdiction over the Claims asserted, and that venue is proper; (b) finally certify the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure; (c) finally approve the settlement pursuant to Rule 23 of the Federal Rules of Procedure; (d) find that the Class Notice as distributed was the best notice practicable under the circumstances and fully satisfied the requirements of due process and Rule 23 of the Federal Rules of Civil Procedure; (e) approve the terms of distribution of cash to Settlement Class Members; (f) approve the method of enrolling Settlement Class Members in Credit Monitoring and Insurance Services; (g) confirm that Representative Plaintiffs and the Settlement Class Members have released all Released Claims and are permanently barred and enjoined from asserting, commencing, prosecuting, or continuing any of the Released Claims against the Released Parties; (h) retain jurisdiction relating to the

administration, consummation, validity, enforcement, and interpretation of this Agreement, the Final Approval Order and Judgment, any final order approving the Fee and Expense Award and service awards, and for any other necessary purpose; and (i) enter a judgment that dismisses the action with prejudice, without costs to any party, except as provided in the Agreement, and subject to the Court's continuing jurisdiction over the Settling Parties for the purpose of enforcement of the terms of the Settlement Agreement.

**10.4** The Settling Parties shall recommend that the Final Fairness Hearing be scheduled for a date at least one hundred and twenty (120) days after the date of commencement of notice to Settlement Class Members, but in no event earlier than ninety (90) days after CAFA Notice is served.

**10.5** At the Final Fairness Hearing, Representative Plaintiffs and Class Counsel shall make a good faith effort to present sufficient evidence to support the entry of the Final Approval Order and Judgment, and shall present such evidence as they deem appropriate to support any award of attorneys' fees and costs. Settlement Class Members who do not object to the Settlement may appear and address the Court at the Final Fairness Hearing.

## XI. RELEASE.

**11.1** Upon the Effective Date, each Settlement Class Member, including the Representative Plaintiffs, shall be deemed to have, and by operation of the Final Approval Order and Judgment shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims against all Released Persons, as defined in ¶¶ 1.32–1.33. Further, upon the Effective Date, and to the fullest extent permitted by law, each Settlement Class Member, including the Representative Plaintiffs, shall, either directly, indirectly, representatively, as a member of or on behalf of the general public or in any capacity, be permanently barred and enjoined from commencing, prosecuting, or participating in any recovery in any action in this or any other forum (other than participation in the settlement as provided herein) in which any Released Claim(s) is/are asserted.

## XII. CONDITIONS OF SETTLEMENT, EFFECT OF DISAPPROVAL, CANCELLATION, OR TERMINATION.

**12.1** The Effective Date of the settlement shall be the date on which the last of the following events occurs:

(a) the Court has entered the Order of Preliminary Approval and Publishing of Notice of a Final Fairness Hearing, as required by ¶ 10.1;

(b) Premera has not exercised its option to terminate the Settlement Agreement under the separate Letter Agreement and the time for Premera to do so has elapsed;

(c) the Court has entered the Final Approval Order and Judgment granting final approval to the settlement as set forth herein; and

(d) the Final Approval Order and Judgment has become Final, as defined in ¶ 1.12.

**12.2** If all of the conditions specified in ¶ 12.1 hereof are not satisfied, the Settlement Agreement shall be cancelled and terminated subject to ¶ 12.3 unless Class Counsel and Premera's counsel mutually agree in writing to proceed with the Settlement Agreement.

**12.3** In the event that the Settlement Agreement is not approved by the Court or the settlement set forth in the Settlement Agreement is terminated in accordance with its terms, (a) the Settling Parties shall be restored to their respective positions in the Litigation and shall jointly request that all scheduled litigation deadlines be reasonably extended by the Court so as to avoid prejudice to any Settling Party or Settling Party's counsel, and (b) the terms and provisions of the Settlement Agreement and statements made in connection with seeking approval of the Agreement shall have no further force and effect with respect to the Settling Parties and shall not be used in the Litigation or in any other proceeding for any purpose, and any judgment or order entered by the Court in accordance with the terms of the Settlement Agreement shall be treated as vacated, *nunc pro tunc*. Notwithstanding any statement in this Settlement Agreement to the contrary, no order of the Court or modification or reversal on appeal of any order reducing the amount of attorneys' fees, costs, expenses, and/or incentive awards shall constitute grounds for cancellation or termination of the Settlement Agreement. Further, notwithstanding any statement in this

Settlement Agreement to the contrary, Premera shall be obligated to pay amounts already billed or incurred for costs of notice to the Settlement Class and Settlement Administration and shall not, at any time, seek recovery of same from any other party to the Litigation or from counsel to any other party to the Litigation.

**XIII. Confidentiality.**

**13.1** It is agreed that until the filing of the motion for preliminary approval, the Settlement Agreement and its terms as well as the related Letter Agreement and its terms shall be confidential and shall not be disclosed to any Person other than Representative Plaintiffs and their counsel unless disclosure is required by applicable disclosure laws, required by auditors or attorneys, or agreed to by the Settling Parties.

**13.2** The Settling Parties shall agree to the content of a joint press release in the form attached as Exhibit G, which shall be released contemporaneously with the filing of a motion for preliminary approval. If the Settling Parties subsequently agree that a second joint press release is warranted to further notify Settlement Class Members of the settlement benefits, the Settling Parties shall agree to the specific timing of a second joint press release aimed at reminding the Settlement Class Members that the end of the Claims Period is approaching. No Settling Party shall issue any other press release concerning the Settlement Agreement without the other party's prior written consent, or an order of the Court.

**13.3** All agreements made and orders entered during the course of this matter relating to the confidentiality of information shall survive this Agreement. The Settling Parties shall continue to comply with the Protective Order entered in this case.

**13.4** Class Counsel may make public statements regarding the settlement (i) in any future pleadings and/or Court filings in the cases or any other case related to the Released Claims, (ii) on any resume or future pleadings in any proceeding relating to Class Counsel's experience and results, and (iii) Class Counsel's websites, in order to inform visitors to their websites of the case status, with links to the Settlement Website. Nothing herein shall bar or otherwise limit Class

Counsel's communications with Representative Plaintiffs, any Settlement Class Member, or any individual requesting information about the Settlement.

**13.5** Nothing in this Section XIII - Confidentiality shall be interpreted to limit representations that the Settling Parties or their attorneys may make to the Court to assist it in its evaluation of the Settlement; nor shall it prohibit Class Counsel from communicating directly with a Settlement Class Member or Settlement Class Members. Premera may also provide necessary and accurate information about the settlement to its officers, directors, and other persons or entities as required by applicable laws or regulations.

**XIV. Miscellaneous Provisions.**

**14.1** The Settling Parties (i) acknowledge that it is their intent to consummate this Agreement; and (ii) agree to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Settlement Agreement, and to exercise their best efforts to accomplish the terms and conditions of this Settlement Agreement.

**14.2** The Settling Parties intend this settlement to be a final and complete resolution of all disputes between them with respect to the Litigation. The Settlement comprises claims which are contested and shall not be deemed an admission by any Settling Party as to the merits of any claim or defense. The Settling Parties each agree that the settlement was negotiated in good faith by the Settling Parties and reflects a settlement that was reached voluntarily after consultation with competent legal counsel. The Settling Parties reserve their right to rebut, in a manner that such party determines to be appropriate, any contention made in any public forum that the Litigation was brought or defended in bad faith or without a reasonable basis.

**14.3** Neither the Settlement Agreement, nor the settlement contained herein, nor any act performed or document executed pursuant to or in furtherance of the Settlement Agreement or the settlement (i) is or may be deemed to be or may be used as an admission of, or evidence of, the validity or lack thereof of any Released Claim, or of any wrongdoing or liability of any of the Released Persons; or (ii) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Released Persons in any civil, criminal or administrative

proceeding in any court, administrative agency or other tribunal. Any of the Released Persons may file the Settlement Agreement and/or the Final Approval Order and Judgment in any action that may be brought against them or any of them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar, or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

**14.4** The terms and provisions of this Agreement may be amended, modified, or expanded by written agreement of the Settling Parties and approval of the Court; provided, however, that, after entry of the Preliminary Approval Order, the Parties may, by written agreement, effect such amendments, modifications, or expansions of this Agreement and its implementing documents (including all Exhibits hereto) without further notice to the Settlement Class or approval by the Court if such changes are consistent with the Court's Preliminary Approval Order and do not materially alter, reduce, or limit the rights of Settlement Class Members under this Agreement.

**14.5** The Settlement Agreement, together with the Exhibits attached hereto, constitutes the entire agreement among the parties hereto, and no representations, warranties or inducements have been made to any party concerning the Settlement Agreement other than the representations, warranties and covenants contained and memorialized in such document. Except as otherwise provided herein, each party shall bear its own costs. This Agreement supersedes all previous agreements made by the Settling Parties.

**14.6** Class Counsel, on behalf of the Settlement Class, is expressly authorized by the Representative Plaintiffs to take all appropriate actions required or permitted to be taken by the Settlement Class pursuant to the Settlement Agreement to effectuate its terms, and also are expressly authorized to enter into any modifications or amendments to the Settlement Agreement on behalf of the Settlement Class which they deem appropriate in order to carry out the spirit of this Settlement Agreement and to ensure fairness to the Settlement Class.

**14.7** Each counsel or other Person executing the Settlement Agreement on behalf of any party hereto hereby warrants that such Person has the full authority to do so.

**14.8** The Settlement Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument. A complete set of original executed counterparts shall be filed with the Court.

**14.9** The Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the parties hereto.

**14.10** The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of the Settlement Agreement, and all parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the settlement embodied in the Settlement Agreement.

**14.11** The Settlement Agreement shall be considered to have been negotiated, executed, and delivered, and to be wholly performed, in the State of Washington, and the rights and obligations of the parties to the Settlement Agreement shall be construed and enforced in accordance with, and governed by, the internal, substantive laws of the State of Washington without giving effect to choice of law principles.

**14.12** As used herein, "he" means "he, she, they, or it;" "his" means "his, hers, theirs, or its," and "him" means "him, her, their, or it.''

**14.13** All dollar amounts are in United States dollars ("USD").

**14.14** Cashing a settlement check is a condition precedent to any Settlement Class Member's right to receive settlement benefits. All settlement checks shall be void one hundred twenty (120) days after issuance and shall bear the language: "This check must be cashed within one hundred twenty (120) days, after which time it is void." If a check becomes void, the Settlement Class Member shall have until two hundred seventy (270) days after the Effective Date to request re-issuance. If no request for re-issuance is made within this period, the Settlement Class Member will have failed to meet a condition precedent to recovery of settlement benefits, the Settlement Class Member's right to receive monetary relief shall be extinguished, and Premera

shall have no obligation to make payments to the Settlement Class Member for expense reimbursement under ¶ 4.3–4.5 or any other type of monetary relief. The same provisions shall apply to any re-issued check. For any checks that are issued or re-issued for any reason more than one hundred eighty (180) days from the Effective Date, requests for re-issuance need not be honored after such checks become void.

**14.15** Unless otherwise specified in writing, any notice sent in connection with this Agreement shall be transmitted by U.S. Mail or Federal Express or an equivalent overnight delivery service as follows:

To Named Plaintiffs and Class Counsel:

**Kim D. Stephens**
Tousley Brain Stephens, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, WA 98101-4416
Telephone: 206.682.5600

To Premera and Premera's counsel:

**Paul G. Karlsgodt**
BakerHostetler
1801 California Street, Suite 4400
Denver, CO 80202-2662
Telephone: 303.861.0600

IN WITNESS WHEREOF, the parties hereto have caused the Settlement Agreement to be executed, by their duly authorized attorneys.

Representative Plaintiffs
and Class Counsel

________________________________

Dated: May 29, 2019

By:

Premera's counsel and Duly Authorized Signatory

________________________________

Dated: _May 29__________, 2019

By: Paul Karlsgodt

________________________________

Dated: _______________, 2019

By:

________________________________

Dated: __________________, 2019

By:

**STATE OF WASHINGTON**
**SNOHOMISH COUNTY SUPERIOR COURT**

| | |
|---|---|
| STATE OF WASHINGTON,<br>Plaintiff,<br>v.<br>PREMERA BLUE CROSS,<br>Defendant. | NO.<br>COMPLAINT 19 2 06171 31 |

Plaintiff, State of Washington, by and through its attorneys Robert W. Ferguson, Attorney General, Tiffany L. Lee, and Andrea M. Alegrett, Assistant Attorneys General, brings this action against Defendant Premera Blue Cross ("Defendant" or "Premera"). The State alleges that Premera engaged in unfair and deceptive acts or practices in violation of the Consumer Protection Act, RCW 19.86, by failing to adequately safeguard consumer information, and violated the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, as amended by the Health Information Technology for Economic and Clinical Health Act, Pub. L. No. 111-5, 123 Stat. 226, as well as the Department of Health and Human Services ("HHS") Regulations, 45 C.F.R. Part 160 *et seq.* (collectively "HIPAA").

Plaintiff alleges the following on information and belief:

## I. PARTIES

1.1 Plaintiff is the Attorney General of the State of Washington.



COPY

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464 7745

1.2 Defendant is Premera Blue Cross ("Premera"), a Washington non-profit corporation with its principal place of business at 7001 220th St. SW, Mountlake Terrace, WA, 98043.

1.3 In the course of its business, Premera collects, maintains, and/or processes sensitive personal data and health information including protected health information ("PHI") and electronic protected health information ("ePHI") (collectively, "sensitive data") from Washington consumers.

1.4 Premera is a "covered entity" and a "business associate" within the meaning of 45 C.F.R. § 160.103, and required to comply with the HIPAA federal standards governing the privacy and security of ePHI, including the Privacy and Security Rules. See 45 C.F.R. § 164.302.

## II. JURISDICTION AND VENUE

2.1 Plaintiff files this Complaint and institutes these proceedings pursuant to the Consumer Protection Act ("CPA"), RCW 19.86. The Attorney General has statutory authority to commence this action pursuant to RCW 19.86.080 and RCW 19.86.140.

2.2 This Court has personal jurisdiction over Defendant pursuant to RCW 4.28.180, RCW 4.28.185, and RCW 19.86.160 because Defendant has engaged in the conduct set forth in this Complaint in King County and elsewhere in the State of Washington.

2.3 Venue is proper in Snohomish County pursuant to RCW 4.12.020 and 4.12.025, and Court Rule 82 because Defendant transacts business in King County and engaged in the conduct set forth in this Complaint in Snohomish County and elsewhere in the State of Washington.

2.4 The Attorneys General has provided written notice of this action to the Secretary of HHS as required by 42 U.S.C. § 1320d-5(d)(4).



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

## III. FACTS

3.1 Premera is a Washington health insurance company. As a health insurance company, Premera collects and maintains sensitive consumer data, including ePHI and PHI. Premera has an obligation to secure such sensitive health data pursuant to state and federal laws.

3.2 On March 17, 2015, Premera publicly announced that it had discovered that an unknown user had gained unauthorized access to its networks and that this breach exposed the sensitive information of eleven (11) million individuals. Upon further investigation, Premera revised the number of affected consumer to 10.466 million, approximately 6.4 million of whom were Washington residents. The sensitive information included private health information, Social Security numbers, member identification numbers, bank account information, names, addresses, phone numbers, dates of birth, and email addresses.

3.3 On January 29, 2015, Premera's cybersecurity expert confirmed the unauthorized access to its networks. Following the breach, Premera's internal investigation revealed that the unauthorized party had access to Premera's network from May 5, 2014, through March 6, 2015. The unauthorized party gained access to the Premera network by taking advantage of multiple weaknesses in Premera's data security. In the years leading up to the breach, Premera's own internal IT auditors and cybersecurity assessors identified multiple network vulnerabilities—such as inadequate safeguards against phishing attempts, inadequate network segmentation, ineffective password management policies, ineffectively configured security tools, and inadequate patch management—many of which Premera accepted without adequate remediation.

3.4 Premera's corporate culture also failed to provide its IT security team with adequate resources to inspect and safeguard consumer data.

3.5 For years leading up to the breach, Premera failed to comply with the security and privacy standards of HIPAA. These include, failing to properly map ePHI on its networks, ensuring appropriate access privileges to ePHI based on job function, enforcing appropriate



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

safeguards to secure physical access to data centers, regularly monitoring log in attempts, regularly and accurately assessing risks to ePHI, updating its security program to protect against known cybersecurity threats, and adequately mitigating identified risks.

3.6 Premera's failure to adequately safeguard personal data permitted unauthorized access to the sensitive information of over 6 million Washington consumers for nearly a year.

3.7 Prior to and during the data breach, Premera made representations about how it protects consumer privacy and safeguards sensitive data in its privacy notices: "We take steps to secure our buildings and electronic systems from unauthorized access."; "We are committed to maintaining the confidentiality of your personal financial and health information."; "We authorize access to your personal information by our employees and business associates only to the extent necessary to conduct our business of serving you, such as paying your claims." After Premera publicly announced the data breach, the company misrepresented the scope and severity of the data breach to affected consumers and misrepresented the security measures Premera had in place at the time of the breach. For example, Premera provided its call-center agents with a script that stated that "[w]e have no reason to believe that any of your information was accessed or misused" and "[t]here were already significant security measures in place to protect your information." All of these assertions are contradicted by Premera's numerous security failures and violations of the CPA and HIPAA.

## IV. FIRST CAUSE OF ACTION (VIOLATION OF THE HIPAA)

4.1 The State realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

4.2 At all times relevant, Premera has been a Covered Entity and a Business Associate pursuant to HIPAA, specifically 45 C.F.R. § 160.103.

4.3 At all relevant times, Premera has maintained the ePHI of millions of individuals pursuant to HIPAA, specifically 45 C.F.R. § 160.103.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

4.4 As a Covered Entity and Business Associate, Premera is required to comply with the HIPAA standards, safeguards, and implementation that govern the privacy of ePHI, including the Privacy Rule and the Security Rule. 45 C.F.R. Part 164, Subparts A, C, & E.

4.5 Premera failed to comply with the following standards, administrative safeguards, physical safeguards, technical safeguards, and implementation specifications as required by HIPAA, the Privacy Rule, and the Security Rule:

a. Premera failed to review and modify security measures as needed to continue the provision of reasonable and appropriate protection of ePHI in accordance with the implementation specifications of the Security Rule, in violation of 45 C.F.R. § 164.306(e).

b. Premera failed to conduct an accurate and thorough risk assessment of the potential risks and vulnerabilities to the confidentiality, integrity, and availability of ePHI it held, in violation of 45 C.F.R. § 164.308(a)(l)(ii)(A).

c. Premera failed to implement adequate security measures sufficient to reduce risks and vulnerabilities to a reasonable and appropriate level to comply with the Security Rule, in violation of 45 C.F.R. § 164.308(a)(l)(ii)(B).

d. Premera failed to adequately implement and follow procedures to regularly review records of information system activity, including but not limited to audit logs, access reports and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(l)(ii)(D).

e. Premera failed to adequately ensure that all members of its workforce had appropriate access to ePHI in violation of 45 C.F.R. § 164.308(a)(3)(i).

f. Premera failed to adequately identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that were known to it; and document security incidents and their outcomes, in violation of 45 C.F.R. § 164.308(a)(6)(ii).

g. Premera failed to adequately update its security awareness and training



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

program to address known deficiencies, in violation of 45 C.F.R. § 164.308(a)(5)(ii)(A).

h. Premera failed to adequately implement policies and procedures to guard against, detect, and report malicious software, in violation of 45 C.F.R. § 164.308(a)(5)(ii)(B).

i. Premera failed to adequately implement policies and procedures for monitoring log-in attempts and reporting discrepancies, in violation of 45 C.F.R. § 164.308(a)(5)(ii)(C).

j. Premera failed to adequately implement adequate password management policies and procedures, in violation of 45 C.F.R. § 164.308(a)(5)(ii)(D).

k. Premera failed to adequately implement policies and procedures to safeguard its facility and the equipment therein from unauthorized physical access, tampering and theft, in violation of 45 C.F.R. § 164.310(a)(2)(ii).

l. Premera failed to adequately perform periodic technical and nontechnical evaluations, based initially upon the HIPAA standards, and subsequently, in response to environmental or operational changes affecting the security of ePHI, that establishes the extent to which Premera's security policies and procedures meet the requirements of 45 C.F.R. § 164.308 in violation of 45 C.F.R. § 164.308(a)(8).

m. Premera failed to adequately implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1).

n. Premera failed to adequately implement policies and procedures to protect ePHI from improper alteration or destruction, in violation of 45 C.F.R. § 164.312(c)(1).

o. Premera permitted unauthorized access to ePHI in violation of the Privacy Rule, 45 C.F.R. § 164.502 et seq.

p. Premera failed to adequately train all members of its workforce on the policies and procedures with respect to PHI as necessary and appropriate for the members of its



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

workforce to carry out their functions and to maintain the security of PHI, in violation of 45 C.F.R. § 164.530(b)(l).

q. Premera failed to reasonably safeguard PHI from any intentional or unintentional use or disclosure that is in violation of the standards, implementation specifications or other requirements of the Privacy Rule, in violation of 45 C.F.R. § 164.530(c)(2)(i).

4.6 Each violation of the above standards, administrative safeguards, physical safeguards, technical safeguards, and/or implementation specifications by Premera constitutes a separate violation of HIPAA on each day the violation occurred, as to each and every Plaintiff State authorized to enforce HIPAA. 42 U.S.C § 1320d-5(d)(2); 45 C.F.R. § 160.406. Each Plaintiff State separately alleges each and every HIPAA violation identified in paragraph 5.5(a)-(q) herein.

4.7 Each and every Plaintiff State is separately and independently entitled to statutory damages pursuant to 42 U.S.C. § 1320d-5(d)(2) and attorneys' fees pursuant to 42 U.S.C. § 1320d-5(d)(3).

## V. SECOND CAUSE OF ACTION
## (VIOLATION OF THE CONSUMER PROTECTION ACT, RCW 19.86)

5.1 The State realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

5.2 Premera engages in "trade" or "commerce" within the meaning of the Consumer Protection Act, RCW 19.86.010(2), by providing services to Washington consumers, including insurance plans and other health services, and advertising, marketing, and soliciting business in Washington.

5.3 Premera engaged in unfair and deceptive acts or practices within the meaning of RCW 19.86.020 by misrepresenting directly or indirectly, the following:

a. Misrepresenting that Premera adequately safeguards personal information and ePHI from unauthorized access or exposure;



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

b. Failing to maintain appropriate administrative and technical safeguards to protect consumers' personal information and ePHI;

c. Failing to remedy or mitigate known security risks that Premera was alerted to, which had the potential of exposing personal information and ePHI; and

d. Misrepresenting to consumers after the breach the security measures in place at Premera at the time of the breach.

5.4 Premera's conduct is unfair and deceptive, and has the capacity to deceive a substantial number of Washington consumers.

5.5 Premera's conduct affects the public interest.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, State of Washington, prays for relief as follows:

6.1 That the Court adjudge and decree that Defendant has engaged in the conduct complained of herein;

6.2 That the Court adjudge and decree that the conduct complained of constitutes unfair or deceptive acts and practices and an unfair method of competition and is unlawful in violation of the Consumer Protection Act, RCW 19.86, and violates HIPAA;

6.3 That the Court issue a permanent injunction enjoining and restraining Defendant, and its representatives, successors, assigns, officers, agents, servants, employees, and all other persons acting or claiming to act for, on behalf of, or in active concert or participation with Defendant, from continuing or engaging in the unlawful conduct complained of herein;

6.4 That the Court assess civil penalties, pursuant to RCW 19.86.140, of up to two thousand dollars ($2,000) per violation against Defendant for each and every violation of RCW 19.86.020 caused by the conduct complained of herein;

6.5 That the Court assess statutory damages under 42 U.S.C. § 1320d-5(d)(1) of up to $100 per violation, not to exceed $25,000 per calendar year, for all violations of an identical requirement or prohibition;



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

6.6 That the Court make such orders pursuant to RCW 19.86.080 as it deems appropriate to provide for restitution to consumers of money or property acquired by Defendant as a result of the conduct complained of herein;

6.7 That the Court make such orders pursuant to RCW 19.86.080 to provide that the Plaintiff State of Washington, recover from Defendant the costs of this action, including reasonable attorneys' fees; and

6.8 For such other relief as the Court may deem just and proper.

DATED this 11th day of July, 2019.

ROBERT W. FERGUSON
Attorney General

TIFFANY L. LEE, WSBA #51979
ANDREA M. ALEGRETT, WSBA #50236
Assistant Attorneys General
Attorneys for Plaintiff State of Washington
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Tiffany.Lee@atg.wa.gov
Andrea.Alegrett@atg.wa.gov

**STATE OF WASHINGTON**
**SNOHOMISH COUNTY SUPERIOR COURT**

| | |
|---|---|
| STATE OF WASHINGTON,<br>Plaintiff,<br>v.<br>PREMERA BLUE CROSS,<br>Defendant. | NO. 19 2 06171 31<br>CONSENT DECREE<br>**[CLERK'S ACTION REQUIRED]** |

## I. JUDGMENT SUMMARY

| | | |
|---|---|---|
| 1.1 | Judgment Creditor: | State of Washington |
| 1.2 | Judgment Debtors: | Premera Blue Cross |
| 1.3 | Total Judgment Amount: | $5,432,677.04 |
| 1.4 | Post Judgment Interest Rate: | 12% per annum |
| 1.5 | Attorneys for Judgment Creditor: | Tiffany L. Lee<br>Andrea M. Alegrett<br>Assistant Attorneys General |
| 1.6 | Attorneys for Judgment Debtors: | Curt R. Hineline<br>Theodore J. Kobus III<br>Patrick H. Haggerty<br>Baker & Hostetler LLP |

1.7 Plaintiff, the Attorney General of the State of Washington ("State") conducted an investigation and commenced this action pursuant to the Health Insurance Portability and

COPY

**EXHIBIT D**

Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, as amended by the Health Information Technology for Economic and Clinical Health Act, Pub. L. No. 111-5, 123 Stat. 226, as well as the Department of Health and Human Services ("HHS") Regulations, 45 C.F.R. §§ 160 *et seq.* (collectively "HIPAA") and the Consumer Protection Act, RCW 19.86.

1.8 Plaintiff appears by and through its attorneys Robert W. Ferguson, Attorney General, Tiffany L. Lee, and Andrea M. Alegrett, Assistant Attorneys General; and Premera Blue Cross as defined in Paragraph 3.14 ("PREMERA"), appears by and through their attorneys, Curt R. Hineline, Theodore Kobus, III, and Patrick H. Haggerty.

1.9 Plaintiff and PREMERA stipulate to the entry of this Consent Decree by the Court without the taking of proof and without trial or adjudication of any fact or law.

1.10 Plaintiff alleges that on March 17, 2015, Premera publicly announced a data security incident involving its computer network system which resulted in the unauthorized disclosure of certain consumers' personal information and protected health information.

1.11 Plaintiff and PREMERA agree that this Consent Decree does not constitute evidence or an admission regarding the existence or non-existence of any issue, fact, or violation of any law alleged by Plaintiff.

1.12 PREMERA recognizes and states that this Consent Decree is entered into voluntarily and that no promises or threats have been made by the Attorney General's Office or any member, officer, agent or representative thereof to induce it to enter into this Consent Decree, except as provided herein.

1.13 PREMERA waives any right they may have to appeal from this Consent Decree.

1.14 PREMERA further agrees that it will not oppose the entry of this Consent Decree on the grounds the Consent Decree fails to comply with Rule 65(d) of the Rules of Civil Procedure, and hereby waives any objections based thereon.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1.15 PREMERA further agrees that this Court shall retain jurisdiction of this action for the purpose of implementing and enforcing the terms and conditions of the Consent Decree and for all other purposes.

The Court finding no just reason for delay,

NOW, THEREFORE, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## II. PARTIES AND JURISDICTION

2.1 Plaintiff is Attorney General of the State of Washington.

2.2 Defendant is Premera Blue Cross, a Washington non-profit corporation with its principal office located at 7001 220th St. SW, Building 1, Mountlake Terrace, Washington 98043.

2.3 This Court has jurisdiction of the subject matter of this action, jurisdiction over the parties to this action, and venue is proper in this Court. RCW 4.12.

2.4 PREMERA consents to the filing of this Consent Decree in a county where the Attorney General maintains an office for the limited purpose of resolving the claims at issue.

2.5 Jurisdiction is proper because PREMERA has transacted business within Washington or has engaged in conduct impacting Washington or its residents at all times relevant to the claims at issue.

2.6 This Consent Decree is entered pursuant to and subject to Revised Code of Washington 19.86 *et seq*.

## III. DEFINITIONS

3.1 "COVERED SYSTEMS" shall mean all components, including but not limited to, assets, technology, and software, within the PREMERA NETWORK that are used to collect, process, transmit, and/or store PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION.

3.2 "CONSUMER PROTECTION LAWS" shall mean the Consumer Protection Act, RCW 19.86.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

3.3 "DESIGNATED PRIVACY OFFICIAL" shall mean the individual designated by PREMERA who is responsible for the development and implementation of the policies and procedures as required by 45 C.F.R. § 164.530(a).

3.4 "DESIGNATED SECURITY OFFICIAL" shall mean the individual designated by PREMERA who is responsible for the development and implementation of the policies and procedures as required by 45 C.F.R. § 164.308(a)(2).

3.5 "EFFECTIVE DATE" shall be July 11, 2019.

3.6 "ENCRYPTED" shall refer to the existing industry standard to encode or obscure data at rest or in transit. As of the EFFECTIVE DATE, the existing industry standard shall be AES 256-bit encryption or Transport Layer Security (TLS) 1.2, or their equivalents.

3.7 "GLBA" shall mean the Gramm-Leach-Bliley Act, Pub. L. No. 106-102, 113 Stat. 1338.

3.8 "HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, as amended by the Health Information Technology for Economic and Clinical Health Act, Pub. L. No. 111-5, 123 Stat. 226, as well as the Department of Health and Human Services ("HHS") Regulations, 45 C.F.R. §§ 160 *et seq.*

3.9 "HIPAA SECURITY RULE" shall mean the Security Standards for the Protection of Electronic Protected Health Information, 45 C.F.R. Part 160 and Part 164, Subparts A and E.

3.10 "HIPAA PRIVACY RULE" shall mean the Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. Part 160 and Part 164, Subparts A and E.

3.11 "MULTI-FACTOR AUTHENTICATION" means authentication through verification of at least two of the following authentication factors: (i) Knowledge factors, such as a password; or (ii) Possession factors, such a token or text message on a mobile phone; or (iii) Inherence factors, such as a biometric characteristic.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

3.12 "MULTISTATE EXECUTIVE COMMITTEE" shall mean the Attorneys General of the States of Washington, Oregon, and California.

3.13 "PERSONAL INFORMATION" shall have the same meaning as listed in the SECURITY BREACH NOTIFICATION ACT.

3.14 "PREMERA" shall mean Premera Blue Cross, its parent and its directly or indirectly wholly-owned or controlled affiliates, subsidiaries and divisions, successors and assigns.[1]

3.15 "PREMERA NETWORK" shall mean all networking equipment, databases or data stores, applications, servers, and endpoints that are capable of using and sharing software, data, and hardware resources, and that are owned, operated, and/or controlled by PREMERA.

3.16 "PROTECTED HEALTH INFORMATION" shall mean "individually identifiable health information" as defined by the Health Insurance Portability and Accountability Act (HIPAA), as amended by the Health Information Technology and Clinical Act (HITECH) and 45 C.F.R. § 160.103.

3.17 "SECURITY BREACH NOTIFICATION ACT" shall mean the Notice of Security Breaches Law, RCW 19.255 *et. seq*.

3.18 "SECURITY INCIDENT" shall mean any compromise to the confidentiality, integrity, or availability of a PREMERA information asset that includes PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION.

## IV. INJUNCTIVE RELIEF

4.1 Application of Injunctions. The injunctive provisions of this Consent Decree shall apply to PREMERA and its officers, directors, and employees.

[1] For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity through majority ownership or voting power.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

4.2 Injunctions. PREMERA shall engage in or refrain from engaging in the practices as identified in this Consent Decree.

4.3 **COMPLIANCE PROGRAM:**

a. PREMERA shall perform a comprehensive review and assessment of the effectiveness of its compliance program ("Compliance Program") pursuant to the terms of Paragraph 5.2.

b. PREMERA shall ensure that its Compliance Program is reasonably designed to ensure compliance with applicable federal and state laws related to data security and privacy.

c. PREMERA shall continue to employ an executive or officer who shall be responsible for implementing, maintaining, and monitoring the Compliance Program (for ease, hereinafter referred to as the "Compliance Officer"). The Compliance Officer shall have the appropriate background or experience in compliance, including appropriate training in compliance with HIPAA, GLBA, and applicable state laws relating to privacy or data security.

d. The Compliance Officer shall continue to oversee PREMERA's Compliance Program, and shall function as an independent and objective body that reviews and evaluates compliance within PREMERA. The Compliance Officer shall develop a process for evaluating compliance risks and determining priorities, reviewing compliance plans, and ensuring follow-up to compliance issues identified occurs within a reasonable timeframe and that processes are in place for determining and implementing appropriate disciplinary and corrective actions when violations arise.

e. PREMERA shall continue to ensure that the Compliance Officer has direct access to the Chief Executive Officer and the Audit and Compliance Committee of the Board of Directors.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

f. PREMERA shall ensure that its Compliance Program continues to receive the resources and support necessary to ensure that the Compliance Program functions as required and intended by this Consent Decree.

g. PREMERA may satisfy the implementation and maintenance of the Compliance Program and the safeguards required by this Consent Decree through review, maintenance, and, if necessary, updating of an existing compliance program or existing safeguards, provided that such existing compliance program and existing safeguards meet the requirements set forth in this Consent Decree.

4.4 **INFORMATION SECURITY PROGRAM:**

a. PREMERA may satisfy the implementation and maintenance of the Information Security Program and the safeguards and controls required by this Consent Decree through review, maintenance, and, if necessary, updating of an existing information security program or existing controls and safeguards, provided that such existing compliance program and existing safeguards and controls meet the requirements set forth in this Consent Decree.

b. PREMERA shall implement, maintain, regularly review and revise, and comply with a comprehensive information security program ("Information Security Program") that is reasonably designed to protect the security, integrity, availability, and confidentiality of the PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION that PREMERA collects, stores, transmits, and/or maintains.

c. PREMERA's Information Security Program shall document the administrative, technical, and physical safeguards appropriate to:

(i). The size and complexity of PREMERA's operations;

(ii). The nature and scope of PREMERA's activities; and

(iii). The sensitivity of the PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION that PREMERA collects, stores, transmits, and/or maintains.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

d. As part of its Information Security Program, PREMERA will not trust traffic on the PREMERA NETWORK. In order to trust the traffic, PREMERA shall:

(i). Regularly monitor, log, and inspect all network traffic, including log-in attempts, through the implementation of hardware, software, or procedural mechanisms that record and examine such activity;

(ii). Ensure that every device, user, and network flow is authorized and authenticated; and

(iii). Only allow access by users of the PREMERA NETWORK to the minimum extent necessary and require appropriate authorization and authentication prior to allowing any such access.

e. The Information Security Program shall be designed to:

(i). Protect the security, integrity, availability, and confidentiality of PERSONAL INFORMATION and PROTECTED HEALTH INFORMATION;

(ii). Protect against any threats to the security, integrity, availability, or confidentiality of PERSONAL INFORMATION and PROTECTED HEALTH INFORMATION;

(iii). Protect against unauthorized access to or use of PERSONAL INFORMATION and PROTECTED HEALTH INFORMATION and minimize the likelihood of harm to any consumer;

(iv). Define and periodically reevaluate a schedule for retention of PERSONAL INFORMATION and PROTECTED HEALTH INFORMATION and for its destruction when such information is no longer needed for business purposes;

(v). Restrict access within the PREMERA NETWORK based on necessity and job function, including but not limited to by restricting access to the PERSONAL INFORMATION and PROTECTED HEALTH INFORMATION within the PREMERA NETWORK;



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

(vi). Assess the number of users on PREMERA's applications and retire any application with no active users and that no longer have a business purpose;

(vii). Restrict the ability of PREMERA employees and vendors to access the PREMERA NETWORK via personal devices (e.g., smartphones, tablets, personal laptops); PREMERA shall permit access only based on a business need. If required, the access shall be restricted to only the data, systems, and other network resources required for the vendor's or employee's job. Any access to the PREMERA NETWORK via a personal device shall be reviewed on a regular basis to determine if the vendor's or employee's job function requires this access. Furthermore, this access shall be provided via a secured connection to the PREMERA NETWORK via VPN and MULTI-FACTOR AUTHENTICATION or other greater security safeguards; and

(viii). Restrict the ability of PREMERA's employees and vendors to use PREMERA assets (critical and non-critical) to access personal email, and social media, and file-sharing sites. For PREMERA's employees, PREMERA shall only permit access to non-PREMERA resources based on a business need.

f. PREMERA may satisfy the implementation and maintenance of the Information Security Program and the safeguards required by this Consent Decree through review, maintenance, and, if necessary, updating, of an existing information security program or existing safeguards, provided that such existing information security program and existing safeguards meet the requirements set forth in this Consent Decree.

g. PREMERA shall employ an executive or officer who shall be responsible for implementing, maintaining, and monitoring the Information Security Program (for ease, hereinafter referred to as the "Chief Information Security Officer"). The Chief Information Security Officer shall have the appropriate background or experience in information security and HIPAA compliance. PREMERA shall ensure that the Chief Information Security Officer is a separate position from the Chief Information Officer, and shall serve as PREMERA's DESIGNATED SECURITY OFFICIAL. The Chief Information Security Officer shall have



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

direct access to the Chief Executive Officer and the Audit and Compliance Committee of the Board of Directors.

h. PREMERA shall ensure that the role of the Chief Information Security Officer includes directly advising PREMERA's Board of Directors, Chief Executive Officer, and Chief Information Officer on the management of PREMERA's security posture, the security risks faced by PREMERA, the security implications of PREMERA's decisions, and the adequacy of PREMERA's Information Security Program. The Chief Information Security Officer shall meet with, and provide an oral or written update to: (1) the Board of Directors on at least an annual basis; (2) the Chief Executive Officer at least every two months; (3) the Chief Information Officer on at least a twice per month basis; and (4) the DESIGNATED PRIVACY OFFICIAL at least every two months. The Chief Information Security Officer shall inform the Chief Executive Officer, the Chief Information Officer, and the DESIGNATED PRIVACY OFFICIAL of any material unauthorized intrusion to the PREMERA NETWORK within forty-eight (48) hours of discovery of the intrusion. A material unauthorized intrusion is any intrusion to the PREMERA NETWORK that affects or may affect any PROTECTED HEALTH INFORMATION or PERSONAL INFORMATION.

i. PREMERA shall ensure that the Chief Information Security Officer and Information Security Program receive the resources and support necessary to ensure that the Information Security Program functions as intended by this Consent Decree.

j. PREMERA shall ensure that employees who are responsible for implementing, maintaining, or monitoring the Information Security Program, including but not limited to the Chief Information Officer and Chief Information Security Officer, have sufficient knowledge of the requirements of the Consent Decree.

k. At least once each year, PREMERA shall provide training on safeguarding and protecting consumer PERSONAL INFORMATION and PROTECTED HEALTH INFORMATION to all employees who handle such information, and its employees



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

responsible for implementing, maintaining, or monitoring the Information Security Program. PREMERA's Information Security Program shall be designed and implemented to ensure the appropriate and timely identification, investigation of, and response to SECURITY INCIDENTS.

l. PREMERA shall provide its DESIGNATED PRIVACY OFFICIAL with appropriate training to ensure the official is able to implement the requirements of and ensure compliance with the HIPAA PRIVACY AND SECURITY RULES.

m. PREMERA shall provide its DESIGNATED SECURITY OFFICIAL with appropriate training to ensure the official is able to implement the requirements of and ensure compliance with the HIPAA SECURITY RULE.

n. PREMERA shall maintain a written incident response plan to prepare for and respond to SECURITY INCIDENTS. PREMERA shall revise and update this response plan, as necessary, to adapt to any changes to the PREMERA NETWORK and its COVERED SYSTEMS. Such a plan shall, at a minimum, identify and describe the following phases:

(i). Preparation;

(ii). Investigation, Detection and Analysis;

(iii). Containment;

(iv). Notification and Coordination with Law Enforcement;

(v). Eradication;

(vi). Recovery;

(vii). Consumer and Regulator Notification and Remediation; and

(viii). Post-Incident Analysis (Lessons Learned).

o. For each SECURITY INCIDENT, PREMERA shall create a report that includes a description of the SECURITY INCIDENT and PREMERA's response to that SECURITY INCIDENT ("Security Incident Report"). The Security Incident Report shall be made available for the Third-Party Assessment as described in Paragraph 5.1.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

p. PREMERA shall make reasonable efforts to ensure that any service providers or vendors it employs that handle PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION shall (1) have safeguards in place to protect any of PERSONAL INFORMATION, or PROTECTED HEALTH INFORMATION, and (2) notify PREMERA promptly after discovering any potential compromise of the confidentiality, integrity, or availability of PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION that is held, stored or processed by the service provider or vendor on behalf of PREMERA.

4.5 **PERSONAL INFORMATION, PROTECTED HEALTH INFORMATION AND MEDICAL INFORMATION SAFEGUARDS AND CONTROLS:**

a. On an annual basis, PREMERA shall review, and if necessary update, its data retention policies to ensure that its PERSONAL INFORMATION and PROTECTED HEALTH INFORMATION within the PREMERA NETWORK is only collected, stored, maintained, and/or processed to the extent necessary to accomplish the intended purpose in using such information.

b. PREMERA shall implement, maintain, regularly review and revise, and comply with policies and procedures to ENCRYPT PERSONAL INFORMATION and PROTECTED HEALTH INFORMATION, whether the information is transmitted electronically over a network or is stored on any media, whether it be static, removable, or otherwise.

c. PREMERA shall not make any representations or material omissions of fact that are capable of misleading consumers regarding the extent to which PREMERA maintains and/or protects the privacy, security, confidentiality, or integrity of any PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION collected from or about consumers.

4.6 **SPECIFIC TECHNICAL SAFEGUARDS AND CONTROLS:**

a. Asset Inventory and Managing Critical Assets:



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

(i). PREMERA shall, within one hundred and eighty days (180) days of the EFFECTIVE DATE of this Consent Decree, implement and maintain a configuration management database that contains an asset inventory for all known Critical Assets that identifies: (a) the name of the asset; (b) the version of the asset; (c) the owner of the asset; (d) the asset's location within the PREMERA NETWORK; (e) whether the asset is a Critical Asset; and (f) the date that each security update or patch was applied. PREMERA shall apply the highest rating it uses for any asset that either it uses to collect, store, transmit, or use PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION ("Critical Assets").

(ii). PREMERA shall, within one year of the EFFECTIVE DATE of this Consent Decree, implement and maintain an asset inventory for all assets that identifies: (a) the name of the asset; (b) the version of the asset; (c) the owner of the asset; (d) the asset's location within the PREMERA NETWORK; (e) whether the asset is a Critical Asset; and (f) the date that each security update or patch was applied.

b. Mapping and Encryption of Sensitive Data:

(i). PREMERA shall, within nine (9) months of the EFFECTIVE DATE, identify and map all locations where PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION is collected, stored, received, maintained, processed or transmitted within the PREMERA network. PREMERA shall perform this identification and mapping procedure at least annually. Any such documentation must be made available for inspection for the Assessment as described in Paragraph 5.1.

(ii). PREMERA shall ensure that electronic PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION that is stored at rest or is in transmission is ENCRYPTED except where PREMERA determines that ENCRYPTION is not reasonable and appropriate and it documents the rationale for this decision.

c. Segmentation: PREMERA shall implement and maintain segmentation protocols and related policies that are reasonably designed to properly segment the PREMERA



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

NETWORK, which shall, at a minimum, ensure system functionality and performance to meet business needs while also mitigating exposure to the enterprise network in the event of an attack or malicious intruder access. Additionally, PREMERA shall regularly evaluate, and as appropriate, restrict and disable any unnecessary ports of service on the PREMERA NETWORK.

d. Penetration Testing: PREMERA shall engage a third-party vendor to perform an annual penetration test to the PREMERA NETWORK, and shall ensure any risks or vulnerabilities identified are risk assessed, prioritized, and addressed under PREMERA'S Information Security Program. The parties understand and agree that addressing a risk may include remediation or alternate risk mitigation efforts based on the risk assessment in Paragraph 4.6(e).

e. Risk Assessment: PREMERA shall conduct an accurate and thorough risk assessment on any material risks and/or vulnerabilities identified by its internal auditors or through penetration testing as required by Paragraph 4.6(d) within thirty (30) days of identification of the risk or vulnerability to the PREMERA NETWORK and its COVERED SYSTEMS. PREMERA shall rate each vulnerability on a risk-based rating scale developed by PREMERA that takes into account cybersecurity best practices and risk to PERSONAL INFORMATION and PROTECTED HEALTH INFORMATION. PREMERA shall ensure that risks or vulnerabilities that threaten the safeguarding or security of any PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION maintained on the PREMERA NETWORK shall be addressed and remediated as expeditiously as possible. PREMERA shall document in writing any decision not to address a risk or vulnerability that threatens the safeguarding or security of any PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION maintained on the PREMERA NETWORK.

(i). The risk assessment shall include an accurate and thorough assessment of the potential risks and vulnerabilities to the confidentiality, integrity, and availability



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

of electronic protected health information held as required by HIPAA Security Rule, 45 C.F.R. § 164.308(a)(1)(ii)(A).

(ii). PREMERA shall implement and maintain a corresponding risk-assessment program designed to identify and assess risks to the PREMERA NETWORK. In cases where PREMERA deems quantitative risk to be acceptable, PREMERA shall generate and retain a report demonstrating how such risks are to be managed in consideration of the risk to PERSONAL INFORMATION and PROTECTED HEALTH INFORMATION, and the cost or difficulty in implementing effective countermeasures. All reports shall be maintained by the Chief Information Security Officer and be available for inspection by its DESIGNATED PRIVACY OFFICIAL, and the Third-Party Assessor described in Paragraph 5.1 of this Consent Decree.

f. Secure Network Communications: PREMERA shall implement and maintain controls that filter incoming emails for potential phishing attacks or other fraudulent emails and that establish strong peer-to-peer communications between its employees and vendors. In addition, PREMERA will secure external communications to limit the ability of an attacker or malicious intruder to communicate from the PREMERA NETWORK to unknown IP addresses.

g. Access Control and Account Management: PREMERA shall implement and maintain appropriate controls to manage access to accounts and shall take into account whether the user is on a PREMERA device or a non-PREMERA device, such as a personal device, and whether the user is physically located at a PREMERA site or connecting to PREMERA through a remote connection.

(i). PREMERA shall, within nine (9) months of the EFFECTIVE DATE, implement and maintain appropriate controls to manage access to, and use of, all administrator, service, and vendor accounts with access to PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION. Such controls shall include, without limitation, (1) strong passwords, (2) password confidentiality policies, (3) password-rotation policies, (4)



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

MULTI-FACTOR AUTHENTICATION or any other equal or greater authentication protocol for identity management, and (5) appropriate safeguards for administrative level passwords.

(ii). PREMERA shall implement and maintain appropriate controls to manage access to, and use of, all PREMERA employee user accounts with access to PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION.

(iii). PREMERA shall implement and maintain appropriate administrative processes and procedures to store and monitor the account credentials and access privileges of employees who have privileges to design, maintain, operate, and update the PREMERA NETWORK.

(iv). PREMERA shall implement and maintain appropriate policies for the secure storage of account passwords, including, without limitation, hashing passwords stored online using an appropriate hashing algorithm that is not vulnerable to a collision attack, and an appropriate salting policy.

(v). PREMERA shall implement and maintain adequate access controls, processes, and procedures, the purpose of which shall be to grant access to the PREMERA NETWORK only if the user is properly authorized and authenticated.

(vi). PREMERA shall immediately disable access privileges for all persons whose access to the PREMERA NETWORK is no longer required or appropriate. PREMERA shall limit access to PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION by persons accessing the PREMERA NETWORK on a least-privileged basis.

(vii). PREMERA shall regularly inventory the users who have access to the PREMERA NETWORK in order to review and determine whether or not such access remains necessary or appropriate. PREMERA shall regularly compare employee termination lists to user accounts to ensure access privileges have been appropriately terminated. At a minimum, such review shall be performed on a quarterly basis. When the privileges, including for any disabled



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

accounts, are determined to be no longer necessary for any business function, PREMERA shall terminate access privileges for those accounts.

(viii). PREMERA shall implement and maintain network endpoint (e.g., devices and PCs) security by using network access controls to identify devices accessing the PREMERA NETWORK, such as an identity-based network access controller or a similar product.

h. <u>File Integrity and End-point Monitoring</u>: PREMERA shall deploy and maintain controls designed to provide near real-time and/or real-time notification of unauthorized access to PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION. PREMERA shall, within six (6) months from the EFFECTIVE DATE of this Consent Decree, deploy and maintain controls designed to provide near real-time or real-time notification of modifications to any applications or systems that either contain or provide access to PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION.

i. <u>Controlling Permissible Applications</u>: For servers in the PREMERA NETWORK, PREMERA shall deploy and maintain controls within one year of the EFFECTIVE DATE that are designed to block and/or prevent the execution of unauthorized applications within the PREMERA NETWORK, as prescribed in the implementation standards of the HITRUST framework. For clients (e.g., desktops, laptops, tablets), PREMERA shall maintain the controls prescribed in the implemented HITRUST framework designed to block and/or prevent the execution of unauthorized applications within the PREMERA NETWORK. Additionally, the controls will provide alerts when unauthorized applications attempt to execute on the PREMERA NETWORK.

j. <u>Logging and Monitoring</u>: PREMERA shall maintain reasonable policies, procedures, and controls the purpose of which shall be to properly monitor and log activities on the PREMERA NETWORK.

(i). PREMERA shall ensure that logs are automatically processed and aggregated, and then actively monitored and analyzed in real time or near real time.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

(ii). PREMERA shall test at least twice per year, any software, hardware, or service used pursuant to this paragraph, to ensure it is properly configured, and regularly updated and maintained to ensure that all COVERED SYSTEMS are adequately logged and monitored.

k. Change Control: PREMERA shall implement and maintain policies and procedures reasonably designed to manage and document changes to the PREMERA NETWORK.

l. Updates/Patch Management: PREMERA shall maintain, keep updated, and support the software on the PREMERA NETWORK taking into consideration the impact a software update will have on data security in the context of the entire PREMERA NETWORK and its ongoing business and network operations, and the scope of the resources required to maintain, update and support the software. PREMERA shall deploy and maintain reasonable controls to ensure that risks posed by software no longer supported by the manufacturer are adequately addressed and reasonably mitigated.

## V. ASSESSMENT AND REPORTING REQUIREMENTS TO THE ATTORNEY GENERAL

5.1 Information Security Assessment:

a. PREMERA shall, for a period of three years (3) after the EFFECTIVE DATE of this Consent Decree, obtain an annual information security assessment and report from a third-party professional ("Third-Party Assessor") using procedures and standards generally accepted in the profession ("Third-Party Assessment"), commencing within one (1) year after the EFFECTIVE DATE of this Consent Decree. The Third Party Assessor's report on the Third-Party Assessment shall:

(i). Set forth the specific administrative, technical, and physical safeguards maintained by PREMERA;

(ii). Explain the extent to which such safeguards are appropriate in light of PREMERA's size and complexity, the nature and scope of PREMERA's activities, and the



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

sensitivity of the PERSONAL INFORMATION or PROTECTED HEALTH INFORMATION maintained by PREMERA;

(iii). Assess and certify the extent to which the administrative, technical, and physical safeguards that have been implemented by PREMERA meet the requirements of the Information Security Program;

(iv). Assess and certify the extent to which PREMERA is complying with the requirements of the Information Security Program;

(v). Specifically review and evaluate the reasonableness of any decision to not encrypt PERSONAL INFORMATION and PERSONAL HEALTH INFORMATION, in compliance with Paragraph 4.6(b);

(vi). Specifically review and evaluate PREMERA's response to SECURITY INCIDENTS in the Security Incident Report (see Paragraph 4.4(o)); and

(vii). Specifically review and evaluate PREMERA's compliance with the penetration testing requirements set forth in Paragraph 4.6(d); the risk assessment requirements set forth in Paragraph 4.6(e); the logging and monitoring requirements set forth in Paragraph 4.6(j); the change control requirements set forth in Paragraph 4.6(k); and the updates/patch management requirements set forth in Paragraph 4.6(l).

b. The Third-Party Assessor shall be a Certified Information Systems Security Professional ("CISSP") or a Certified Information Systems Auditor ("CISA"), or a similarly qualified person or organization; have at least five (5) years of experience evaluating the effectiveness of computer system security or information system security; and must be approved by the MULTISTATE EXECUTIVE COMMITTEE.

c. Each Third-Party Assessment must be completed within sixty (60) days after the end of the reporting period to which the Third-Party Assessment applies. PREMERA shall provide a copy of the Third-Party Assessor's Report on the Third-Party Assessment to the Washington Attorney General's Office within thirty (30) days of the completion of the report.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

d. The State of Washington shall, to the extent permitted by the laws of the State of Washington, treat such Third-Party Assessor's Report as exempt from disclosure under the relevant public records laws.

e. The Washington Attorney General's Office may provide a copy of the Third-Party Assessor's Report received from PREMERA to another Attorney General's Office upon request, and that Attorney General shall, to the extent permitted by the laws of Washington, treat such Third-Party Assessor's Report as exempt from disclosure under the relevant public records laws.

5.2 Compliance Program Assessment: Within one-hundred-and-eighty (180) days of the EFFECTIVE DATE of this Consent Decree, PREMERA shall conduct an assessment of the structure of and personnel responsible for PREMERA's Compliance Program (the "Compliance Program Assessment"). The Compliance Program Assessment required by this paragraph shall be conducted by a third-party professional (the "Compliance Program Assessor").

a. The Compliance Program Assessor shall use procedures and standards generally accepted in the profession.

b. The Compliance Program Assessor shall:

(i). Examine the effectiveness of the PREMERA's Compliance Program;

(ii). Examine the independence and effectiveness of the structure of employees responsible for PREMERA's Compliance Program;

(iii). Identify any potential conflicts-of-interest that may hinder PREMERA's obligation to comply with state and federal laws related to data security and privacy; and

(iv). Examine PREMERA's HIPAA Risk Analysis Assessment and Mitigation Plan, as required by 45 C.F.R. § 164.308(a)(1)(ii)(A) and relevant guidelines provided by the Office for Civil Rights.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

c. The findings of the Compliance Program Assessment shall be documented in a report (the "Compliance Program Assessor's Report"). PREMERA shall provide a copy of the Compliance Program Assessor's Report to the Washington Attorney General's Office within thirty (30) days of the completion of the Compliance Program Assessment.

d. The State of Washington shall, to the extent permitted by the laws of the State of Washington, treat such Compliance Program Assessor's Report as exempt from disclosure under the relevant public records laws.

e. The Washington Attorney General's Office may provide a copy of the Compliance Program Assessor's Report received from PREMERA to another Attorney General's Office upon request, and that Attorney General shall, to the extent permitted by the laws of Washington, treat such Compliance Program Assessor's Report as exempt from disclosure under the relevant public records laws.

5.3 PREMERA will make reasonable good faith efforts to address any concerns and implement recommendations made by the Third-Party Assessor or the Compliance Assessor.

## VI. DOCUMENT RETENTION

6.1 PREMERA shall retain and maintain the reports, records, information and other documentation required by this Consent Decree for a period of no less than three (3) years after the document is finalized, last edited, or last used.

## VII. PAYMENT TO THE ATTORNEY GENERAL'S OFFICE

7.1 No later than thirty (30) days after the EFFECTIVE DATE, PREMERA shall pay a total of $5,432,677.04 to the Attorney General's Office. The Attorney General shall use the funds for recovery of its costs and attorneys' fees in investigating this matter, future monitoring and enforcement of this Consent Decree, future enforcement of RCW 19.86, or for any lawful purpose in the discharge of the Attorney General's duties at the sole discretion of the Attorney General.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

## VIII. RELEASE

8.1 Following full payment of the amount due under this Consent Decree, the Plaintiff shall release and discharge PREMERA from all civil claims that the Attorney General has or could have brought under the Consumer Protection Act, RCW 19.86; Notice of Security Breaches Law, RCW 19.255, the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, as amended by the Health Information Technology for Economic and Clinical Health Act, Pub. L. No. 111-5, 123 Stat. 226, as well as the Department of Health and Human Services ("HHS") Regulations, 45 C.F.R. §§ 160 *et seq.*, and Washington Nonprofit Corporation Act, RCW 24.03, arising out of PREMERA's conduct related to, and the Attorney General's investigation of, the data security incident first publicly announced March 17, 2015. Nothing contained in this paragraph shall be construed to limit the ability of the Attorney General to enforce the obligations that PREMERA has under this Consent Decree. Further, nothing in this Consent Decree shall be construed to create, waive, or limit any private right of action or any action brought by any state agency other than the Attorney General's Office.

8.2 The obligations and other provisions of this Consent Decree set forth in Sections 4.4 and 4.6 shall expire at the conclusion of the five (5) year period after the EFFECTIVE DATE of this Consent Decree, unless they have expired at an earlier date pursuant to their specific terms. The obligations and other provisions of this Consent Decree set forth in Paragraphs 4.3 and 4.5 shall expire at the conclusion of the ten (10) year period after the EFFECTIVE DATE of this Consent Decree, unless they have expired at an earlier date pursuant to their specific terms. Other sections and paragraph with specified time periods shall expire as detailed in those sections and paragraphs. Nothing in this paragraph should be construed or applied to excuse PREMERA from its obligation to comply with all applicable state and federal laws, regulations and rules.

8.3 Notwithstanding any term of this Consent Decree, any and all of the following forms of liability are specifically reserved and excluded from the release as to any entity or



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

person, including PREMERA:

a. Any criminal liability that any person or entity, including PREMERA, has or may have to the States.

b. Any civil or administrative liability that any person or entity, including PREMERA, has or may have to the States under any statute, regulation or rule giving rise to, any and all of the following claims:

(i). State or federal antitrust violations;

(ii). State or federal securities violations; or

(iii). State or federal tax claims.

## IX. MEET AND CONFER

9.1 If any Attorney General determines that PREMERA has failed to comply with any of Sections IV and V of this Consent Decree, and if in the Attorney General's sole discretion the failure to comply with this Consent Decree does not threaten the health or safety of the citizens of the Attorney General's State and/or does not create an emergency requiring immediate action, the Attorney General will notify PREMERA in writing of such failure to comply and PREMERA shall have thirty (30) days from receipt of such written notice to provide a good faith written response to that Attorney General, including either a statement that PREMERA believes it is in full compliance or otherwise a statement explaining how the violation occurred, how it has been addressed or when it will be addressed, and what PREMERA will do to make sure the violation does not happen again. The Attorney General may agree to provide PREMERA more than thirty (30) days to respond.

9.2 Nothing herein shall be construed to exonerate any failure to comply with any provision of this Consent Decree, or limit the right and authority of an Attorney General to initiate a proceeding for any failure to comply with this Consent Decree after receiving the response from PREMERA described in Paragraph 9.1, if the Attorney General determines that an enforcement action is in the public interest.



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

## X. ENFORCEMENT

10.1 Violation of any of the injunctions contained in this Consent Decree, as determined by the Court, shall constitute a violation of an injunction for which civil penalties may be sought by the Attorney General pursuant to RCW 19.86.10 and/or such other remedies as may be provided by law.

10.2 This Consent Decree is entered pursuant to RCW 19.86.080. Jurisdiction is retained for the purpose of enabling any party to this Consent Decree with or without the prior consent of the other party to apply to the Court at any time for enforcement of compliance with this Consent Decree, to punish violations thereof, or to modify or clarify this Consent Decree.

10.3 Under no circumstances shall this Consent Decree or the name of the State of Washington, the Office of the Attorney General, Consumer Protection Division, or any of their employees or representatives be used by PREMERA in connection with any selling, advertising, or promotion of products or services, or as an endorsement or approval of PREMERA's acts, practices or conduct of business.

10.4 Nothing in this Consent Decree shall be construed to limit the authority or ability of the Attorney General to protect the interests of Washington or the people of Washington. This Consent Decree shall not bar the Attorney General or any other governmental entity from enforcing laws, regulations, or rules against PREMERA for conduct subsequent to or otherwise not covered by this Consent Decree. Further, nothing in this Consent Decree shall be construed to limit the ability of the Attorney General to enforce the obligations that PREMERA has under this Consent Decree.

10.5 Nothing in this Consent Decree shall be construed as relieving PREMERA of the obligation to comply with all state and federal laws, regulations, and rules, nor shall any of the provisions of this Consent Decree be deemed to be permission to engage in any acts or practices prohibited by such laws, regulations, and rules.

10.6 PREMERA shall deliver a copy of this Consent Decree to, and otherwise fully



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

apprise, its Chief Executive Officer, Chief Information Officer, Chief Information Security Officer, Compliance Officer, DESIGNATED PRIVACY OFFICIAL, DESIGNATED SECURITY OFFICIAL, Chief Legal Officer, and its Board of Directors within (30) days of the EFFECTIVE DATE. To the extent PREMERA hires or replaces any of the above listed officers, counsel or Directors, PREMERA shall deliver a copy of this Consent Decree to their replacements within thirty (30) days from the date on which such person assumes his/her position with PREMERA.

10.7 No court costs, if any, shall be taxed upon the Attorney General. To the extent there are any court costs associated with the filing of this Consent Decree, PREMERA shall pay all such court costs.

10.8 PREMERA shall not participate in any activity or form a separate entity or corporation for the purpose of engaging in acts or practices in whole or in part that are prohibited by this Consent Decree or for any other purpose that would otherwise circumvent any term of this Consent Decree. PREMERA shall not knowingly cause, permit, or encourage any other persons or entities acting on its behalf, to engage in practices prohibited by this Consent Decree.

10.9 PREMERA agrees that this Consent Decree does not entitle it to seek or to obtain attorneys' fees as a prevailing party under any statute, regulation, or rule, and PREMERA further waives any right to attorneys' fees that may arise under such statute, regulation, or rule.

10.10 This Consent Decree shall not be construed to waive any claims of sovereign immunity Washington may have in any action or proceeding.

10.11 If any portion of this Consent Decree is held invalid by operation of law, the remaining terms of this Consent Decree shall not be affected and shall remain in full force and effect.

10.12 Whenever PREMERA shall provide reports to the Washington Attorney General under Section V of this Consent Decree, those requirements shall be satisfied by sending the report to: ATTN: Tiffany L. Lee and Andrea M. Alegrett, Assistant Attorneys General,



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

Consumer Protection Division, Office of the Attorney General, 800 Fifth Avenue #2000, Seattle, WA 98104.

10.13 Any notice or report provided by the Attorney General to PREMERA under Section IX of this Consent Decree shall be satisfied by sending notice to: Chief Legal Officer, Premera Blue Cross, 7001 220th St., SW, MS 316, Mountlake Terrace, WA 98043.

10.14 All documents to be provided under this Consent Decree shall be sent by United States mail, certified mail return receipt requested, or other nationally recognized courier service that provides for tracking services and identification of the person signing for the notice or document, and shall have been deemed to be sent upon mailing. The parties may update their designee or address by sending written notice to the other party informing it of the change.

10.15 Jurisdiction is retained by the Court for the purpose of enabling any party to the Consent Decree to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or the carrying out of this Consent Decree, for the modification of any of the injunctive provisions hereof, for enforcement of compliance herewith, and for the punishment of violations hereof, if any.

10.16 The clerk is ordered to enter this Consent Decree forthwith.

## XI. DISMISSAL AND WAIVER OF CLAIMS

11.1 Upon entry of this Consent Decree, all claims in this matter, not otherwise addressed by this Consent Decree are dismissed.

DONE IN OPEN COURT this _____ day of _______________, 2019.

JUDGE/COURT COMMISSIONER



ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

Approved for entry and presented by:

ROBERT W. FERGUSON
Attorney General

TIFFANY LEE, WSBA #51979
ANDREA M. ALEGRETT, WSBA #50236
Assistant Attorneys General
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: (206) 464-7744
tiffany.lee@atg.wa.gov
andrea.alegrett@atg.wa.gov

Attorneys for Plaintiff

Approved for Entry, Notice of Presentation Waived:

CURT ROY HINELINE, WSBA #16317
Baker & Hostetler LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1101
Email: chineline@bakerlaw.com

THEODORE J. KOBUS III
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111-0100
Telephone: (212) 271-1504
Email: tkobus@bakerlaw.com

PATRICK H. HAGGERTY
Baker & Hostetler LLP
312 Walnut St., Suite 3200
Cincinnati, OH 45202
Telephone: (513) 929-3412
Email: phaggerty@bakerlaw.com

Attorneys for Defendant

# POLICY CHANGE 4

Effective 10/01/2013 , this endorsement forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)
issued to
PREMERA
(See ASC 00 11 01 98, Schedule 1)
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

In Accordance with this Policy Change Your Premium is Revised as follows:

Return
Premium

$[redacted]

This Policy Change Amends the Following Policy Provisions:

Automobile Declarations, ACA 02 03 10

Delete Vehicle(s):
Auto No.
1 State: WA
Year: 1988
Make: FORD
Model: E350
VIN: 1FDKE37H4JHB09258

3 6-43-4154 09/09/2014 DDS CPW PR 1.000

EXHIBIT E-1

# POLICY CHANGE 4

Effective 10/01/2013, this endorsement forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)

issued to
PREMERA
(See ASC 00 11 01 98, Schedule 1)
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

Policy Change Premium Breakdown

| Coverage | Term Premium | Add/Ret Premium |
|---|---|---|
| Broad Form Physical Damage | $[redacted] | $0 |

| Auto No. | Coverage | Term Premium | Add/Ret Premium |
|---|---|---|---|
| 1 | Liability | | $[redacted] RP |
| | Medical Payments | | $[redacted] RP |
| | Comprehensive | | $[redacted] RP |
| | Collision | | $[redacted] RP |
| | UIM BI & PD | | $[redacted] RP |
| | Rental Reimbursement Comprehensive | | $[redacted] RP |
| | Rental Reimbursement Collision | | $[redacted] RP |
| | Terrorism - Auto | | $[redacted] RP |

3 6-43-4154 09/09/2014 DDS CPW PR 1.000

OneBeacon
INSURANCE GROUP

**Atlantic Specialty Insurance Company**
150 Royall Street
Canton, MA 02021

Insured Name and Address:

PREMERA
(See ASC 00 11 01 98, Schedule 1)
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

Policy Number: 712-00-78-31-0006

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM INSURANCE COVERAGE

You were notified that under rights granted by the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses arising out of acts of terrorism as defined in Section 102(1) of the Act. Under the Act, the term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

COVERAGE FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, AS DEFINED IN THE ACT, MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT IN ACCORDANCE WITH A FORMULA ESTABLISHED UNDER THE ACT. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT WOULD PAY 85% OF COVERED TERRORISM LOSSES THAT EXCEED THE STATUTORILY IMPOSED DEDUCTIBLE FOR WHICH THE INSURANCE COMPANY IS RESPONSIBLE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSSES COVERED BY THE UNITED STATES GOVERNMENT UNDER THE ACT.

THE ACT CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES EXCEEDS $100 BILLION IN ANY ONE CALENDAR YEAR. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

The premium required for your terrorism coverage would have been: $[redacted].

> The premium shown above is calculated based in part on the federal participation in payment of terrorism losses as set forth in the Terrorism Risk Insurance Act. The federal program established by the Act is scheduled to terminate at the end of 12/31/14. If the federal program terminates or if the level or terms of federal participation change, the estimated premium shown above may not have been appropriate.
>
> If this policy contains a Conditional Exclusion, continuation of coverage for certified acts of terrorism, or termination of such coverage, will be determined upon disposition of the federal program, subject to the terms and conditions of the Conditional Exclusion. If this policy does not contain a Conditional Exclusion, coverage for certified acts of terrorism will continue. In either case, when disposition of the federal program is determined, we would have recalculated the estimated premium shown above and would have charged additional premium or refunded excess premium, if indicated.

You were given an offer of terrorism coverage required under the Act, which you elected to reject. You do not have coverage for losses arising from an act of terrorism as defined in the Act, unless you have a sublimit endorsement attached to your policy.

3 6-43-4154 04/08/2015 K1C CPW PR 1.000


Copyright 2008, OneBeacon Insurance Group LLC
E-INSURED

**If your policy includes Property Coverage in one or more of these states: CA, CT, GA, HI, IA, IL, MA, ME, MO, NC, NJ, NY, OR, RI, VA, WA, WI, or WV; the following statement applies:**

The terrorism exclusion makes an exception for (and thereby continues your coverage for) property fire losses resulting from an act of terrorism. Therefore, if you reject the offer of terrorism coverage, that rejection does not apply to fire losses resulting from an act of terrorism - the coverage in your policy for such fire losses will continue. If such a loss occurs, and is certified under the Act, the loss may be reimbursed by the United States government under the formula detailed above.

The portion of your policy premium attributable to terrorism (fire only) coverage in all of the states listed above, in which your policy provides property coverage, is $$[redacted]________________ . This amount is included in your policy premium and cannot be rejected.

You need to take no action with respect to this notice. You will receive a bill for your policy premium which will include the amount required for your coverage for fire losses resulting from an act of terrorism, if applicable.

If you have any questions about this notice, please contact your agent.


Copyright 2008, OneBeacon Insurance Group LLC

# POLICY CHANGE 5

Effective 10/01/2013, this endorsement forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)
issued to
PREMERA
(See ASC 00 11 01 98, Schedule 1)
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

In Accordance with this Policy Change Your Premium is Revised as follows:

Return
Premium

$[redacted]

This Policy Change Amends the Following Policy Provisions:

Liability Declarations ASC 00 05 01 98

Add Form(s):
CG 21 75 06 08 — EXCLUSION OF CERTIFIED ACTS OF TERRORISM & OTHER TERRORISM

Delete Form(s):
CG 21 71 06 08 — EXCL- OTHER ACTS OF TERRORISM; CAP ON CERTIFIED LOSSES

Umbrella Declarations VCU 001 12 99

Add Form(s):
VCU 306 01 08 — EXCLUSION OF CERTIFIED ACTS OF TERRORISM & OTHER TERRORISM

Delete Form(s):
VCU 303 01 08 — EXCL OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE US

Automobile Declarations, ACA 01 03 10

Add Form(s):
CA 23 92 01 06 — WA EXCLUSION OF TERRORISM

3 6-43-4154 04/08/2015 K1C CPW PR 1.000

# POLICY CHANGE 5

Effective 10/01/2013 , this endorsement forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)
issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

Automobile Declarations, ACA 01 03 10

Delete Form(s):

| | |
|---|---|
| CA 23 93 01 06 | WA EXCL OF TERRORISM - NUCLEAR BIOLOGICAL OR CHEMICAL |

Non-Policy Forms ASC 00 14 01 98

Add Non-Policy Form(s):

| | |
|---|---|
| CLD 142 01 08 | POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COV |

Delete Non-Policy Form(s):

| | |
|---|---|
| CLD 132 01 08 | POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COV |

3 6-43-4154 04/08/2015 K1C CPW PR 1.000

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM AND EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism", or out of an "other act of terrorism" that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, with respect to an "other act of terrorism", this exclusion applies only when one or more of the following are attributed to such act:

**1.** The total of insured damage to all types of property exceeds $25,000,000 (valued in US dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

**a.** Physical injury that involves a substantial risk of death; or

**b.** Protracted and obvious physical disfigurement; or

**c.** Protracted loss of or impairment of the function of a bodily member or organ; or

**3.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;

**b.** The act resulted in damage:

**(1)** Within the United States (including its territories and possessions and Puerto Rico); or

 Copyright 2008, OneBeacon Insurance Group LLC 

**(2)** Outside of the United States in the case of:

**(a)** An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

**(b)** The premises of any United States mission; and

**c.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

**C.** In the event of any incident of a "certified act of terrorism" or an "other act of terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.


Copyright 2008, OneBeacon Insurance Group LLC

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WASHINGTON EXCLUSION OF TERRORISM

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
SINGLE INTEREST AUTOMOBILE PHYSICAL DAMAGE INSURANCE POLICY
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A.** The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury, damage, loss or expense, are enclosed in quotation marks:

**1.** "Terrorism" means activities against persons, organizations or property of any nature:

**a.** That involve the following or preparation for the following:

**(1)** Use or threat of force or violence; or

**(2)** Commission or threat of a dangerous act; or

**(3)** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

**b.** When one or both of the following applies:

**(1)** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

**(2)** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

**2.** "Any injury, damage, loss or expense" means any injury, damage, loss or expense covered under any Coverage Form or Policy to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal injury", personal and advertising injury", "loss", loss of use, rental reimbursement after "loss" or "covered pollution cost or expense", as may be defined under this Coverage Form, Policy or any applicable endorsement.

**B.** Except with respect to Physical Damage Coverage, Trailer Interchange Coverage, Garagekeepers Coverage, Garagekeepers Coverage – Customers' Sound Receiving Equipment or the Single Interest Automobile Physical Damage Insurance Policy, the following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for "any injury, damage, loss or expense" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

**1.** The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

**2.** Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

**3.** The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**4.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials; or


© ISO Properties, Inc., 2004
E-INSURED

5. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

6. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   a. Physical injury that involves a substantial risk of death; or

   b. Protracted and obvious physical disfigurement; or

   c. Protracted loss of or impairment of the function of a bodily member or organ.

Multiple incidents of "terrorism" which occur within a 72hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the thresholds in Paragraphs **B.5.** and **B.6.** are exceeded.

With respect to this Exclusion, Paragraphs **B.5.** and **B.6.** describe the thresholds used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Form, Policy or any applicable endorsement.

**C.** With respect to Physical Damage Coverage, Trailer Interchange Coverage, Garagekeepers Coverage, Garagekeepers Coverage – Customers' Sound Receiving Equipment or the Single Interest Automobile Physical Damage Insurance Policy, the following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for any "loss", loss of use or rental reimbursement after "loss" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

1. The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

2. Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

3. The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

4. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials; or

5. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions.

Multiple incidents of "terrorism" which occur within a 72hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the threshold in Paragraph **C.5.** is exceeded.

With respect to this Exclusion, Paragraph **C.5.** describes the threshold used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Form, Policy or any applicable endorsement.


© ISO Properties, Inc., 2004

**D.** In the event of any incident of "terrorism" that is not subject to the Exclusion in Paragraphs **B.** or **C.,** coverage does not apply to "any injury, damage, loss or expense" that is otherwise excluded under this Coverage Form, Policy or any applicable endorsement.

 © ISO Properties, Inc., 2004 

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM AND EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY COVERAGE PART

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism" or out of an "other act of terrorism" that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, with respect to an "other act of terrorism", this exclusion applies only when one or more of the following are attributed to such act:

**1.** The total of insured damage to all types of property exceeds $25,000,000 (valued in U.S. dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

**a.** Physical injury that involves a substantial risk of death; or

**b.** Protracted and obvious physical disfigurement; or

**c.** Protracted loss of or impairment of the function of a bodily member or organ; or

**3.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part or underlying insurance to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part or underlying insurance.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2008, OneBeacon Insurance Group LLC

**b.** The act resulted in damage:

**(1)** Within the United States (including its territories and possessions and Puerto Rico); or

**(2)** Outside of the United States in the case of:

**(a)** An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

**(b)** The premises of any United States mission; and

**c.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

**C.** In the event of any incident of a "certified act of terrorism" or an "other act of terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2008, OneBeacon Insurance Group LLC

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.


© ISO Properties, Inc., 2004

OneBeacon
PROFESSIONAL INSURANCE®

199 Scott Swamp Road
Farmington, CT 06032

877.701.0171 t
866.625.3590 f

onebeaconpro.com

Hello.

Thanks for choosing to renew your policy with OneBeacon Professional Insurance. As you likely already know, your policy with us gives you access to experts who know financial institutions as well as they know insurance. We'd like to remind you that you have available to you a broad range of risk control and claims resources, all designed to assist you in your efforts to maintain a safe and secure facility. For additional information on services available from OneBeacon, go to http://onebeaconpro.com/900.

**Risk Control Information and Support at Your Fingertips**
Managing risks in community banks is a big task. That's why OneBeacon Professional Insurance wants to help you identify and protect your facility from potential exposures. As a policyholder, you can arrange for a dedicated Risk Control Specialist to work directly with your organization to help develop an approach that aims to address your specific needs. We offer a wide range of services to complement your existing risk control efforts:

- Disaster recovery and business continuity planning
- Fire protection system evaluation
- Auto fleet risk improvement/driver training
- Slip and fall prevention
- Ergonomics/computer workstation evaluations
- Materials handling/back injury prevention

For more information about the risk control services available to you as an OBPI policyholder, contact rtriplett@onebeacon.com.

**Superior Claims Support**
We realize that - despite best efforts - claims sometimes do occur. If this happens, an experienced Claims Examiner is assigned and will serve as a dedicated resource and point of contact. For your convenience, claims can be submitted one of four ways:

| | |
|---|---|
| 24/7 Phone: | 877.248.3455 |
| Secure E-mail: | claims@onebeacon.com |
| Fax: | 866.243.2802 |
| U.S. Mail: | OneBeacon Insurance Group<br>150 Royall St.<br>Canton, MA 02021 |

We hope you find these resources helpful as we strive to provide you with an entirely better insurance experience. We welcome any feedback, which can be sent to us at tellobpi@onebeaconpro.com. Additionally, if you are not the person who should be receiving this information, please forward it to the appropriate person and copy tellobpi@onebeaconpro.com so we can update our files.

Thank you again for renewing with OneBeacon Professional Insurance. We're pleased to be working with you.

Craig M. Collins

Craig Collins
President, Financial Services
952.852.2434
ccollins@onebeaconpro.com

[X] Commercial [ ] Personal

## INSURANCE IDENTIFICATION CARD

Washington
(STATE)

COMPANY NUMBER: 27154
COMPANY: Atlantic Specialty Insurance Company

POLICY NUMBER: 712-00-78-31-0006
EFFECTIVE DATE: 10/01/2013
EXPIRATION DATE: 10/01/2014

YEAR MAKE/MODEL: 1988 FORD/E350
VEHICLE IDENTIFICATION NUMBER: 1FDKE37H4JHB09258

AGENCY/COMPANY ISSUING CARD
MARSH USA, INC.
1301 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101

INSURED
PREMERA
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

AUTHORIZED REPRESENTATIVE

**SEE IMPORTANT NOTICE ON REVERSE SIDE**

[X] Commercial [ ] Personal

## INSURANCE IDENTIFICATION CARD

Washington
(STATE)

COMPANY NUMBER: 27154
COMPANY: Atlantic Specialty Insurance Company

POLICY NUMBER: 712-00-78-31-0006
EFFECTIVE DATE: 10/01/2013
EXPIRATION DATE: 10/01/2014

YEAR MAKE/MODEL: 2013 FORD/TRANSIT CONNECT XLT
VEHICLE IDENTIFICATION NUMBER: NM0KS9CN9DT153640

AGENCY/COMPANY ISSUING CARD
MARSH USA, INC.
1301 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101

INSURED
PREMERA
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

AUTHORIZED REPRESENTATIVE

**SEE IMPORTANT NOTICE ON REVERSE SIDE**

**THIS CARD MUST BE KEPT IN THE INSURED VEHICLE AND PRESENTED UPON DEMAND**

IN CASE OF ACCIDENT: Report all accidents to your Agent/Company as soon as possible. Obtain the following information:

1. Name and address of each driver, passenger and witness.
2. Name of Insurance Company and policy number for each vehicle involved.

Report accidents or claims to your agent or broker.
or
Telephone 1-877-248-3455 Fax 1-866-213-2802
Call toll free 24 hour service

AC 5012 (ED.5/83) ACORD 50 (1/83)
IIR/ACORD CORPORATION 1983

**THIS CARD MUST BE KEPT IN THE INSURED VEHICLE AND PRESENTED UPON DEMAND**

IN CASE OF ACCIDENT: Report all accidents to your Agent/Company as soon as possible. Obtain the following information:

1. Name and address of each driver, passenger and witness.
2. Name of Insurance Company and policy number for each vehicle involved.

Report accidents or claims to your agent or broker.
or
Telephone 1-877-248-3455 Fax 1-866-213-2802
Call toll free 24 hour service

AC 5012 (ED.5/83) ACORD 50 (1/83)
IIR/ACORD CORPORATION 1983

[X] Commercial [ ] Personal

**INSURANCE IDENTIFICATION CARD**

Washington
(STATE)

COMPANY NUMBER: 27154
COMPANY: Atlantic Specialty Insurance Company

POLICY NUMBER: 712-00-78-31-0006
EFFECTIVE DATE: 10/01/2013
EXPIRATION DATE: 10/01/2014

YEAR: 2003
MAKE/MODEL: CHEVROLET/G3500 EXPRESS CUTAWA
VEHICLE IDENTIFICATION NUMBER: 1GBJG31U931167446

AGENCY/COMPANY ISSUING CARD
MARSH USA, INC.
1301 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101

INSURED
PREMERA
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

AUTHORIZED REPRESENTATIVE

**SEE IMPORTANT NOTICE ON REVERSE SIDE**

[X] Commercial [ ] Personal

**INSURANCE IDENTIFICATION CARD**

Washington
(STATE)

COMPANY NUMBER: 27154
COMPANY: Atlantic Specialty Insurance Company

POLICY NUMBER: 712-00-78-31-0006
EFFECTIVE DATE: 10/01/2013
EXPIRATION DATE: 10/01/2014

YEAR: 2005
MAKE/MODEL: KIA/SEDONA EX/LX
VEHICLE IDENTIFICATION NUMBER: KNDUP132456756127

AGENCY/COMPANY ISSUING CARD
MARSH USA, INC.
1301 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101

INSURED
PREMERA
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

AUTHORIZED REPRESENTATIVE

**SEE IMPORTANT NOTICE ON REVERSE SIDE**

**THIS CARD MUST BE KEPT IN THE INSURED VEHICLE AND PRESENTED UPON DEMAND**

IN CASE OF ACCIDENT: Report all accidents to your Agent/Company as soon as possible. Obtain the following information:

1. Name and address of each driver, passenger and witness.
2. Name of Insurance Company and policy number for each vehicle involved.

Report accidents or claims to your agent or broker.
or
Telephone 1-877-248-3455 Fax 1-866-213-2802
Call toll free 24 hour service

AC 5012 (ED.5/83) ACORD 50 (1/83)
IIR/ACORD CORPORATION 1983

**THIS CARD MUST BE KEPT IN THE INSURED VEHICLE AND PRESENTED UPON DEMAND**

IN CASE OF ACCIDENT: Report all accidents to your Agent/Company as soon as possible. Obtain the following information:

1. Name and address of each driver, passenger and witness.
2. Name of Insurance Company and policy number for each vehicle involved.

Report accidents or claims to your agent or broker.
or
Telephone 1-877-248-3455 Fax 1-866-213-2802
Call toll free 24 hour service

AC 5012 (ED.5/83) ACORD 50 (1/83)
IIR/ACORD CORPORATION 1983

[X] Commercial [ ] Personal

**INSURANCE IDENTIFICATION CARD**

Washington
(STATE)

COMPANY NUMBER 27154
COMPANY Atlantic Specialty Insurance Company

POLICY NUMBER 712-00-78-31-0006
EFFECTIVE DATE 10/01/2013
EXPIRATION DATE 10/01/2014

YEAR / MAKE/MODEL 2005 KIA/SEDONA EX/LX
VEHICLE IDENTIFICATION NUMBER KNDUP132656756128

AGENCY/COMPANY ISSUING CARD
MARSH USA, INC.
1301 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101

INSURED
PREMERA
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

[signature]
AUTHORIZED REPRESENTATIVE

**SEE IMPORTANT NOTICE ON REVERSE SIDE**

[X] Commercial [ ] Personal

**INSURANCE IDENTIFICATION CARD**

Washington
(STATE)

COMPANY NUMBER 27154
COMPANY Atlantic Specialty Insurance Company

POLICY NUMBER 712-00-78-31-0006
EFFECTIVE DATE 10/01/2013
EXPIRATION DATE 10/01/2014

YEAR / MAKE/MODEL 2008 FORD/F250 SUPER DUTY
VEHICLE IDENTIFICATION NUMBER 1FTNF21548EE24113

AGENCY/COMPANY ISSUING CARD
MARSH USA, INC.
1301 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101

INSURED
PREMERA
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

[signature]
AUTHORIZED REPRESENTATIVE

**SEE IMPORTANT NOTICE ON REVERSE SIDE**

**THIS CARD MUST BE KEPT IN THE INSURED VEHICLE AND PRESENTED UPON DEMAND**

IN CASE OF ACCIDENT: Report all accidents to your Agent/Company as soon as possible. Obtain the following information:

1. Name and address of each driver, passenger and witness.
2. Name of Insurance Company and policy number for each vehicle involved.

Report accidents or claims to your agent or broker.
or
Telephone 1-877-248-3455 Fax 1-866-213-2802
Call toll free 24 hour service

AC 5012 (ED.5/83) ACORD 50 (1/83)

IIR/ACORD CORPORATION 1983

**THIS CARD MUST BE KEPT IN THE INSURED VEHICLE AND PRESENTED UPON DEMAND**

IN CASE OF ACCIDENT: Report all accidents to your Agent/Company as soon as possible. Obtain the following information:

1. Name and address of each driver, passenger and witness.
2. Name of Insurance Company and policy number for each vehicle involved.

Report accidents or claims to your agent or broker.
or
Telephone 1-877-248-3455 Fax 1-866-213-2802
Call toll free 24 hour service

AC 5012 (ED.5/83) ACORD 50 (1/83)

IIR/ACORD CORPORATION 1983

[X] Commercial [ ] Personal

**INSURANCE IDENTIFICATION CARD**

Washington
(STATE)

COMPANY NUMBER 27154
COMPANY Atlantic Specialty Insurance Company

POLICY NUMBER 712-00-78-31-0006
EFFECTIVE DATE 10/01/2013
EXPIRATION DATE 10/01/2014

YEAR / MAKE/MODEL 2010 FORD/TRANSIT CONNECT XL
VEHICLE IDENTIFICATION NUMBER NM0LS6AN8AT035970

AGENCY/COMPANY ISSUING CARD
MARSH USA, INC.
1301 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101

INSURED
PREMERA
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

AUTHORIZED REPRESENTATIVE

**SEE IMPORTANT NOTICE ON REVERSE SIDE**

[X] Commercial [ ] Personal

**INSURANCE IDENTIFICATION CARD**

Washington
(STATE)

COMPANY NUMBER 27154
COMPANY Atlantic Specialty Insurance Company

POLICY NUMBER 712-00-78-31-0006
EFFECTIVE DATE 10/01/2013
EXPIRATION DATE 10/01/2014

YEAR / MAKE/MODEL 2012 BMW/X6 XDRIVE50I
VEHICLE IDENTIFICATION NUMBER 5UXFG8C57CL590095

AGENCY/COMPANY ISSUING CARD
MARSH USA, INC.
1301 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101

INSURED
PREMERA
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

AUTHORIZED REPRESENTATIVE

**SEE IMPORTANT NOTICE ON REVERSE SIDE**

**THIS CARD MUST BE KEPT IN THE INSURED VEHICLE AND PRESENTED UPON DEMAND**

IN CASE OF ACCIDENT: Report all accidents to your Agent/Company as soon as possible. Obtain the following information:

1. Name and address of each driver, passenger and witness.
2. Name of Insurance Company and policy number for each vehicle involved.

Report accidents or claims to your agent or broker.
or
Telephone 1-877-248-3455 Fax 1-866-213-2802
Call toll free 24 hour service

AC 5012 (ED.5/83) ACORD 50 (1/83)

IIR/ACORD CORPORATION 1983

**THIS CARD MUST BE KEPT IN THE INSURED VEHICLE AND PRESENTED UPON DEMAND**

IN CASE OF ACCIDENT: Report all accidents to your Agent/Company as soon as possible. Obtain the following information:

1. Name and address of each driver, passenger and witness.
2. Name of Insurance Company and policy number for each vehicle involved.

Report accidents or claims to your agent or broker.
or
Telephone 1-877-248-3455 Fax 1-866-213-2802
Call toll free 24 hour service

AC 5012 (ED.5/83) ACORD 50 (1/83)

IIR/ACORD CORPORATION 1983

OneBeacon
INSURANCE GROUP

Atlantic Specialty Insurance Company

150 Royall Street
Canton, MA 02021

Insured Name and Address:
PREMERA
(See ASC 00 11 01 98, Schedule 1)
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

Policy Number: 712-00-78-31-0006

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act (the Act), as amended, you have a right to purchase insurance coverage for losses arising out of acts of terrorism, as defined in Section 102(1) of the Act: Under the Act, the term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

IF COVERAGE IS PROVIDED FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT IN ACCORDANCE WITH A FORMULA ESTABLISHED UNDER THE ACT. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT WOULD PAY 85% OF COVERED TERRORISM LOSSES THAT EXCEED THE STATUTORILY IMPOSED DEDUCTIBLE FOR WHICH THE INSURANCE COMPANY IS RESPONSIBLE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSSES COVERED BY THE UNITED STATES GOVERNMENT UNDER THE ACT.

THE ACT CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES EXCEEDS $100 BILLION IN ANY ONE CALENDAR YEAR. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

## SELECTION OR REJECTION OF TERRORISM INSURANCE COVERAGE

The prospective premium required for your terrorism coverage is: $[redacted]______________. If you wish to reject this offer of coverage, you should check the box below, sign this notice and send it to your agent. An exclusion of terrorism losses, as defined by the Act, will then be made part of your policy.

| | |
|---|---|
| ☐ | I hereby reject the offer of terrorism coverage. I understand that I will have no coverage for losses arising from acts of terrorism, as defined in the Act. |

## A. Possibility of Additional or Return Premium

The premium shown above is calculated based in part on the federal participation in payment of terrorism losses as set forth in the Terrorism Risk Insurance Act. The federal program established by the Act is scheduled to terminate at the end of 12/31/14. If the federal program terminates or if the level or terms of federal participation change, the estimated premium shown above may not be appropriate.

If this policy contains a Conditional Exclusion, continuation of coverage for certified acts of terrorism, or termination of such coverage, will be determined upon disposition of the federal program, subject to the terms and conditions of the Conditional Exclusion. If this policy does not contain a Conditional Exclusion, coverage for certified acts of terrorism will continue. In either case, when disposition of the federal program is determined, we will recalculate the estimated premium shown above and will charge additional premium or refund excess premium, if indicated.

If we notify you of an additional premium charge, the additional premium will be due as specified in such notice.

3 6-43-4154 10/01/2013 DDS CPW PR 1.000


Copyright 2008, OneBeacon Insurance Group LLC

**B. If your policy includes Property Coverage in one or more of these states: CA, CT, GA, HI, IA, IL, MA, ME, MO, NC, NJ, NY, OR, RI, VA, WA, WI, or WV; the following statement applies:**

The terrorism exclusion makes an exception for (and thereby continues your coverage for) property fire losses resulting from an act of terrorism. Therefore, if you reject the offer of terrorism coverage, that rejection does not apply to fire losses resulting from an act of terrorism - the coverage in your policy for such fire losses will continue. If such a loss occurs, and is certified under the Act, the loss may be reimbursed by the United States government under the formula detailed above.

The portion of your policy premium attributable to terrorism (fire only) coverage in all of the states listed above, in which your policy provides property coverage, is $[redacted]__________________ . This amount is included in your policy premium and cannot be rejected.

| | |
|---|---|
| ______________________________ | Atlantic Specialty Insurance Company |
| Policyholder/Applicant's Signature | Insurance Company |
| ______________________________ | 712-00-78-31-0006 |
| Print Name | Policy Number |

Date: ______________________________

If you have any questions about this notice, please contact your agent.



Copyright 2008, OneBeacon Insurance Group LLC

OneBeacon
INSURANCE GROUP

Atlantic Specialty Insurance Company
Executive Office
150 Royall Street
Canton, MA 02021

# WASHINGTON UNDERINSURED MOTORISTS COVERAGE SELECTION/REJECTION

| Applicant/Named Insured: | Producer: |
|---|---|
| PREMERA<br>(See ASC 00 11 01 98, Schedule 1)<br>7001 220TH ST SW<br>MOUNTLAKE TERRACE, WA 98043-2160 | MARSH USA, INC.<br>1301 FIFTH AVENUE, SUITE 1900<br>SEATTLE, WA<br>98101 |
| **Policy Effective Date:**<br>10/01/2013 | **Policy Number:**<br>712-00-78-31-0006 |

Washington law permits you to make certain decisions regarding Underinsured Motorists Coverage. This document describes this coverage and the options available.

You should read this document carefully and contact your agent if you have any questions regarding Underinsured Motorists Coverage and your options with respect to this coverage.

This document includes general descriptions of coverage. However, no coverage is provided by this document. You should read your policy and review your Declarations Page(s) and/or Schedule(s) for complete information on the coverages you are provided.

**UNDERINSURED MOTORISTS COVERAGE**

Underinsured Motorists Coverage provides insurance protection to an insured for compensatory damages which the insured is legally entitled to recover from the owner or operator of an underinsured motor vehicle because of bodily injury or property damage caused by an automobile accident. Also included are damages due to bodily injury or property damage that result from an automobile accident with a hit-and-run vehicle whose owner or operator cannot be identified.

Unless rejected in whole or in part, Underinsured Motorists Coverage will be provided at a limit equal to your policy's Combined Single Limit for Liability Coverage. Property Damage Underinsured Motorists Coverage need only be issued in conjunction with Bodily Injury Underinsured Motorists Coverage, unless you reject this coverage.

Please indicate your choice from either **A.**, **B.**, or **C.** as follows:



Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2007, OneBeacon Insurance Group LLC
E-INSURED

**A. Selection of Bodily Injury AND Property Damage Underinsured Motorists Coverage Limits**

Please indicate your choice as follows:

Please note that we only offer Underinsured Motorists Coverage limits up to the Liability Coverage limit of your policy, even though higher limits may appear below.

**(Initials)**

______ **a. I select Bodily Injury AND Property Damage Underinsured Motorists Coverage at a limit equal to my Combined Single Limit for Liability Coverage;**

**OR**

**(Initials)**

______ **b. I reject Bodily Injury AND Property Damage Underinsured Motorists Coverage at a limit equal to my Combined Single Limit for Liability Coverage and select from the following:**

| (Initials) | Combined Single Limit | (Initials) | Combined Single Limit |
|---|---|---|---|
| ______ | $ 60,000 | ______ | $ 350,000 |
| ______ | $ 100,000 | ______ | $ 500,000 |
| ______ | $ 250,000 | ______ | $ 1,000,000 |

______________________________ ______________

**Signature of Applicant/Named Insured** **Date**

**B. Rejection of Property Damage Underinsured Motorists Coverage and Selection Of Bodily Injury Underinsured Motorists Coverage Only**

Please indicate your choice by initialing next to the appropriate item(s) and signing below.

Please note that we only offer Bodily Injury Underinsured Motorists Coverage limits up to the Liability Coverage limits of your policy, even though higher limits may appear below.

**(Initials)**

______ **1. I reject Property Damage Underinsured Motorists Coverage and select ONLY Bodily Injury Underinsured Motorists Coverage at a limit equal to my Combined Single Limit for Liability Coverage;**

**OR**

**(Initials)**

______ **2. I reject Property Damage Underinsured Motorists Coverage and select ONLY Bodily Injury Underinsured Motorists Coverage at the following limit which is lower than the Combined Single Limit for my Liability Coverage:**

| (Initials) | Combined Single Limit | (Initials) | Combined Single Limit |
|---|---|---|---|
| ______ | $ 50,000 | ______ | $ 350,000 |
| ______ | $ 100,000 | ______ | $ 500,000 |
| ______ | $ 250,000 | ______ | $ 1,000,000 |

______________________________ ______________

**Signature of Applicant/Named Insured** **Date**



Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2007, OneBeacon Insurance Group LLC

**C. Rejection of Bodily Injury AND Property Damage Underinsured Motorists Coverage**

If you wish to reject Bodily Injury Underinsured Motorists Coverage and Property Damage Underinsured Motorists Coverage, you may do so by initialing and signing below.

**(Initials)**

______________

**I reject Bodily Injury AND Property Damage Underinsured Motorists Coverage.**

______________________________ ______________

**Signature of Applicant/Named Insured** **Date**


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2007, OneBeacon Insurance Group LLC

OneBeacon
INSURANCE GROUP

**Atlantic Specialty Insurance Company**

1051 Texas Street
Salem, VA 24153

1-888-907-2536

# IMPORTANT NOTICE TO WASHINGTON POLICYHOLDERS

Effective January 1, 1990, any person who operates a motor vehicle registered in the State of Washington must have an identification card in his or her possession.

The automobile insurance identification card provided with your policy satisfies this law. It must be kept in the insured vehicle and presented upon demand. A new card will be issued with each renewal.

If you do not presently have an identification card, please contact your agent or broker and one will be provided to you.

3 6-43-4154 10/01/2013 DDS CPW PR 1.000

# IMPORTANT NOTICE TO POLICYHOLDERS

# ATTORNEY FEES COVERAGE

## THIS POLICY LIMITS COVERAGE FOR ATTORNEY FEES UNDER ALASKA RULE OF CIVIL PROCEDURE 82

In any suit in Alaska in which we have a right or duty to defend an insured in addition to the limits of liability, our obligation under the applicable coverage to pay attorneys fees taxable as costs against the insured is limited as follows:

Alaska Rule of Civil Procedure 82 provides that if you are held liable, some or all of the attorney fees of the person making a claim against you must be paid by you. The amount that must be paid by you is determined by Alaska Rule of Civil Procedure 82. We provide coverage for attorney fees for which you are liable under Alaska Rule of Civil Procedure 82 subject to the following limitation:

> We will not pay that portion of any attorney's fees that is in excess of fees calculated by applying the schedule for contested cases in Alaska Rule of Civil Procedure 82(b)(1) to the limit of liability of the applicable coverage.

<u>This limitation means the potential costs that may be awarded against you as attorney fees may not be covered in full. You will have to pay any attorney fees not covered directly.</u>

For example, the attorney fees provided by the schedule for contested cases in Alaska Rule of Civil Procedure 82(b)(1) are:

> 20% of the first $25,000 of a judgment;
>
> 10% of the amounts over $25,000 of a judgment.

Therefore, if a court awards a judgment against you in the amount of $125,000, in addition to that amount you would be liable under Alaska Rule of Civil Procedure 82(b)(1) for attorney fees of $15,000, calculated as follows:

| | | |
|---|---|---|
| 20% of | $25,000 | $5,000 |
| 10% of | $100,000 | $10,000 |

Total Award $125,000 Total Attorney Fees $15,000

If the limit of Liability of the applicable coverage is $100,000, we would pay $100,000 of the $125,000 award, and $12,500 for the Alaska Rule of Civil Procedure 82(b)(1) attorney fees, calculated as follows:

| | | |
|---|---|---|
| 20% of | $25,000 | $5,000 |
| 10% of | $75,000 | $7,500 |

Total Limit of Liability $100,000 Total Attorney Fees Covered $12,500

You would be liable to pay, directly and without our assistance, the remaining $25,000 in liability plus the remaining $2,500 for attorney fees under Alaska Rule of Civil Procedure 82 not covered by this policy.


Copyright 2000, OneBeacon Insurance Group LLC
E-INSURED

# 2013 GENERAL LIABILITY MULTISTATE FORMS REVISION NOTICE TO POLICYHOLDERS

We are pleased to enclose your renewal Policy.

This notice provides a brief synopsis of the revised Commercial General Liability Coverage Forms and summarizes major changes to multistate coverage endorsements as compared to those that may be provided by your expiring policy. Areas within the policy that broaden, reduce or clarify coverage are highlighted in this notice. Some policy provisions have been restated or re-punctuated for clarity and readability but with no change in coverage intent. This notice does not reference every editorial change made in the policy.

**This notice does not provide insurance protection nor does it change, modify, replace, add to, or invalidate any of the provisions of the insurance contract, including its endorsements. You should read the insurance policy and review its declarations pages for complete information and to understand the insurance protection that is provided. If there is any conflict between the policy (including its endorsements) and this notice, the provisions of the policy prevail over any statement made in this notice.**

Coverage may vary by state or may not be available in all states. Some of the changes described for a form may be further modified by other forms, including state amendments. If you have any questions regarding the scope of your insurance protection, please contact your producer.

## COMMERCIAL GENERAL LIABILITY COVERAGE FORMS CG 00 01 04 13 AND CG 00 02 04 13

### I. EXCLUSIONS

#### A. BROADENING OF COVERAGE

1. Coverage **A** – Exclusion **2.c.** (Liquor Liability) is revised to provide an exception with respect to allowing a person to bring alcoholic beverages onto the named insured's premises for consumption on the named insured's premises.
2. Coverage **A** – Exclusion **2.p.** (Electronic Data) is revised to introduce an exception for liability for damages because of bodily injury.

#### B. OTHER CHANGES

1. Coverage **A** – Exclusion **2.c.** (Liquor Liability) is revised to reinforce that the exclusion applies even if claims against an insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others, or providing or failing to provide transportation with respect to any person that may be under the influence of alcohol.
2. Coverage **A** – Exclusion **2.g.** (Aircraft, Auto Or Watercraft) is revised to delete reference to "in the state".
3. Coverage **A** – Exclusion **2.q.** and Coverage **B** – Exclusion **2.p.** (Recording And Distribution Of Material Or Information In Violation Of Law) were previously added to your policy via mandatory endorsement. The endorsement contained an exclusion addressing injury or damage arising out of any action or omission that violates or is alleged to violate certain statutes, ordinances and regulations. This exclusion has been incorporated directly into your policy.
4. Coverage **B** – Exclusions **2.b.** and **2.c.** (Material Published With Knowledge Of Falsity and Material Published Prior To Policy Period) are revised to reference "in any manner", with respect to oral or written publication, for consistency with the definition of personal and advertising injury.

### II. CONDITIONS

#### OTHER CHANGES

Condition **4.** (Other Insurance) is generally revised so that the insurance provided is excess over any for which the named insured has been added as an additional insured, whether by endorsement or any other means.

### III. DEFINITIONS

#### OTHER CHANGES

1. Definition **2.** (Auto) is revised to delete reference to "in the state" with respect to where a vehicle is licensed or principally garaged.


Includes copyrighted material of ISO, used with its permission

2. Definition **12.** (Mobile Equipment) is revised to delete reference to "in the state" with respect to where a vehicle is licensed or principally garaged.

## OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM – COVERAGE FOR OPERATIONS OF DESIGNATED CONTRACTOR CG 00 09 04 13

**I. EXCLUSIONS**

**BROADENING OF COVERAGE**

Exclusion **2.l.** (Electronic Data) is revised to introduce an exception for liability for damages because of bodily injury.

**II. DEFINITIONS**

**OTHER CHANGES**

1. Definition **1.** (Auto) is revised to delete reference to "in the state" with respect to where a vehicle is licensed or principally garaged.
2. Definition **10.** (Mobile Equipment) is revised to delete reference to "in the state" with respect to where a vehicle is licensed or principally garaged.

## LIQUOR LIABILITY COVERAGE FORMS CG 00 33 04 13 AND CG 00 33 04 13

**WHO IS AN INSURED**

**BROADENING OF COVERAGE**

We have included trusts as Named Insureds. In addition, trustees have been included as insureds but only with respect to their duties as trustees.

## CG 00 35 04 13 – RAILROAD PROTECTIVE LIABILITY COVERAGE FORM

**EXCLUSIONS**

**BROADENING OF COVERAGE**

Exclusion **2.f.(3)(a)** (Pollution) is amended to expand the exception to the exclusion with respect to bodily injury or property damage arising out of fuel or lubricants for equipment used at the job location not just when they escape from such equipment.

## PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM CG 00 37 04 13 AND CG 00 38 04 13

**I. EXCLUSIONS**

**BROADENING OF COVERAGE**

1. Exclusion **2.c.** (Liquor Liability) is revised to provide an exception with respect to allowing a person to bring alcoholic beverages onto the named insured's premises for consumption on the named insured's premises.
2. Exclusion **2.l.** (Electronic Data) is revised to introduce an exception for liability for damages because of bodily injury.

**II. DEFINITIONS**

**OTHER CHANGES**

1. Exclusion **2.c.** (Liquor Liability) is revised to reinforce that the exclusion applies even if claims against an insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others, or providing or failing to provide transportation with respect to any person that may be under the influence of alcohol.

 Includes copyrighted material of ISO, used with its permission 

2. Definition 1. (Auto) is revised to delete reference to "in the state" with respect to where a vehicle is licensed or principally garaged.
3. Definition 10. (Mobile Equipment) is revised to delete reference to "in the state" with respect to where a vehicle is licensed or principally garaged.

## MULTISTATE ENDORSEMENTS

### A. BROADENING OF COVERAGE

1. Electronic Data Liability Endorsement **CG 04 37** is revised to introduce an exception to the electronic data exclusion in order to provide that the exclusion does not apply to liability for damages because of bodily injury.
2. Additional Insured – Owners, Lessees Or Contractors – Automatic Status For Other Parties When Required In Written Construction Agreement Endorsement **CG 20 38** is introduced to provide additional insured status to those parties whom the named insured is obligated in writing in a contract or agreement to name as an additional insured.
3. Druggists Endorsement **CG 22 69** is revised to introduce an exception for the administering of vaccinations.
4. Liquor Liability – Bring Your Own Alcohol Establishments Endorsement **CG 24 06** is introduced to provide coverage to insureds who permit any person to bring any alcoholic beverage on an insured's premises, for consumption on the insured's premises.

### B. REDUCTIONS OF COVERAGE

1. Additional Insured – Users Of Golfmobiles Endorsement **CG 20 08** is revised to include a definition of the term golfmobile.
2. **Liquor Liability Exclusion Endorsements**

   The following endorsements are revised to indicate that the liquor liability exclusion will apply if a named insured permits any person to bring any alcoholic beverages on the named insured's premises, for consumption on the named insured's premises:

   - **CG 21 50** – Amendment Of Liquor Liability Exclusion (for use with Commercial General Liability Coverage Part)
   - **CG 21 51** – Amendment Of Liquor Liability Exclusion – Exception For Scheduled Premises Or Activities (for use with Commercial General Liability Coverage Part)
   - **CG 29 52** – Amendment Of Liquor Liability Exclusion (for use with Products/Completed Operations Liability Coverage Part)
   - **CG 29 53** – Amendment Of Liquor Liability Exclusion – Exception For Scheduled Premises Or Activities (for use with Products/Completed Operations Liability Coverage Part)
3. Total Pollution Exclusion For Designated Products Or Work Endorsement **CG 21 99** is introduced to exclude coverage with respect to bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants which arises out of the product or work scheduled in the endorsement.
4. Amendment Of Personal And Advertising Injury Definition Endorsement **CG 24 13** is introduced to remove from the definition of personal and advertising injury the offense of oral and written publication, in any manner, of material that violates a person's right of privacy.

### C. OTHER CHANGES

Primary And Noncontributory – Other Insurance Condition Endorsement **CG 20 01** is introduced to revise the Other Insurance Condition to indicated that coverage is provided to an additional insured on a primary and noncontributory basis, provided that certain requirements are met.

3. **Additional Insured Endorsements**

   The following additional insured endorsements are revised to indicate that when these endorsements are attached to a policy, if coverage provided to the additional insured is required by contract or agreement, coverage to the additional insured will be afforded to the extent permissible by law and to the extent the named insured is required by the contract or agreement to provide insurance for the additional insured.

   Additionally, if coverage provided to the additional insured is required by contract or agreement, the limits of insurance of the named insured's policy that are available to an additional insured will be limited to the extent required by the contract or agreement or the amount of insurance available under the applicable Limits of Insurance shown in the Declarations, whichever is less:

   - **CG 20 03** – Additional Insured – Concessionaires Trading Under Your Name


Includes copyrighted material of ISO, used with its permission

- **CG 20 05** – Additional Insured – Controlling Interest
- **CG 20 07** – Additional Insured – Engineers, Architects Or Surveyors
- **CG 20 10** – Additional Insured – Owners, Lessees Or Contractors – Scheduled Person Or Organization
- **CG 20 11** – Additional Insured – Managers Or Lessors Of Premises
- **CG 20 12** – Additional Insured – State Or Governmental Agency Or Subdivision Or Political Subdivision – Permits Or Authorizations
- **CG 20 13** – Additional Insured – State Or Governmental Agency Or Subdivision Or Political Subdivision – Permits Or Authorizations Relating To Premises
- **CG 20 15** – Additional Insured – Vendors
- **CG 20 18** – Additional Insured – Mortgagee, Assignee Or Receiver
- **CG 20 23** – Additional Insured – Executors, Administrators, Trustees Or Beneficiaries
- **CG 20 24** – Additional Insured – Owners Or Other Interest From Whom Land Has Been Leased
- **CG 20 26** – Additional Insured – Designated Person Or Organization
- **CG 20 27** – Additional Insured – Co-owner Of Insured Premises
- **CG 20 28** – Additional Insured – Lessor Of Leased Equipment
- **CG 20 29** – Additional Insured – Grantor Of Franchise
- **CG 20 30** – Oil Or Gas Operations – Nonoperating, Working Interests
- **CG 20 31** – Additional Insured – Engineers, Architects Or Surveyors
- **CG 20 32** – Additional Insured – Engineers, Architects Or Surveyors Not Engaged By The Named Insured
- **CG 20 33** – Additional Insured – Owners, Lessees Or Contractors – Automatic Status When Required In Construction Agreement With You
- **CG 20 34** – Additional Insured – Lessor Of Leased Equipment – Automatic Status When Required In Lease Agreement With You
- **CG 20 35** – Additional Insured – Grantor Of Licenses – Automatic Status When Required By Licensor
- **CG 20 36** – Additional Insured – Grantor Of Licenses
- **CG 20 37** – Additional Insured – Owners, Lessees Or Contractors – Completed Operations
- **CG 29 35** – Additional Insured – State Or Governmental Agency Or Subdivision Or Political Subdivision – Permits Or Authorizations

**4. Professional Services Endorsements**

The following endorsements are revised to expressly address, in part, claims alleging negligence or other wrongdoing in the hiring, employment, training, supervision or monitoring of others by any insured:

- **CG 21 16** – Exclusion – Designated Professional Services
- **CG 21 52** – Exclusion – Financial Services
- **CG 21 56** – Exclusion – Funeral Services
- **CG 21 57** – Exclusion – Counseling Services
- **CG 21 58** – Exclusion – Professional Veterinarian Services
- **CG 21 59** – Exclusion – Diagnostic Testing Laboratories
- **CG 22 24** – Exclusion – Inspection, Appraisal And Survey Companies
- **CG 22 32** – Exclusion – Professional Services – Blood Banks
- **CG 22 33** – Exclusion – Testing Or Consulting Errors And Omissions
- **CG 22 34** – Exclusion – Construction Management Errors And Omissions
- **CG 22 36** – Exclusion – Products And Professional Services (Druggists)
- **CG 22 37** – Exclusion – Products And Professional Services (Optical And Hearing Aid Establishments)
- **CG 22 39** – Exclusion – Camps Or Campgrounds
- **CG 22 43** – Exclusion – Engineers, Architects Or Surveyors Professional Liability
- **CG 22 44** – Exclusion – Services Furnished By Health Care Providers
- **CG 22 45** – Exclusion – Specified Therapeutic Or Cosmetic Services


Includes copyrighted material of ISO, used with its permission

- **CG 22 48** – Exclusion – Insurance And Related Operations
- **CG 22 69** – Druggists
- **CG 22 71** – Colleges Or Schools (Limited Form)
- **CG 22 72** – Colleges Or Schools
- **CG 22 75** – Professional Liability Exclusion – Computer Software
- **CG 22 76** – Professional Liability Exclusion – Health Or Exercise Clubs Or Commercially Operated Health Or Exercise Facilities
- **CG 22 77** – Professional Liability Exclusion – Computer Data Processing
- **CG 22 79** – Exclusion – Contractors – Professional Liability
- **CG 22 80** – Limited Exclusion – Contractors – Professional Liability
- **CG 22 87** – Exclusion – Adult Day Care Centers
- **CG 22 88** – Professional Liability Exclusion – Electronic Data Processing Services And Computer Consulting Or Programming Services
- **CG 22 90** – Professional Liability Exclusion – Spas or Personal Enhancement Facilities
- **CG 22 91** – Exclusion – Telecommunication Equipment Or Service Providers Errors And Omissions
- **CG 22 96** – Limited Exclusion – Personal And Advertising Injury – Lawyers
- **CG 22 98** – Exclusion – Internet Service Providers And Internet Access Providers Errors And Omissions
- **CG 22 99** – Professional Liability Exclusion – Web Site Designers
- **CG 23 01** – Exclusion – Real Estate Agents Or Brokers Errors Or Omissions
- **CG 31 15** – Construction Project Management Protective Liability Coverage

5. Exclusion – Volunteer Workers Endorsement **CG 21 66** is revised to delete reference to "in the state" from Exclusion **2.g.** (Aircraft, Auto Or Watercraft).
6. Exclusion – Failure To Supply Endorsement **CG 22 50** is revised to expressly state that the exclusion also applies to the failure of any insured to adequately supply biofuel.
7. Pesticide Or Herbicide Applicator Coverage Endorsements **CG 22 64** and **CG 28 12** and Lawn Care Services Coverage Endorsement **CG 22 93** are revised to reflect a change in titles to Herbicide Applicator – Limited Pollution Coverage endorsements and Lawn Care Services – Limited Pollution Coverage.
8. Real Estate Property Managed Endorsement **CG 22 70** is revised to reinforce that the insurance provided is excess over any other insurance available, whether such insurance is primary or excess.
9. Colleges Or Schools Endorsements **CG 22 71** and **CG 22 72** are revised to expressly address, in part, claims alleging negligence or other wrongdoing in the hiring, employment, training, supervision or monitoring of others by any insured.
10. Waiver Of Governmental Immunity Endorsement **CG 24 14** is revised to reference that the endorsement also applies to the Owners And Contractors Protective Liability Coverage Part and the Railroad Protective Liability Coverage Part.
11. Amendment Of Insured Contract Definition Endorsement **CG 24 26** and Limited Contractual Liability – Railroads Endorsement **CG 24 27** are revised to reflect that the defined term insured contract addresses certain liability assumed by the named insured with respect to the tort liability of another party to the extent the assumption of the tort liability is permitted by law.
12. Designated Locations(s) Aggregate Limit Endorsement **CG 25 14** is introduced to make a separate Designated Location Aggregate Limit available for each location of the insured listed in the Schedule of the endorsement.
13. Supplemental Extended Reporting Period Endorsement **CG 27 10** and Supplemental Extended Reporting Period Endorsement For Specific Accidents, Products, Work Or Locations Endorsement **CG 27 11** are revised to amend Condition **4.** (Other Insurance) so that the insurance provided is excess over any for which the named insured has been added as an additional insured, whether by endorsement or any other means.
14. Principals Protective Liability Coverage Endorsement **CG 28 07** is revised to delete reference to "in the state" from Exclusion **2.c.(1)(e)(i).**
15. **Liquor Liability Exclusion Endorsements**

    The following endorsements are revised to reinforce that the exclusion applies even if claims against an insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others, or providing or failing to provide transportation with respect to any person that may be under the influence of alcohol:


Includes copyrighted material of ISO, used with its permission

- **CG 21 50** – Amendment Of Liquor Liability Exclusion (for use with Commercial General Liability Coverage Part)
- **CG 21 51** – Amendment Of Liquor Liability Exclusion – Exception For Scheduled Premises Or Activities (for use with Commercial General Liability Coverage Part)
- **CG 29 52** – Amendment Of Liquor Liability Exclusion (for use with Products/Completed Operations Liability Coverage Part)
- **CG 29 53** – Amendment Of Liquor Liability Exclusion – Exception For Scheduled Premises Or Activities (for use with Products/Completed Operations Liability Coverage Part)


Includes copyrighted material of ISO, used with its permission

OneBeacon
INSURANCE GROUP

Atlantic Specialty Insurance Company *
150 Royall Street
Canton, MA 02021

(781) 332-7000
* A Stock Company

@vantage℠
for Financial Services
Premier

# Common Policy Declarations

**Named Insured and Mailing Address**

PREMERA
(See ASC 00 11 01 98, Schedule 1)
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

**Policy Number** 712-00-78-31-0006

In return for the payment of the premium, and subject to all terms of this policy, we agree with you to provide the insurance as stated in this policy.

**Policy Period:** from October 01, 2013 to October 01, 2014
at 12:01 A.M. Standard Time at your mailing address shown above.

The Named Insured is a(n): Corporation

Business Description: HEALTH INSURANCE COMPANY

**Producer**

MARSH USA, INC.
1301 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101

**Total Premium**

At inception: $[redacted]

Certified to be a true and correct copy of the original

Forms applicable to all Coverage Parts:
See ASC 00 11 01 98, Schedule 2

Esther Greene
Esther Greene
Supervisor
OneBeacon Customer Service

3 6-43-4154 10/01/2013 DDS CPW PR 1.000


Copyright 1998, OneBeacon Insurance Group LLC

In witness whereof, we have issued this policy, signed by the President and Secretary, but it shall not be valid unless countersigned by our duly authorized representative.

Secretary

President

Countersigned ______________________________

Authorized Representative Date


Copyright 1998, OneBeacon Insurance Group LLC

# SCHEDULE 1

Effective 10/01/2013 , this schedule forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)
issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

Named Insured

PREMERA

PREMERA BLUE CROSS

PREMERA FIRST, INC

LIFEWISE ASSURANCE COMPANY ("LWAC")

LIFEWISE HEALTH PLAN OF WASHINGTON ("LWWA")

CALYPSO HEALTHCARE SOLUTIONS

LIFEWISE ADMINISTRATORS, INC.

NORTH STAR ADMINISTRATORS, INC.

LIFEWISE HEALTH PLAN OF OREGON ("LWOR")

VIVACITY, INC.

ACADEME, INC.

CONNEXION INSURANCE SOLUTIONS, INC.

3 6-43-4154 10/01/2013 DDS CPW PR 1.000

**Policy Number**: 712-00-78-31-0006

## COMMON POLICY DECLARATIONS
## PREMIUM STATEMENT

**Named Insured:**
PREMERA
(See ASC 00 11 01 98, Schedule 1)
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

**Producer:**
MARSH USA, INC.
1301 FIFTH AVENUE, SUITE 1900
SEATTLE, WA 98101

**Premium Statement for the period from** October 01, 2013 **to** October 01, 2014

This policy consists of the following coverage parts for which a premium is indicated. This premium may be subject to adjustment.

| COVERAGE SECTION | PREMIUM | | |
|---|---|---|---|
| | At inception | 1st Anniversary | 2nd Anniversary |
| Liability Coverages | $[redacted] | | |
| Automobile Coverages | $[redacted] | | |
| Umbrella Coverages | $[redacted] | | |
| Automobile Terrorism Coverage | $[redacted] | | |
| Terrorism Coverage | $[redacted] | | |
| Total Advanced Premium | $[redacted] | | |

3 6-43-4154 10/01/2013 DDS CPW PR 1.000


Copyright 1998, OneBeacon Insurance Group LLC
E-INSURED

# SCHEDULE 2

Effective 10/01/2013 , this schedule forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)
issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

Common Policy Declarations, 4 VIL 100 10 98, Continued:

Forms Applicable to All Coverage Parts:

| | |
|---|---|
| 4 VIL 100 10 98 | COMMON POLICY DECLARATIONS |
| ASC 00 02 01 98 | PREMIUM STATEMENT |
| ASC 00 12 01 98 | SCHEDULE OF LOCATIONS |
| VIL 001 02 05 | COMMON POLICY CONDITIONS- (N/A TO VA AUTO) |
| VIL 605 AK 08 12 | AK CHANGES - CANCELLATION & NONRENEWAL |
| VIL 652 OR 02 05 | OR CHANGES |
| VIL 653 OR 02 05 | OR CHANGES-CANCELLATION & NONRENEWAL |
| VIL 674 WA 08 10 | WA COMMON POLICY CONDITIONS |
| VIL 714 AK 04 02 | AK CHANGES - CANCELLATION & NONRENEWAL |
| ASC 00 10 01 98 | Policy Change 1 - NOTICE OF CANCELLATION AND NONRENEWAL TO CERTIFICATE HOLDER |
| ASC 00 11 01 98 | Schedule 1 - NAMED INSURED |
| ASC 00 11 01 98 | Schedule 2 - LIST OF COMMON DEC FORMS |

3 6-43-4154 10/01/2013 DDS CPW PR 1.000

# SCHEDULE OF LOCATIONS

Effective 10/01/2013, this schedule forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)

issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

The following locations are identified by their corresponding numbers on the various coverage part declarations of this policy.

| Location/ Premises | Location Address<br>Location Description<br>Building Number and Description |
|---|---|
| 1 | 7001 220TH ST SW<br>MOUNTLAKE TER, WA 98043-2160<br><br>Building 1<br><br>Building 2 Description: BUILDING 2<br><br>Building 3 Description: BUILDING 3<br><br>Building 4 Description: BUILDING 4 |
| 2 | 6707 220TH ST SW<br>MOUNTLAKE TER, WA 98043-2137<br><br>Building 1 Description: BUILDING 5 |
| 3 | 66TH AVE W<br>MOUNTLAKE TER, WA 98043-2137<br><br>Building 1 |
| 4 | 3900 E SPRAGUE AVE<br>SPOKANE, WA 99202-4847<br><br>Building 1 Description: BUILDING 1<br><br>Building 2 Description: BUILDING 2<br><br>Building 3 Description: BUILDING 3<br><br>Building 4 Description: BUILDING 4 |

3 6-43-4154 10/01/2013 DDS CPW PR 1.000


Copyright 1998, OneBeacon Insurance Group LLC
E-INSURED

# SCHEDULE OF LOCATIONS

Effective 10/01/2013, this schedule forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)

issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

The following locations are identified by their corresponding numbers on the various coverage part declarations of this policy.

| Location/ Premises | Location Address<br>Location Description<br>Building Number and Description |
|---|---|
| 5 | 2020 SW 4TH AVE<br>PORTLAND, OR 97201-4953<br><br>Building 1 Description: 7TH FLOOR |
| 6 | 2550 DENALI ST STE 1400<br>ANCHORAGE, AK 99503-2783<br><br>Building 1 |
| 7 | 316 N NEEL ST<br>KENNEWICK, WA 99336-2663<br><br>Building 1 |
| 8 | 21520 30TH DR SE<br>BOTHELL, WA 98021-7009<br><br>Building 1 Description: 1st FLOOR SUITE<br><br>Building 2 Description: 2nd FLOOR SUITE |

3 6-43-4154 10/01/2013 DDS CPW PR 1.000


Copyright 1998, OneBeacon Insurance Group LLC
E-INSURED

# POLICY CHANGE 1

Effective 10/01/2013 , this endorsement forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)

issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

NOTICE OF CANCELLATION AND NONRENEWAL TO CERTIFICATE HOLDER

This endorsement modifies the notice of cancellation of insurance provided hereunder:

We shall provide written notice in accordance with state law in the event this policy is cancelled or nonrenewed, for any permissible reason within this policy, other than for nonpayment of premium, to those entities set out in the schedule on file with the Company.

3 6-43-4154 10/01/2013 DDS CPW PR 1.000

**Policy Number:** 712-00-78-31-0006

## LIABILITY COVERAGE PART DECLARATIONS

**Limits of Insurance** **@vantage for General Liability Endorsement Applies**

| | |
|---|---|
| General Aggregate | $2,000,000 |
| Products/Completed Operations Aggregate | $2,000,000 |
| Each Occurrence | $1,000,000 |
| Personal and Advertising Injury | $1,000,000 |
| Damage to Premises Rented to You | $1,000,000 Per Occurrence |
| Medical Expenses | $10,000 Per Person |
| Employee Benefits - Claims Made | $1,000,000 Each Claim<br>$2,000,000 Annual Aggregate<br>3294 Employees<br>$1,000 Deductible<br>10/01/2005 Retro Date |
| Products Recall | $50,000 Annual Aggregate<br>$25,000 Per Occurrence<br>$1,000 Deductible |
| Stop Gap Employers Liability | |
| Bodily Injury by Accident | $1,000,000 Each Accident |
| Bodily Injury by Disease | $1,000,000 Each Employee |
| Bodily Injury by Disease | $1,000,000 Aggregate Limit |

| State | Remuneration |
|---|---|
| Washington | |
| Wyoming | |

**Forms applicable to the Liability Coverage Part:**
See ASC 00 11 01 98, Schedule 3

3 6-43-4154 10/01/2013 DDS CPW PR 1.000


Copyright 1998, OneBeacon Insurance Group LLC
E-INSURED

POLICY NUMBER: 712-00-78-31-0006

| CLASS | CLASS DESCRIPTION<br>LOCATION AND PREMIUM BASIS |
|---|---|
| 46622 | Parking - private<br><br>Subline(s): 334 Premises/Operations<br>336 Products/Completed Operations |
| 61224 | Buildings or Premises - office - premises occupied by employees of the insured - Other than Not-For-Profit<br><br>Subline(s): 334 Premises/Operations<br>336 Products/Completed Operations |

Class 46622:

| Loc | Bldg | Area | Subline(s) |
|---|---|---|---|
| 3 | 1 | 200,377 | 334, 336 |
| 4 | 4 | 95,886 | 334, 336 |

Class 61224:

| Loc | Bldg | Area | Subline(s) |
|---|---|---|---|
| 1 | 1 | 105,603 | 334, 336 |
| 1 | 2 | 102,696 | 334, 336 |
| 1 | 3 | 107,193 | 334, 336 |
| 1 | 4 | 135,892 | 334, 336 |
| 2 | 1 | 20,524 | 334, 336 |
| 4 | 1 | 49,230 | 334, 336 |
| 4 | 2 | 23,329 | 334, 336 |
| 4 | 3 | 44,179 | 334, 336 |
| 5 | 1 | 18,550 | 334, 336 |
| 6 | 1 | 7,949 | 334, 336 |
| 7 | 1 | 1,405 | 334, 336 |
| 8 | 1 | 9,099 | 334, 336 |
| 8 | 2 | 26,982 | 334, 336 |

**Note: See reverse side for definition of premium basis**



Copyright 1998, OneBeacon Insurance Group LLC
E-INSURED

**Definition of Premium Basis**

When used as a premium basis:

"admissions" means the total number of persons, other than employees of the named insured, admitted to the event insured or to events conducted on the premises whether on paid admission tickets, complimentary tickets or passes.

"cost" means total cost of all work let or sublet in connection with each specific project including: the cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work and all fees, bonuses or commissions made, paid or due.

"area" means the total number of square feet or floor space at the insured premises.

"payroll" means remuneration (all money or substitutes for money) earned during the policy period by proprietors and by all employees of the named insured subject to any overtime earnings or limitation of payroll rule applicable in accordance with the manuals in use by the Company.

"sales" means the gross amount charged by the named insured, concessionaires of the named insured or by other trading under the insured's name for all good or products sold or distributed, for operations performed during the policy period and for rentals subject to the limitation sales rule applicable in accordance with the manuals in use by the Company.

"each" means a unit of exposure whose quantity is indicated in the classification footnotes in the manual used by the Company, such as "per person."

"unit" (primarily applicable to apartment buildings and condominiums) means a single room or group of rooms intended for occupancy as separate living quarters by a family, by a group of unrelated persons living together or by a person living alone.


Copyright 1998, OneBeacon Insurance Group LLC

# SCHEDULE 3

Effective 10/01/2013 , this schedule forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)
issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

Liability Coverage Part Declarations, ASC 00 05 01 98, Continued:

Forms Applicable to the Liability Coverage Part:

| | |
|---|---|
| ASC 00 05 01 98 | LIABILITY COVERAGE PART DEC |
| CG 00 01 04 13 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| CG 01 97 12 07 | WA CHANGES - EMPLOYMENT- RELATED PRACTICES EXCL |
| CG 03 00 01 96 | DEDUCTIBLE LIABILITY INSURANCE |
| CG 04 42 11 03 | STOP GAP-EMPLOYERS LIABILITY COVERAGE ENDORSEMENT-WA |
| CG 04 44 11 03 | STOP GAP-EMPLOYERS LIABILITY COVERAGE ENDORSEMENT-WY |
| CG 04 50 05 08 | WA CHANGES - WHO IS AN INSURED |
| CG 21 16 04 13 | EXCL - DESIGNATED PROFESSIONAL SERVICES |
| CG 21 30 04 13 | AK REC & DIST OF MATERIAL IN VIOLATION OF LAW EXCLUSION |
| CG 21 47 12 07 | EMPLOYMENT-RELATED PRACTICES EXCLUSION (N/A TX & WA) |
| CG 21 67 12 04 | FUNGI OR BACTERIA EXCLUSION |
| CG 21 71 06 08 | EXCL- OTHER ACTS OF TERRORISM; CAP ON CERTIFIED LOSSES |
| CG 26 70 10 01 | AK CHANGES - DEFINITION OF METATAG |
| CG 26 77 12 04 | WA - FUNGI OR BACTERIA EXCL |
| CG 26 97 03 06 | AK WAR LIABILITY EXCLUSION |
| IL 00 21 07 02 | NUCLEAR ENERGY LIABILITY EXCL (n/a to NY or WA) |
| IL 01 42 09 08 | OR CHANGES - DOMESTIC PARTNERSHIP |
| IL 01 98 09 08 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDT (BROAD FORM) |
| VCG 008 02 05 | EMPLOYEE BENEFITS COVERAGE FORM - CLAIMS MADE |
| VCG 100 10 98 | LIABILITY SCHEDULE |
| VCG 205 07 09 | @VANTAGE FOR GENERAL LIABILITY |
| VCG 217 07 09 | EXCL-INFRINGEMENT OF COPYRIGHT PATENT, TRADEMARK,TRADE SECRET |
| VCG 221 07 09 | FINANCIAL INSTITUTIONS |
| VCG 302 07 07 | ABSOLUTE EXCLUSION-ASBESTOS LIABILITY |
| VCG 603 AK 10 98 | AK CHANGES - ATTORNEYS FEES |

3 6-43-4154 10/01/2013 DDS CPW PR 1.000

# SCHEDULE 3

Effective 10/01/2013 , this schedule forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)
issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

Liability Coverage Part Declarations, ASC 00 05 01 98, Continued:

Forms Applicable to the Liability Coverage Part:

| | |
|---|---|
| VCG 654 AK 01 00 | AK IMPORTANT NOTICE - ATTORNEYS FEES COVERAGE |
| ASC 00 10 01 98 | Policy Change 2 - ASBESTOS LIABILITY EXCLUSION |
| ASC 00 11 01 98 | Schedule 3 - LIABILITY FORMS LIST |

3 6-43-4154 10/01/2013 DDS CPW PR 1.000

POLICY NUMBER: 712-00-78-31-0006

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DEDUCTIBLE LIABILITY INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Coverage | Amount and Basis of Deductible PER CLAIM | or | PER OCCURRENCE |
|---|---|---|---|
| Bodily Injury Liability | $ | | $ |
| OR | | | |
| Property Damage Liability | $ | | $ |
| OR | | | |
| Bodily Injury Liability and/or Property Damage Liability Combined | $ | | $5,000 |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**APPLICATION OF ENDORSEMENT** (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "bodily injury" and "property damage", however caused):

**A.** Our obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

**B.** You may select a deductible amount on either a per claim or a per "occurrence" basis. Your selected deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above. The deductible amount stated in the Schedule above applies as follows:

**1. PER CLAIM BASIS.** If the deductible amount indicated in the Schedule above is on a per claim basis, that deductible applies as follows:

**a.** Under Bodily Injury Liability Coverage, to all damages sustained by any one person because of "bodily injury";

**b.** Under Property Damage Liability Coverage, to all damages sustained by any one person because of "property damage"; or

**c.** Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages sustained by any one person because of:

**(1)** "Bodily injury";

**(2)** "Property damage"; or

**(3)** "Bodily injury" and "property damage" combined

as the result of any one "occurrence".

 Copyright, Insurance Services Office, Inc., 1994 

If damages are claimed for care, loss of services or death resulting at any time from "bodily injury", a separate deductible amount will be applied to each person making a claim for such damages.

With respect to "property damage", person includes an organization.

2. **PER OCCURRENCE BASIS.** If the deductible amount indicated in the Schedule above is on a "per occurrence" basis, that deductible amount applies as follows:

   **a.** Under Bodily Injury Liability Coverage, to all damages because of "bodily injury";

   **b.** Under Property Damage Liability Coverage, to all damages because of "property damage"; or

   **c.** Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages because of:

      **(1)** "Bodily injury";

      **(2)** "Property damage"; or

      **(3)** "Bodily injury" and "property damage" combined

   as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

**C.** The terms of this insurance, including those with respect to:

   **1.** Our right and duty to defend the insured against any "suits" seeking those damages; and

   **2.** Your duties in the event of an "occurrence", claim, or "suit"

   apply irrespective of the application of the deductible amount.

**D.** We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.


Copyright, Insurance Services Office, Inc., 1994

POLICY NUMBER: 712-00-78-31-0006

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# STOP GAP – EMPLOYERS LIABILITY COVERAGE ENDORSEMENT – WASHINGTON

This endorsement modifies the insurance provided by the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**SCHEDULE**

| **Limits Of Insurance** | | | |
|---|---|---|---|
| Bodily Injury By Accident | $ | | Each Accident |
| Bodily Injury By Disease | $ | | Aggregate Limit |
| Bodily Injury By Disease | $ | | Each Employee |
| | | | |

(If no entry appears above, the information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** The following is added to **Section I – Coverages:**

**COVERAGE – STOP GAP – EMPLOYERS LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated by Washington Law to pay as damages because of "bodily injury by accident" or "bodily injury by disease" to your "employee" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any accident and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in **Section III – Limits Of Insurance;** and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under this coverage.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

**b.** This insurance applies to "bodily injury by accident" or "bodily injury by disease" only if:

**(1)** The:

**(a)** "Bodily injury by accident" or "bodily injury by disease" takes place in the "coverage territory";

**(b)** "Bodily injury by accident" or "bodily injury by disease" arises out of and in the course of the injured "employee's" employment by you; and

**(c)** "Employee", at the time of the injury, was covered under a worker's compensation policy and subject to a "workers compensation law" of Washington; and

**(2)** The:

**(a)** "Bodily injury by accident" is caused by an accident that occurs during the policy period; or

**(b)** "Bodily injury by disease" is caused by or aggravated by conditions of employment by you and the injured "employee's" last day of last exposure to the conditions causing or aggravating such "bodily injury by disease" occurs during the policy period.

**c.** The damages we will pay, where recovery is permitted by law, include damages:

**(1)** For:

**(a)** Which you are liable to a third party by reason of a claim or "suit" against you by that third party to recover the damages claimed against such third party as a result of injury to your "employee";

**(b)** Care and loss or services; and


© ISO Properties, Inc., 2003
E-INSURED

(c) Consequential "bodily injury by accident" or "bodily injury by disease" to a spouse, child, parent, brother or sister of the injured "employee";

provided that these damages are the direct consequence of "bodily injury by accident" or "bodily injury by disease" that arises out of and in the course of the injured "employee's" employment by you; and

(2) Because of "bodily injury by accident" or "bodily injury by disease" to your "employee" that arises out of and in the course of employment, claimed against you in a capacity other than as employer.

**2. Exclusions**

This insurance does not apply to:

**a. Intentional Injury**

"Bodily injury by accident" or "bodily injury by disease" intentionally caused or aggravated by you, or "bodily injury by accident" or "bodily injury by disease" resulting from an act which is determined to have been committed by you if it was reasonable to believe that an injury is substantially certain to occur.

**b. Fines Or Penalties**

Any assessment, penalty, or fine levied by any regulatory inspection agency or authority.

**c. Statutory Obligations**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**d. Contractual Liability**

Liability assumed by you under any contract or agreement.

**e. Violation Of Law**

"Bodily injury by accident" or "bodily injury by disease" suffered or caused by any employee while employed in violation of law with your actual knowledge or the actual knowledge of any of your "executive officers".

**f. Termination, Coercion Or Discrimination**

Damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any "employee", or arising out of other employment or personnel decisions concerning the insured.

**g. Failure To Comply With "Workers Compensation Law"**

"Bodily injury by accident" or "bodily injury by disease" to an "employee" when you are:

(1) Deprived of common law defenses; or

(2) Otherwise subject to penalty;

because of your failure to secure your obligations or other failure to comply with any "workers compensation law".

**h. Violation Of Age Laws Or Employment Of Minors**

"Bodily injury by accident" or "bodily injury by disease" suffered or caused by any person:

(1) Knowingly employed by you in violation of any law as to age; or

(2) Under the age of 14 years, regardless of any such laws.

**i. Federal Laws**

Any premium, assessment, penalty, fine, benefit, liability or other obligation imposed by or granted pursuant to:

(1) The Federal Employer's Liability Act (45 USC Section 51-60);

(2) The Non-appropriated Fund Instrumentalities Act (5 USC Sections 8171-8173);

(3) The Longshore and Harbor Workers' Compensation Act (33 USC Sections 910-950);

(4) The Outer Continental Shelf Lands Act (43 USC Section 1331-1356);

(5) The Defense Base Act (42 USC Sections 1651-1654);

(6) The Federal Coal Mine Health and Safety Act of 1969 (30 USC Sections 901-942);

(7) The Migrant and Seasonal Agricultural Worker Protection Act (29 USC Sections 1801-1872);

(8) Any other workers compensation, unemployment compensation or disability laws or any similar law; or

(9) Any subsequent amendments to the laws listed above.

**j. Punitive Damages**

Multiple, exemplary or punitive damages.

**k. Crew Members**

"Bodily injury by accident" or "bodily injury by disease" to a master or member of the crew of any vessel or any member of the flying crew of an aircraft.


© ISO Properties, Inc., 2003

**B.** The **Supplementary Payments** provisions apply to Coverage – Stop Gap Employers Liability as well as to Coverages **A** and **B.**

**C.** For the purposes of this endorsement, **Section II – Who Is An Insured,** is replaced by the following:

If you are designated in the Declarations as:

1. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.
2. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.
3. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.
4. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**D.** For the purposes of this endorsement, **Section III – Limits Of Insurance,** is replaced by the following:

1. The Limits of Insurance shown in the Schedule of this endorsement and the rules below fix the most we will pay regardless of the number of:
   - **a.** Insureds;
   - **b.** Claims made or "suits" brought; or
   - **c.** Persons or organizations making claims or bringing "suits".
2. The "Bodily Injury By Accident" – Each Accident Limit shown in the Schedule of this endorsement is the most we will pay for all damages covered by this insurance because of "bodily injury by accident" to one or more "employees" in any one accident.
3. The "Bodily Injury By Disease" – Aggregate Limit shown in the Schedule of this endorsement is the most we will pay for all damages covered by this insurance and arising out of "bodily injury by disease", regardless of the number of "employees" who sustain "bodily injury by disease".
4. Subject to Paragraph **D.3.** of this endorsement, the "Bodily Injury By Disease" – Each "Employee" Limit shown in the Schedule of this endorsement is the most we will pay for all damages because of "bodily injury by disease" to any one "employee".

The limits of the coverage apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**E.** For the purposes of this endorsement, Condition **2. – Duties In The Event Of Occurrence, Claim Or Suit** of the Conditions Section **IV** is deleted and replaced by the following:

**2. Duties In The Event Of Injury, Claim Or Suit**

**a.** You must see to it that we or our agent are notified as soon as practicable of a "bodily injury by accident" or "bodily injury by disease" which may result in a claim. To the extent possible, notice should include:

- **(1)** How, when and where the "bodily injury by accident" or "bodily injury by disease" took place.
- **(2)** The names and addresses of any injured persons and witnesses; and
- **(3)** The nature and location of any injury.

**b.** If a claim is made or "suit" is brought against any insured, you must:

- **(1)** Immediately record the specifics of the claim or "suit" and the date received; and
- **(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

- **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the injury, claim, proceeding or "suit";
- **(2)** Authorize us to obtain records and other information;
- **(3)** Cooperate with us and assist us, as we may request, in the investigation or settlement of the claim or defense against the "suit";


© ISO Properties, Inc., 2003

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury to which this insurance may also apply; and

**(5)** Do nothing after an injury occurs that would interfere with our right to recover from others.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**F.** For the purposes of this endorsement, Paragraph **4.** of the **Definitions** Section is replaced by the following:

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places includes in **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of the activities of a person whose home is in the territory described in **a.** above, but who is away for a short time on your business;

provided the insured's responsibility to pay damages is determined in the United States (including its territories and possessions), Puerto Rico, or Canada, in a suit on the merits according to the substantive law in such territory, or in a settlement we agree to.

**G.** The following are added to the **Definitions** Section:

**1.** "Workers Compensation Law" means the Workers Compensation Law and any Occupational Disease Law of Washington. This does not include provisions of any law providing non-occupational disability benefits.

**2.** "Bodily injury by accident" means bodily injury, sickness or disease sustained by a person, including death, resulting from an accident. A disease is not "bodily injury by accident" unless it results directly form "bodily injury by accident"

**3.** "Bodily injury by disease" means a disease sustained by a person, including death. "Bodily injury by disease" does not include a disease that results directly from an accident.

**H.** For the purposes of this endorsement, the definitions of "bodily injury" does not apply.


© ISO Properties, Inc., 2003

POLICY NUMBER: 712-00-78-31-0006

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# STOP GAP – EMPLOYERS LIABILITY COVERAGE ENDORSEMENT – WYOMING

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**SCHEDULE**

| **Limits Of Insurance** | | | |
|---|---|---|---|
| Bodily Injury By Accident | $ | | Each Accident |
| Bodily Injury By Disease | $ | | Aggregate Limit |
| Bodily Injury By Disease | $ | | Each Employee |
| | | | |

(If no entry appears above, the information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** The following is added to **Section I – Coverages:**

**COVERAGE – STOP GAP – EMPLOYERS LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated by Wyoming Law to pay as damages because of "bodily injury by accident" or "bodily injury by disease" to your "employee" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any accident and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in **Section III – Limits Of Insurance;** and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under this coverage.

The tender of the limits of insurance before judgment or settlement does not relieve us of our duty to defend.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

**b.** This insurance applies to "bodily injury by accident" or "bodily injury by disease" only if:

**(1)** The:

**(a)** "Bodily injury by accident" or "bodily injury by disease" takes place in the "coverage territory";

**(b)** "Bodily injury by accident" or "bodily injury by disease" arises out of and in the course of the injured "employee's" employment by you; and

**(c)** "Employee", at the time of the injury, was covered under a worker's compensation policy and subject to a "workers compensation law" of Wyoming; and

**(2)** The:

**(a)** "Bodily injury by accident" is caused by an accident that occurs during the policy period; or

**(b)** "Bodily injury by disease" is caused by or aggravated by conditions of employment by you and the injured "employee's" last day of last exposure to the conditions causing or aggravating such "bodily injury by disease" occurs during the policy period.

**c.** The damages we will pay, where recovery is permitted by law, include damages:

**(1)** For:

**(a)** Which you are liable to a third party by reason of a claim or "suit" against you by that third party to recover the damages claimed against such third party as a result of injury to your "employee";



© ISO Properties, Inc., 2003

(b) Care and loss of services; and

(c) Consequential "bodily injury by accident" or "bodily injury by disease" to a spouse, child, parent, brother or sister of the injured "employee";

provided that these damages are the direct consequence of "bodily injury by accident" or "bodily injury by disease" that arises out of and in the course of the injured "employee's" employment by you; and

(2) Because of "bodily injury by accident" or "bodily injury by disease" to your "employee" that arises out of and in the course of employment, claimed against you in a capacity other than as employer.

d. Damages include prejudgment interest awarded against the insured.

**2. Exclusions**

This insurance does not apply to:

**a. Intentional Injury**

"Bodily injury by accident" or "bodily injury by disease" intentionally caused or aggravated by you, or "bodily injury by accident" or "bodily injury by disease" resulting from an act which is determined to have been committed by you if it was reasonable to believe that an injury is substantially certain to occur.

**b. Fines Or Penalties**

Any assessment, penalty, or fine levied by any regulatory inspection agency or authority.

**c. Statutory Obligations**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**d. Contractual Liability**

Liability assumed by you under any contract or agreement.

**e. Violation Of Law**

"Bodily injury by accident" or "bodily injury by disease" suffered or caused by any employee while employed in violation of law with your actual knowledge or the actual knowledge of any of your "executive officers".

**f. Termination, Coercion Or Discrimination**

Damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any "employee", or arising out of other employment or personnel decisions concerning the insured.

**g. Failure To Comply With "Workers Compensation Law"**

"Bodily injury by accident" or "bodily injury by disease" to an "employee" when you are:

(1) Deprived of common law defenses; or

(2) Otherwise subject to penalty;

because of your failure to secure your obligations or other failure to comply with any "workers compensation law".

**h. Violation Of Age Laws Or Employment Of Minors**

"Bodily injury by accident" or "bodily injury by disease" suffered or caused by any person:

(1) Knowingly employed by you in violation of any law as to age; or

(2) Under the age of 14 years, regardless of any such law.

**i. Federal Laws**

Any premium, assessment, penalty, fine, benefit, liability or other obligation imposed by or granted pursuant to:

(1) The Federal Employer's Liability Act (45 USC Section 51-60);

(2) The Non-appropriated Fund Instrumentalities Act (5 USC Sections 8171-8173);

(3) The Longshore and Harbor Workers' Compensation Act (33 USC Sections 910-950);

(4) The Outer Continental Shelf Lands Act (43 USC Section 1331-1356);

(5) The Defense Base Act (42 USC Sections 1651-1654);

(6) The Federal Coal Mine Health and Safety Act of 1969 (30 USC Sections 901-942);

(7) The Migrant and Seasonal Agricultural Worker Protection Act (29 USC Sections 1801-1872);

(8) Any other workers compensation, unemployment compensation or disability laws or any similar law; or

(9) Any subsequent amendments to the laws listed above.

**j. Punitive Damages**

Multiple, exemplary or punitive damages.

**k. Crew Members**

"Bodily injury by accident" or "bodily injury by disease" to a master or member of the crew of any vessel or any member of the flying crew of an aircraft.


© ISO Properties, Inc., 2003

**B.** The **Supplementary Payments** provisions apply to Coverage – Stop Gap Employers Liability as well as to Coverages **A** and **B.**

**C.** For the purposes of this endorsement, **Section II – Who Is An Insured,** is replaced by the following:

If you are designated in the Declarations as:

**1.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**2.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**3.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**4.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**D.** For the purposes of this endorsement, **Section III – Limits Of Insurance,** is replaced by the following:

**1.** The Limits of Insurance shown in the Schedule of this endorsement and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The "Bodily Injury By Accident" – Each Accident Limit shown in the Schedule of this endorsement is the most we will pay for all damages covered by this insurance because of "bodily injury by accident" to one or more "employees" in any one accident.

**3.** The "Bodily Injury By Disease" – Aggregate Limit shown in the Schedule of this endorsement is the most we will pay for all damages covered by this insurance and arising out of "bodily injury by disease", regardless of the number of "employees" who sustain "bodily injury by disease".

**4.** Subject to Paragraph **D.3.** of this endorsement, the "Bodily Injury By Disease" – Each "Employee" Limit shown in the Schedule of this endorsement is the most we will pay for all damages because of "bodily injury by disease" to any one "employee".

The limits of the coverage apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**E.** For the purposes of this endorsement, Condition **2. – Duties In The Event Of Occurrence, Claim Or Suit** of the Conditions **Section IV** is deleted and replaced by the following:

**2. Duties In The Event Of Injury, Claim Or Suit**

**a.** You must see to it that we or our agent are notified as soon as practicable of a "bodily injury by accident" or "bodily injury by disease" which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "bodily injury by accident" or "bodily injury by disease" took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the injury, claim, proceeding or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us and assist us, as we may request, in the investigation or settlement of the claim or defense against the "suit";

 © ISO Properties, Inc., 2003 

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury to which this insurance may also apply; and

**(5)** Do nothing after an injury occurs that would interfere with our right to recover from others.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**F.** For the purposes of this endorsement, Paragraph **4.** of the **Definitions** Section is replaced by the following:

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of the activities of a person whose home is in the territory described in **a.** above, but who is away for a short time on your business;

provided the insured's responsibility to pay damages is determined in the United States (including its territories and possessions), Puerto Rico, or Canada, in a suit on the merits according to the substantive law in such territory, or in a settlement we agree to.

**G.** The following are added to the **Definitions** Section:

**1.** "Workers Compensation Law" means the Workers Compensation Law and any Occupational Disease Law of Wyoming. This does not include provisions of any law providing non-occupational disability benefits.

**2.** "Bodily injury by accident" means bodily injury, sickness or disease sustained by a person, including death, resulting from an accident. A disease is not "bodily injury by accident" unless it results directly from "bodily injury by accident".

**3.** "Bodily injury by disease" means a disease sustained by a person, including death. "Bodily injury by disease" does not include a disease that results directly from an accident.

**H.** For the purposes of this endorsement, the definition of "bodily injury" does not apply.


© ISO Properties, Inc., 2003

POLICY NUMBER: 712-00-78-31-0006

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – DESIGNATED PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Description Of Professional Services |
|---|
| ALL PROFESSIONAL SERVICES |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |


© Insurance Services Office, Inc.,2012

E-INSURED

With respect to any professional services shown in the Schedule, the following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" due to the rendering of or failure to render any professional service.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional service.


© Insurance Services Office, Inc.,2012

POLICY NUMBER: 712-00-78-31-0006

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ALASKA CHANGES – ATTORNEYS FEES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

In any "suit" we defend in Alaska, our obligation under **SUPPLEMENTARY PAYMENTS – COVERAGES A AND B** to pay all costs taxed against the "insured" is amended by the following:

**A.** We will pay that portion of the attorney's fees awarded as costs which does not exceed the amount allowed for a contested case in the schedule of attorney's fees contained in Alaska Civil Rule 82 for a judgment equal to the applicable Limit of Insurance.

**B.** However, if a premium and a judgment amount are shown in the Schedule, we will pay, instead of the attorney's fees provided in Paragraph **A.** above, that portion of the attorney's fees awarded as costs which do not exceed the amount allowed for a contested case in Civil Rule 82 for the judgment amount shown in the Schedule.

**SCHEDULE***

| Attorney's Fees for a Judgment of | Additional Premium |
| --- | --- |

* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 1998, OneBeacon Insurance Group LLC
E-INSURED


ASIC00229

# POLICY CHANGE 2

Effective 10/01/2013 , this endorsement forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)
issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

(The information provided for above is required to be completed only when this endorsement is issued for attachment to the policy subsequent to its effective date.)

## ASBESTOS LIABILITY EXCLUSION

This endorsement modifies the insurance provided by the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This insurance does not apply to any liability for property damage, bodily injury, personal and advertising injury, sickness, death, mental anguish, and mental injury at any time arising out of the manufacture of, or use of, or mining of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust, to any obligation of the insured to indemnify any party because of damages arising out of such property damage, personal injury, bodily injury, sickness, disease, occupational disease, disability, shock, death, mental anguish or mental injury at any time as a result of the manufacture of, use of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

It is further agreed that we are not obligated to defend any suit or claim against the insured alleging or seeking said damages, if such suit or claim arises from said damages resulting from or contributed to by any and all manufacture of, mining of, use of, sales of, installation of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

3 6-43-4154 10/01/2013 DDS CPW PR 1.000

# Business Auto Declarations (Part I)

ITEM **ONE** This Declarations Page is issued with and is part of **Policy No.** 712-00-78-31 -0006

**Business Entity:** Corporation

See Common Policy Declarations 4 VIL 100 for additional information.

ITEM **TWO** **Schedule of Coverages and Covered Autos**

This policy provides only those coverages where a charge is shown in the premium column below. Each of these coverages will apply only to those "autos" shown as covered "autos." "Autos" are shown as covered "autos" for a particular coverage by the entry of one or more of the symbols from the COVERED AUTO Section of the Business Auto Coverage Form next to the name of the coverage.

| COVERAGES | | COVERED AUTOS | LIMIT | | PREMIUM |
|---|---|---|---|---|---|
| **LIABILITY INSURANCE** | | 1 | $ 1,000,000 | | $ [redacted] |
| **PERSONAL INJURY PROTECTION (P.I.P.)** (or equivalent No-fault Coverage) | | | Separately Stated In Each P.I.P. Endorsement Minus $ **Deductible** | | $ |
| **ADDED PERSONAL INJURY PROTECTION** (or equivalent Added No-fault Coverage) | | | Separately Stated In Each Added P.I.P. Endorsement | | $ |
| **PROPERTY PROTECTION INSURANCE (P.P.I.)** (Michigan only) | | | Separately Stated In The P.P.I. Endorsement Minus $ **Deductible** For Each Accident | | $ |
| **AUTO MEDICAL PAYMENTS INSURANCE** | | 2 | See Item Three Extension $ | | $ [redacted] |
| **UNINSURED MOTORISTS INSURANCE** | | | $ | | $ |
| **UNDERINSURED MOTORISTS** (When not included in Uninsured Motorists Coverage) (Not Applicable in New York) | | 2 | $ See ASC 00 11 01 98, Schedule 8 | | $ [redacted] |
| **PHYSICAL DAMAGE INSURANCE** | **COMPREHENSIVE COVERAGE** | 2 | ACTUAL CASH VALUE OR COST OF REPAIR WHICHEVER IS LESS MINUS | $See **Deductible** For Each Covered Auto, But No Deductible Applies to Loss Caused by Fire or Lightning. See Item Four for Hired or Borrowed Autos. | $ [redacted] |
| | **SPECIFIED CAUSES OF LOSS COVERAGE** | | | $See **Deductible** For Each Covered Auto For Loss Caused By Mischief Or Vandalism. See Item Four for Hired or Borrowed Autos. | $ |
| | **COLLISION COVERAGE** | 2 | | $See **Deductible** For Each Covered Auto See Item Four For Hired Or Borrowed Autos | $ [redacted] |
| | **TOWING AND LABOR** | | $ | for each disablement of a private passenger auto | $ |
| Automobile Terrorism | | | | | $ [redacted] |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | **PREMIUM FOR ENDORSEMENTS** | $ [redacted] |
| | | | | **ESTIMATED TOTAL PREMIUM** | $ [redacted] |

ENDORSEMENTS ATTACHED TO THIS POLICY:

See ASC 00 11 01 98, Schedule 4

REFER TO COVERED AUTO SECTION OF THE BUSINESS AUTO COVERAGE FORM FOR DESCRIPTION OF COVERED AUTO DESIGNATION SYMBOLS 1 THROUGH 9. ENTER SYMBOL 10 DESCRIPTION HERE.


Copyright 2010, OneBeacon Insurance Group LLC
E-INSURED

# Business Auto Declarations
## (Part II)

ITEM **THREE** Schedule of Covered Autos You Own

**Policy Number:** 712-00-78-31-0006

| Covered Auto No. | DESCRIPTION Year, Model, Trade Name, Body Type, Serial Number(s), Vehicle Identification Number (VIN) | | PURCHASED Original Cost New | Actual Cost New (N) Used (U) | Territory: Town & State Where The Covered Auto Will Be Principally Garaged | |
|---|---|---|---|---|---|---|
| 1 | 1988 FORD | E350 | 12,700 | 12,700 | MOUNTLAKE TERRACE | WA |
| | 1FDKE37H4JHB09258 | Cutaway | | (N) | (46-030) 98043-0000 | |
| 2 | 2013 FORD | TRANSIT CONNECT XLT | 24,040 | 24,040 | BOTHELL | WA |
| | NM0KS9CN9DT153640 | Sports Van | | (N) | (46-021) 98041-0000 | |
| 3 | 2003 CHEVROLET | G3500 EXPRESS CUTAWA | 26,714 | 26,714 | MOUNTLAKE TERRACE | WA |
| | 1GBJG31U931167446 | Motorized Cutaway | | (N) | (46-030) 98043-0000 | |
| 4 | 2005 KIA | SEDONA EX/LX | 22,672 | 22,672 | MOUNTLAKE | WA |
| | KNDUP132456756127 | Sports Van | | (N) | (46-030) 98043-0000 | |

**CLASSIFICATION**

| Covered Auto No. | Radius of Operation | BUSINESS USE S = Service R = Retail C = Commercial | Size GVW, GCW or, Vehicle Seating Capacity | Age Group | RATING FACTOR Liability | Physical Damage | Secondary Factor | Code | Except for Towing all physical damage loss is payable to you and the loss payee named below according to their interests in the auto at the time of the loss. |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 50 | S | 10,000 | [redacted] | [redacted] | [redacted] | INCL | 01499 | If Any, See Attached Schedule |
| 2 | 50 | S | 10,000 | [redacted] | [redacted] | [redacted] | INCL | 01499 | |
| 3 | 50 | S | 10,000 | [redacted] | [redacted] | [redacted] | INCL | 01499 | |
| 4 | | | | [redacted] | | | | 73980 | |

**COVERAGES – PREMIUMS, LIMITS AND DEDUCTIBLES**

(Absence of a deductible or limit entry in any column below means that the limit or deductible entry in the corresponding ITEM TWO column applies instead)

| Covered Auto No. | LIABILITY LIMIT | LIABILITY PREMIUM | PERSONAL INJURY PROTECTION Limit stated in each P.I.P. End. minus deductible shown below | PERSONAL INJURY PROTECTION PREMIUM | ADDED P.I.P. Limit stated in each Added P.I.P. End. PREMIUM | PROPERTY PROTECTION INSURANCE (MICHIGAN ONLY) Limit stated in P.P.I. End. minus deductible shown below | PROPERTY PROTECTION INSURANCE PREMIUM | AUTO MEDICAL PAYMENTS LIMIT | AUTO MEDICAL PAYMENTS PREMIUM |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1,000,000 | [redacted] | | | | | | 5,000 | [redacted] |
| 2 | 1,000,000 | [redacted] | | | | | | 5,000 | [redacted] |
| 3 | 1,000,000 | [redacted] | | | | | | 5,000 | [redacted] |
| 4 | 1,000,000 | [redacted] | | | | | | 5,000 | [redacted] |
| TOTAL PREMIUM | | | | | | | | | |

| Covered Auto No. | COMPREHENSIVE Limit stated in ITEM TWO minus deductible shown below | COMPREHENSIVE PREMIUM | SPECIFIED CAUSES OF LOSS COVERAGE Limit stated in ITEM TWO minus deductible shown below | SPECIFIED CAUSES OF LOSS PREMIUM | COLLISION Limit stated in ITEM TWO minus deductible shown below | COLLISION PREMIUM | TOWING AND LABOR Limit Per Disablement | TOWING AND LABOR PREMIUM |
|---|---|---|---|---|---|---|---|---|
| 1 | 5000 | [redacted] | | | 5000 | [redacted] | | |
| 2 | 5000 | [redacted] | | | 5000 | [redacted] | | |
| 3 | 5000 | [redacted] | | | 5000 | [redacted] | | |
| 4 | 5000 | [redacted] | | | 5000 | [redacted] | | |
| TAL PREMIUM | | | | | | | | |


Copyright 2010, OneBeacon Insurance Group LLC

# Business Auto Declarations

## (Part II)

## ITEM THREE Schedule of Covered Autos You Own

**Policy Number:** 712-00-78-31-0006

| Covered Auto No. | DESCRIPTION<br>Year, Model, Trade Name, Body Type, Serial Number(s), Vehicle Identification Number (VIN) | | PURCHASED<br>Original Cost New | Actual Cost New (N) Used (U) | Territory: Town & State<br>Where The Covered Auto Will Be Principally Garaged | |
|---|---|---|---|---|---|---|
| 5 | 2005 KIA<br>KNDUP132656756128 | SEDONA EX/LX<br>Sports Van | 22,767 | 22,767<br>(N) | SPOKANE<br>(46-002) 99202-0000 | WA |
| 6 | 2008 FORD<br>1FTNF21548EE24113 | F250 SUPER DUTY<br>Pickup | 33,435 | 33,435<br>(N) | MOUNTLAKE TERRACE<br>(46-030) 98043-0000 | WA |
| 7 | 2010 FORD<br>NM0LS6AN8AT035970 | TRANSIT CONNECT XL<br>Cargo Van | 21,740 | 21,740<br>(N) | MOUNTLAKE TERRACE<br>(46-030) 98043-0000 | WA |
| 8 | 2012 BMW<br>5UXFG8C57CL590095 | X6 XDRIVE50I<br>4 Dr. Wagon | 71,125 | 71,125<br>(N) | MERCER ISLAND<br>(46-033) 98040-0000 | WA |

### CLASSIFICATION

| Covered Auto No. | Radius of Operation | BUSINESS USE<br>S = Service<br>R = Retail<br>C = Commercial | Size GVW, GCW or, Vehicle Seating Capacity | Age Group | RATING FACTOR<br>Liability | Physical Damage | Secondary Factor | Code | Except for Towing all physical damage loss is payable to you and the loss payee named below according to their Interests in the auto at the time of the loss. |
|---|---|---|---|---|---|---|---|---|---|
| 5 | | | | [redacted] | | | | 73980 | If Any, See Attached Schedule |
| 6 | 50 | S | 10,000 | [redacted] | [redacted] | [redacted] | INCL | 01499 | |
| 7 | 50 | S | 10,000 | [redacted] | [redacted] | [redacted] | INCL | 01499 | |
| 8 | | | | [redacted] | | | | 73980 | |

### COVERAGES – PREMIUMS, LIMITS AND DEDUCTIBLES

(Absence of a deductible or limit entry in any column below means that the limit or deductible entry in the corresponding ITEM TWO column applies instead).

| Covered Auto No. | LIABILITY<br>LIMIT | PREMIUM | PERSONAL INJURY PROTECTION<br>Limit stated in each P.I.P. End. minus deductible shown below | PREMIUM | ADDED P.I.P.<br>Limit stated in each Added P.I.P. End.<br>PREMIUM | PROPERTY PROTECTION INSURANCE (MICHIGAN ONLY)<br>Limit stated in P.P.I. End. minus deductible shown below | PREMIUM | AUTO MEDICAL PAYMENTS<br>LIMIT | PREMIUM |
|---|---|---|---|---|---|---|---|---|---|
| 5 | 1,000,000 | [redacted] | | | | | | 5,000 | [redacted] |
| 6 | 1,000,000 | [redacted] | | | | | | 5,000 | [redacted] |
| 7 | 1,000,000 | [redacted] | | | | | | 5,000 | [redacted] |
| 8 | 1,000,000 | [redacted] | | | | | | 5,000 | [redacted] |
| TOTAL PREMIUM | | [redacted] | | | | | | | [redacted] |

| Covered Auto No. | COMPREHENSIVE<br>Limit stated in ITEM TWO minus deductible shown below | PREMIUM | SPECIFIED CAUSES OF LOSS COVERAGE<br>Limit stated in ITEM TWO minus deductible shown below | PREMIUM | COLLISION<br>Limit stated in ITEM TWO minus deductible shown below | PREMIUM | TOWING AND LABOR<br>Limit Per Disablement | PREMIUM |
|---|---|---|---|---|---|---|---|---|
| 5 | 5000 | [redacted] | | | 5000 | [redacted] | | |
| 6 | 5000 | [redacted] | | | 5000 | [redacted] | | |
| 7 | 5000 | [redacted] | | | 5000 | [redacted] | | |
| 8 | 5000 | [redacted] | | | 5000 | [redacted] | | |
| TOTAL PREMIUM | | [redacted] | | | | [redacted] | | |


Copyright 2010, OneBeacon Insurance Group LLC

# Business Auto Declarations (Part III)

## ITEM FOUR Schedule of Hired or Borrowed Covered Auto Coverage and Premiums

Policy Number: 712-00-78-31-0006

Liability Coverage - Cost Of Hire Rating Basis For Autos NOT Used In Your Motor Carrier Operations (Other than Mobile or Farm Equipment)

| LIABILITY COVERAGE | STATE CLASS Primary And All States | ESTIMATED ANNUAL COST OF HIRE FOR EACH STATE | RATE PER EACH $100 COST OF HIRE | FACTOR (IF LIABILITY COVERAGE IS PRIMARY) | PREMIUM |
|---|---|---|---|---|---|
| PRIMARY COVERAGE | 46-66190 | If Any | 4.644 | | $[redacted] |
| EXCESS COVERAGE | | | | | $ |
| * Subject to Evidence of Insurance<br>Cost of Hire means the total amount you incur for the hire of "autos" you don't own (not including "autos" you borrow or rent from your partners or "employees" or their family members). Cost of Hire does not include charges for services performed by motor carriers of property or passengers. | | | TOTAL PREMIUM | | $[redacted] |

PHYSICAL DAMAGE COVERAGE

| COVERAGES | STATE Primary And All States | LIMIT OF INSURANCE THE MOST WE WILL PAY DEDUCTIBLE | ESTIMATED ANNUAL COST OF HIRE For Each State (Excluding Autos Hired With A Driver) | RATE PER EACH $100 ANNUAL COST OF HIRE | PREMIUM |
|---|---|---|---|---|---|
| COMPREHENSIVE | | ACTUAL CASH VALUE, OR COST OF REPAIRS, OR $ WHICHEVER IS LESS, MINUS $ DEDUCTIBLE FOR EACH COVERED AUTO, BUT NO DEDUCTIBLE APPLIES TO LOSS CAUSED BY FIRE OR LIGHTNING | | | $ |
| SPECIFIED CAUSES OF LOSS | | ACTUAL CASH VALUE, OR COST OF REPAIRS, OR $ WHICHEVER IS LESS, MINUS $ 25 DEDUCTIBLE FOR EACH COVERED AUTO FOR LOSS CAUSED BY MISCHIEF OR VANDALISM | | | $ |
| COLLISION | | ACTUAL CASH VALUE, OR COST OF REPAIRS, OR $ WHICHEVER IS LESS, MINUS $ DEDUCTIBLE FOR EACH COVERED AUTO. | | | $ |
| | | | TOTAL PREMIUM | | $ |

## ITEM FIVE Schedule for Non-ownership Liability

| NAMED INSURED'S BUSINESS | RATING BASIS | NUMBER | PREMIUM |
|---|---|---|---|
| 46-660100-611-98043 OTHER THAN GARAGE SERVICE OPERATIONS AND OTHER THAN SOCIAL SERVICE AGENCIES | Number of Employees | 25 | $ [redacted] |
| | Number of Partners (Active and Inactive) | | $ |
| SOCIAL SERVICE AGENCIES | Number of Employees | | $ |
| | Number of Volunteers Who Regularly Use Autos To Transport Clients | | $ |
| | Number of Partners (Active and Inactive) | | $ |
| GARAGE SERVICE OPERATIONS | Number of Employees Whose Principal Duty Involves The Operations of Autos | | $ |
| | Number of Partners (Active and Inactive) | | $ |
| INDIVIDUAL EMPLOYEE LIABILITY 46-66710-611-98043 | NUMBER OF EMPLOYEES | 25 | $ [redacted] |
| | | | $ |
| | | TOTAL PREMIUM | $ [redacted] |


Copyright 2010, OneBeacon Insurance Group LLC
E-INSURED

# SCHEDULE 4

Effective 10/01/2013 , this schedule forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)
issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

Commercial Auto Coverage Part Declarations, ACA 01 03 10, Continued:

Forms Applicable to the Auto Coverage Part:

| | |
|---|---|
| ACA 01 03 10 | BUSINESS AUTO DEC (PART I) |
| ACA 02 03 10 | BUSINESS AUTO DEC (PART II) |
| ACA 03 03 10 | BUSINESS AUTO DEC (PART III) |
| CA 00 01 03 10 | BUSINESS AUTO COVERAGE FORM |
| CA 01 35 01 08 | WA CHANGES |
| CA 21 34 01 08 | WA UIM COVERAGE |
| CA 23 93 01 06 | WA EXCL OF TERRORISM - NUCLEAR BIOLOGICAL OR CHEMICAL |
| CA 99 03 03 06 | AUTO MEDICAL PAYMENTS COVERAGE |
| CA 99 10 03 10 | DRIVE OTHER CAR COVERAGE |
| CA 99 23 03 10 | RENTAL REIMBURSEMENT COV |
| CA 99 33 02 99 | EMPLOYEES AS INSUREDS |
| IL 01 98 09 08 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDT (BROAD FORM) |
| VCA 201 01 09 | @VANTAGE FOR AUTOMOBILE (N/A SC) |
| ASC 00 11 01 98 | Schedule 4 - AUTO FORMS LIST |
| ASC 00 11 01 98 | Schedule 5 - DRIVE OTHER CAR SCHEDULE |
| ASC 00 11 01 98 | Schedule 6 - RENTAL REIMBURSEMENT SCHEDULE |
| ASC 00 11 01 98 | Schedule 7 - AUTO LOSS PAYEE SCHEDULE |
| ASC 00 11 01 98 | Schedule 8 - UNINSURED MOTORIST |

3 6-43-4154 10/01/2013 DDS CPW PR 1.000

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WASHINGTON UNDERINSURED MOTORISTS COVERAGE

For a covered "auto" licensed or principally garaged in, or for "garage operations" conducted in, Washington, this endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

| | |
|---|---|
| Endorsement Effective Date: 10/01/2013 | Policy Number: 712-00-78-31-0006 |
| Named Insured: PREMERA | Countersigned By: |

(Authorized Representative)

**SCHEDULE**

| | | |
|---|---|---|
| **"Bodily Injury" And "Property Damage":** | **$** 1,000,000 | **Each "Accident"** |
| **Or** | | |
| **"Bodily Injury":** | **$** | **Each "Accident"** |

This endorsement provides "bodily injury" and "property damage" underinsured motorists coverage unless an "X" is entered below:

☐ If an "X" is entered in this box, this endorsement provides "bodily injury" underinsured motorists coverage only for the following "autos":

**Description of "Autos":**

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Coverage**

1. We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or driver of an "underinsured motor vehicle". The damages must result from "bodily injury" or "property damage" sustained by the "insured" caused by an "accident". The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the "underinsured motor vehicle".

**B. Who Is An Insured**

If the Named Insured is designated in the Declarations as:

1. An individual, then the following are "insureds":
   a. The Named Insured and any "family members".
   b. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.
   c. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".
2. A partnership, limited liability company, corporation or any other form of organization, then the following are "insureds":
   a. Anyone "occupying" a covered "auto" or a temporary substitute for a covered

 © ISO Properties, Inc., 2007 

E-INSURED

ASIC00236

"auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.

**b.** Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".

**c.** The Named Insured for "property damage" only.

**C. Exclusions**

This insurance does not apply to:

**1.** The benefit of any insurer or self-insurer under any workers' compensation law or any similar disability benefits law.

**2.** The benefit of any insurer of property.

**3.** "Bodily injury" sustained by:

**a.** An individual Named Insured while "occupying" any vehicle owned by that Named Insured or made available for that Named Insured's regular use that is not a covered "auto" for Liability Coverage under this Coverage Form;

**b.** Any "family member" while "occupying" any vehicle owned by that "family member" or available for that "family member's" regular use that is not a covered "auto" for Liability Coverage under this Coverage Form; or

**c.** Any "family member" while "occupying" any vehicle owned by the Named Insured or made available for the Named Insured's regular use that is insured for Liability Coverage on a primary basis under any other Coverage Form or policy.

**4.** Property contained in or struck by any vehicle owned by or available for the regular use of the Named Insured or any "family member", if the Named Insured is an individual, which is not a covered "auto" for Liability Coverage under this Coverage Form.

**5.** The first $300 of the amount of "property damage" to the property of each "insured" as the result of any one "accident" caused by a hit-and-run vehicle as described in Paragraph **5.d.** of the definition of "underinsured motor vehicle". In all other cases, this insurance does not apply to the first $100 of the amount of "property damage" to the property of each "insured" as the result of any one "accident".

**6.** Anyone using a vehicle without a reasonable belief that the person is entitled to do so.

**7.** "Bodily injury" or "property damage" to an "insured" while operating or "occupying" a motorcycle or motor driven cycle which is not a covered "auto" for Liability Coverage under this Coverage Form.

**8.** Punitive or exemplary damages.

**9.** "Bodily injury" or "property damage" arising directly or indirectly out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**D. Limit Of Insurance**

**1.** Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for all damages resulting from any one "accident" is the limit shown in the Schedule or in the Declarations.

**2.** No one will be entitled to receive duplicate payments for the same elements of "loss" under this Coverage Form and any Liability Coverage Form, Medical Payments Coverage Endorsement or Personal Injury Protection Coverage Endorsement attached to this Coverage Part.

We will not make a duplicate payment under this Coverage for any element of "loss" for which payment has been made by or for anyone who is legally responsible.

**E. Changes In Conditions**

The conditions are changed for Washington Underinsured Motorists Coverage as follows:

**1. Other Insurance** in the Business Auto and Garage Coverage Forms and **Other Insurance – Primary And Excess Insurance Provisions** in the Truckers and Motor Carrier Coverage Forms are replaced by the following:

If there is other applicable insurance available under one or more policies or provisions of coverage:


© ISO Properties, Inc., 2007

a. The maximum recovery under all coverage forms or policies combined may equal but not exceed the highest applicable limit for any one vehicle under any coverage form or policy providing coverage on either a primary or excess basis.

b. Any insurance we provide with respect to a vehicle the Named Insured does not own shall be excess over any other collectible underinsured motorists insurance providing coverage on a primary basis.

c. If the coverage under this Coverage Form is provided:

(1) On a primary basis, we will pay only our share of the loss that must be paid under insurance providing coverage on a primary basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage on a primary basis.

(2) On an excess basis, we will pay only our share of the loss that must be paid under insurance providing coverage on an excess basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage on an excess basis.

2. **Duties In The Event Of Accident, Claim, Suit Or Loss** is changed by adding the following:

a. A person seeking Underinsured Motorists Coverage must also promptly notify us in writing of a tentative settlement between the "insured" and the insurer of an "underinsured motor vehicle", and allow us 30 days to advance payment to that "insured" in an amount equal to the tentative settlement to preserve our rights against the insurer, owner or operator of such "underinsured motor vehicle". However, this provision does not apply if failure to notify us does not prejudice our right to recover payment from the person legally responsible for the "accident".

3. **Legal Action Against Us** is replaced by the following:

a. No one may bring a legal action against us under this Coverage Form until there has been full compliance with all the terms of this Coverage Form.

b. Any legal action against us under this Coverage Form must be brought within one year after the date on which the cause of action accrues.

If this action is brought pursuant to Sec. 3 of RCW 48.30 then 20 days prior to filing such an action, you are required to provide written notice of the basis for the cause of action to us and the Office of the Insurance Commissioner. Such notice may be sent by regular mail, registered mail or certified mail with return receipt requested.

4. **Transfer Of Rights Of Recovery Against Others To Us** is changed by adding the following:

If we make any payment and the "insured" recovers from another party, the "insured" shall hold the proceeds in trust for us and pay us back the amount we have paid. We shall be entitled to recovery only after the "insured" has been fully compensated for damages.

Our rights do not apply under this provision with respect to damages caused by an "accident" with an "underinsured motor vehicle" if we:

a. Have been given prompt notice of a tentative settlement between an "insured" and the insurer of an "underinsured motor vehicle"; and

b. Fail to advance payment to the "insured" in an amount equal to the tentative settlement within 30 days after receipt of notification.

If we advance payment to the "insured" in an amount equal to the tentative settlement within 30 days after receipt of notification:

(1) That payment will be separate from any amount the "insured" is entitled to recover under the provisions of Underinsured Motorists Coverage; and

(2) We also have a right to recover the advanced payment.

5. The following condition is added:

**ARBITRATION**

a. If we and an "insured" disagree whether the "insured" is legally entitled to recover damages from the owner or driver of an "underinsured motor vehicle" or do not agree as to the amount of damages that are recoverable by that "insured", then the matter may be


© ISO Properties, Inc., 2007

arbitrated. However, disputes concerning coverage under this endorsement may not be arbitrated. Both parties must agree to arbitration. If so agreed, each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction. We will pay all arbitration expenses. Arbitration expenses will not include the "insured's" attorney's fees or any expenses incurred in producing evidence or witnesses.

**b.** Unless both parties agree otherwise, arbitration will take place in the county in which the "insured" lives. Local rules of law as to arbitration procedure and evidence will apply. A decision agreed to by two of the arbitrators will be binding.

**F. Additional Definitions**

As used in this endorsement:

**1.** "Property damage" means injury to or destruction of the property of an "insured".

**2.** "Family member" means a person related to an individual Named Insured by blood, marriage or adoption who is a resident of such Named Insured's household, including a ward or foster child.

**3.** "Occupying" means in, upon, getting in, on, out or off.

**4.** "Suit" means a civil proceeding in which:

**a.** Damages because of "bodily injury" or "property damage"; or

**b.** A "covered pollution cost or expense" to which this insurance applies, are alleged.

"Suit" includes:

**(1)** An arbitration proceeding in which such damages or "covered pollution costs or expenses" are claimed; or

**(2)** Any other alternative dispute resolution proceeding in which such damages or "covered pollution costs or expenses" are claimed.

**5.** "Underinsured motor vehicle" means a land motor vehicle or "trailer":

**a.** For which no liability bond or policy applies at the time of an "accident"; or

**b.** For which liability bonds or policies apply at the time of the "accident", but the amount paid under all of the bonds or policies to an "insured" is not enough to pay the full amount an "insured" is legally entitled to recover as damages caused by the "accident"; or

**c.** For which all insuring or bonding companies deny coverage or are or become insolvent; or

**d.** That is a hit-and-run vehicle and neither the driver nor owner can be identified. The vehicle must either:

**(1)** Hit an "insured", a covered "auto" or a vehicle an "insured" is "occupying"; or

**(2)** Cause "bodily injury" or "property damage" with no physical contact with the "insured" or the vehicle the "insured" was "occupying" at the time of the "accident" provided:

**(a)** The facts of the "accident" can be corroborated by competent evidence other than the testimony of any person having an underinsured motorists coverage claim as a result of such "accident"; and

**(b)** Someone reports the "accident" to the police within 72 hours of the "accident".

However, "underinsured motor vehicle" does not include any vehicle:

**a.** For which the Liability Coverage of this Coverage Form applies. However, if the Named Insured is an individual and that Named Insured or any "family member" sustains damages while "occupying", or when struck by, an "auto" which is a covered "auto" for Liability Coverage under this Coverage Form, this exception to this definition of an "underinsured motor vehicle" does not apply to that Named Insured or any such "family member".

**b.** Owned by a governmental unit or agency. This provision does not apply if the governmental unit or agency is unable to pay damages because of financial inability or insolvency.

**6.** Whenever the terms "uninsured motorists coverage" or "uninsured motor vehicle" appear in the Coverage Form or any endorsements attached to the Coverage Form, they are replaced by the terms "underinsured motorists coverage" and "underinsured motor vehicle" for covered "autos" licensed in or "garage operations" conducted in Washington.


© ISO Properties, Inc., 2007

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# DRIVE OTHER CAR COVERAGE – BROADENED COVERAGE FOR NAMED INDIVIDUALS

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| | |
|---|---|
| Endorsement Effective Date: 10/01/13 | Policy Number: 712-00-78-31-0006 |
| Named Insured: PREMERA | Countersigned By: |

**SCHEDULE***

| | | | | |
|---|---|---|---|---|
| **Name of Individual:** See Schedule 5 | | | | |
| **Liability** | **Limit:** | 1,000,000 | **Premium:** | [redacted] |
| **Auto Medical Payments** | **Limit:** | 5,000 | **Premium:** | [redacted] |
| **Comprehensive** | **Deductible:** | Full | **Premium:** | [redacted] |
| **Collision** | **Deductible:** | 50 | **Premium:** | [redacted] |
| **Uninsured Motorists** | **Limit:** | | **Premium:** | |
| **Underinsured Motorists** | **Limit:** | 1,000,000 | **Premium:** | [redacted] |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | | |

Total Premium $[redacted]

**Note** – When Uninsured Motorists Coverage is provided at limits higher than the basic limits required by a financial responsibility law, Underinsured Motorists Coverage is included, unless otherwise noted. If Underinsured Motorists Coverage is provided as a separate coverage, make appropriate entry in the Schedule above.

**A.** This endorsement changes only those coverages where a premium is shown in the Schedule.

**B. Changes In Liability Coverage**

1. Any "auto" you don't own, hire or borrow is a covered "auto" for Liability Coverage while being used by any individual named in the Schedule or by his or her spouse while a resident of the same household except:

   **a.** Any "auto" owned by that individual or by any member of his or her household.

   **b.** Any "auto" used by that individual or his or her spouse while working in a business of selling, servicing, repairing or parking "autos".

2. The following is added to **Who Is An Insured:**

   Any individual named in the Schedule and his or her spouse, while a resident of the same household, are "insureds" while using any covered "auto" described in Paragraph **B.1.** of this endorsement.

**C. Changes In Auto Medical Payments And Uninsured And Underinsured Motorists Coverages**

The following is added to **Who Is An Insured:**

Any individual named in the Schedule and his or her "family members" are "insureds" while "occupying" or while a pedestrian when being struck by any "auto" you don't own except:


© Insurance Services Office, Inc., 2009
E-INSURED

ASIC00240

Any "auto" owned by that individual or by any "family member".

**D. Changes In Physical Damage Coverage**

Any private passenger type "auto" you don't own, hire or borrow is a covered "auto" while in the care, custody or control of any individual named in the Schedule or his or her spouse while a resident of the same household except:

1. Any "auto" owned by that individual or by any member of his or her household.
2. Any "auto" used by that individual or his or her spouse while working in a business of selling, servicing, repairing or parking "autos".

**E. Additional Definition**

As used in this endorsement:

"Family member" means a person related to the individual named in the Schedule by blood, marriage or adoption who is a resident of the individual's household, including a ward or foster child.


© Insurance Services Office, Inc., 2009

# SCHEDULE 5

Effective 10/01/2013 , this schedule forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)

issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

3 6-43-4154 10/01/2013 DDS CPW PR 1.000

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# RENTAL REIMBURSEMENT COVERAGE

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| Endorsement Effective Date: 10/01/2013 | Policy Number: 712-00-78-31-0006 |
|---|---|
| Named Insured: PREMERA | Countersigned By: |
| | (Authorized Representative) |

## SCHEDULE

| Coverages | Designation or Description of Covered "Autos" to Which This Insurance applies | Maximum Payment Each Covered "Auto" Any One Day | No. of Days | Any One Period | Premium |
|---|---|---|---|---|---|
| Comprehensive | See Schedule 6 | $See | Sched | $ | $ [redacted] |
| | | $ | | $ | $ |
| Collision | See Schedule 6 | $See | Sched | $ | $ [redacted] |
| | | $ | | $ | $ |
| Specified Causes of Loss | | $ | | $ | $ |
| | | $ | | $ | $ |
| | | | | Total Premium | [redacted] |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | | | | | |

**A.** This endorsement provides only those coverages where a premium is shown in the Schedule. It applies only to a covered "auto" described or designated in the Schedule.

**B.** We will pay for rental reimbursement expenses incurred by you for the rental of an "auto" because of "loss" to a covered "auto". Payment applies in addition to the otherwise applicable amount of each coverage you have on a covered "auto". No deductibles apply to this coverage.

**C.** We will pay only for those expenses incurred during the policy period beginning 24 hours after the "loss" and ending, regardless of the policy's expiration, with the lesser of the following number of days:

**1.** The number of days reasonably required to repair or replace the covered "auto". If "loss" is caused by theft, this number of days is added to the number of days it takes to locate the covered "auto" and return it to you.

**2.** The number of days shown in the Schedule.

**D.** Our payment is limited to the lesser of the following amounts:

**1.** Necessary and actual expenses incurred.

**2.** The maximum payment stated in the Schedule applicable to "any one day" or "any one period".

**E.** This coverage does not apply while there are spare or reserve "autos" available to you for your operations.

**F.** If "loss" results from the total theft of a covered "auto" of the private passenger type, we will pay under this coverage only that amount of your rental reimbursement expenses which is not already provided for under the Physical Damage Coverage Extension.


© Insurance Services Office, Inc., 2009

# SCHEDULE 6

Effective 10/01/2013 , this schedule forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)
issued to
PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

Rental Reimbursement

| Auto No. | Maximum Payment Any One Day | No. Days | Any One Period | Coverage | Premium |
|---|---|---|---|---|---|
| 1 | $30 | 30 | $900 | Comprehensive | $[redacted] |
| | $30 | 30 | $900 | Collision | $[redacted] |
| 2 | $30 | 30 | $900 | Comprehensive | $[redacted] |
| | $30 | 30 | $900 | Collision | $[redacted] |
| 3 | $30 | 30 | $900 | Comprehensive | $[redacted] |
| | $30 | 30 | $900 | Collision | $[redacted] |
| 4 | $30 | 30 | $900 | Comprehensive | $[redacted] |
| | $30 | 30 | $900 | Collision | $[redacted] |
| 5 | $30 | 30 | $900 | Comprehensive | $[redacted] |
| | $30 | 30 | $900 | Collision | $[redacted] |
| 6 | $30 | 30 | $900 | Comprehensive | $[redacted] |
| | $30 | 30 | $900 | Collision | $[redacted] |
| 7 | $30 | 30 | $900 | Comprehensive | $[redacted] |
| | $30 | 30 | $900 | Collision | $[redacted] |
| 8 | $30 | 30 | $900 | Comprehensive | $[redacted] |
| | $30 | 30 | $900 | Collision | $[redacted] |

3 6-43-4154 10/01/2013 DDS CPW PR 1.000

# SCHEDULE 7

Effective 10/01/2013 , this schedule forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)
issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

Loss Payable

Except for towing, all physical damage loss is payable to you and the loss payee named below as interests may appear at the time of the loss.

BMW FINANCIAL SERVICES
INSURANCE SERVICE CENTER
PO BOX 390902
MINNEAPOLIS, MN 55439-0902
Auto No.
8

3 6-43-4154 10/01/2013 DDS CPW PR 1.000

# SCHEDULE 8

Effective 10/01/2013 , this schedule forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)
issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

Uninsured Motorist Limits (UM)
and
Underinsured Motorist Limits (UIM)
(when not included in Uninsured Motorists Coverage)

| State | Coverage | Limit | Premium |
|---|---|---|---|
| Washington | UIM BI & PD | $1,000,000 | $[redacted] (Incl) |

3 6-43-4154 10/01/2013 DDS CPW PR 1.000

POLICY NUMBER 712-00-78-31 -0006


## UMBRELLA DECLARATIONS

**1. Limit of Insurance:**

| | |
|---|---|
| $15,000,000 | Each Occurrence Limit |
| $15,000,000 | Products/Completed Operations Aggregate Limit of Insurance |
| $15,000,000 | Bodily Injury By Disease Aggregate Limit |
| $15,000,000 | General Aggregate Limit of Insurance |

**2. Schedule of Underlying Insurance.**

In addition to the policies listed below, the underlying insurance which is to be maintained by the Insured as provided for in Condition 4 of the Commercial Umbrella Liability Coverage Form shall be as stated in the Liability Declarations and/or Automobile Declarations contained in this policy.

| Line of Insurance | Carrier Policy Number | Policy Period | Limit of Insurance |
|---|---|---|---|
| | ATLANTIC SPECIALTY INSURANCE COMPANY 4060399400001 | 10/01/2013 to 10/01/2014 | |
| Employers Liability | | | |
| | Bodily Injury By Accident - Each Accident | | $1,000,000 |
| | Bodily Injury By Disease - Policy Limit | | $1,000,000 |
| | Bodily Injury By Disease - Each Employee | | $1,000,000 |

**These Declarations are completed by the following:**

See ASC 00 11 01 98, Schedule 9


Copyright 1999, OneBeacon Insurance Group LLC

# SCHEDULE 9

Effective 10/01/2013 , this schedule forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)

issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

Commercial Umbrella Coverage Part Declarations, VCU 001 12 99, Continued:

Forms Applicable to the Umbrella Coverage Part:

| | |
|---|---|
| IL 01 42 09 08 | OR CHANGES - DOMESTIC PARTNERSHIP |
| IL 01 98 09 08 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDT (BROAD FORM) |
| VCU 001 12 99 | UMBRELLA DECLARATIONS |
| VCU 100 07 09 | COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM |
| VCU 209 11 04 | EXCLUSION - PROFESSIONAL LIABILITY |
| VCU 212 07 09 | FINANCIAL INSTITUTIONS EXCLUSION |
| VCU 216 07 09 | EXCL - INTELLECTUAL PROPERTY - CHANGES |
| VCU 232 11 04 | EXCL- CARE, CUSTODY OR CONTROL (PROPERTY OF OTHERS) |
| VCU 267 07 09 | UNDERLYING EMPLOYEE BENEFITS LIABILITY CLAIMS -MADE COVERAGE |
| VCU 273 11 04 | EXCLUSION - FUNGI OR BACTERIA |
| VCU 284 05 09 | RECORDING & DISTRIB OF MAT OR INFO IN VIOLATION OF LAW EXCL |
| VCU 303 01 08 | EXCL OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE US |
| VCU 398 01 08 | AMENDED TERRORISM COVERAGE - COVERED AUTOS |
| VCU 400 07 07 | ABSOLUTE EXCLUSION - ASBESTOS LIABILITY |
| VCU 669 WA 07 09 | WA CHANGES |
| VCU 763 WA 11 04 | WA-FUNGI OR BACTERIA EXCLUSION |
| ASC 00 10 01 98 | Policy Change 3 - ASBESTOS LIABILITY EXCLUSION |
| ASC 00 11 01 98 | Schedule 9 - UMBRELLA POLICY FORMS LIST |

3 6-43-4154 10/01/2013 DDS CPW PR 1.000

# POLICY CHANGE 3

Effective 10/01/2013 , this endorsement forms a part of Policy No. 712-00-78-31-0006
(At the time stated in the policy)
issued to

PREMERA
(See ASC 00 11 01 98, Schedule 1)

Producer: MARSH USA, INC.

by Atlantic Specialty Insurance Company

(The information provided for above is required to be completed only when this endorsement is issued for attachment to the policy subsequent to its effective date.)

## ASBESTOS LIABILITY EXCLUSION

This endorsement modifies the insurance provided by the following:

COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

This insurance does not apply to any liability for bodily injury, property damage, personal and advertising injury, sickness, disease, occupational disease, disability, shock, death, mental anguish, and mental injury at any time arising out of the manufacture of, or use of, or mining of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust, to any obligation of the insured to indemnify any party because of damages arising out of such property damage, personal injury, bodily injury, sickness, disease, occupational disease, disability, shock, death, mental anguish or mental injury at any time as a result of the manufacture of, use of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

It is further agreed that we are not obligated to defend any suit or claim against the insured alleging or seeking said damages, if such suit or claim arises from said damages resulting from or contributed to by any and all manufacture of, mining of, use of, sales of, installation of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

3 6-43-4154 10/01/2013 DDS CPW PR 1.000

OneBeacon
INSURANCE GROUP

Atlantic Specialty Insurance Company

150 Royall Street
Canton, MA 02021

Insured Name and Address:
PREMERA
(See ASC 00 11 01 98, Schedule 1)
7001 220TH ST SW
MOUNTLAKE TERRACE, WA 98043-2160

Policy Number: 712-00-78-31-0006

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act (the Act), as amended, you have a right to purchase insurance coverage for losses arising out of acts of terrorism, as defined in Section 102(1) of the Act: Under the Act, the term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

IF COVERAGE IS PROVIDED FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT IN ACCORDANCE WITH A FORMULA ESTABLISHED UNDER THE ACT. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT WOULD PAY 85% OF COVERED TERRORISM LOSSES THAT EXCEED THE STATUTORILY IMPOSED DEDUCTIBLE FOR WHICH THE INSURANCE COMPANY IS RESPONSIBLE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSSES COVERED BY THE UNITED STATES GOVERNMENT UNDER THE ACT.

THE ACT CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES EXCEEDS $100 BILLION IN ANY ONE CALENDAR YEAR. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

## SELECTION OR REJECTION OF TERRORISM INSURANCE COVERAGE

The prospective premium required for your terrorism coverage is: $[redacted]. If you wish to reject this offer of coverage, you should check the box below, sign this notice and send it to your agent. An exclusion of terrorism losses, as defined by the Act, will then be made part of your policy.

| | |
|---|---|
| ☐ | I hereby reject the offer of terrorism coverage. I understand that I will have no coverage for losses arising from acts of terrorism, as defined in the Act. |

### A. Possibility of Additional or Return Premium

The premium shown above is calculated based in part on the federal participation in payment of terrorism losses as set forth in the Terrorism Risk Insurance Act. The federal program established by the Act is scheduled to terminate at the end of 12/31/14. If the federal program terminates or if the level or terms of federal participation change, the estimated premium shown above may not be appropriate.

If this policy contains a Conditional Exclusion, continuation of coverage for certified acts of terrorism, or termination of such coverage, will be determined upon disposition of the federal program, subject to the terms and conditions of the Conditional Exclusion. If this policy does not contain a Conditional Exclusion, coverage for certified acts of terrorism will continue. In either case, when disposition of the federal program is determined, we will recalculate the estimated premium shown above and will charge additional premium or refund excess premium, if indicated.

If we notify you of an additional premium charge, the additional premium will be due as specified in such notice.

3 6-43-4154 10/01/2013 DDS CPW PR 1.000


Copyright 2008, OneBeacon Insurance Group LLC
E-INSURED

**B. If your policy includes Property Coverage in one or more of these states: CA, CT, GA, HI, IA, IL, MA, ME, MO, NC, NJ, NY, OR, RI, VA, WA, WI, or WV; the following statement applies:**

The terrorism exclusion makes an exception for (and thereby continues your coverage for) property fire losses resulting from an act of terrorism. Therefore, if you reject the offer of terrorism coverage, that rejection does not apply to fire losses resulting from an act of terrorism - the coverage in your policy for such fire losses will continue. If such a loss occurs, and is certified under the Act, the loss may be reimbursed by the United States government under the formula detailed above.

The portion of your policy premium attributable to terrorism (fire only) coverage in all of the states listed above, in which your policy provides property coverage, is $[redacted]__________________. This amount is included in your policy premium and cannot be rejected.

______________________________
Policyholder/Applicant's Signature

Atlantic Specialty Insurance Company
Insurance Company

______________________________
Print Name

712-00-78-31-0006
Policy Number

Date: _________________________

If you have any questions about this notice, please contact your agent.


Copyright 2008, OneBeacon Insurance Group LLC

**POLICY NUMBER:** 712-00-78-31 -0006

## Non-Policy Forms

The following forms were sent to you with your policy, but they are not part of your policy. They contain information which you may find useful about your policy, insurance in general, your premium payments, or other topics of interest. These forms do not give you insurance coverage. Refer to the forms that are part of your policy to determine if a loss is covered, and what we will pay, as well as your rights and duties.

| | |
|---|---|
| A 1058 12 89 | IMPORTANT NOTICE (WA) |
| CLD 132 01 08 | POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COV |
| IL P 001 01 04 | U.S. TREASURY DEPT OFFICE OF FOREIGN ASSETS NOTICE |
| RC 291 09 12 | WELCOME LETTER |
| VCA U 046 WA 01 07 | WA UNDERINSURED MOTORISTS COVERAGE SELECTION/REJECTION |
| VGN 055 04 13 | 2013 GL MULTISTATE REVISION NOTICE TO POLICYHOLDERS |

3 6-43-4154 10/01/2013 DDS CPW PR 1.000


Copyright 1998, OneBeacon Insurance Group LLC
E-INSURED

# COMMON POLICY CONDITIONS

All coverages of this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.
2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:
   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or
   b. 30 days before the effective date of cancellation if we cancel for any other reason.
3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.
4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.
5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.
6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 45 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**C. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**D. Concealment, Misrepresentation or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This policy;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this policy.

**E. Examination of Your Books and Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**F. Inspections and Surveys**

We have the right but are not obligated to:

1. Make inspections and surveys at any time;
2. Give you reports on the conditions we find; and
3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or
2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

**G. Liberalization**

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

**H. Premiums**

1. All Named Insureds shown in the Declarations are jointly and severally liable and responsible for the payment of all premiums.
2. The first Named Insured shown in the Declarations will be the payee of any return premiums we pay.

**I. Premium Audit**

1. This policy is subject to audit if a premium designated as an advance premium is shown in the Declarations. We will compute the final premium due when we determine your actual exposures.
2. Premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.
3. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**J. Transfer of Your Rights and Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**K. Unintentional Errors or Omissions**

Your failure to disclose all hazards existing as of the inception date of the policy shall not prejudice you with respect to the coverage afforded by this policy, provided such failure or omission is not intentional. However, this provision does not affect our right to collect additional premium or exercise our right of cancellation or nonrenewal.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ALASKA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

COMMON POLICY CONDITIONS

**A.** Paragraph **A. Cancellation** is replaced by the following:

**A. Cancellation**

**1.** The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

**2.** We may cancel this policy by mailing to you and the agent or broker of record written notice of cancellation. Such notice, stating the reason for cancellation, must be sent by first class mail at least:

**a.** 10 days before the effective date of cancellation if we cancel for:

**(1)** Conviction of the insured of a crime having as one of its necessary elements an act increasing a hazard insured against, or

**(2)** Fraud or material misrepresentation by the insured or a representative of the insured in obtaining the insurance or by the insured in pursuing a claim under this policy; or

**b.** 20 days before the effective date of cancellation if we cancel for:

**(1)** Nonpayment of premium, or

**(2)** Failure or refusal of the insured to provide the information necessary to confirm exposure or determine the policy premium; or

**c.** 60 days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail our notice to your last known address and the last known address of the agent or broker of record.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** A post office certificate of mailing or certified mail receipt will be sufficient proof of mailing of notice.

**6.** If this policy is cancelled, we will return any premium refund due to the first Named Insured, or, if applicable, to the premium finance company. If:

**a.** We cancel, the refund will be the pro rata unearned premium. The refund will be returned or credited before the effective date of cancellation. However, if cancellation is for:

**(1)** Nonpayment of premium;

**(2)** Conviction of the insured of a crime having as one of its necessary elements an act increasing a hazard insured against;

**(3)** Discovery of fraud or material misrepresentation made by the insured or a representative of the insured in obtaining the insurance or by the insured in pursuing a claim under the policy; or

**(4)** Failure or refusal of the insured to provide the information necessary to confirm exposure or necessary to determine the policy premium;

any unearned premium shall be returned or credited within 45 days after the cancellation notice is given; or

**b.** The first Named Insured cancels, the refund:

**(1)** Will be the pro rata unearned premium minus a cancellation fee of 7.5% of the pro rata unearned premium. However, we will not retain this cancellation fee if this policy is cancelled:

**(a)** And rewritten with us or in our company group; or

**(b)** At our request;

**(c)** Because you no longer have a financial or insurable interest in the property or business operation that is the subject of this insurance; or


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2012, OneBeacon Insurance Group LLC

**(d)** After the first year for a prepaid policy written for a term of more than one year.

**(2)** Will be returned or credited:

**(a)** By the effective date of cancellation; or

**(b)** Within 45 days of your request to cancel;

whichever is later.

If the policy is selected for audit, we will complete the audit within 45 days of the receipt of the request for cancellation. The refund will be returned within 45 days of completion of an audit, or the effective date of cancellation, whichever is later.

**B.** Paragraph **B. When We Do Not Renew** is replaced by the following:

**1.** If we decide not to renew this policy, we will mail written notice of nonrenewal, by first class mail, to you and the agent or broker of record at least 45 days before:

**a.** The expiration date; or

**b.** The anniversary date if this policy has been written for more than one year or with no fixed expiration date.

**2.** We need not mail notice of nonrenewal if:

**a.** We have manifested in good faith our willingness to renew; or

**b.** The first Named Insured has failed to pay any premium required for this policy; or

**c.** The first Named Insured fails to pay the premium required for renewal of this policy.

**3.** Any notice of nonrenewal will be mailed to your last known address and the last known address of the agent or broker of record. A post office certificate of mailing or certified mail receipt will be sufficient proof of mailing of notice.

**C.** The following is added to paragraph **C. Changes**:

If the premium to renew this policy increases more than 10% for a reason other than an increase in coverage or exposure basis, or if after the renewal there will be a material restriction or reduction in coverage not specifically requested by the insured, we will mail written notice to your last known address and the last known address of the agent or broker of record at least 45 days before:

**1.** The expiration date; or

**2.** The anniversary date if this policy has been written for more than one year or with no fixed expiration date.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2012, OneBeacon Insurance Group LLC

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OREGON CHANGES

This endorsement modifies the insurance provided by the following:

PROPERTY CONDITIONS
COMMON POLICY CONDITIONS

1. COMMON POLICY CONDITIONS Section **D. Concealment, Misrepresentation or Fraud,** is deleted in its entirety and replaced by the following:

   **D. Concealment, Misrepresentation or Fraud**

   1. Subject to paragraphs **2.** and **3.** below, this policy will be void if, whether before or after a loss, you have willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject of it, or your interest in it, or in case of any fraud or false swearing by you relating to it.
   2. All statements made by you or on your behalf, in the absence of fraud, will be deemed representations and not warranties. No such statements that arise from an error in the application will be used in defense of a claim under this policy unless:
      a. The statements are contained in a written application; and
      b. A copy of the application is endorsed upon or attached to this policy when issued.
   3. In order to use any representation made by you or on your behalf in defense of a claim under the policy, we must show that the representations are material and that we relied on them.

2. PROPERTY CONDITIONS, Section **F. APPRAISAL** is deleted in its entirety and replaced by the following:

   **F. APPRAISAL**

   If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. However, an appraisal will be made only if both we and you agree, voluntarily, to have the loss appraised. If so agreed, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision will not be binding on either party. Each party will:

   1. Pay its chosen appraiser; and
   2. Bear the other expenses of the appraisal and umpire equally.

   If there is an appraisal, we will still retain our right to deny a claim.


Includes copyrighted material of Insurance Services Office, Inc.
©, OneBeacon Insurance Group, 2004

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OREGON CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies the insurance provided by the following:

COMMON POLICY CONDITIONS

**1.** Section **A. Cancellation,** paragraphs **2.** and **3.** are deleted in their entirety and replaced by the following:

**2.** If this policy had been in effect for:

**a.** Fewer than 60 days and is not a renewal policy, we may cancel for any reason.

**b.** 60 days or more or is a renewal policy, we may cancel only for one or more of the following reasons:

**(1)** Nonpayment of premium;

**(2)** Fraud or material misrepresentation made by you or with your knowledge in obtaining the policy, continuing the policy or in presenting a claim under the policy;

**(3)** Substantial increase in the risk of loss after insurance coverage has been issued or renewed, including but not limited to an increase in exposure due to rules, legislation or court decision;

**(4)** Substantial breach of contractual duties, conditions or warranties;

**(5)** Determination by the commissioner that the continuation of a line of insurance or class of business to which the policy belongs will jeopardize our solvency or will place us in violation of the insurance laws of Oregon or any other state; or

**(6)** Loss or decrease in reinsurance covering the risk.

**c.** 60 days or more or is a renewal policy, we may cancel for any other reason approved by the commissioner by rule.

**3.** We will mail or deliver to the first Named Insured written notice of cancellation, stating the reason for cancellation.

**2.** Section **B. When We Do Not Renew** is deleted in its entirety and replaced with the following:

**1.** We may elect not to renew this policy by mailing or delivering to the first Named Insured at the last mailing address known to us, written notice of nonrenewal before the:

**a.** Expiration date of the policy; or

**b.** Anniversary date of the policy if the policy is written for a term of more than one year or without a fixed expiration date.

However, if this policy is issued for a term of more than one year and for additional consideration the premium is guaranteed, we may not refuse to renew the policy at its anniversary date.

Nonrenewal will not be effective until at least 30 days after the first Named Insured receives our notice.

**2.** If notice of nonrenewal is mailed, a post office certificate of mailing will be conclusive of proof that the first Named Insured received the notice on the third calendar day after the date of the certificate of mailing.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2005, OneBeacon Insurance Group LLC
E-INSURED

# WASHINGTON COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

**1.** The first Named Insured shown in the Declarations may cancel this policy by notifying us or the insurance producer in one of the following ways:

**a.** Written notice by mail, fax or e-mail;

**b.** Surrender of the policy or binder; or

**c.** Verbal notice.

Upon receipt of such notice, we will cancel this policy or any binder issued as evidence of coverage, effective on the later of the following:

**a.** The date on which notice is received or the policy or binder is surrendered; or

**b.** The date of cancellation requested by the first Named Insured.

**2.** We may cancel this policy by mailing or delivering to the first Named Insured and the first Named Insured's agent or broker written notice of cancellation, including the actual reason for the cancellation, to the last mailing address known to us, at least:

**a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**b.** 45 days before the effective date of cancellation if we cancel for any other reason,

except as provided in Paragraphs **3.** and **4.** below.

**3.** We may cancel the Commercial Property Coverage Part, if made a part of this policy, by mailing or delivering to the first Named Insured and the first Named Insured's agent or broker written notice of cancellation at least five days before the effective date of cancellation for any structure where two or more of the following conditions exist:

**a.** Without reasonable explanation, the structure is unoccupied for more than 60 consecutive days, or at least 65% of the rental units are unoccupied for more than 120 consecutive days unless the structure is maintained for seasonal occupancy or is under construction or repair;

**b.** Without reasonable explanation, progress toward completion of permanent repairs to the structure has not occurred within 60 days after receipt of funds following satisfactory adjustment or adjudication of loss resulting from a fire;

**c.** Because of its physical condition, the structure is in danger of collapse;

**d.** Because of its physical condition, a vacation or demolition order has been issued for the structure, or it has been declared unsafe in accordance with applicable law;

**e.** Fixed and salvageable items have been removed from the structure, indicating an intent to vacate the structure;

**f.** Without reasonable explanation, heat, water, sewer, and electricity are not furnished for the structure for 60 consecutive days; or

**g.** The structure is not maintained in substantial compliance with fire, safety and building codes.

**4.** If:

**a.** You are an individual;

**b.** A covered auto you own is of the "private passenger type"; and

**c.** The policy does not cover garage, automobile sales agency, repair shop, service station or public parking place operations hazards,

we may cancel the Commercial Auto Coverage Part by mailing or delivering to the first Named Insured and the first Named Insured's agent or broker written notice of cancellation, including the actual reason for cancellation, to the last mailing address known to us:

**a.** At least 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**b.** At least 10 days before the effective date of cancellation for any other reason if the policy is in effect less than 30 days; or


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2010, OneBeacon Insurance Group LLC

**c.** At least 20 days before the effective date of cancellation for other than nonpayment if the policy is in effect 30 days or more; or

**d.** At least 20 days before the effective date of cancellation if the policy is in effect for 60 days or more or is a renewal or continuation policy, and the reason for cancellation is that your driver's license or that of any driver who customarily uses a covered "auto" has been suspended or revoked during policy period.

**5.** We will also mail or deliver to any mortgage holder, pledgee or other person shown in this policy to have an interest in any loss which may occur under this policy, at their last mailing address known to us, written notice of cancellation, prior to the effective date of cancellation. If cancellation is for reasons other than those contained in Paragraph **A.3.** above, this notice will be the same as that mailed or delivered to the first Named Insured. If cancellation is for a reason contained in Paragraph **A.3.** above, we will mail or deliver this notice at least 20 days prior to the effective date of cancellation.

**6.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**7.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund will be at least 90% of the pro rata refund unless the following applies:

**a.** For Division Two – Boiler and Machinery, if the first Named Insured cancels, the refund will be at least 75% of the pro rata refund.

**b.** If:

**(1)** You are an individual;

**(2)** A covered auto you own is of the "private passenger type";

**(3)** The policy does not cover garage, automobile sales agency, repair shop, service station or public parking place operations hazards; and

**(4)** The first Named Insured cancels,

the refund will be not less than 90% of any unearned portion not exceeding $100, plus 95% of any unearned portion over $100 but not exceeding $500, and not less than 97% of any unearned portion in excess of $500.

**c.** The cancellation will be effective even if we have not made or offered a refund.

**8.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Nonrenewal**

**1.** We may elect not to renew this policy by mailing or delivering written notice of nonrenewal, stating the reasons for nonrenewal, to the first Named Insured and the first Named Insured's agent or broker, at their last mailing addresses known to us. We will also mail to any mortgage holder, pledgee or other person shown in this policy to have an interest in any loss which may occur under this policy, at their last mailing address known to us, written notice of nonrenewal. We will mail or deliver these notices at least 45 days before the:

**a.** Expiration of the policy; or

**b.** Anniversary date of this policy if this policy has been written for a term of more than one year.

Otherwise, we will renew this policy unless:

**a.** The first Named Insured fails to pay the renewal premium after we have expressed our willingness to renew, including a statement of the renewal premium, to the first Named Insured and the first Named Insured's insurance agent or broker, at least 20 days before the expiration date; or

**b.** Other coverage acceptable to the insured has been procured prior to the expiration date of the policy; or

**c.** The policy clearly states that it is not renewable, and is for a specific line, subclassification, or type of coverage that is not offered on a renewable basis.

**2.** If:

**a.** You are an individual;

**b.** A covered auto you own is of the "private passenger type"; and

**c.** The policy does not cover garage, automobile sales agency, repair shop, service station or public parking place operations hazards,

the following applies to nonrenewal of the Commercial Auto Coverage Part in place of **B.1.:**

**a.** We may elect not to renew or continue this policy by mailing or delivering to you and your agent or broker written notice at least 20 days before the end of the policy period including the actual reason for


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2010, OneBeacon Insurance Group LLC

nonrenewal. If the policy period is more than one year, we will have the right not to renew or continue it only at an anniversary of its original effective date. If we offer to renew or continue and you do not accept, this policy will terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due shall mean that you have not accepted our offer.

**b.** We will not refuse to renew Liability Coverage or Collision Coverage solely because an "insured" has submitted claims under Comprehensive Coverage or Towing and Labor Coverage.

**c.** If we fail to mail or deliver proper notice of nonrenewal and you obtain other insurance this policy will end on the effective date of that insurance.

**C. Changes**

The policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**D. Concealment, Misrepresentation Or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

**1.** This policy;

**2.** The Covered Property;

**3.** Your interest in the Covered Property; or

**4.** A claim under this policy.

**E. Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**F. Inspection And Surveys**

**1.** We have the right to:

**a.** Make inspections and surveys at any time;

**b.** Give you reports on the conditions we find; and

**c.** Recommend changes.

**2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

**a.** Are safe or healthful; or

**b.** Comply with laws, regulations, codes or standards.

**3.** Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**4.** Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**G. Liberalization**

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

**H. Premiums**

**1.** All Named Insureds shown in the Declarations are jointly and severally liable and responsible for the payment of all premiums.

**2.** The first Named Insured shown in the Declarations will be the payee for any return premiums we pay.

**I. Premium Audit**

**1.** This policy is subject to audit if a premium designated as an advance premium is shown in the Declarations. We will compute the final premium due when we determine your actual exposures.

**2.** Premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2010, OneBeacon Insurance Group LLC

to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**3.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such time as we may request.

**J. Transfer Of Your Rights And Duties Under This Policy**

**1.** Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

**2.** If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**K. Unintentional Errors or Omissions**

Your failure to disclose all hazards existing as of the inception of the policy shall not prejudice you with respect to the coverage afforded by this policy, provided such failure or omission is not intentional.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2010, OneBeacon Insurance Group LLC

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ALASKA CANCELLATION CHANGES

This endorsement modifies insurance provided under the following:

COMMON POLICY CONDITIONS

The following is added to Section **A. Cancellation:**

If any one of the following conditions exists at any building that is Covered Property in this policy, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 60 days before the effective date of cancellation.

**A.** The building has been vacant or unoccupied 60 or more consecutive days. This does not apply to:

  **1.** Seasonal unoccupancy;

  **2.** Buildings in the course of construction, renovation or addition; or

  **3.** Buildings to which the Vacancy Permit endorsement applies.

  Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

**B.** After damage by a Covered Cause of Loss, permanent repairs to the building:

  **1.** Have not started; and

  **2.** Have not been contracted for, within 30 days of initial payment of loss.

**C.** The building has:

  **1.** An outstanding order to vacate;

  **2.** An outstanding demolition order;

  **3.** Been declared unsafe by governmental authority.

**D.** Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to such removal that is necessary or incidental to any renovation or remodeling.

**E.** Failure to:

  **1.** Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonable unoccupancy; or

  **2.** Pay property taxes that are owning and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.


Includes copyrighted material of Insurance Services Office, Inc. with its permission.
Copyright 2002, OneBeacon Insurance Group LLC

E-INSURED

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or


© Insurance Services Office, Inc.,2012

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

**(a)** The supervision, hiring, employment, training or monitoring of others by that insured; or

**(b)** Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol;

if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph **(1)**, **(2)** or **(3)** above.

However, this exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages. For the purposes of this exclusion, permitting a person to bring alcoholic beverages on your premises, for consumption on your premises, whether or not a fee is charged or a license is required for such activity, is not by itself considered the business of selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";


© Insurance Services Office, Inc.,2012

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

 © Insurance Services Office, Inc.,2012 

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged; or

**(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III** – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

 © Insurance Services Office, Inc., 2012 

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

However, this exclusion does not apply to liability for damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **III** – Limits Of Insurance.

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

 © Insurance Services Office, Inc.,2012 

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or


© Insurance Services Office, Inc.,2012

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE C – MEDICAL PAYMENTS

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, X-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A.**

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;


© Insurance Services Office, Inc.,2012

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

(1) "Bodily injury" or "personal and advertising injury":

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** or **(b)** above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by;


© Insurance Services Office, Inc.,2012

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage **C;**

**b.** Damages under Coverage **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage **B.**

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to Paragraph **2.** above, the Personal And Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage **A;** and

**b.** Medical expenses under Coverage **C**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and


© Insurance Services Office, Inc.,2012

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.


© Insurance Services Office, Inc.,2012

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication;

 © Insurance Services Office, Inc.,2012 

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

**7.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to

 © Insurance Services Office, Inc., 2012 

permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy Schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or


© Insurance Services Office, Inc.,2012

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.


© Insurance Services Office, Inc.,2012

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# WASHINGTON CHANGES – EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Coverage A – Bodily Injury And Property Damage Liability (Section I – Coverages):**

This insurance does not apply to:

"Bodily injury" to:

**1.** A person arising out of any:

- **a.** Refusal to employ that person;
- **b.** Termination of that person's employment; or
- **c.** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**2.** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **a., b.** and **c.** above is directed.

This exclusion applies:

**1.** Whether the injury-causing event described in Paragraphs **a., b.** or **c.** above occurs before employment, during employment or after employment of that person;

**2.** Whether the insured may be liable as an employer or in any other capacity; and

**3.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

However, Paragraphs **1.a.** and **2.** of this exclusion do not apply if such "bodily injury" is sustained by any "employee" of the insured whose employment is subject to the Industrial Insurance Act of Washington (Washington Revised Code Title 51).

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Coverage B – Personal And Advertising Injury Liability (Section I – Coverages):**

This insurance does not apply to:

"Personal and advertising injury" to:

**1.** A person arising out of any:

- **a.** Refusal to employ that person;
- **b.** Termination of that person's employment; or
- **c.** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**2.** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **a., b.** and **c.** above is directed.

This exclusion applies:

**1.** Whether the injury-causing event described in Paragraphs **a., b.** or **c.** above occurs before employment, during employment or after employment of that person;

**2.** Whether the insured may be liable as an employer or in any other capacity; and

**3.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

However, Paragraphs **1.a.** and **2.** of this exclusion do not apply if such "personal and advertising injury" is sustained by any "employee" of the insured whose employment is subject to the Industrial Insurance Act of Washington (Washington Revised Code Title 51).


© ISO Properties, Inc., 2006
E-INSURED

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# WASHINGTON CHANGES – WHO IS AN INSURED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraphs **2.a.(1)(a)**, **(b)** and **(c)** of **Section II – Who Is An Insured** apply only to "employees" of the insured whose employment is not subject to the Industrial Insurance Act of Washington (Washington Revised Code Title 51).

With respect to "employees" of the insured whose employment is subject to the Industrial Insurance Act of Washington, the reference to "volunteer workers" is removed from Paragraph **2.(a)** of **Section II – Who Is An Insured** and Paragraph **2.a.(1)** of **Section II – Who Is An Insured** is replaced with the following:

**2.** Each of the following is also an insured:

**a.** Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

**(b)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraph **(1)(a)** above; or

**(c)** Arising out of his or her providing or failing to provide professional health care services.


© ISO Properties, Inc., 2007

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ALASKA RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **q.** under Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**B.** Exclusion **p.** under Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.


© Insurance Services Office, Inc., 2012


E-INSURED

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.


© ISO Properties, Inc., 2006

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.


© ISO Properties, Inc., 2003

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES; CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of an "other act of terrorism" that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, this exclusion applies only when one or more of the following are attributed to such act:

**1.** The total of insured damage to all types of property exceeds $25,000,000 (valued in U.S. dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

**a.** Physical injury that involves a substantial risk of death; or

**b.** Protracted and obvious physical disfigurement; or

**c.** Protracted loss of or impairment of the function of a bodily member or organ; or

**3.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;


Copyright 2008, OneBeacon Insurance Group LLC

E-INSURED

**b.** The act resulted in damage:

**(1)** Within the United States (including its territories and possessions and Puerto Rico); or

**(2)** Outside of the United States in the case of:

**(a)** An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

**(b)** The premises of any United States mission; and

**c.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

**C.** In the event of an "other act of terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.

**D.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.


Copyright 2008, OneBeacon Insurance Group LLC

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ALASKA CHANGES – DEFINITION O METATAG

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following is added to **Section V – Definitions:**

"Metatag" means hidden or embedded text or code that is not seen by persons viewing the web site, but that operates to attract search engines to that site.

**B.** Exclusion **l.** under Paragraph **2.** of **Section I – Coverage B – Personal And Advertising Injury** s replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or "metatag", or any other similar tactics to mislead another's potential customers.


© ISO Properties, Inc., 2001
E-INSURED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WASHINGTON – FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

 © ISO Properties, Inc., 2003 

E-INSURED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ALASKA WAR LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **i.** under Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**i. War**

"Bodily injury" or "property damage", however caused, arising out of:

**(1)** War, including undeclared or civil war; or

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**B.** Exclusion **o.** under Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**o. War**

"Personal and advertising injury", however caused, arising out of:

**(1)** War, including undeclared or civil war; or

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**C.** Exclusion **h.** under Paragraph **2., Exclusions** of **Section I – Coverage C – Medical Payments** does not apply. Medical payments due to war are now subject to Exclusion **g.** of Paragraph **2., Exclusions** of **Section I – Coverage C – Medical Payments** since "bodily injury" arising out of war is now excluded under Coverage **A.**

 © ISO Properties, Inc., 2005 

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

**(Broad Form)**

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".


© ISO Properties, Inc., 2001
E-INSURED

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.


© ISO Properties, Inc., 2001

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# OREGON CHANGES – DOMESTIC PARTNERSHIP

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The term "spouse" is replaced by the following:

Spouse or individual who is in a domestic partnership recognized under Oregon law.

**B.** Under the Commercial Auto Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to the:

1. Individual Named Insured by blood, adoption, marriage or domestic partnership recognized under Oregon law, who is a resident of such Named Insured's household, including a ward or foster child; or
2. Individual named in the Schedule by blood, adoption, marriage or domestic partnership recognized under Oregon law, who is a resident of the individual's household, including a ward or foster child, if the Drive Other Car Coverage – Broadened Coverage For Named Individual Endorsement is attached.

**C.** With respect to coverage for the ownership, maintenance, or use of "covered autos" provided under the Commercial Liability Umbrella Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to you by blood, adoption, marriage or domestic partnership recognized under Oregon law, who is a resident of your household, including a ward or foster child.

 © ISO Properties, Inc.,2007 

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

**(Broad Form)**

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**1.** The insurance does not apply:

**A.** Under any Liability Coverage, to "bodily injury" or "property damage":

**(1)** With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(2)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.** Under any Medical Payments Coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**C.** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

**(1)** The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or **(b)** has been discharged or dispersed therefrom;

**(2)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**(3)** The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.


© ISO Properties, Inc., 2007

E-INSURED

**2.** As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties;

"Nuclear material" means "source material", "Special nuclear material" or "by-product material";

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive contamination of property.


© ISO Properties, Inc., 2007

# EMPLOYEE BENEFITS LIABILITY COVERAGE FORM – CLAIMS MADE

**This is claims made insurance coverage. Except as otherwise provided it applies only to claims made against the insured during the policy period. Please read the entire form carefully.**

Various provisions in this form restrict coverage. Read the entire form carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION II – WHO IS AN INSURED.**

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION VII – DEFINITIONS.**

## SECTION I – EMPLOYEE BENEFITS LIABILITY COVERAGE

### 1. INSURING AGREEMENT

**a.** We will pay those sums that the insured becomes legally obligated to pay as "damages" because of "employee benefits injury" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Employee Benefits Liability Coverage. This insurance does not apply to "employee benefits injury" which occurred before the retroactive date, if any, shown in the Declarations or which occurs after the policy period. The negligent act, error or omission must take place in the "coverage territory". We will have the right and duty to defend any "claim" or "suit" seeking such "damages". But:

**(1)** The amount we will pay for "damages" is limited as described in **SECTION III – LIMITS OF INSURANCE;**

**(2)** We may, at our discretion, investigate any alleged act, error or omission and settle any "claim" or "suit" that may result; and

**(3)** Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements under Employee Benefits Liability Coverage. This applies both to "claims" and "suits" pending at that time and to those filed thereafter.

**b.** This insurance applies to an "employee benefits injury" only if:

**(1)** A "claim" for "damages" because of the "employee benefits injury" is first made against any insured during the policy period; and

**(2)** At the time you applied for this insurance you had no knowledge of any "claim" or "suit" or of any "employee benefits injury" which might reasonably be expected to result in a "claim" or "suit" except as you had reported to us in writing at the time you so applied.

**c.** A "claim" by a person or organization seeking "damages" will be deemed to have been made when notice of such "claim" is received and recorded by an insured or by us, whichever comes first.

**d.** All "claims" for "damages" because of "employee benefits injury" to the same person or organization will be deemed to have been made at the time the first of those "claims" is made against any insured.

### 2. EXCLUSIONS

This insurance does not apply to:

**a.** The failure by an insured to comply with any law concerning workers compensation, unemployment compensation, social security, disability benefits law or any similar legislation that may be enacted or fiduciary liability or fiduciary responsibility imposed by the Employee Retirement Income Security Act of 1974, as amended, or any similar legislation that may be enacted.

**b.** "Bodily injury", "property damage" or "personal and advertising injury".

**c.** Any dishonest, fraudulent, criminal or malicious act.

**d.** The failure of any investment or saving program to perform as represented by an insured.

**e.** An "employee benefits injury" that arises out of advice given by any insured to an employee to participate or not to participate in any "employee benefits program".


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC
E-INSURED

**f.** The failure of any person or organization to perform any obligation or to fulfill any guarantee with respect to:

**(1)** The payment of benefits under "employee benefits programs"; or

**(2)** The providing, handling or investing of funds related thereto.

**g.** "Bodily injury":

**(1)** Arising out of any:

**(a)** Refusal to employ;

**(b)** Termination of employment;

**(c)** Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, policies, acts or omissions.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity;

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury; and

**(3)** To any and all acts, committed by:

**(a)** The insured;

**(b)** The insured's employees; or

**(c)** Additional insureds or their employees

whether committed with or without the knowledge of the insured or by or at the direction of the insured, the insured's employees or any additional insureds named on the policy.

**h.** "Personal and advertising injury":

**(1)** Arising out of any:

**(a)** Refusal to employ;

**(b)** Termination of employment;

**(c)** Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, policies, acts or omissions.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity;

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury; and

**(3)** To any and all acts, committed by:

**(a)** The insured;

**(b)** The insured's employees; or

**(c)** Additional insureds or their employees

whether committed with or without the knowledge of the insured or by or at the direction of the insured, the insured's employees or any additional insureds named on the policy.

**i.** Loss arising out of failure of performance of contract by any insurer.

**j.** Loss arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefits program".

**k.** Loss or damage for which benefits have accrued under the terms of an employee benefit plan to the extent that such benefits are available from funds accrued by the insured for such benefits or from collectible insurance, notwithstanding the insured's act, error or omission in administering the plan which precluded the claimant from receiving such benefits.

**l.** Loss arising out of the investment, divestment or non-investment of funds.

**3. SUPPLEMENTARY PAYMENTS – EMPLOYEE BENEFITS LIABILITY COVERAGE**

We will pay, with respect to any "claim" or "suit" we defend:

**a.** All expenses we incur.

**b.** The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

c. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" or "suit", including actual loss of earnings up to $500 a day because of time off from work.

d. All costs taxed against the insured in the "suit".

e. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

These payments will not reduce the Limits of Insurance.

**SECTION II – WHO IS AN INSURED**

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

   a. Any other person for whose acts you are legally liable, provided such person is authorized to act in the "administration" of your "employee benefits programs".

   b. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will be deemed to be a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until end of the policy period; and

   b. Employee Benefits Liability Coverage does not apply to "employee benefits injury" that occurred before you acquired or formed the organization.

   No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. "Claims" made or "suits" brought;

   c. Persons or organizations making "claims" or bringing "suits";

   d. Acts, errors or omissions that result in loss; or

   e. Plans included in your "employee benefits program".

2. The Employee Benefits Liability Aggregate Limit is the most we will pay for all "damages" to which this insurance applies.

3. Subject to **2.** above the Each Claim Limit is the most we will pay for all "damages" with respect to any one "claim".

4. All "claims" arising from a single negligent act, error or omission or a series of related negligent acts, errors or omissions in the "administration" of " employee benefit programs" shall be deemed to be a single "claim".

   The limits of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period, shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

**SECTION IV – DEDUCTIBLE**

1. Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in Item 4 of the Declarations as applicable to each employee. The Limits of Insurance applicable to each employee will be reduced by the amount of this deductible. The Aggregate Limit shall not be reduced by the application of such deductible amount.
2. The deductible amount stated in the Declarations applies to all damages sustained by an employee because of an act, error or omission covered by this insurance.
3. The terms of this insurance including those with respect to:
   - **a.** Our right and duty to defend any "suits" seeking those "damages"; and
   - **b.** Your duties in the event of an act, error or omission, "claim", or "suit"

   apply irrespective of the application of the deductible amount.
4. We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

**SECTION V – EMPLOYEE BENEFITS LIABILITY CONDITIONS**

1. **BANKRUPTCY**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.
2. **DUTIES IN THE EVENT OF EMPLOYEE BENEFITS INJURY, CLAIM OR SUIT**
   - **a.** You must see to it that we are notified as soon as practicable of an "employee benefits injury" which may result in a "claim". To the extent possible, notice should include:
     - **(1)** How, when and where the "employee benefits injury" took place; and
     - **(2)** The names and addresses of any injured persons and witnesses.

     Notice of an "employee benefits injury" is not notice of a "claim".
   - **b.** If a written "claim" is made or "suit" is brought against any insured, you must see to it that we receive prompt written notice of the "claim" or "suit".
   - **c.** You and any other involved insured must:
     - **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";
     - **(2)** Authorize us to obtain records and other information;
     - **(3)** Cooperate with us in the investigation, settlement or defense of the "claim" or "suit"; and
     - **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of "employee benefits injury" to which this insurance may also apply.
   - **d.** No insureds will, except at their own cost, voluntarily make a payment, assume any obligation or incur any expense other than for first aid, without our consent.
3. **LEGAL ACTION AGAINST US**

   No person or organization has a right under this Coverage Part:
   - **a.** To join us as a party or otherwise bring us into a "suit" asking for "damages" from an insured; or
   - **b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for "damages" that are not payable under the terms of this Coverage Part or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.
4. **OTHER INSURANCE**

   This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis, that is effective prior to the beginning of the policy period shown in the Declarations of this Coverage Part and applies to "damages" on other than a claims-made basis, if:
   - **a.** No retroactive date is shown in the Declarations of this Coverage Part; or


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

b. The other insurance has a policy period which continues after the retroactive date shown in the Declarations of this Coverage Part.

We will have no duty to defend any "claim" or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

We will pay only our share of the amount of the loss, if any, that exceeds the sum of:

a. The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

b. The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this excess insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**5. PREMIUM AUDIT**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period.

Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. REPRESENTATIONS**

By accepting this policy, you agree:

a. The statements in the declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

**7. SEPARATION OF INSUREDS**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom "claim" is made or "suit" is brought.

**8. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**SECTION VI – EXTENDED REPORTING PERIODS**

1. We will provide one or more extended reporting periods, as described below, if:

   a. This Coverage Part is cancelled or not renewed; or

   b. We renew or replace this Coverage Part with insurance that:

      (1) Has a retroactive date later than the date shown in the Declarations of this Coverage Part; or

      (2) Does not apply to "employee benefits injury" on a claims-made basis.

2. A basic extended reporting period is automatically provided without additional charge. This period starts with the end of the policy period and lasts for:

   a. One year for "claims" arising out of an "employee benefits injury" reported to us, not later than 60 days after the end of the policy period, in accordance with paragraph **2.a.** of **SECTION V – EMPLOYEE BENEFITS LIABILITY CONDITIONS**; or

   b. Sixty days for all other "claims".

   The basic extended reporting period does not apply to "claims" that are covered under any subsequent insurance you purchase, or that would be covered but for exhaustion of the amount of insurance applicable to such "claims".


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

3. A supplemental extended reporting period of three years duration is available, but only by an endorsement and for an extra charge. This supplemental period starts:
   a. One year after the end of the policy period for "claims" arising out of an "occurrence" reported to us, not later than 60 days after the end of the policy period, in accordance with paragraph **2.a.** of **SECTION V – EMPLOYEE BENEFITS LIABILITY CONDITIONS**; or
   b. Sixty days after the end of the policy period for all other "claims".

   You must give us a written request for the endorsement within 60 days after the end of the policy period. The supplemental extended reporting period will not go into effect unless you pay the additional premium promptly when due.

   We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:
   a. The exposures insured;
   b. Previous types and amount of insurance;
   c. Limits of insurance available under this Coverage Part for future payment of "damages"; and
   d. Other related factors.

   The additional premium will not exceed 200% of the annual premium for this Coverage Part.

   This endorsement shall set forth the terms, consistent with this section, applicable to the supplemental extended reporting period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the supplemental extended reporting period starts.
4. Extended reporting periods do not extend the policy period or change the scope of coverage provided. They apply only to "claims" for "employee benefits injury" that occur before the end of the policy period (but not before the retroactive date, if any, shown in the Declarations.)

   "Claims" for such injury which are first received and recorded during the basic extended reporting period (or during the supplemental extended reporting period, if it is in effect) will be deemed to have been made on the last day of the policy period.

   Once in effect, extended reporting periods may not be cancelled.
5. Extended reporting periods do not reinstate or increase the Limits of Insurance applicable to any "claim" to which this Coverage Part applies, except to the extent described in paragraph **6.** of this section.
6. If the supplemental extended reporting period is in effect, we will provide the separate Aggregate Limit of Insurance described below, but only for "claims" first received and recorded during the supplemental extended reporting period.

   The separate Aggregate Limit of Insurance will be equal to the dollar amount shown for the Employee Benefits Liability Aggregate Limit shown in the Declarations.

## SECTION VII – DEFINITIONS

### Administration

"Administration" means:

a. Giving counsel to your employees or their dependents and beneficiaries, with respect to interpreting the scope of your "employee benefits program" or their eligibility to participate in such program;
b. Handling records in connection with your "employee benefits program"; and
c. Starting or stopping any employee's participation in your "employee benefits program".

### Advertisement

"Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.

### Bodily Injury

"Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

### Claim

"Claim" means a written demand received by any insured for "damages" alleging "employee benefits injury", including the institution of a "suit" for such "damages" against any insured.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

**Coverage Territory**

"Coverage territory" means anywhere. However, the insured's responsibility to pay damages must be determined in a settlement we agree to or in a "suit" on the merits brought within the United States of America ( including its territories and possessions), Puerto Rico or Canada.

**Damages**

"Damages" means money damages including prejudgment interest awarded against the insured on that part of the judgment we pay. "Damages" do not include:

**a.** Fines;

**b.** Penalties; or

**c.** Damages for which insurance is prohibited by the law applicable to the construction of this Coverage Part.

**Employee Benefits Injury**

"Employee benefits injury" means injury that arises out of any negligent act, error or omission in the "administration" of your "employee benefits program".

**Employee Benefits Program**

"Employee benefits program" means a formal program or programs of employee benefits maintained in connection with your business or operation to which participation is limited to employees or those entitled to claim benefits under such plans only through an employee's participation. Such programs may include, but are not limited to:

**a.** Group life insurance, group accident or health insurance, profit sharing plans, defined benefit or defined contribution pension plans and stock subscription plans; and

**b.** Unemployment insurance, social security benefits, workers' compensation and disability benefits.

**Personal and Advertising Injury**

"Personal and advertising injury" means injury, including consequential "bodily injury" arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication of material that violates a person's right of privacy;

**f.** The use of another's advertising ideas in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**Property Damage**

"Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it.

**Suit**

"Suit" means a civil proceeding in which "damages" because of "employee benefits injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such "damages" are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such "damages" are claimed and to which the insured submits with our consent.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# @VANTAGE FOR GENERAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The following schedule lists the coverage extensions provided by this endorsement. Refer to the individual provisions to determine the extent of your coverage.

**SCHEDULE OF COVERAGE EXTENSIONS**

1. Additional Insured – Broad Form Vendors
2. Additional Insured – by Contract, Agreement or Permit relating to:
   - Work performed by you
   - Premises you own, rent, lease or occupy
   - Equipment you lease
3. Aggregate Limit Per Location
4. Alienated Premises
5. Blanket Waiver of Subrogation
6. Bodily Injury Redefined- Mental Anguish
7. Broadened Named Insured
8. Broadened Property Damage
   - Borrowed Equipment
   - Customers' Goods
   - Use of Elevators
9. Broadened Property Damage Rented Premises
10. Coverage Territory – Worldwide
11. Duties in Event of Occurrence, Claim or Suit
12. Expected or Intended Injury (PD)
13. Incidental Medical Malpractice
14. Medical Payments
15. Mobile Equipment Redefined
16. Newly Formed or Acquired Organizations
17. Non-Owned Aircraft
18. Non-Owned Watercraft
19. Personal and Advertising Injury – Non Employment Related Discrimination
20. Personal Injury – Limited Contractual Liability Coverage
21. Product Recall Expense
22. Supplementary Payments Increased Limits

## 1. ADDITIONAL INSURED – BROAD FORM VENDORS

**Section II – Who Is An Insured** is amended to include as an additional insured any person(s) or organization(s) (referred to below as vendor) with whom you agreed in a written contract or agreement to provide insurance, but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business, subject to the following additional exclusions:

**a.** This provision **1.** does not apply to:

**(1)** "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

**(2)** Any express warranty not authorized by you;

**(3)** Any physical or chemical change in the product made intentionally by the vendor;

**(4)** Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

**(5)** Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

**(6)** Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

**(7)** Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

(8) "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

(a) The exceptions contained in Subparagraphs **4.** or **6.**; or

(b) Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

(9) Any vendor, person or organization if the "products-completed operations hazard" is excluded either by the provisions of the Coverage Form or by endorsement.

**b.** This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

**2. ADDITIONAL INSURED – CONTRACT, AGREEMENT OR PERMIT**

**a.** **Section II – Who Is An Insured** is amended to include as an additional insured any person(s) or organization(s) with whom you agreed in a written contract, written agreement or permit to provide insurance such as is afforded under this Coverage Part, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

**1.** In the performance of "your work" for the additional insured(s) at the location designated in the contract, agreement or permit; or

**2.** In the maintenance, operation or use of equipment leased to you by such person(s) or organization(s), or

**3.** In connection with premises you own, rent, lease or occupy.

This insurance applies on a primary or primary and non-contributory basis if that is required in writing by the contract, agreement or permit.

**b.** The insurance provided to the additional insured herein is limited. This insurance does not apply:

**1.** Unless

(a) the written contract, agreement or permit is currently in effect or becomes effective during the term of this policy; and

(b) the contract or agreement was executed or permit issued prior to the "bodily injury", "property damage", or "personal and advertising injury";

**2.** To any person or organization included as an insured under the Additional Insured – Broad Form Vendors provision of this endorsement;

**3.** To any person or organization included as an insured by an endorsement issued by us and made part of this Coverage Part;

**4.** To any person or organization if the "bodily injury", "property damage", or "personal and advertising injury" arises out of the rendering of or failure to render any professional architectural, engineering or surveying services by or for you including:

(a) The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Supervisory, inspection, architectural or engineering activities.

**5.** To any:

(a) Lessor of equipment after the equipment lease terminates or expires; or

(b) Owners or other interests from whom land has been leased; or

(c) Managers or lessors of premises if:

(1) The "occurrence" takes place after you cease to be a tenant in that premises; or

(2) The "bodily injury", "property damage", "personal and advertising injury" arises out of structural alterations, new construction or demolition operations performed by or on behalf of the manager or lessor.

**6.** To "bodily injury, or "property damage" occurring after:

(a) All work on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured at the site of the covered operations has been completed; or


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

(b) That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as part of the same project.

c. **Limits of Insurance** applicable to the additional insured are those specified in the contract, agreement or permit or in the Declarations of this policy, whichever is less, and fix the most we will pay regardless of the number of:

1. Insureds;
2. Claims made or "suits" brought; or
3. Persons or organizations making claims or bringing "suits".

These Limits of Insurance are inclusive of and not in addition to the Limits of Insurance shown in the Declarations.

3. **AGGREGATE LIMIT PER LOCATION**

a. Under **Section III – Limits of Insurance,** the General Aggregate Limit applies separately to each of your "locations" owned by or rented or leased to you.

b. Under **Section V – Definitions,** the following definition is added:

"Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

4. **ALIENATED PREMISES**

Paragraph **j. (2)** of **2. Exclusions** of **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** is deleted and replaced with the following:

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises and occurs from hazards that were known to you or should have been known to you, at the time the property was transferred or abandoned.

5. **BLANKET WAIVER OF SUBROGATION**

**Section IV –Transfer of Rights of Recovery Against Others to Us** Condition is amended to add the following:

We will waive any right of recovery we may have against any person or organization because of payments we make for injury or damage arising out of your ongoing operations done under a written contract or agreement with that person or organization and included in "your work" or the "products-completed operations hazard". This waiver applies only to persons or organizations with whom you have a written contract, executed prior to the "bodily injury" or "property damage", that requires you to waive your rights of recovery.

6. **BODILY INJURY REDEFINED – MENTAL ANGUISH**

Under **Section V – Definitions**, the definition of "bodily injury" is replaced by the following:

"Bodily injury" means bodily injury, sickness, or disease sustained by a person, including mental anguish or death resulting from any of these at any time.

7. **BROADENED NAMED INSURED**

**Section II – Who Is An Insured** is amended to include as an insured the following:

Any organization which is a legally incorporated entity in which you own a financial interest of more than 50 percent of the voting stock on the effective date of this endorsement will be a Named Insured until the 180th day or the end of the policy period, whichever comes first, provided there is no other similar insurance available to that organization.

The insurance afforded herein does not apply to any entity which is also an insured under another policy or would be an insured under such policy but for its termination or the exhaustion of its limits of insurance.

8. **BROADENED PROPERTY DAMAGE – BORROWED EQUIPMENT, CUSTOMERS' GOODS AND USE OF ELEVATORS**

The insurance for "property damage" liability is subject to the following:

a. The **Damage To Property** exclusion under **Section I** Coverage **A** is amended as follows:

1. The exclusion for personal property in the care, custody or control of the insured does not apply to "property damage" to equipment you borrow while at a job site and provided it is not being used by anyone to perform operations at the time of loss.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

2. The exclusions for
   (a) Property loaned to you;
   (b) Personal property in the care, custody or control of the insured; and
   (c) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it

   do not apply to "property damage" to "customers' goods" while on your premises nor do they apply to "property damage" arising from the use of elevators at premises you own, rent, lease or occupy.

   Subject to the Each Occurrence Limit, the most we will pay for "property damage" to "Customers' Goods" is $35,000 per "occurrence".

b. Under **Section V – Definitions,** the following definition is added:

   "Customers' Goods" means goods of your customer on your premises for the purpose of being:

   1. Repaired; or
   2. Used in your manufacturing process.

c. The insurance afforded by this provision is excess over any other valid and collectible property insurance (including any deductible) available to the insured whether such insurance is primary, excess, contingent or on any other basis. Any payments by us will follow the Other Insurance – Excess provisions in the COMMERCIAL GENERAL LIABILITY CONDITIONS.

9. **BROADENED PROPERTY DAMAGE – RENTED PREMISES**

a. In the **Damage To Property** exclusion under **Section I** Coverage **A**, the exclusion for "property damage" to:

   Property you own, rent or occupy;

   does not apply to real property you rent or temporarily occupy with permission of the owner.

b. In **Section III – Limits Of Insurance**, the Damage To Premises Rented To You Limit is amended as follows:

   Subject to the Each Occurrence Limit, $500,000 is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises while rented to you or occupied by you with permission of the owner. If any amount other than $500,000 is shown in the Declarations as the Damage To Premises Rented To You Limit, the amount shown in the Declarations will replace $500,000 as the Limit of Insurance provided for this coverage.

c. The insurance afforded by this Provision **9.** is excess over any other valid and collectible property insurance (including any deductible) available to the insured whether such insurance is primary, excess, contingent or on any other basis. Any payments by us will follow the Other Insurance –Excess Insurance provisions in the COMMERCIAL GENERAL LIABILITY CONDITIONS.

10. **COVERAGE TERRITORY – WORLDWIDE**

The definition of "coverage territory" is replaced by the following:

"Coverage territory" means anywhere provided the insured's responsibility to pay damages must be determined in a settlement we agree to or in a "suit" on the merits brought within the United States of America (including its territories and possessions), Puerto Rico or Canada.

11. **DUTIES IN THE EVENT OF OCCURRENCE, OFFENSE, CLAIM OR SUIT**

**Section IV – Duties In The Event Of Occurrence, Claim or Suit** is amended by adding the following paragraphs:

a. The requirements that you must
   1. notify us of an "occurrence" offense, claim or "suit" and
   2. send us documents concerning a claim or "suit"

   apply only when such "accident" claim, "suit" or "loss" is known to:

   1. You, if you are an individual;
   2. A partner, if you are a partnership;
   3. An executive officer of the corporation or insurance manager, if you are a corporation; or
   4. A manager, if you are a limited liability company.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

b. The requirement that you must notify us as soon as practicable of an "occurrence" or an offense that may result in a claim does not apply if you report an "occurrence" to your worker's compensation insurer which later develops into a liability claim for which coverage is provided by this policy. However, as soon as you have definite knowledge that the particular "occurrence" is a liability claim rather than a workers compensation claim, you must comply with the **Duties In The Event Of Occurrence, Offense, Claim Or Suit Condition.**

**12. EXPECTED OR INTENDED INJURY (PROPERTY DAMAGE)**

The **Expected Or Intended Injury** exclusion under **Coverage A Bodily Injury and Property Damage** is replaced by:

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

**13. INCIDENTAL MEDICAL MALPRACTICE – EMPLOYED PHYSICIANS, NURSES, EMT'S AND PARAMEDICS**

a. Under **Section II–Who Is An Insured,** the paragraph that excludes an employee or volunteer worker as insured for "bodily injury" or "personal and advertising injury" arising out of his or her providing or failing to provide professional health care services does not apply to a physician, dentist, nurse, emergency medical technician or paramedic employed by you if you are not engaged in the business or occupation of providing medical, paramedical, surgical, dental, x-ray or nursing services.

b. The insurance afforded by this provision is excess over any other valid and collectible insurance whether such insurance is primary, excess, contingent or on any other basis. Any payments by us will follow the Other Insurance – Excess Insurance provisions in the COMMERCIAL GENERAL LIABILITY CONDITIONS.

**14. MEDICAL PAYMENTS – INCREASED LIMITS AND TIME PERIOD**

In the Insuring Agreement under Coverage **C Medical Payments**, the requirement that expenses are incurred and reported to us within one year of the date of the accident is changed to three years.

a. The Medical Expense Limit is $15,000 per person or the amount shown in the Declarations as the Medical Expense Limit, whichever is greater.

b. This provision **14.** does not apply if Coverage **C–Medical Payments** is otherwise excluded either by the provisions of the Coverage Form or by endorsement.

**15. MOBILE EQUIPMENT – SELF-PROPELLED SNOW REMOVAL, ROAD MAINTENANCE AND STREET CLEANING EQUIPMENT**

The following is added to the "mobile equipment" definition:

Vehicles maintained primarily for purposes other than the transportation of persons or cargo that are self-propelled vehicles of less than 1,000 pounds gross vehicle weight with the following types of permanently attached equipment will be considered "mobile equipment":

a. Snow removal;

b. Road maintenance, but not construction or resurfacing; or

c. Street cleaning.

**16. NEWLY FORMED OR ACQUIRED ORGANIZATIONS**

Under **Section II – Who Is An Insured**, the time period limitation for newly acquired or formed organizations is replaced by:

Coverage under this provision is afforded only until the end of the current policy period.

**17. NON-OWNED AIRCRAFT**

a. The **Aircraft, Auto Or Watercraft** exclusion under Coverage **A Bodily Injury And Property Damage Liability** does not apply to an aircraft that is:

1. Hired, chartered or loaned with a paid crew; and
2. Not owned by any insured.

b. The insurance afforded by this provision **17.** is excess over any other valid and collectible insurance (including any deductible or Self Insured Retention) available to the insured, whether such insurance is primary, excess, contingent or on any other basis. Any payments by us will follow the Other Insurance–Excess Insurance provisions in the COMMERCIAL GENERAL LIABILITY CONDITIONS.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

**18. NON-OWNED WATERCRAFT**

**a.** **Section II – Who Is An Insured** is amended to include as an insured for any watercraft that is covered by this policy, any person who, with your expressed or implied consent, either uses or is responsible for the use of a watercraft. However, no person or organization is an insured with respect to:

**1.** "Bodily injury" to a co-"employee" of the person operating the watercraft; or

**2.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**b.** In the exception to the **Aircraft, Auto Or Watercraft** exclusion under **Coverage A Bodily Injury And Property Damage Liability**, the limitation on the length of a watercraft is increased to 55 feet.

**c.** The insurance afforded by this provision **18.** is excess over any other valid and collectible insurance (including any deductible or Self Insured Retention) available to the insured, whether such insurance is primary, excess, contingent or on any other basis. Any payments by us will follow the Other Insurance –Excess Insurance provisions in the COMMERCIAL GENERAL LIABILITY CONDITIONS.

**19. PERSONAL AND ADVERTISING INJURY – NON-EMPLOYMENT RELATED DISCRIMINATION**

The following is added to the definition of "personal and advertising injury":

Discrimination because of race, color, creed, national origin, age, sex or physical disability, where insurance therefore is not prohibited by law, but only if such discrimination is:

**a.** not done intentionally by or at the direction of:

**(1)** the insured; or

**(2)** any executive officer, director, stockholder, partner or member of the insured staff; and

**b.** not directly or indirectly related to the employment, prospective employment or termination of employment of any person or persons by any insured.

The insurance afforded under this provision does not apply to fines or penalties, or that portion of any award or judgment resulting from the multiplication of actual damages under state or federal law.

This provision does not apply if **Coverage B – Personal and Advertising Injury Liability** is otherwise excluded either by the provisions of this Coverage Form or by any endorsement.

**20. PERSONAL INJURY – LIMITED CONTRACTUAL LIABILITY COVERAGE**

**a.** The **Contractual Liability** exclusion of paragraph **2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement.

This exclusion does not apply to:

**(1)** Liability for damages that the insured would have in the absence of the contract or agreement; or

**(2)** Liability for "personal and advertising injury" if:

**(a)** The liability pertains to your business and is required by a signed contract or agreement in which you assume the tort liability of another. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement;

**(b)** The "personal and advertising injury" occurs subsequent to the execution of the designated contract or agreement; and

**(c)** The "personal and advertising injury" arises out of the offenses of false arrest, detention or imprisonment.

**21. PRODUCT RECALL EXPENSE**

**a.** With respect to this Provision **21.**, the **Recall Of Products, Work Or Impaired Property** exclusion under **Coverage A Bodily Injury And Property Damage Liability** is deleted.

**b.** The following is added to **Section III – Limits Of Insurance** section:


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

1. The Limits of Insurance shown in the Product Recall Schedule and rules below fix the most we will pay regardless of the number of

   (a) Insureds;

   (b) "Covered recalls" initiated; or

   (c) Number of "your products" recalled.

2. The Product Recall Aggregate Limit is the most we will reimburse you for the sum of all "product recall expenses" incurred for all "covered recalls" initiated during the policy period.

3. Subject to **2.** above, the Each Product Recall Limit is the most we will reimburse you for the sum of all "product recall expenses" arising out of any one "covered recall" for the same defect or deficiency.

4. Subject to **3.** above, we will pay only the amount of "product recall expenses" in excess of the deductible amount shown in the Product Recall Schedule.

| **Products Recall Schedule** | |
|---|---|
| | **Limits of Insurance** |
| Product Recall Aggregate Limit | $ 50,000 |
| Each Product Recall Limit | $ 25,000 |
| Each Product Recall Deductible | $1,000 |

If any limits and deductible other than those above are shown in the Declarations as the Products Recall Expense Limits, the amounts shown in the Declarations will replace the Limits of Insurance and deductible provided for this coverage.

The Limits of Insurance for this coverage apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for the purposes of determining the Limits of Insurance.

**c.** The following is added to the **Duties In The Event Of Occurrence, Offense, Claim Or Suit** provision under **Section IV – Conditions:**

You must see to it that the following are done in the event of an actual or anticipated "covered recall" that may result in "product recall expense":

1. Give us prompt notice of any discovery or notification that "your product" must be withdrawn or recalled. Include a description of "your product" and the reason for the withdrawal or recall;

2. Cease any further release, shipment, consignment or any other method of distribution of like or similar products until it has been determined that all such products are free from defects that could be a cause of loss under this insurance;

3. As often as may be reasonably required, permit us to inspect "your product" that demonstrates the need for the "covered recall" and permit us to examine your books and records. Also permit us to take damaged and undamaged samples of "your products" for inspection, testing and analysis; and permit us to make copies from your books and records;

4. Send us a signed, sworn, proof of loss containing the information we requested to settle the claim. You must do this within 60 days after our request. We will supply you with the necessary forms; and

5. Permit us to examine any insured under oath, while not in the presence of any other insured and at such times as may reasonably be required, about any matter relating to this insurance or your claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

**d.** The following definitions are added to the Definitions Section:

1. "Covered recall" means a recall made necessary because the insured or a government body has determined that a known or suspected defect, deficiency, inadequacy or dangerous condition in "your product" has resulted in or will result in "bodily injury" or "property damage".

2. "Product Recall Expense" means:

   (a) The following necessary and reasonable expenses you incur exclusively for the purpose of recalling "your product":


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

**(1)** For communications, including radio or television announcements or printed advertisements including stationery, envelopes and postage;

**(2)** For shipping the recalled products from any purchaser, distributor or user to the place or places designated by you;

**(3)** For remuneration paid to your regular "employees" for necessary overtime;

**(4)** For hiring additional persons, other than your regular "employees";

**(5)** Incurred by "employees", including transportation and accommodations;

**(6)** To rent additional warehouse or storage space; or

**(7)** For disposal of "your products", but only to the extent that specific methods of destruction other than those employed for trash discarding or disposal are required to avoid "bodily injury" or "property damage" as a result of such disposal, but

"product recall expenses" does not include costs of regaining your market share, goodwill, revenue or profit.

**(b)** "Product Recall Expense" does not include any expenses resulting from:

**(1)** Failure of any product to accomplish its intended purpose;

**(2)** Breach of warranties of fitness, quality, durability or performance;

**(3)** Loss of customer approval, or any cost incurred to regain customer approval;

**(4)** Redistribution or replacement of "your product" which has been recalled by like products or substitutes;

**(5)** Caprice or whim of the insured;

**(6)** A condition likely to cause loss of which any insured knew or had reason to know at the inception of this insurance; and

**(7)** Recall of "your products" that have no known or suspected defect solely because a known or suspected defect in another of "your products" has been found

**22. SUPPLEMENTARY PAYMENTS – INCREASED LIMITS**

Under Section **I – Coverages**, **Supplementary Payments – Coverages A and B**, paragraphs **1.b.** and **1.d.** are replaced by the following:

**b.** Up to $2,500 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $500 a day because of time off from work.



Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – INFRINGEMENT OF COPYRIGHT, PATENT, TRADEMARK OR TRADE SECRET – CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

1. Exclusion **i** of Paragraph **2., Exclusions** of **Section I – COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY,** is deleted and replaced by the following:

   **i. Intellectual Property**

   **(1)** "Personal and advertising injury" arising out of the actual or alleged infringement or violation of any:

   **(a)** copyright,

   **(b)** patent,

   **(c)** trademark,

   **(d)** trade dress,

   **(e)** trade name,

   **(f)** trade secret, or

   **(g)** any other intellectual property rights or laws.

   This exclusion applies regardless of whether this insurance would otherwise apply to all or part of any such actual or alleged "personal and advertising injury" in the absence of any actual or alleged infringement or violation.

   However, this exclusion does not apply to infringement or violation of another's copyright, trade dress or slogan in your "advertisement".

   **(2)** Any act committed by the insured with malice.

2. **Personal and Advertising Injury Redefined**

   Paragraph **14.** of **SECTION V – DEFINITIONS** is replaced by the following:

   "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   **a.** False arrest, detention or imprisonment;

   **b.** Malicious prosecution;

   **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   **d.** Oral or written publication, in any manner, of material that:

   **(1)** slanders or libels a person or organization. This does not include any slander or libel related to the actual or alleged infringement or violation of any intellectual property rights or laws;

   **(2)** Oral or written publication, in any manner, of material that disparages a person's or organization's goods, products or services. This does not include any disparagement related to the actual or alleged infringement or violation of any intellectual property rights or laws;

   **e.** Oral or written publication of material that violates a person's right of privacy;

   **f.** The use of another's advertising idea in your "advertisement"; or

   **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".


Includes copyrighted material of Insurance Services Office, Inc.
Copyright, 2009 OneBeacon Insurance Group LLC

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FINANCIAL INSTITUTIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A. Additional Bodily Injury And Property Damage Exclusions**

In **Section I – Coverage A. Bodily Injury And Property Damage Liability 2. Exclusions** and **Coverage B. Personal And Advertising Injury Liability 2. Exclusions,** the following exclusions are added. These are additional exclusions and do not replace any other exclusions.

This insurance does not apply to:

**a. Insurance and Benefits Obligations Assumed**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of any obligation assumed by any insured including the failure to discharge, or the improper discharge of, any obligation or duty, contractual or otherwise, with respect to any contract or treaty of insurance, reinsurance, suretyship, annuity, endowment or employee benefit plan, including applications, receipts or binders.

**b. Plans and Associations**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of membership in or contribution to or management of any plan, pool, association, insolvency or guarantee fund or any similar fund, organization or association, whether voluntary or involuntary.

**c. Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering or failure to render professional services including but not limited to:

**(1)** Advising, inspecting, reporting, or making recommendations in the insured's capacity as an insurance company, mortgagee, mortgage servicing agency, bank or lending institution, financial advisor, consultant, broker, agent or representative;

**(2)** Effecting insurance, reinsurance or suretyship coverages;

**(3)** Investigating, defending or setting any claim under any contract or insurance, self-insurance, reinsurance or suretyship;

**(4)** Auditing or maintaining of accounts or records of others;

**(5)** Conducting an investment, leasing, loan or real estate department or operation;

**(6)** Acting in any capacity as a fiduciary or trustee;

**(7)** Performing any claim, investigation, adjustment, engineering, inspection, survey or appraisal service;

**(8)** Performing electronic data processing, systems analysis, design, programming or consulting or other similar services;

**(9)** Checking or reporting of credit; or

**(10)** Tax planning, tax advising or the preparation of tax returns.

**d. Fines and penalties**

Any obligation to pay fines and penalties.

**e. Safe Deposit Boxes**

"Property damage" to property in customers' safe deposit boxes, or contained in vaults and for which customers have been issued storage receipts.

**f. Stop Payment**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of:

**(1)** Compliance or failure to comply with any notice to stop payment;

**(2)** Refusal to pay or to certify;

**(3)** Failure to give proper notice of dishonor on any check, note or draft drawn, made or accepted by any depositor of the insured.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

**g. Foreclosure Liability**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of any real or personal property acquired by foreclosure, repossession, deed in lieu of foreclosure or as mortgagee in possession.

**h. Trust Liability**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of any real or personal property in any trust, guardianship or estate for which you are acting in a fiduciary or representative capacity.

**i. Mortgageholder's Liability**

Damages due to error or accidental omission in the operation of your customary procedure in processing and maintaining "valid insurance" against the Covered Causes of Loss for the benefit of the mortgagor in amounts, and under conditions, customarily accepted by the mortgagor.

**B. Amended Definition**

**1.** Paragraph **17.** of **Section V – Definitions** is replaced by the following:

"Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Tangible property does not include money, currency, coin, bank notes, Federal Reserve notes, money orders, travelers checks, instruments or contracts that represent money or an interest in property, including but not limited to certificated and uncertificated securities, negotiable instruments, certificates of deposit, drafts, checks, acceptances, evidence of debt, security agreements, withdrawal orders, certificates of origin or title, letters of credit, warrants, scrip, contracts, bills of lading, insurance policies, abstracts of title, deeds and mortgages on real estate, revenue and other stamps, tokens, unsold State lottery tickets, books of account and other records, gems, jewelry, precious metals in bars or ingots, and all other property of a similar nature.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**C. Additional Definition**

The following definition is added to **Section V – Definitions:**

"Valid insurance" means a valid policy, or other evidence, of insurance.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright, 2009 OneBeacon Insurance Group LLC

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ABSOLUTE EXCLUSION – ASBESTOS LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This insurance does not apply to:

**1.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of or alleged to have risen out of:

- **a.** exposure to asbestos, asbestos fiber, or any material containing asbestos or asbestos products; or
- **b.** the removal of asbestos, asbestos fiber, or any material containing asbestos or asbestos products, including, without limitation,
  - **(1)** the costs of asbestos removal; or
  - **(2)** "property damage" in the course of effecting such removal.

We shall not be obligated to investigate, or defend the insured against any claim for any liability described above which is asserted against any insured or to pay any judgment entered against any insured for such liability.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2007, OneBeacon Insurance Group LLC

# BUSINESS AUTO COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

## SECTION I – COVERED AUTOS

Item Two of the Declarations shows the "autos" that are covered "autos" for each of your coverages. The following numerical symbols describe the "autos" that may be covered "autos". The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos".

**A. Description Of Covered Auto Designation Symbols**

| Symbol | Description Of Covered Auto Designation Symbols | |
|---|---|---|
| **1** | Any "Auto" | |
| **2** | Owned "Autos" Only | Only those "autos" you own (and for Liability Coverage any "trailers" you don't own while attached to power units you own). This includes those "autos" you acquire ownership of after the policy begins. |
| **3** | Owned Private Passenger "Autos" Only | Only the private passenger "autos" you own. This includes those private passenger "autos" you acquire ownership of after the policy begins. |
| **4** | Owned "Autos" Other Than Private Passenger "Autos" Only | Only those "autos" you own that are not of the private passenger type (and for Liability Coverage any "trailers" you don't own while attached to power units you own). This includes those "autos" not of the private passenger type you acquire ownership of after the policy begins. |
| **5** | Owned "Autos" Subject To No-fault | Only those "autos" you own that are required to have no-fault benefits in the state where they are licensed or principally garaged. This includes those "autos" you acquire ownership of after the policy begins provided they are required to have no-fault benefits in the state where they are licensed or principally garaged. |
| **6** | Owned "Autos" Subject To A Compulsory Uninsured Motorists Law | Only those "autos" you own that because of the law in the state where they are licensed or principally garaged are required to have and cannot reject Uninsured Motorists Coverage. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement. |
| **7** | Specifically Described "Autos" | Only those "autos" described in Item Three of the Declarations for which a premium charge is shown (and for Liability Coverage any "trailers" you don't own while attached to any power unit described in Item Three). |
| **8** | Hired "Autos" Only | Only those "autos" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your "employees", partners (if you are a partnership), members (if you are a limited liability company) or members of their households. |
| **9** | Non-owned "Autos" Only | Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your "employees", partners (if you are a partnership), members (if you are a limited liability company) or members of their households but only while used in your business or your personal affairs. |


© Insurance Services Office, Inc.,2009

| | | |
|---|---|---|
| **19** | Mobile Equipment Subject To Compulsory Or Financial Responsibility Or Other Motor Vehicle Insurance Law Only | Only those "autos" that are land vehicles and that would qualify under the definition of "mobile equipment" under this policy if they were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where they are licensed or principally garaged. |

**B. Owned Autos You Acquire After The Policy Begins**

1. If Symbols **1, 2, 3, 4, 5, 6** or **19** are entered next to a coverage in Item Two of the Declarations, then you have coverage for "autos" that you acquire of the type described for the remainder of the policy period.
2. But, if Symbol **7** is entered next to a coverage in Item Two of the Declarations, an "auto" you acquire will be a covered "auto" for that coverage only if:
   a. We already cover all "autos" that you own for that coverage or it replaces an "auto" you previously owned that had that coverage; and
   b. You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

**C. Certain Trailers, Mobile Equipment And Temporary Substitute Autos**

If Liability Coverage is provided by this coverage form, the following types of vehicles are also covered "autos" for Liability Coverage:

1. "Trailers" with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.
2. "Mobile equipment" while being carried or towed by a covered "auto".
3. Any "auto" you do not own while used with the permission of its owner as a temporary substitute for a covered "auto" you own that is out of service because of its:
   a. Breakdown;
   b. Repair;
   c. Servicing;
   d. "Loss"; or
   e. Destruction.

## SECTION II – LIABILITY COVERAGE

**A. Coverage**

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos". However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".

We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

**1. Who Is An Insured**

The following are "insureds":

a. You for any covered "auto".

b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

(1) The owner or anyone else from whom you hire or borrow a covered "auto".

This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto" you own.


© Insurance Services Office, Inc.,2009

(2) Your "employee" if the covered "auto" is owned by that "employee" or a member of his or her household.

(3) Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

(4) Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company) or a lessee or borrower or any of their "employees", while moving property to or from a covered "auto".

(5) A partner (if you are a partnership) or a member (if you are a limited liability company) for a covered "auto" owned by him or her or a member of his or her household.

c. Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

**2. Coverage Extensions**

**a. Supplementary Payments**

We will pay for the "insured":

(1) All expenses we incur.

(2) Up to $2,000 for cost of bail bonds (including bonds for related traffic law violations) required because of an "accident" we cover. We do not have to furnish these bonds.

(3) The cost of bonds to release attachments in any "suit" against the "insured" we defend, but only for bond amounts within our Limit of Insurance.

(4) All reasonable expenses incurred by the "insured" at our request, including actual loss of earnings up to $250 a day because of time off from work.

(5) All court costs taxed against the "insured" in any "suit" against the "insured" we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the "insured".

(6) All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" against the "insured" we defend, but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the Limit of Insurance.

**b. Out-of-state Coverage Extensions**

While a covered "auto" is away from the state where it is licensed we will:

(1) Increase the Limit of Insurance for Liability Coverage to meet the limits specified by a compulsory or financial responsibility law of the jurisdiction where the covered "auto" is being used. This extension does not apply to the limit or limits specified by any law governing motor carriers of passengers or property.

(2) Provide the minimum amounts and types of other coverages, such as no-fault, required of out-of-state vehicles by the jurisdiction where the covered "auto" is being used.

We will not pay anyone more than once for the same elements of loss because of these extensions.

**B. Exclusions**

This insurance does not apply to any of the following:

**1. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the "insured".

**2. Contractual**

Liability assumed under any contract or agreement.

But this exclusion does not apply to liability for damages:

a. Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

b. That the "insured" would have in the absence of the contract or agreement.


© Insurance Services Office, Inc.,2009

**3. Workers' Compensation**

Any obligation for which the "insured" or the "insured's" insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law or any similar law.

**4. Employee Indemnification And Employer's Liability**

"Bodily injury" to:

**a.** An "employee" of the "insured" arising out of and in the course of:

**(1)** Employment by the "insured"; or

**(2)** Performing the duties related to the conduct of the "insured's" business; or

**b.** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **a.** above.

This exclusion applies:

**(1)** Whether the "insured" may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

But this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits or to liability assumed by the "insured" under an "insured contract". For the purposes of the coverage form, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

**5. Fellow Employee**

"Bodily injury" to:

**a.** Any fellow "employee" of the "insured" arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business; or

**b.** The spouse, child, parent, brother or sister of that fellow "employee" as a consequence of Paragraph **a.** above.

**6. Care, Custody Or Control**

"Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "insured" or in the "insured's" care, custody or control. But this exclusion does not apply to liability assumed under a sidetrack agreement.

**7. Handling Of Property**

"Bodily injury" or "property damage" resulting from the handling of property:

**a.** Before it is moved from the place where it is accepted by the "insured" for movement into or onto the covered "auto"; or

**b.** After it is moved from the covered "auto" to the place where it is finally delivered by the "insured".

**8. Movement Of Property By Mechanical Device**

"Bodily injury" or "property damage" resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto".

**9. Operations**

"Bodily injury" or "property damage" arising out of the operation of:

**a.** Any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment"; or

**b.** Machinery or equipment that is on, attached to or part of a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

**10. Completed Operations**

"Bodily injury" or "property damage" arising out of your work after that work has been completed or abandoned.

In this exclusion, your work means:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in Paragraph **a.** or **b.** above.

Your work will be deemed completed at the earliest of the following times:

**(1)** When all of the work called for in your contract has been completed.

**(2)** When all of the work to be done at the site has been completed if your contract calls for work at more than one site.


© Insurance Services Office, Inc., 2009

**(3)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**11. Pollution**

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**a.** That are, or that are contained in any property that is:

**(1)** Being transported or towed by, handled or handled for movement into, onto or from the covered "auto";

**(2)** Otherwise in the course of transit by or on behalf of the "insured"; or

**(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

**b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

**(1)** The "pollutants" escape, seep, migrate or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** above of this exclusion do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

**(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

**(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**12. War**

"Bodily injury" or "property damage" arising directly or indirectly out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**13. Racing**

Covered "autos" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply while that covered "auto" is being prepared for such a contest or activity.

**C. Limit Of Insurance**

Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for the total of all damages and "covered pollution cost or expense" combined resulting from any one "accident" is the Limit of Insurance for Liability Coverage shown in the Declarations.


© Insurance Services Office, Inc.,2009

All "bodily injury", "property damage" and "covered pollution cost or expense" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident".

No one will be entitled to receive duplicate payments for the same elements of "loss" under this coverage form and any Medical Payments Coverage endorsement, Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage endorsement attached to this Coverage Part.

**SECTION III – PHYSICAL DAMAGE COVERAGE**

**A. Coverage**

1. We will pay for "loss" to a covered "auto" or its equipment under:

   a. **Comprehensive Coverage**

      From any cause except:

      (1) The covered "auto's" collision with another object; or

      (2) The covered "auto's" overturn.

   b. **Specified Causes Of Loss Coverage**

      Caused by:

      (1) Fire, lightning or explosion;

      (2) Theft;

      (3) Windstorm, hail or earthquake;

      (4) Flood;

      (5) Mischief or vandalism; or

      (6) The sinking, burning, collision or derailment of any conveyance transporting the covered "auto".

   c. **Collision Coverage**

      Caused by:

      (1) The covered "auto's" collision with another object; or

      (2) The covered "auto's" overturn.

2. **Towing**

   We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered "auto" of the private passenger type is disabled. However, the labor must be performed at the place of disablement.

3. **Glass Breakage – Hitting A Bird Or Animal – Falling Objects Or Missiles**

   If you carry Comprehensive Coverage for the damaged covered "auto", we will pay for the following under Comprehensive Coverage:

   a. Glass breakage;

   b. "Loss" caused by hitting a bird or animal; and

   c. "Loss" caused by falling objects or missiles.

   However, you have the option of having glass breakage caused by a covered "auto's" collision or overturn considered a "loss" under Collision Coverage.

4. **Coverage Extensions**

   a. **Transportation Expenses**

      We will pay up to $20 per day to a maximum of $600 for temporary transportation expense incurred by you because of the total theft of a covered "auto" of the private passenger type. We will pay only for those covered "autos" for which you carry either Comprehensive or Specified Causes Of Loss Coverage. We will pay for temporary transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered "auto" is returned to use or we pay for its "loss".

   b. **Loss Of Use Expenses**

      For Hired Auto Physical Damage, we will pay expenses for which an "insured" becomes legally responsible to pay for loss of use of a vehicle rented or hired without a driver under a written rental contract or agreement. We will pay for loss of use expenses if caused by:

      (1) Other than collision only if the Declarations indicate that Compehensive Coverage is provided for any covred "auto";

      (2) Specified Causes Of Loss only if the Declarations indicate that Specified Causes Of Loss Coverage is provided for any covered "auto"; or

      (3) Collision only if the Declarations indicate that Collision Coverage is provided for any covered "auto".

      However, the most we will pay for any expenses for loss of use is $20 per day, to a maximum of $600.

**B. Exclusions**

1. We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".


© Insurance Services Office, Inc., 2009

a. **Nuclear Hazard**

(1) The explosion of any weapon employing atomic fission or fusion; or

(2) Nuclear reaction or radiation, or radioactive contamination, however caused.

b. **War Or Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**2.** We will not pay for "loss" to any covered "auto" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. We will also not pay for "loss" to any covered "auto" while that covered "auto" is being prepared for such a contest or activity.

**3.** We will not pay for "loss" due and confined to:

**a.** Wear and tear, freezing, mechanical or electrical breakdown.

**b.** Blowouts, punctures or other road damage to tires.

This exclusion does not apply to such "loss" resulting from the total theft of a covered "auto".

**4.** We will not pay for "loss" to any of the following:

**a.** Tapes, records, discs or other similar audio, visual or data electronic devices designed for use with audio, visual or data electronic equipment.

**b.** Any device designed or used to detect speed-measuring equipment such as radar or laser detectors and any jamming apparatus intended to elude or disrupt speed-measurement equipment.

**c.** Any electronic equipment, without regard to whether this equipment is permanently installed, that reproduces, receives or transmits audio, visual or data signals.

**d.** Any accessories used with the electronic equipment described in Paragraph **c.** above.

**5.** Exclusions **4.c.** and **4.d.** do not apply to equipment designed to be operated solely by use of the power from the "auto's" electrical system that, at the time of "loss", is:

**a.** Permanently installed in or upon the covered "auto";

**b.** Removable from a housing unit which is permanently installed in or upon the covered "auto";

**c.** An integral part of the same unit housing any electronic equipment described in Paragraphs **a.** and **b.** above; or

**d.** Necessary for the normal operation of the covered "auto" or the monitoring of the covered "auto's" operating system.

**6.** We will not pay for "loss" to a covered "auto" due to "diminution in value".

**C. Limit Of Insurance**

**1.** The most we will pay for "loss" in any one "accident" is the lesser of:

**a.** The actual cash value of the damaged or stolen property as of the time of the "loss"; or

**b.** The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

**2.** $1,000 is the most we will pay for "loss" in any one "accident" to all electronic equipment that reproduces, receives or transmits audio, visual or data signals which, at the time of "loss", is:

**a.** Permanently installed in or upon the covered "auto" in a housing, opening or other location that is not normally used by the "auto" manufacturer for the installation of such equipment;

**b.** Removable from a permanently installed housing unit as described in Paragraph **2.a.** above or is an integral part of that equipment; or

**c.** An integral part of such equipment.

**3.** An adjustment for depreciation and physical condition will be made in determining actual cash value in the event of a total "loss".

**4.** If a repair or replacement results in better than like kind or quality, we will not pay for the amount of the betterment.


© Insurance Services Office, Inc.,2009

**D. Deductible**

For each covered "auto", our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to "loss" caused by fire or lightning.

## SECTION IV – BUSINESS AUTO CONDITIONS

The following conditions apply in addition to the Common Policy Conditions:

**A. Loss Conditions**

**1. Appraisal For Physical Damage Loss**

If you and we disagree on the amount of "loss", either may demand an appraisal of the "loss". In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If we submit to an appraisal, we will still retain our right to deny the claim.

**2. Duties In The Event Of Accident, Claim, Suit Or Loss**

We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:

**a.** In the event of "accident", claim, "suit" or "loss", you must give us or our authorized representative prompt notice of the "accident" or "loss". Include:

**(1)** How, when and where the "accident" or "loss" occurred;

**(2)** The "insured's" name and address; and

**(3)** To the extent possible, the names and addresses of any injured persons and witnesses.

**b.** Additionally, you and any other involved "insured" must:

**(1)** Assume no obligation, make no payment or incur no expense without our consent, except at the "insured's" own cost.

**(2)** Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit".

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit".

**(4)** Authorize us to obtain medical records or other pertinent information.

**(5)** Submit to examination, at our expense, by physicians of our choice, as often as we reasonably require.

**c.** If there is "loss" to a covered "auto" or its equipment you must also do the following:

**(1)** Promptly notify the police if the covered "auto" or any of its equipment is stolen.

**(2)** Take all reasonable steps to protect the covered "auto" from further damage. Also keep a record of your expenses for consideration in the settlement of the claim.

**(3)** Permit us to inspect the covered "auto" and records proving the "loss" before its repair or disposition.

**(4)** Agree to examinations under oath at our request and give us a signed statement of your answers.

**3. Legal Action Against Us**

No one may bring a legal action against us under this coverage form until:

**a.** There has been full compliance with all the terms of this coverage form; and

**b.** Under Liability Coverage, we agree in writing that the "insured" has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the "insured's" liability.

**4. Loss Payment – Physical Damage Coverages**

At our option we may:

**a.** Pay for, repair or replace damaged or stolen property;


© Insurance Services Office, Inc., 2009

**b.** Return the stolen property, at our expense. We will pay for any damage that results to the "auto" from the theft; or

**c.** Take all or any part of the damaged or stolen property at an agreed or appraised value.

If we pay for the "loss", our payment will include the applicable sales tax for the damaged or stolen property.

**5. Transfer Of Rights Of Recovery Against Others To Us**

If any person or organization to or for whom we make payment under this coverage form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "accident" or "loss" to impair them.

**B. General Conditions**

**1. Bankruptcy**

Bankruptcy or insolvency of the "insured" or the "insured's" estate will not relieve us of any obligations under this coverage form.

**2. Concealment, Misrepresentation Or Fraud**

This coverage form is void in any case of fraud by you at any time as it relates to this coverage form. It is also void if you or any other "insured", at any time, intentionally conceal or misrepresent a material fact concerning:

**a.** This coverage form;

**b.** The covered "auto";

**c.** Your interest in the covered "auto"; or

**d.** A claim under this coverage form.

**3. Liberalization**

If we revise this coverage form to provide more coverage without additional premium charge, your policy will automatically provide the additional coverage as of the day the revision is effective in your state.

**4. No Benefit To Bailee – Physical Damage Coverages**

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this coverage form.

**5. Other Insurance**

**a.** For any covered "auto" you own, this coverage form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this coverage form is excess over any other collectible insurance. However, while a covered "auto" which is a "trailer" is connected to another vehicle, the Liability Coverage this coverage form provides for the "trailer" is:

**(1)** Excess while it is connected to a motor vehicle you do not own.

**(2)** Primary while it is connected to a covered "auto" you own.

**b.** For Hired Auto Physical Damage Coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own. However, any "auto" that is leased, hired, rented or borrowed with a driver is not a covered "auto".

**c.** Regardless of the provisions of Paragraph **a.** above, this coverage form's Liability Coverage is primary for any liability assumed under an "insured contract".

**d.** When this coverage form and any other coverage form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our coverage form bears to the total of the limits of all the coverage forms and policies covering on the same basis.

**6. Premium Audit**

**a.** The estimated premium for this coverage form is based on the exposures you told us you would have when this policy began. We will compute the final premium due when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the first Named Insured will be billed for the balance, if any. The due date for the final premium or retrospective premium is the date shown as the due date on the bill. If the estimated total premium exceeds the final premium due, the first Named Insured will get a refund.

**b.** If this policy is issued for more than one year, the premium for this coverage form will be computed annually based on our rates or premiums in effect at the beginning of each year of the policy.


© Insurance Services Office, Inc.,2009

**7. Policy Period, Coverage Territory**

Under this coverage form, we cover "accidents" and "losses" occurring:

**a.** During the policy period shown in the Declarations; and

**b.** Within the coverage territory.

The coverage territory is:

**(1)** The United States of America;

**(2)** The territories and possessions of the United States of America;

**(3)** Puerto Rico;

**(4)** Canada; and

**(5)** Anywhere in the world if:

**(a)** A covered "auto" of the private passenger type is leased, hired, rented or borrowed without a driver for a period of 30 days or less; and

**(b)** The "insured's" responsibility to pay damages is determined in a "suit" on the merits, in the United States of America, the territories and possessions of the United States of America, Puerto Rico or Canada or in a settlement we agree to.

We also cover "loss" to, or "accidents" involving, a covered "auto" while being transported between any of these places.

**8. Two Or More Coverage Forms Or Policies Issued By Us**

If this coverage form and any other coverage form or policy issued to you by us or any company affiliated with us applies to the same "accident", the aggregate maximum Limit of Insurance under all the coverage forms or policies shall not exceed the highest applicable Limit of Insurance under any one coverage form or policy. This condition does not apply to any coverage form or policy issued by us or an affiliated company specifically to apply as excess insurance over this coverage form.

**SECTION V – DEFINITIONS**

**A.** "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

**B.** "Auto" means:

**1.** A land motor vehicle, "trailer" or semitrailer designed for travel on public roads; or

**2.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**C.** "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

**D.** "Covered pollution cost or expense" means any cost or expense arising out of:

**1.** Any request, demand, order or statutory or regulatory requirement that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**2.** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

"Covered pollution cost or expense" does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**a.** That are, or that are contained in any property that is:

**(1)** Being transported or towed by, handled or handled for movement into, onto or from the covered "auto";

**(2)** Otherwise in the course of transit by or on behalf of the "insured"; or

**(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

**b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".


© Insurance Services Office, Inc., 2009

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

**(1)** The "pollutants" escape, seep, migrate or are discharged, dispersed or releaseed directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraph **6.b.** or **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** above do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

**(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

**(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**E.** "Diminution in value" means the actual or perceived loss in market value or resale value which results from a direct and accidental "loss".

**F.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**G.** "Insured" means any person or organization qualifying as an insured in the Who Is An Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

**H.** "Insured contract" means:

**1.** A lease of premises;

**2.** A sidetrack agreement;

**3.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**4.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**5.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement;

**6.** That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

An "insured contract" does not include that part of any contract or agreement:

**a.** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

**b.** That pertains to the loan, lease or rental of an "auto" to you or any of your "employees", if the "auto" is loaned, leased or rented with a driver; or

**c.** That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a covered "auto" over a route or territory that person or organization is authorized to serve by public authority.

**I.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**J.** "Loss" means direct and accidental loss or damage.

**K.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:


© Insurance Services Office, Inc.,2009

1. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;
2. Vehicles maintained for use solely on or next to premises you own or rent;
3. Vehicles that travel on crawler treads;
4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:
   a. Power cranes, shovels, loaders, diggers or drills; or
   b. Road construction or resurfacing equipment such as graders, scrapers or rollers;
5. Vehicles not described in Paragraph **1.**, **2.**, **3.** or **4.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:
   a. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well-servicing equipment; or
   b. Cherry pickers and similar devices used to raise or lower workers; or
6. Vehicles not described in Paragraph **1.**, **2.**, **3.** or **4.** above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":
   a. Equipment designed primarily for:
      (1) Snow removal;
      (2) Road maintenance, but not construction or resurfacing; or
      (3) Street cleaning;
   b. Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and
   c. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well-servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**L.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**M.** "Property damage" means damage to or loss of use of tangible property.

**N.** "Suit" means a civil proceeding in which:

1. Damages because of "bodily injury" or "property damage"; or
2. A "covered pollution cost or expense";

to which this insurance applies, are alleged.

"Suit" includes:

   a. An arbitration proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" must submit or does submit with our consent; or
   b. Any other alternative dispute resolution proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the insured submits with our consent.

**O.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**P.** "Trailer" includes semitrailer.

 © Insurance Services Office, Inc., 2009 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WASHINGTON CHANGES

For a covered "auto" licensed or principally garaged in, or for "garage operations" conducted in, Washington, this endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A. Changes In Liability Coverage**

The Employee Indemnification And Employer's Liability Exclusion applies only to "bodily injury" to any "employee" of the insured whose employment is not subject to the Industrial Insurance Act of Washington (Washington Revised Code Title 51).

With respect to "bodily injury" to "employees" of the insured whose employment is subject to the Industrial Insurance Act of Washington, the **Employee Indemnification And Employer's Liability** Exclusion is replaced with the following:

This insurance does not apply to "bodily injury" to:

**a.** An "employee" of the insured arising out of and in the course of:

**(1)** Employment by the "insured"; or

**(2)** Performing duties related to the conduct of the "insured's" business; or

**b.** Any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits or to liability assumed by the insured under an "insured contract". A domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

**B. Changes In Physical Damage Coverage**

**1.** The lead-in to Paragraph **B.1.** is replaced by the following:

We will not pay for "loss" caused directly or indirectly by any of the following:

**2.** The Limit of Insurance Provision with respect to repair or replacement resulting in better than like kind or quality is replaced by the following, and supersedes any provision to the contrary:

**3.** We may deduct for betterment for parts normally subject to repair and replacement during the useful life of the "auto". In this event, deductions shall be limited to the lesser of:

**a.** An amount equal to the proportion that the expired life of the part to be repaired or replaced bears to the normal useful life of that part; or

**b.** The amount which the resale value of the "auto" is increased from the repair or replacement.

**3.** The following is added to Paragraph **C. Limit Of Insurance:**

We will not pay for a loss which is paid under Underinsured Motorists Coverage.

**C. Changes In Garagekeepers Coverage**

If Garagekeepers Coverage in the Garage Coverage Form is selected or if the Garagekeepers Coverage endorsement or the Garagekeepers Coverage – Customers' Sound Receiving Equipment endorsement is attached, then Exclusion **3.** is replaced by the following:

**3.** We will not pay for "loss" arising directly or indirectly out of the following:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or


© ISO Properties, Inc., 2007

E-INSURED
ASIC00324

**c.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**D. Changes In Conditions**

**1.** The **Appraisal For Physical Damage Loss** Condition is replaced by the following:

**APPRAISAL FOR PHYSICAL DAMAGE LOSS**

If you and we disagree on the amount of "loss", either may demand an appraisal of the "loss". In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

Neither we nor you shall be held to have waived any rights by any act relating to appraisal.

**2.** The **Transfer Of Rights Of Recovery Against Others To Us** Condition is replaced by the following:

**a.** If any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us for that payment. That person or organization must do everything necessary to secure our rights and must do nothing after "accident" or "loss" to impair them.

**b.** We are entitled to a recovery only after the person or organization has been fully compensated for damages by another party.

**3.** The following is added to the **Legal Action Against Us** Condition:

If this action is brought pursuant to Sec. 3 of RCW 48.30 then 20 days prior to filing such an action, you are required to provide written notice of the basis for the cause of action to us and the Office of the Insurance Commissioner. Such notice may be sent by regular mail, registered mail, or certified mail with return receipt requested.


© ISO Properties, Inc., 2007

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WASHINGTON EXCLUSION OF TERRORISM INVOLVING NUCLEAR, BIOLOGICAL OR CHEMICAL TERRORISM

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
SINGLE INTEREST AUTOMOBILE PHYSICAL DAMAGE INSURANCE POLICY
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A.** The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury, damage, loss or expense, are enclosed in quotation marks:

**1.** "Terrorism" means activities against persons, organizations or property of any nature:

**a.** That involve the following or preparation for the following:

**(1)** Use or threat of force or violence; or

**(2)** Commission or threat of a dangerous act; or

**(3)** Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

**b.** When one or both of the following applies:

**(1)** The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

**(2)** It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

**2.** "Any injury, damage, loss or expense" means any injury, damage, loss or expense covered under any Coverage Form or Policy to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal injury", "personal and advertising injury", "loss", loss of use, rental reimbursement after "loss" or "covered pollution cost or expense", as may be defined under this Coverage Form, Policy or any applicable endorsement.

**B.** The following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for "any injury, damage, loss or expense" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

**1.** The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

**2.** Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

**3.** The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**4.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials.

 © ISO Properties, Inc., 2004 
E-INSURED

**ASIC00326**

**C.** In the event of any incident of "terrorism" that is not subject to this Exclusion, coverage does not apply to "any injury, damage, loss or expense" that is otherwise excluded under this Coverage Form, Policy or any applicable endorsement.


© ISO Properties, Inc., 2004

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AUTO MEDICAL PAYMENTS COVERAGE

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A. Coverage**

We will pay reasonable expenses incurred for necessary medical and funeral services to or for an "insured" who sustains "bodily injury" caused by "accident". We will pay only those expenses incurred, for services rendered within three years from the date of the "accident".

**B. Who Is An Insured**

1. You while "occupying" or, while a pedestrian, when struck by any "auto".
2. If you are an individual, any "family member" while "occupying" or, while a pedestrian, when struck by any "auto".
3. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto". The covered "auto" must be out of service because of its breakdown, repair, servicing, loss or destruction.

**C. Exclusions**

This insurance does not apply to any of the following:

1. "Bodily injury" sustained by an "insured" while "occupying" a vehicle located for use as a premises.
2. "Bodily injury" sustained by you or any "family member" while "occupying" or struck by any vehicle (other than a covered "auto") owned by you or furnished or available for your regular use.
3. "Bodily injury" sustained by any "family member" while "occupying" or struck by any vehicle (other than a covered "auto") owned by or furnished or available for the regular use of any "family member".
4. "Bodily injury" to your "employee" arising out of and in the course of employment by you. However, we will cover "bodily injury" to your domestic "employees" if not entitled to workers' compensation benefits. For the purposes of this endorsement, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.
5. "Bodily injury" to an "insured" while working in a business of selling, servicing, repairing or parking "autos" unless that business is yours.
6. "Bodily injury" arising directly or indirectly out of:
   a. War, including undeclared or civil war;
   b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
   c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.
7. "Bodily injury" to anyone using a vehicle without a reasonable belief that the person is entitled to do so.
8. "Bodily injury" sustained by an "insured" while "occupying" any covered "auto" while used in any professional racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply to any "bodily injury" sustained by an "insured" while the "auto" is being prepared for such a contest or activity.


© ISO Properties, Inc., 2005
E-INSURED

**D. Limit of Insurance**

Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for "bodily injury" for each "insured" injured in any one "accident" is the Limit Of Insurance for Auto Medical Payments Coverage shown in the Declarations.

No one will be entitled to receive duplicate payments for the same elements of "loss" under this coverage and any Liability Coverage Form, Uninsured Motorists Coverage Endorsement or Underinsured Motorists Coverage Endorsement attached to this Coverage Part.

**E. Changes In Conditions**

The Conditions are changed for Auto Medical Payments Coverage as follows:

1. The Transfer Of Rights Of Recovery Against Others To Us Condition does not apply.
2. The reference in Other Insurance in the Business Auto and Garage Coverage Forms and Other Insurance – Primary And Excess Insurance Provisions in the Truckers and Motor Carrier Coverage Forms to "other collectible insurance" applies only to other collectible auto medical payments insurance.

**F. Additional Definitions**

As used in this endorsement:

1. "Family member" means a person related to you by blood, marriage or adoption who is a resident of your household, including a ward or foster child.
2. "Occupying" means in, upon, getting in, on, out or off.

 © ISO Properties, Inc., 2005 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYEES AS INSUREDS

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

The following is added to the **Section II - Liability Coverage**, Paragraph **A.1. Who Is An Insured** Provision:

Any "employee" of yours is an "insured" while using a covered "auto" you don't own, hire or borrow in your business or your personal affairs.


Copyright, Insurance Services Office, Inc., 1998

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# @VANTAGE FOR AUTOMOBILE

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM

The following schedule lists the coverage extensions provided by this endorsement. Refer to the individual provisions to determine the extent of your coverage.

| SCHEDULE OF COVERAGE EXTENSIONS | | | |
|---|---|---|---|
| **1.** | Additional Insured By Contract | **12.** | Employee Hired Autos |
| **2.** | Airbag Discharge | **13.** | Fellow Employee Exclusion |
| **3.** | Auto Theft Reward | **14.** | Glass Repair – Waiver of Deductible |
| **4.** | Blanket Waiver of Subrogation | **15.** | Hired Auto Physical Damage Coverage |
| **5.** | Bodily Injury Redefined – Mental Anguish | **16.** | Lease Gap Coverage |
| **6.** | Broad Form Named Insured | **17.** | Liability Coverage – Supplementary Payments |
| **7.** | Communications Equipment | **18.** | Newly Formed or Acquired Organizations |
| **8.** | Diminution in Value | **19.** | Physical Damage – Transportation Expenses |
| **9.** | Drive Other Car – Executive Officers | **20.** | Rental Reimbursement – Private Passenger Vehicles |
| **10.** | Duties In The Event of Accident, Claim, Suit or Loss | | |
| **11.** | Employees As Insureds | **21.** | Towing – Any Covered Auto |

## 1. ADDITIONAL INSURED BY CONTRACT

The **Who Is An Insured** provision under **SECTION II – LIABILITY COVERAGE** is amended to include as an additional "insured" any person or organization with whom you agreed in a written contract, written agreement or permit, to provide insurance such as is afforded under this Coverage Form. Such person or organization is an "insured" only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part by your maintenance, operation or use of your covered "autos".

With respect to the insurance afforded to these additional "insureds", this insurance does not apply:

**a.** Unless the written contract or agreement has been executed or the permit has been issued prior to the "bodily injury" or "property damage";

**b.** To any person or organization included as an "insured" by endorsement or in the Declarations; or

**c.** To any lessor of "autos" when their contract or agreement with you for such leased "auto" ends.

## 2. AIRBAG DISCHARGE

If you purchased physical damage coverage for a covered "auto" under this policy, we will pay to reset or replace an airbag that accidentally discharges without the vehicle being involved in an accident. No deductible applies to this additional coverage. However, this coverage only applies if the airbag is not covered under a manufacturer's warranty and you did not intentionally cause the airbag to discharge.

## 3. AUTO THEFT REWARD

We will pay up to a $2,000 reward in the event of a covered loss, for information leading to the arrest and conviction of anyone stealing a covered "auto". A reward will not be paid to you, a family member, employee or any public official while performing their duty.

## 4. BLANKET WAIVER OF SUBROGATION

The **Transfer Of Rights of Recovery Against Others To Us** condition under **SECTION IV – BUSINESS AUTO CONDITIONS, paragraph A. LOSS CONDITIONS** is replaced by the following:

We will waive any right of recovery we may have against any person or organization because of payments we make for injury or damage arising out of the operation of a covered "auto" when you have assumed liability for such "bodily injury" or "property damage" under an "insured contract", provided the contract is in writing and executed prior to the "bodily injury" or "property damage".

## 5. BODILY INJURY REDEFINED – MENTAL ANGUISH

The definition of "bodily injury" under **SECTION V – DEFINITIONS** is replaced by the following:

"Bodily injury" means bodily injury, sickness, or disease sustained by a person, including mental anguish or death resulting from any of these at any time.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

**6. BROAD FORM NAMED INSURED**

a. The **Who Is An Insured** provision under **SECTION II – LIABILITY COVERAGE** is amended to include the following:

Any organization which is a legally incorporated entity in which you own a financial interest of more than 50% of the voting stock on the effective date of this Coverage Form will be a Named Insured until the 180th day or the end of the policy period whichever comes first, provided there is no other similar insurance available to that organization.

b. Paragraph **a.** of this provision **6.** does not apply to "bodily injury" or "property damage" for which an "insured" is also an "insured" under any other automobile policy or would be an "insured" under such a policy, but for its termination or the exhaustion of its Limit of Insurance.

**7. COMMUNICATIONS EQUIPMENT**

a. The exclusion for electronic equipment under **Exclusions** of **SECTION III – PHYSICAL DAMAGE COVERAGE** does not apply to loss of any permanently installed, non-removable communications equipment designed for use as a:

1. Citizen's band radio;
2. Two-way mobile radio or telephone;
3. Scanning monitor receiver; or
4. GPS Navigation System,

including its antenna and other accessories.

b. No Deductible applies to this additional coverage.

c. The most we will pay for this coverage is $5,000 per occurrence.

**8. DIMINUTION IN VALUE**

The "diminution in value" exclusion under **SECTION III – PHYSICAL DAMAGE COVERAGE, B. Exclusions** does not apply if the covered "auto" is a private passenger "auto" and is leased, rented, hired or borrowed without a driver for a period of 30 days or less and is used in the conduct of the insured's business. The most we will pay for "loss" arising out of an "accident" is the lesser of $7,500 or 20% of the actual cash value of the "auto" as determined by Kelley Blue Book or other independent valuation sources.

**9. DRIVE OTHER CAR – EXECUTIVE OFFICERS**

a. The **Who Is An Insured** provision under **SECTION II – LIABILITY COVERAGE** is amended to include:

If you are designated in the Declarations as:

1. An individual; you and your spouse.
2. A partnership; your partners and their spouses.
3. An organization other than an individual or a partnership; your "executive officers" and their spouses.

b. **SECTION II – LIABILITY COVERAGE** and **SECTION III – PHYSICAL DAMAGE COVERAGE** are extended to include "autos" you don't own, hire, lease or borrow while in the care, custody or control of an "insured" listed in **9.a.** This does not include any "auto":

1. Owned by any "insured" listed in **9.a.**, or any member of their household, including any such "auto" that is owned but not insured;
2. Used by an "insured" listed in **9.a.** while working in the business of selling, servicing, repairing or parking autos; or
3. Insured under another policy of insurance.

If Medical Payments, Uninsured/Underinsured Motorist, Personal Injury Protection or other compulsory coverages required by the governing jurisdiction are covered on this policy, then insureds listed in **9.a.** above and family members residing in the same households are "insureds" while:

1. Occupying as a passenger; or
2. A pedestrian when struck by,

any "auto" you do not own, hire, lease or borrow, except any "auto" owned by that "insured" listed in **9.a**, their family members or an "auto" insured under any other policy.

c. The limits and deductibles applicable to this provision will be the largest applicable to any owned "auto" for the specific insurance.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

**d.** The following definition is added to the **DEFINITIONS** section of the policy:

"Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any similar governing document.

**e.** The **Other Insurance Condition**, under **Section IV – BUSINESS AUTO CONDITIONS**, does not apply to the provisions of this Drive Other Car endorsement. There is no "other insurance" applicable to this endorsement.

**10. DUTIES IN THE EVENT OF ACCIDENT, CLAIM, SUIT OR LOSS**

Under **SECTION IV – BUSINESS AUTO CONDITIONS –** the **Duties In The Event Of Accident, Claim, Suit Or Loss** Condition is amended as follows:

The requirements that you must:

**a.** Notify us of an "accident", claim, "suit" or "loss"; and

**b.** Send us documents concerning a claim or "suit",

apply only when such "accident", claim, "suit" or "loss" is known to:

**a.** You, if you are an individual;

**b.** A partner, if you are a partnership;

**c.** An executive officer of the corporation or insurance manager, if you are a corporation; or

**d.** A manager, if you are a limited liability company.

**11. EMPLOYEES AS INSUREDS**

The **Who Is An Insured** provision under **SECTION II – LIABILITY COVERAGE** is changed by adding the following:

Any "employee" of yours while using a covered "auto" you don't own, hire or borrow in your business or your personal affairs. This coverage is excess over any other collectible insurance.

**12. EMPLOYEE HIRED AUTOS**

The following is added to the **Who Is An Insured** Provision:

An "employee" of yours is an "insured" while operating an "auto" hired or rented under a contact or agreement in that "employee's" name, with your permission, while performing duties related to the conduct of your business.

For purposes of this coverage grant, paragraph **5.b.** of the **Other Insurance** Condition in the Business Auto Coverage Form is replaced by the following:

**b.** For Hired Auto Physical Damage Coverage, the following are deemed to be covered "autos" you own:

**1.** Any covered "auto" you lease, hire, rent or borrow; and

**2.** Any covered "auto" hired or rented by your "employee" under a contract in that individual "employee's" name, with your permission, while performing duties related to the conduct of your business.

However, any "auto" that is leased, hired, rented or borrowed with a driver is not a covered "auto".

This coverage is excess over any other collectible insurance.

**13. FELLOW EMPLOYEE EXCLUSION**

The Fellow Employee exclusion under **SECTION II – LIABILITY COVERAGE** does not apply if the "bodily injury" results from the use of a covered "auto" you own or hire. This coverage is excess over any other insurance.

**14. GLASS REPAIR – WAIVER OF DEDUCTIBLE**

Under paragraph **D. – Deductible –** of **SECTION III – PHYSICAL DAMAGE COVERAGE**, the following is added:

No deductible applies to glass damage if the glass is repaired rather than replaced.

**15. HIRED AUTO – PHYSICAL DAMAGE COVERAGE**

If hired "autos" are covered "autos" under **SECTION II – LIABILITY COVERAGE** and if **Comprehensive**, **Specified Causes of Loss**, or **Collision** coverages are provided under this policy for any "auto" you own, then **SECTION III – PHYSICAL DAMAGE COVERAGE** is extended to "autos" you hire, subject to the following limit:

The most we will pay for "loss" to any hired "auto" is the lesser of:

**a.** $75,000 for "autos" of the private passenger type and $50,000 for all other "autos";


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

**b.** The actual cash value; or

**c.** The cost of repairing or replacing it with other property of like kind or quality.

The deductible will be equal to the largest deductible applicable to any owned "auto" for that coverage. No deductible applies to "loss" caused by fire or lightning.

Subject to the above limit, deductible and excess provisions, we will provide coverage equal to the broadest coverage applicable to any covered "auto" you own.

We will also cover loss of use of the hired "auto" if the following conditions are met:

**a.** It results from an accident;

**b.** You are legally liable; and

**c.** The lessor incurs an actual financial loss.

The most we will pay for this loss of use coverage is $1,000 per "accident".

**16. LEASE GAP COVERAGE**

Under paragraph **C. Limit of Insurance** – of **SECTION III – PHYSICAL DAMAGE COVERAGE**, the following is added:

If a covered "auto" is leased, we will also pay the difference between the actual cash value of a covered "auto" at the time of "loss" and the remaining balance on your lease if the following conditions are met:

**a.** The "auto" has a long term lease and is covered on this policy.

**b.** The lessor is added as an Additional Insured in a written lease agreement.

**c.** You are legally obligated for the remaining balance.

We will not pay for any amounts representing excess wear and tear charges; additional mileage charges; taxes; overdue payments; penalties, interest or charges resulting from overdue payments; or lease termination fees.

**17. LIABILITY COVERAGE EXTENSIONS – SUPPLEMENTARY PAYMENTS**

Under **SECTION II – LIABILITY COVERAGE**, the Coverage Extension for **Supplementary Payments** is revised as follows:

**a.** The limit for the cost of bail bonds is amended to $3,500.

**b.** The limit for reasonable expenses incurred by the "insured" is amended to $500 a day.

**18. NEWLY FORMED OR ACQUIRED ORGANIZATIONS**

**a.** The **Who Is An Insured** provision under **SECTION II – LIABILITY COVERAGE** is amended to include as an "insured" any organization that is formed or acquired by you and over which you maintain majority ownership.

**b.** Paragraph **a.** of this provision **18.** does not apply to any organization:

**1.** That is a joint venture or partnership;

**2.** That is an "insured" under any other policy;

**3.** That has exhausted its Limit of Insurance under any other policy; or

**4.** 180 days or more after its acquisition or formation by you, unless you have given us notice of the acquisition or formation.

**c.** Paragraph **a.** of this provision **18.** does not apply to "bodily injury" or "property damage" that results from an "accident" that occurred before you formed or acquired the organization.

**19. PHYSICAL DAMAGE – TRANSPORTATION EXPENSES COVERAGE**

Under **SECTION III – PHYSICAL DAMAGE** Coverage Extensions, the limit for **Transportation Expenses** is amended to $75 per day and the maximum is amended to $2,250.

**20. RENTAL REIMBURSEMENT**

We will pay for rental reimbursement expenses incurred by you for the rental of an "auto" of the private passenger type because of "loss" to a "covered auto" of the private passenger type. Payment applies in addition to the otherwise applicable amount of each coverage you have on a "covered auto". No deductibles apply to this coverage.

We will pay those expenses incurred during the policy period beginning 24 hours after the "loss" and ending, regardless of the policy's expiration, six (6) days after the "loss".


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

Payment is limited to the lesser of the following amounts:

1. Necessary and actual expenses incurred.
2. The maximum daily payment of $25 for any one day.

This coverage does not apply while there are spare or reserve "autos" available to you.

If "loss" results from the total theft of the private passenger "auto", we will pay under this coverage only that amount of your rental reimbursement expenses which is not already provided for under the PHYSICAL DAMAGE COVERAGE Extension.

**21. TOWING – COVERED AUTOS**

Under **SECTION III – PHYSICAL DAMAGE COVERAGE**, Coverage for Towing is amended as follows:

**a.** This coverage applies to any covered "auto" for which a premium charge for towing and labor is shown in the Schedule or in the Declarations.

**b.** The limit is $100.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

# COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (SECTION V).

## SECTION I – COVERAGES

We agree with you in consideration of the payment of premium and in reliance upon your statements in the Declarations and subject to the Limit of Insurance shown in the Umbrella Declarations, and all the exclusions, terms and conditions of this policy as follows:

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay on behalf of the insured the "Ultimate Net Loss" in excess of the "retained limit" because of "bodily injury" or "property damage" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A and B.

We will have the right and duty to defend the insured against any "suit" seeking damages for such "bodily injury" or "property damage", but:

**(1)** The amount we will pay for "Ultimate Net Loss" is limited as described in SECTION III – LIMITS OF INSURANCE;

**(2)** We may, at our discretion, investigate any "occurrence" that may involve this insurance and settle any resultant claim or "suit", for which we may have the duty to defend;

**(3)** Our duty to defend applies only to "suits" not covered by any "Underlying Insurance" shown in the Umbrella Declarations or by any other insurance or when the limits of "Underlying Insurance" have been exhausted;

**(4)** When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply, and;

**(5)** Our right and duty to defend end when we have exhausted the applicable Limit of Insurance by payment of judgments or settlements under **Coverages A or B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC
E-INSURED

EXHIBIT E-2
ASIC00336

**d.** "Bodily injury" or property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

**2. Exclusions**

This insurance does not apply to:

**a. Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" arising out of any liability assumed by the insured under any contract or agreement, except insofar as coverage is available to the insured as provided by "underlying insurance" as set forth in the Schedule Of Underlying Insurance.

**c. Workers Compensation and Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**d. E.R.I.S.A.**

Any obligation of the insured under the Employees' Retirement Income Security Act (E.R.I.S.A.), and any amendments thereto or any similar federal, state, or local statute.

**e. Auto Coverages**

**(1)** Any loss, cost or expense payable under or resulting from any first party physical damage coverage; no-fault law; personal injury protection or auto medical payments coverage; or uninsured or underinsured motorist law; or

**(2)** "Bodily injury" or "property damage" arising out of the ownership, maintenance or use of any "auto" which is not a "covered auto".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any "auto" that is owned or operated by or rented or loaned to any insured.

**f. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

With respect to injury arising out of a "covered auto", this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits. For the purposes of this insurance, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

This exclusion does not apply to the extent that valid "underlying insurance" for the employer's liability risks described above exists or would have existed but for the exhaustion of underlying limits for "bodily injury". Coverage provided will follow the provisions, exclusions and limitations of the "underlying insurance" unless otherwise directed by this insurance.

**g. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire."

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(f)** That are, or that are contained in any property that is:

**(i)** Being transported or towed by, handled, or handled for movement into, onto or from, the covered "auto";

**(ii)** Otherwise in the course of transit by or on behalf of the insured; or

**(iii)** Being stored, disposed of, treated or processed in or upon the covered "auto";

**(g)** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the insured for movement into or onto the covered "auto"; or


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

**(h)** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the insured.

Paragraph **(f)** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

**(i)** The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(ii)** The "bodily injury" or "property damage" does not arise out of the operation of any equipment listed in Paragraphs **14.f.(2)** and **14.f.(3)** of the definition of "mobile equipment."

Paragraphs **(g)** and **(h)** above of this exclusion do not apply to accidents that occur away from premises owned by or rented to an insured with respect to "pollutants" not in or upon a covered "auto" if:

**(i)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

**(ii)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**h. Aircraft or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading and unloading".

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is less than 51 feet long and not used to carry passengers for a charge;

**(3)** An aircraft that is hired, chartered or loaned with a paid crew and not owned by any insured,

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft or watercraft that is owned or operated by or rented or loaned to any insured.

**i. Racing Activities**

"Bodily injury" or "property damage" arising out of the use of any "auto" or "mobile equipment" in, or while in practice for or while being prepared for, any prearranged professional or organized racing, speed or demolition or stunting activity or contest.

**j. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**k. Damage to Property**

"Property damage" to:

**(1)** Property:

**(a)** You own, rent, or occupy including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property; or

**(b)** Owned or transported by the insured and arising out of the ownership, maintenance or use of a "covered auto".

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(1)(b)**, **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraphs **(3)** and **(4)** of this exclusion do not apply to liability assumed under a written Trailer Interchange agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**l. Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**m. Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**n. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**o. Recall of Products, Work or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product;"

**(2)** "Your work;" or

**(3)** "Impaired property;"

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

**p. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**q. Employment Related Practices**

"Bodily injury" to:

**(1)** A person arising out of any;

**(a)** Refusal to employ that person;

**(b)** Termination of the person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies whether the injury-causing event described in Paragraphs **(a), (b)** or **(c)** above occurs before employment, during employment or after employment of that person.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity;

**(2)** to any obligation to share damages with or repay someone else who must pay damages because of the injury; and

**(3)** to the insured and insured's employees. It applies to any and all acts, committed by the insured or the insured's employees whether committed with or without the knowledge of the insured or by or at the direction of the insured or the insured's employees.

**r. Nuclear Energy Exclusion.** This insurance does not apply:

**(1)** Under any Liability Coverage, to "bodily injury" or "property damage:"

**(a)** With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**(b)** Resulting from the "hazardous properties" of "nuclear material" and with respect to which (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (ii) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**(2)** Under any Medical Payments Coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

**(3)** Under any Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material," if:

**(a)** The "nuclear material" **(i)** is at any nuclear facility owned by, or operated by or on behalf of, an insured or (ii) has been discharged or dispersed therefrom;

**(b)** The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

**(c)** The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(c)** applies only to "property damage" to such "nuclear facility" and any property thereat.

**s. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**t. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(a)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(b)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(c)** The Fair Credit Reporting Act (FRCA) and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act ( FACTA); or

**(d)** Any federal, state or local statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that prohibits or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement.**

**a.** We will pay on behalf of the insured the "Ultimate Net Loss" in excess of the "retained limit" because of "personal and advertising injury" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A and B.

We will have right and duty to defend the insured against any "suit" seeking damages for such "personal and advertising injury", but:

**(1)** The amount we will pay for "Ultimate Net Loss" is limited as described in SECTION III – LIMITS OF INSURANCE;

**(2)** We may, at our discretion, investigate any offense that may involve this insurance and settle any resultant claim or "suit", for which we have the duty to defend;

**(3)** Our duty to defend applies only to "suits" not covered by any "Underlying Insurance" shown in the Umbrella Declarations or by any other insurance or when the limits of "Underlying Insurance" have been exhausted;

**(4)** When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other "suit" seeking damages to which this insurance may apply. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply, and;

**(5)** Our right and duty to defend end when we have exhausted the applicable Limit of Insurance by payment of judgments or settlements under **Coverages A or B.**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a.** "Personal and Advertising Injury":

**(1) Knowing Violation Of Rights Of Another**

Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**(2) Material Published With Knowledge Of Falsity**

Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**(3) Material Published Prior To Policy Period**

Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

**(4) Criminal Acts**

Arising out of a criminal act committed by or at the direction of the insured.

**(5) Contractual Liability**

For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to:

**(a)** Liability for damages that the insured would have in the absence of the contract or agreement,

**(b)** Liability for false arrest, detention or imprisonment assumed in a contract or agreement.

**(6) Breach Of Contract**

Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**(7) Quality Or Performance Of Goods – Failure To Conform To Statements**

Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**(8) Wrong Description Of Prices**

Arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**(9) Intellectual Property**

Arising out of the actual or alleged infringement or violation of trade dress, trade name, trade secrets, trademark, patent, copyright or any other intellectual property rights or laws, or any act committed by the insured with malice. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement.

However, this exclusion does not apply to infringement of copyrighted materials, trade dress or slogans in your "advertisement".

**(10) Insureds In Media And Internet Type Businesses**

Committed by an insured whose business is:

**(a)** Advertising, broadcasting, publishing or telecasting;

**(b)** Designing or determining content of websites for others; or

**(c)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **17.a., b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**(11) Electronic Chatrooms Or Bulletin Boards**

Arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**(12) Unauthorized Use Of Another's Name Or Product**

Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**(13) Pollution**

Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**(14) Employment Related Practices**

To:

**(a)** A person arising out of any:

**(i)** Refusal to employ that person;

**(ii)** Termination of that person's employment or;

**(iii)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

**(b)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person whom any of the employment-related practices described in Paragraphs **(a), (b),** or **(c)** above is directed.

This exclusion applies whether the injury-causing event described in Paragraphs **(i), (ii)** or **(iii)** above occurs before employment, during employment or after employment of that person.

This exclusion applies:

**(i)** Whether the insured may be liable as an employer or in any other capacity;

**(ii)** To any obligation to share damages with or repay someone else who must pay damages because of the injury; and

**(iii)** To the insured and insured's employees. It applies to any and all acts, committed by the insured or the insured's employees whether committed with or without the knowledge of the insured or by or at the direction of the insured or the insured's employees.

**(15) War**

"Personal and advertising injury", however caused, arising directly or indirectly, out of:

**(a)** War, including undeclared or civil war;

**(b)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(c)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**(16) Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(a)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(b)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(c)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and accurate Credit Transaction Act (FACTA); or

**(d)** Any federal, state or local statute, ordinance or regulation other than the TCPA or CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**b.** "Pollution cost or expense"

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

**1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend, when the duty to defend exists:

**a.** All expenses we incur.

**b.** Up to $2000 for cost of bail bonds (including bonds for related traffic law violations) required because of an "occurrence" we cover. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $500 a day because of time off from work.

**e.** All costs taxed against the insured in any "suit" we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Pre-judgment interest awarded against the insured on that part of any judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any pre-judgment interest based upon that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court that part of the judgment that is within the applicable Limit of Insurance.

These payments will not reduce the Limit of Insurance.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

2. When we have the right but not the duty to defend the insured and elect to participate in the defense, we will pay our own expenses but will not contribute to the expenses of the insured or the underlying insurer.

3. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to a "suit", we will defend that indemnitee if all of the following conditions are met:

   a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a written contract or written agreement that is an "insured contract";

   b. This insurance applies to such liability assumed by the insured;

   c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

   d. The allegations of the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

   e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

   f. The indemnitee:

      (1) Agrees in writing to:

         (a) Cooperate with us in the investigation, settlement or defense of the "suit".

         (b) Immediately send us copies of any demands, notices, summonses or legal papers received connection with the "suit";

         (c) Notify any other insurer whose coverage is available to the indemnitee; and

         (d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

      (2) Provides us with written authorization to:

         (a) Obtain records and other information related to the "suit"; and

         (b) Conduct and control the defense of the indemnitee in such "suit".

   So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments and will not reduce the limits of insurance. Such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

   Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments, or settlements, or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

1. Except for liability arising out of the ownership, maintenance, or use of "covered autos":

   a. If you are designated in the Declarations as:

      (1) An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

      (2) A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

      (3) A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

      (4) An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

      (5) A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

**b.** Each of the following is also an insured:

**(1)** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(a)** "Bodily injury" or "personal and advertising injury":

**(i)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(ii)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(a)(i)** above;

**(iii)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(a)(i)** or **(ii)** above; or

**(iv)** Arising out of his or her providing or failing to provide professional health care services.

**(b)** "Property damage" to property:

**(i)** Owned, occupied or used by,

**(ii)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**(2)** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**(3)** Any person or organization having proper temporary custody of your property if you die, but only:

**(a)** With respect to liability arising out of the maintenance or use of that property; and

**(b)** Until your legal representative has been appointed.

**(4)** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**c.** Any organization you newly acquire or form, other than a partnership or joint venture or a limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However,

**(1)** Coverage under this provision is afforded from the date you acquire or form the organization until the end of the policy period;

**(2)** **Coverage A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**(3)** **Coverage B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

**2.** Only with respect to liability arising out of the ownership, maintenance, or use of "covered autos":

**a.** You are an insured.

**b.** Anyone else while using with your permission a "covered auto" you own, hire, or borrow is also an insured except:

**(1)** The owner or anyone else from whom you hire or borrow a "covered auto". This exception does not apply if the "covered auto" is a trailer or semi trailer connected to a "covered auto" you own.

**(2)** Your "employee" if the "covered auto" is owned by that "employee" or a member of his or her household.

**(3)** Someone using a "covered auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

**(4)** Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their "employees", while moving property to or from a "covered auto".


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

(5) A partner (if you are a partnership), or a member (if you are a limited liability company) for a "covered auto" owned by him or her or a member of his or her household.

(6) "Employees" with respect to "bodily injury" to any fellow "employee" of the insured arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business.

c. Anyone liable for the conduct of an insured described above is also an insured, but only to the extent of that liability.

3. Subject to the terms of this Coverage Part, any additional insured, other than you, included in the "underlying insurance" listed in the Umbrella Declarations.

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance required by the contract, less any amounts payable by any "underlying insurance".

Additional insured coverage provided by this insurance will not be broader than coverage provided by the "underlying insurance".

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMIT OF INSURANCE**

1. The Limit of Insurance shown in the Umbrella Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made, "suits" brought, or number of vehicles involved;

c. Persons or organizations making claims or bringing "suits."

2. The Products-Completed Operations Aggregate Limit is the most we will pay for the sum of all "Ultimate Net Loss" under **Coverage A** and **Coverage B** combined for damages included in the "products-completed operations hazard."

3. The Bodily Injury By Disease Aggregate Limit is the most we will pay for the sum of all "Ultimate Net Loss" under **Coverage A** and **Coverage B** combined because of "bodily injury" by disease to your employees arising out of and in the course of their employment by you.

4. The General Aggregate is the most we will pay for the sum of all "Ultimate Net Loss" arising from damages under **Coverage A** and **Coverage B** combined, except:

a. For damages included in the "products/completed operations hazards"; or

b. For damages because of "bodily injury" by disease to your employees arising out of and in the course of their employment by you; or

c. Coverages included in "underlying insurance" to which no underlying aggregate applies.

5. Subject to the above, whichever applies, the Each Occurrence Limit is the most we will pay:

a. Under **Coverage A** for the sum of all "Ultimate Net Loss" because of all "bodily injury" and "property damage" arising out of any one "occurrence."

b. Under **Coverage B** for the sum of all "Ultimate Net Loss" because of all "personal and advertising injury" sustained by any one person or organization.

c. With respect to Employee Benefit Liability coverage under **Coverage A** if included under "underlying insurance," for the sum of all "Ultimate Net Loss" sustained by any one "employee" or former "employee."

The Limit of Insurance applies separately to each consecutive annual period, and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limit of Insurance.

**SECTION IV – COMMERCIAL UMBRELLA LIABILITY CONDITIONS**

1. **Bankruptcy**

Bankruptcy, insolvency, or receivership of the insured, the insured's estate or of any underlying insurer will not relieve us of our obligations under this Coverage Part. But with regard to bankruptcy, insolvency, or receivership of any underlying insurer, our Limit of Insurance will apply only in excess of the required Limit of Insurance stated in the Schedule of "Underlying Insurance" of the Umbrella Declarations of this policy and shall apply in the same manner as though the "Underlying Insurance" were available and collectible.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

**2. Duties In The Event Of Occurrence, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of any "occurrence" or offense, regardless of the amount, which may result in a claim when the "occurrence" or offense is known to:

**(1)** You, if you are an individual;

**(2)** Your partner, if you are a partnership;

**(3)** Your member, if you are a joint venture;

**(4)** Your member or manager, if you are a limited liability company;

**(5)** Your officer or insurance manager, if you are an organization other than a partnership or joint venture; or

**(6)** Your trustee, if you are a trust.

To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation, settlement or defense of the claim or "suit;" and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**e.** If you report an "occurrence" to your workers compensation insurer which later develops into a liability claim for which coverage is provided by this policy, failure to report such "occurrence" to us at the time of "occurrence" shall not be deemed in violation of paragraphs **(a), (b)** and **(c)** above. However, it is understood and agreed that you shall give written notice of the aforesaid "occurrence" to us as soon as you are made aware of the fact the particular "occurrence" may be a liability claim rather than or in addition to a workers compensation claim.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable Limit of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Maintenance Of/Changes To Underlying Insurance**

**a.** You must keep the "underlying insurance" listed in the Schedule of "underlying insurance" in the Umbrella Declarations of this policy in full effect throughout the policy period except for the reduction of the aggregate due to the payment of claims, settlements or judgments.

**b.** Failure to maintain "underlying insurance" will not invalidate this insurance. However, this insurance will apply as if the "underlying insurance" were in full effect.

**c.** If there is an increase in the scope of coverage of any "underlying insurance" during the term of this policy, our liability will be no more than it would have been if there had been no such increase.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

**d.** You must notify us within 30 days when any "underlying insurance" is no longer in effect or if the limits or scope of coverage of any "underlying insurance" is changed.

**e.** No provision in this section affects cancellation or non-renewal provisions of this policy.

**5. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this Coverage Part, our obligations under this Coverage Part are limited as follows:

**a. Excess Insurance**

This insurance is excess over, and shall not contribute with any other insurance, whether primary, excess, contingent or on any other basis; or scheduled in "Underlying Insurance" or not, except insurance bought by you to specifically apply in excess of this Coverage Part.

**b.** We will have no duty under **Coverages A** or **B** to defend any claim or "suit" if any other insurer had or has a duty to defend. If no other insurer defends, we may undertake to do so, but we will be entitled to the insured's rights against all other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under this or any other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this excess insurance provision.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Umbrella Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us;

**c.** We have issued this policy in reliance upon your representations; and

**d.** This policy is void in any case of fraud by you as it relates to this policy or any claim under this policy.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

Recoveries shall reimburse us and all others, including the insured, in the same proportion as the total limit of liability of each participant in such loss payment bears to the total loss sustained.

When we elect to participate in the exercise of the insured's rights of recovery, reasonable expenses resulting therefrom shall be apportioned among all interests in the ratio of their respective losses for which recovery is sought.

If there should be no recovery as a result of proceedings instituted solely at our request, we shall bear all expenses of such proceedings.

**9. Appeals**

If the underlying insurer or insured elects not to appeal a judgment in excess of the "retained limit", we may do so at our own expense. We will be liable for taxable costs, pre- and post judgment interest and disbursements.

**10. Loss Payable**

Liability under this Coverage Part shall not apply unless and until the insured or insured's underlying insurer has become obligated to pay the "retained limit". Such obligation by the insured to pay part of the "ultimate net loss" shall have been previously determined by a final settlement or judgment after an actual trial or written agreement between the insured, claimant, and us.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

**11. Transfer of Defense**

When the underlying limits of insurance have been used up in the payments of judgments or settlements, the duty to defend will be transferred to us. We will cooperate in the transfer of control to us of any outstanding claims or "suits" seeking damages to which this insurance applies which would have been covered by the "underlying insurance" had the applicable limit not been used up.

**12. Expanded Territory**

**a.** If a "suit" is brought in a part of the "coverage territory" that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada, and we are prevented by law, or otherwise, from defending the insured, the insured will initiate a defense of the "suit". We will reimburse the insured, under Supplementary Payments, for any reasonable and necessary expenses incurred for the defense of a "suit" seeking damages to which this insurance applies, that we would have paid had we been able to exercise our right and duty to defend.

If the insured becomes legally obligated to pay sums because of damages to which this insurance applies in a part of the "coverage territory" that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada, and we are prevented by law, or otherwise, from paying such sums on the insured's behalf, we will reimburse the insured for such sums.

**b.** All payments or reimbursements we make for damages because of judgments or settlements will be made in U.S. currency at the prevailing exchange rate at the time the insured became legally obligated to pay such sums. All payments or reimbursements we make for expenses under Supplementary Payments will be made in U.S. currency at the prevailing exchange rates at the time the expenses were incurred.

**c.** Any disputes between you and us as to whether there is coverage under this policy must be filed in the courts or the United States of America (including its territories or possessions), Puerto Rico or Canada.

**d.** The insured must fully maintain any coverage required by law, regulation or other governmental authority during the policy period, except for reduction of the aggregate limits due to payment of claims, judgments or settlements.

Failure to maintain such coverage required by law, regulation or other governmental authority will not invalidate this insurance. However, this insurance will apply as if the required coverage by law, regulation or other governmental authority was in full effect.

## SECTION V – DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment.

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment."

**3.** "Bodily injury" means bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time. "Bodily injury" includes mental anguish or other mental injury resulting from "bodily injury".

**4.** "Coverage territory" means this insurance applies anywhere in the world with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America.

**5.** "Covered auto" means only those "autos" to which "underlying insurance" applies.

**6.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**7.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**8.** "Hazardous properties" include radioactive, toxic, or explosive properties.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

9. "Hostile Fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

10. "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work," that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work:" or

   b. Your fulfilling the terms of the contract or agreement.

11. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work performed for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you, or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

   g. That part of any contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraphs **f.** and **g.** do not include that part of any contract or agreement:

   (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

   (2) That pertains to the loan, lease or rental of an "auto" to you or any of your "employees" if the "auto" is loaned, leased or rented with a driver;

   (3) That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a "covered auto" over a route or territory that a person or organization is authorized to serve by public authority.

12. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

13. "Loading or unloading" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b. While it is in or on an aircraft, watercraft or "auto" ; or

   c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but, "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

14. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a., b., c.,** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a., b., c.,** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos;"

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing;

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobiles or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle law are considered "autos".

**15.** "Nuclear material" means "source material," "special nuclear material," or "by-product material."

**16.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**17.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that:

**(1)** slanders or libels a person or organization. This does not include any slander or libel related to the actual or alleged infringement or violation of any intellectual property rights or laws; or

**(2)** disparages a person's or organization's goods, products or services. This does not include any disparagement related to the actual or alleged infringement or violation of any intellectual property rights or laws;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**18.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke; vapor; soot; fumes; acids; alkalis; chemicals and "waste." "Waste" includes materials to be recycled, reconditioned or reclaimed.

**19.** "Pollution cost or expense" means any loss, cost or expense arising out of any:

**a.** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of, "pollutants"; or

**b.** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

20 a. "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned.

b. "Your work" will be deemed completed at the earliest of the following times:

(1) When all of the work called for in your contract has been completed.

(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

c. This hazard does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you and that the condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials.

(3) Products or operations for which the classification in this Coverage Part includes products or completed operations.

21. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For purposes of this insurance, with respect to other than the ownership maintenance or use "covered autos", electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

22. "Retained limit" means the total of all insurance amounts available to the insured and applicable to any loss covered under this Coverage Part.

All insurance amounts available to the "insured" as specified above shall include not only any insurance shown in Schedule of Underlying Insurance, of the Umbrella Declarations of this policy, but also any other valid and collectible insurance as specified in Condition 5, Other Insurance.

23. Source material," "special nuclear material," and "by-product material" have the meaning given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

24. "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor."

25. "Suit" means a civil proceeding in which damages because of "bodily injury," property damage," "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent or the "underlying insurer's" consent.

26. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

27. "Ultimate Net Loss" means the total amount of damages in excess of the "retained limit" for which the insured is legally liable in payment of "bodily injury," "property damage," and "personal and advertising injury." "Ultimate Net Loss" may be established by adjudication, arbitration, or a compromise settlement to which we have previously agreed in writing.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

"Ultimate Net Loss" shall be reduced by any recoveries or salvages which have been paid or will be collected, but the amount of "Ultimate Net Loss" shall not include any expenses incurred by any insured, by us or by any "Underlying Insurance" carrier.

**28.** "Underlying Insurance" means the coverage(s) afforded under insurance policies designated in the Schedule of Underlying Insurance of the Umbrella Declarations of this policy; including any policies issued to replace these policies which include the same limits; same coverage; the same terms and conditions.

**29.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**30.** "Waste" means any "waste" material (a) containing "by-product material" other than the tailings or "wastes" produced by the extraction or concentration of uranium or thorium from any one processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

"Nuclear facility" means:

**a.** Any "nuclear reactor;"

**b.** Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel," or (3) handling, processing or packaging "waste;"

**c.** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**d.** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste;" and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive contamination of property.

**31.** "Your product";

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**32.** "Your work":

**a.** Means:

**(1)** Work or operations performed by your or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

**(2)** The providing of or failure to provide warnings or instructions.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – PROFESSIONAL LIABILITY

This endorsement modifies the insurance provided by the following:

COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

This insurance does not apply to "bodily injury," "property damage," or "personal and advertising injury" due to the rendering or failure to render professional services by the Insured or any employee of the Insured or on behalf of the Insured or any employee of the Insured.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC
E-INSURED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FINANCIAL INSTITUTIONS

This endorsement modifies the insurance provided by the following:

COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

**A. Additional Bodily Injury And Property Damage Exclusions**

In **Section I – Coverage A Bodily Injury And Property Damage Liability 2. Exclusions** and **Coverage B. Personal And Advertising Injury Liability 2. Exclusions**, the following exclusions are added. These are additional exclusions and do not replace any other exclusions.

This insurance does not apply to:

**a. Insurance and Benefits Obligations Assumed**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of any obligation assumed by any insured including the failure to discharge, or the improper discharge of, any obligation or duty, contractual or otherwise, with respect to any contract or treaty of insurance, reinsurance, suretyship, annuity, endowment or employee benefit plan, including applications, receipts or binders.

**b. Plans and Associations**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of membership in or contribution to or management of any plan, pool, association, insolvency or guarantee fund or any similar fund, organization or association, whether voluntary or involuntary.

**c. Professional Services**

Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering or failure to render professional services including but not limited to:

**(1)** Advising, inspecting, reporting, or making recommendations in the insured's capacity as an insurance company, mortgagee, mortgage servicing agency, bank or lending institution, financial advisor, consultant, broker, agent or representative;

**(2)** Effecting insurance, reinsurance or suretyship coverages;

**(3)** Investigating, defending or setting any claim under any contract or insurance, self-insurance, reinsurance or suretyship;

**(4)** Auditing or maintaining of accounts or records of others;

**(5)** Conducting an investment, leasing, loan or real estate department or operation;

**(6)** Acting in any capacity as a fiduciary or trustee;

**(7)** Performing any claim, investigation, adjustment, engineering, inspection, survey or appraisal service;

**(8)** Performing electronic data processing, systems analysis, design, programming or consulting or other similar services;

**(9)** Checking or reporting of credit; or

**(10)** Tax planning, tax advising or the preparation of tax returns.

**d. Fines and penalties**

Any obligation to pay fines and penalties.

**e. Safe Deposit Boxes**

"Property damage" to property in customers' safe deposit boxes, or contained in vaults and for which customers have been issued storage receipts.

**f. Stop Payment**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of:

**(1)** Compliance or failure to comply with any notice to stop payment;

**(2)** Refusal to pay or to certify;

**(3)** Failure to give proper notice of dishonor on any check, note or draft drawn, made or accepted by any depositor of the insured.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC
E-INSURED

**g. Foreclosure Liability**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of any real or personal property acquired by foreclosure, repossession, deed in lieu of foreclosure or as mortgagee in possession, except:

**(1)** If there is a policy specifically covering Foreclosure Liability listed in the Schedule of Underlying Insurance of this policy, this exclusion does not apply to the extent coverage is provided in such "Underlying Insurance". As respects any coverage provided under this exception: the definitions of "your product" and "your work" in the Foreclosure Liability "Underlying Insurance" policy will also apply to this policy, and any other terms of this policy that apply to property you own will also apply to property acquired by you by foreclosure, repossession, deed in lieu of foreclosure or as mortgagee in possession.

**(2)** If there is another specific exclusion for Foreclosure Liability attached to this policy, part **(1)** above will not apply.

**h. Trust Liability**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of any real or personal property in any trust, guardianship or estate for which you are acting in a fiduciary or representative capacity, except:

**(1)** If there is a policy specifically covering Trust Liability listed in the Schedule of Underlying Insurance of this policy, this exclusion does not apply to the extent coverage is provided in such "Underlying Insurance". As respects any coverage provided under this exception: the definitions of "your product" and "your work" in the Trust Liability "Underlying Insurance" policy will also apply to this policy, and any other terms of this policy that apply to property you own will also apply to property in any trust, guardianship or estate for which you are acting in a fiduciary or representative capacity.

**(2)** If there is another specific exclusion for Trust Liability attached to this policy, part **(1)** above will not apply.

**i. Mortageholder's Liability**

Damages due to error or accidental omission in the operation of your customary procedure in processing and maintaining "valid insurance" against the Covered Causes of Loss for the benefit of the mortgagor in amounts, and under conditions, customarily accepted by the mortgagor.

**B. Amended Definition**

In **Section V. Definitions,** the definition of "Property damage" is deleted and replaced by:

"Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Tangible property does not include money, currency, coin, bank notes, Federal Reserve notes, money orders, travelers checks, instruments or contracts that represent money or an interest in property, including but not limited to certificated and uncertificated securities, negotiable instruments, certificates of deposit, drafts, checks, acceptances, evidence of debt, security agreements, withdrawal orders, certificates of origin or title, letters of credit, warrants, scrip, contracts, bills of lading, insurance policies, abstracts of title, deeds and mortgages on real estate, revenue and other stamps, tokens, unsold State lottery tickets, books of account and other records, gems, jewelry, precious metals in bars or ingots, and all other property of a similar nature.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

The following definition is added to **Section V – Definitions:**

**"Valid insurance"** means a valid policy, or other evidence, of insurance


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – INTELLECTUAL PROPERTY – CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

1. Exclusion **(9)**. of Paragraph **2. Exclusions** of Section **I – Coverage B - Personal And Advertising Injury Liability,** is deleted and replaced by the following:

   **(9) Intellectual Property**

   **a.** The actual or alleged infringement or violation of any of the following:

   **(i)** trade dress;

   **(ii)** trade name;

   **(iii)** trade secrets;

   **(iv)** trademark;

   **(v)** patent;

   **(vi)** copyright; or

   **(vii)** any other intellectual property rights or laws.

   This exclusion applies regardless of whether this insurance would otherwise apply to all or part of any such actual or alleged "personal and advertising injury" in the absence of any actual or alleged infringement or violation.

   However, this exclusion does not apply to infringement or violation of another's copyright, trade dress, or slogan in your "advertisement";

   **b.** Any act committed by the insured with malice.

2. **Personal and Advertising Injury Redefined**

   Paragraph **17.** of **Section V – Definitions** is deleted and replaced by the following:

   **17.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   **a.** False arrest, detention or imprisonment;

   **b.** Malicious prosecution;

   **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   **d.** Oral or written publication, in any manner, of material that

   **(1)** slanders or libels a person or organization. This does not include any slander or libel related to the actual or alleged infringement or violation of any intellectual property rights or laws; or

   **(2)** disparages a person's or organization's goods, products or services. This does not include any disparagement related to the actual or alleged infringement or violation of any intellectual property rights or laws;

   **e.** Oral or written publication of material that violates a person's right of privacy;

   **f.** The use of another's advertising idea in your "advertisement"; or

   **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# UNDERLYING EMPLOYEE BENEFITS LIABILITY CLAIMS-MADE COVERAGE

This endorsement modifies the insurance provided by the following:

COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

If any "underlying insurance" is written on a "claims"-made basis, the following applies to the insurance provided by this policy which is excess over that underlying insurance:

**A.** Paragraphs **1.b. (2), 1.b.(3), 1.c., 1.d.,** and **1.e.** of **SECTION I – COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** are replaced by the following:

**1. Insuring Agreement**

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(2)** The "bodily injury" or "property damage" did not occur before the Retroactive Date, if any, shown in the Declarations of the "underlying insurance" or after the end of the policy period; and

**(3)** A "claim" for damages because of the "bodily Injury" or "property damage" is first made against any insured, in accordance with Paragraph **c.** below, during the policy period or any Extended Reporting Period we provide under Extended Reporting Periods.

**c.** A "claim" by a person or organization seeking damages will be deemed to have been made at the earlier of the following times:

**(1)** When notice of such "claim" is received and recorded by any insured or by the underlying insurer or us if the limits of the "underlying insurance" have been used up, whichever comes first; or

**(2)** When we make settlement in accordance with Paragraph **1.a.** or settlement is made by the underlying insurer with our agreement.

**d.** All "claims" for damages because of "bodily injury" to the same person, including damages claimed by any person or organization for care, loss of services, or death resulting at any time from the "bodily injury", will be deemed to have been made at the time the first of those "claims" is made against any insured.

**e.** All "claims" for damages because of "property damage" causing loss to the same person or organization will be deemed to have been made at the time the first of those "claims" is made against any insured.

**B.** Paragraph **1.b.** of **SECTION I – COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY** is replaced by the following:

**1. Insuring Agreement**

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business, but only if:

**(1)** The offense was committed in the "coverage territory";

**(2)** The offense was not committed before the Retroactive Date, if any, shown in the Declarations of the "underlying insurance" or after the end of the policy period; and

**(3)** A "claim" for damages because of the "personal and advertising injury" is first made against any insured, in accordance with Paragraph **c.** below, during the policy period or any Extended Reporting Period we provide under Extended Reporting Periods.

**c.** A "claim" made by a person or organization seeking damages will be deemed to have been made at the earlier of the following times:

**(1)** When notice of such "claim" is received and recorded by any insured or by the underlying insurer or us if the limits of the "underlying insurance" have been used up, whichever comes first; or

**(2)** When we make settlement in accordance with Paragraph **1.a.** or settlement is made by the underlying insurer with our agreement.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC
E-INSURED

All "claims" for damages because of "personal and advertising injury" to the same person or organization as a result of an offense will be deemed to have been made at the time the first of those "claims" is made against any insured.

**C.** The following Section is added:

**EXTENDED REPORTING PERIODS**

**1.** We will provide one or more extended reporting periods, as described below, if:

**a.** This Coverage Part is cancelled or not renewed; or

**b.** We renew or replace this Coverage Part with insurance that:

**(1)** Has a retroactive date later than the date shown in the Declarations of this Coverage Part; or

**(2)** Does not apply to "employee benefits injury" on a "claims"-made basis.

**2.** A basic extended reporting period is automatically provided without additional charge. This period starts with the end of the policy period and lasts for:

**a.** One year for "claims" arising out of an "employee benefits injury" reported to us, not later than 60 days after the end of the policy period, in accordance with paragraph **2.a.** of Section **V** - Employee Benefits Liability Conditions; or

**b.** Sixty days for all other "claims".

The basic extended reporting period does not apply to "claims" that are covered under any subsequent insurance you purchase, or that would be covered but for exhaustion of the amount of insurance applicable to such "claims".

**3.** A supplemental extended reporting period of three years duration is available, but only by an endorsement and for an extra charge. This supplemental period starts:

**a.** One year after the end of the policy period for "claims" arising out of an "occurrence" reported to us, not later than 60 days after the end of the policy period, in accordance with paragraph **2.a.** of Section **V** - Employee Benefits Liability Conditions; or

**b.** Sixty days after the end of the policy period for all other "claims".

You must give us a written request for the endorsement within 60 days after the end of the policy period. The supplemental extended reporting period will not go into effect unless you pay the additional premium promptly when due.

We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

**a.** The exposures insured;

**b.** Previous types and amount of insurance;

**c.** Limits of insurance available under this Coverage Part for future payment of "damages"; and

**d.** Other related factors.

The additional premium will not exceed 200% of the annual premium for this Coverage Part.

This endorsement shall set forth the terms, consistent with this section, applicable to the supplemental extended reporting period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the supplemental extended reporting period starts.

**4.** Extended reporting periods do not extend the policy period or change the scope of coverage provided. They apply only to "claims" for "employee benefits injury" that occur before the end of the policy period (but not before the retroactive date, if any, shown in the Declarations.)

"Claims" for such injury which are first received and recorded during the basic extended reporting period (or during the supplemental extended reporting period, if it is in effect) will be deemed to have been made on the last day of the policy period.

Once in effect, extended reporting periods may not be cancelled.

**5.** Extended reporting periods do not reinstate or increase the Limits of Insurance applicable to any "claim" to which this Coverage Part applies, except to the extent described in paragraph **6.** of this section.

**6.** If the supplemental extended reporting period is in effect, we will provide the separate Aggregate Limit of Insurance described below, but only for "claims" first received and recorded during the supplemental extended reporting period.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

The separate Aggregate Limit of Insurance will be equal to the dollar amount shown for the Employee Benefits Liability Aggregate Limit shown in the Declarations.

**D.** The following definitions are added to **SECTION V – DEFINITIONS** for the purposes of this endorsement only:

**1.** "Claim" means a written demand received by any insured for "damages" alleging "employee benefits injury", including the institution of a "suit" for such "damages" against any insured.

**2.** "Damages" means money damages including prejudgment interest awarded against the insured on that part of the judgment we pay. "Damages" do not include:

**a.** Fines;

**b.** Penalties; or

**c.** Damages for which insurance is prohibited by the law applicable to the construction of this Coverage Part.

**2.** "Employee Benefits Injury" means injury that arises out of any negligent act, error or omission in the "administration" of your "employee benefits program".

**3.** "Administration" means:

**a.** Giving counsel to your employees or their dependents and beneficiaries, with respect to interpreting the scope of your "employee benefits program" or their eligibility to participate in such program:

**b.** Handling records in connection with your "employee benefits program"; and

**c.** Starting or stopping any employee's participation in your "employee benefits program".

**2.** "Employee Benefits Program" means a formal program or programs of employee benefits maintained in connection with your business or operation to which participation is limited to employees or those entitled to "claim" benefits under such plans only through an employee's participation. Such programs may include, but are not limited to:

**a.** Group life insurance, group accident or health insurance, profit sharing plans, defined benefit or defined contribution pension plans and stock subscription plans; and

**b.** Unemployment insurance, social security benefits, workers' compensation and disability benefits.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – FUNGI OR BACTERIA

This endorsement modifies the insurance provided by the following:

COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**2. Exclusions**

This insurance does not apply to:

**Fungi or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **SECTION I – COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

**2. Exclusions**

This insurance does not apply to:

**Fungi or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **SECTION V – DEFINITIONS:**

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC
E-INSURED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES; CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY COVERAGE PART

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of an "other act of terrorism" that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, this exclusion applies only when one or more of the following are attributed to such act:

**1.** The total of insured damage to all types of property exceeds $25,000,000 (valued in U.S. dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**2.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

**a.** Physical injury that involves a substantial risk of death; or

**b.** Protracted and obvious physical disfigurement; or

**c.** Protracted loss of or impairment of the function of a bodily member or organ; or

**3.** The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

**4.** The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**5.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part or underlying insurance to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part or underlying insurance.

**2.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2008, OneBeacon Insurance Group LLC

**b.** The act resulted in damage:

**(1)** Within the United States (including its territories and possessions and Puerto Rico); or

**(2)** Outside of the United States in the case of:

**(a)** An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

**(b)** The premises of any United States mission; and

**c.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** "Other act of terrorism" means a violent act or act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

**C.** In the event of an "other act of terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.

**D.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2008, OneBeacon Insurance Group LLC

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDED TERRORISM COVERAGE – COVERED AUTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY COVERAGE PART

**SCHEDULE**

| | |
|---|---|
| **VCU 302** – | Exclusion Of Certified Acts Of Terrorism |
| **VCU 303** – | Exclusion Of Other Acts of Terrorism Committed Outside The United States; Cap On Losses From Certified Acts of Terrorism |
| **VCU 306** – | Exclusion Of Certified Acts Of Terrorism And Exclusion Of Other Acts Of Terrorism Committed Outside The United States |
| **VCU 307** – | Exclusion Of Punitive Damage Related To A Certified Act Of Terrorism |
| **VCU 402** – | Arkansas – Exclusion Of Punitive Damage Related To A Certified Act Of Terrorism |
| **VCU 673 AK** – | Alaska – Exclusion Of Certified Acts Of Terrorism |
| **VCU 674 AK** – | Alaska – Exclusion Of Other Acts Of Terrorism Committed Outside The United States; Cap On Losses From Certified Acts of Terrorism |
| **VCU 677 AK** – | Alaska – Exclusion Of Certified Acts Of Terrorism And Exclusion Of Other Acts Of Terrorism Committed Outside The United States |
| **VCU 678 AK** – | Alaska – Exclusion Of Punitive Damages Related To A Certified Act Of Terrorism |

**A.** If any of the endorsements shown in the schedule are attached to the policy, those endorsements do not apply to "bodily injury" or "property damage" arising out of the ownership, maintenance or use of any "auto" which is a "covered "auto".

**B.** With respect to "bodily injury" or "property damage" arising out of the ownership, maintenance or use of any "auto" which is a "covered auto", coverage provided under this Coverage Part for acts of terrorism (however defined) will follow the provisions, exclusions and limitations of the "underlying insurance" unless otherwise directed by this insurance.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2008, OneBeacon Insurance Group LLC
E-INSURED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ABSOLUTE EXCLUSION – ASBESTOS LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

This insurance does not apply to:

**1.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of or alleged to have risen out of:

**a.** exposure to asbestos, asbestos fiber, or any material containing asbestos or asbestos products; or

**b.** the removal of asbestos, asbestos fiber, or any material containing asbestos or asbestos products, including, without limitation,

**(1)** the costs of asbestos removal; or

**(2)** "property damage" in the course of effecting such removal.

We shall not be obligated to investigate, or defend the insured against any claim for any liability described above which is asserted against any insured or to pay any judgment entered against any insured for such liability.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2007, OneBeacon Insurance Group LLC
E-INSURED

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WASHINGTON CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

**A.** Exclusion **f.** of Coverage A – Bodily Injury And Property Damage Liability (Section I – Coverages) applies only to "bodily injury" to any "employee" of the insured whose employment is not subject to the Industrial Insurance Act of Washington (Washington Revised Code Title 51).

With respect to "bodily injury" to "employees" of the insured whose employment is subject to the Industrial Insurance Act of Washington, exclusion **f.** is replaced with the following:

This insurance does not apply to:

**1.** "Bodily injury" to an "employee" of the insured arising out of and in the course of:

**a.** Employment by the insured; or

**b.** Performing duties related to the conduct of the insured's business; or

**2.** Any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**B.** Exclusion **q.** of Coverage A – Bodily Injury And Property Damage Liability (Section I – Coverage) applies only to "bodily injury" to any "employee" of the insured whose employment is not subject to the Industrial Insurance Act of Washington (Washington Revised Code Title 51).

With respect to "employees" of the insured whose employment is subject to the Industrial Insurance Act of Washington, Exclusion **q.** is replaced with the following:

This insurance does not apply to:

"Bodily injury" to:

**1.** A person arising out of any:

**a.** Termination of that person's employment; or

**b.** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person.

This exclusion applies:

**1.** Whether the insured may be liable as an employer or in any other capacity; and

**2.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**C.** Exclusion **14.** of Coverage B – Personal and Advertising Injury Liability (Section I – Coverages) applies only to "personal and advertising injury" to any "employee" of the insured whose employment is not subject to the Industrial Insurance Act of Washington (Washington Revised Code Title 51).

With respect to "personal and advertising injury" to "employees" of the insured whose employment is subject to the Industrial Insurance Act of Washington, Exclusion **14.** is replaced with the following:

This insurance does not apply to:

"Personal and advertising injury" to:

**1.** A person arising out of any:

**a.** Termination of that person's employment; or

**b.** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person.

This exclusion applies:

**1.** Whether the insured may be liable as an employer or in any other capacity; and

**2.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2009, OneBeacon Insurance Group LLC
E-INSURED

**D.** Paragraph **1.b.(1)(a)(i), (ii),** and **(iii)** of Section II – Who Is An Insured apply only to "employees" of the insured whose employment is not subject to the Industrial Insurance Act of Washington (Washington Revised Code Title 51).

With respect to "employees" of the insured whose employment is subject to the Industrial Insurance Act of Washington, paragraph **1.b. (1)(a)** of Section II – Who Is An Insured is replaced with the following:

**b.** Each of the following is also an insured:

**(1)** Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

**(a)** "Bodily injury" or "personal and advertising injury":

**i.** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

**ii.** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraph **(1)(a)** above; or

**iii.** Arising out of his or her providing or failing to provide professional health care services.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# WASHINGTON – FUNGI OR BACTERIA EXCLUSION

This endorsement modifies the insurance provided by the following:

COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

A. The following exclusion is added to Paragraph **2., Exclusions** of **SECTION I – COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**2. Exclusions**

This insurance does not apply to:

**Fungi or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for consumption.

B. The following exclusion is added to Paragraph **2., Exclusions** of **SECTION I – COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY:**

**2. Exclusions**

This insurance does not apply to:

**Fungi or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

C. The following definition is added to the **DEFINITIONS** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi.


Includes copyrighted material of Insurance Services Office, Inc.
Copyright 2004, OneBeacon Insurance Group LLC

| IRONSHORE® your safe harbour | **Ironshore Insurance Services LLC.**<br>A subsidiary of Ironshore Holdings (U.S.) Inc.<br>300 South Wacker<br>7th Floor<br>Chicago, IL 60606 |
|---|---|

February 26, 2015

Nicole Francis
Marsh USA, Inc. (IL)
540 West Madison Street
SUITE NO 1200
Chicago, IL 60661

| | |
|---|---|
| **Re:** | Premera<br>7001 220th Street SW<br>Mountlake Terrace, WA 98043 |
| **Line Of Business:** | Managed Care Errors & Omissions Liability |
| **Policy Number:** | 000728305 |
| **Policy Term:** | 10/1/2014 TO 10/1/2015 |

Dear Nicole:

Enclosed please find the policy for the above referenced account. We appreciate your consideration of Ironshore. Feel free to contact me with any questions or concerns.

Sincerely,

Jeffrey Kolodkin

Jeffrey Kolodkin
Production Specialist
Ironshore Insurance Services LLC.
Office: +1 (312) 496-7515
Cell: +1 (312) 965-4376
Fax: 312-237-3499
Email: jeffrey.kolodkin@ironshore.com



**EXHIBIT F**

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

This contract is registered and delivered as a surplus line coverage under the insurance code of the state of Washington, Title 48 RCW. It is not protected by any Washington state guaranty association law.

# MANAGED CARE ERRORS AND OMISSIONS LIABILITY DECLARATIONS

**Policy Number:** 000728305

**NOTICE: THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST, AND REPORTED BY, THE INSURED DURING THE POLICY PERIOD OR ANY EXTENDED REPORTING PERIOD.**

***PLEASE READ THIS POLICY CAREFULLY.***

| **ITEM 1. NAMED INSURED** (Name and Principal Address): | **ITEM 2. POLICY PERIOD** |
|---|---|
| Premera<br>7001 220th Street SW<br>Mountlake Terrace, WA 98043 | (a) **Inception Date:** October 01, 2014<br>(b) **Expiration Date:** October 01, 2015<br><br>At 12:01 a.m. both dates at the Principal Address stated in ITEM 1. |

**ITEM 3. LIMITS OF LIABILITY:**

(a) Insuring Agreement A (inclusive of **Defense Expenses**):

(i) $10,000,000 maximum aggregate Limit of Liability for all **Claims** or **Related Claims** for which this Policy provides coverage.

(ii) $10,000,000 each **Claim** or **Related Claim**

(b) Insuring Agreement B:

$250,000 maximum aggregate Limit of Liability for all **Private Information Protection Event Expenses**.

**ITEM 4. RETENTION** (subject to Condition IV(A) and applicable to **Defense Expenses**):

$1,000,000 Each **Claim**

$Nil Each **Private Information Protection Event**

**ITEM 5. PREMIUM for the Policy Period:**

*Compliance with all surplus lines placement requirements, including stamping the Policy and collection and payment of surplus lines taxes, is the responsibility of the broker.*

| | |
|---|---|
| Premium: | $504,550.00 |
| --------------------- | ---------------- |
| Total Amount Due: | $504,550.00 |

*See Invoice for the date Premium is due and payable. Failure to pay the premium in full may result in voidance of coverage.*

☒ This amount is net of commission – no percentage of the premium will be paid to the broker.
☐ This amount includes commission – a percentage of the premium will be paid to the broker.

**ITEM 6. EXTENDED REPORTING PERIOD OPTIONS:**

**Option 1**:

Length of Extended Reporting Period: 1 year
Percentage of Full Annual Premium: 100%

**Option 2**:

Length of Extended Reporting Period: N/A
Percentage of Full Annual Premium: N/A

"Full Annual Premium" means the amount set forth in ITEM 5 above plus any/all additional premium(s) paid during the Policy Period.

**ITEM 7. RETROACTIVE DATE**: 10/10/1933

**ITEM 8. ALL NOTICES REQUIRED TO BE GIVEN TO THE UNDERWRITER UNDER CONDITION (B), MUST BE ADDRESSED TO**:

Vice President of Claims
IronHealth
175 Powder Forest Drive, 1st Floor
Weatogue, CT 06089

**ALL OTHER NOTICES REQUIRED TO BE GIVEN TO THE UNDERWRITER UNDER THIS POLICY MUST BE ADDRESSED TO:**

Underwriting Department
IronHealth
175 Powder Forest Drive, 1st Floor
Weatogue, CT 06089

**ITEM 9. POLICY FORM**

MC.013 (0408 Ed.) Managed Care E&O Policy

**ENDORSEMENTS ATTACHED AT ISSUANCE**

1. MC.P.005 (4.08 ed.) Schedule A Endorsement
2. MC.P.008 (4.08 ed.) EDP Endorsement
3. MC.P.014 (4.08 ed.) Amend Definition of Insured Endorsement
4. MC.P.017 (4.08 ed.) Amend Definition of Managed Care Service
5. MC.P.028 (4.08 ed.) Class Action Retention Endorsement

6. MC.P.055 (11.08 ed.) Amend Definition of Managed Care Service
7. MC.P.081 (6 10 ed) Clarification Endorsement
8. MC.END.088 (2.11 ed.) Washington Service of Suit
9. MC.END.091 (5.11 ed.) MCO Charitable Services Coverage.
10. MC.END.097 (12.11 ed.) Subpoena Defense Expense Recognition Endorsement.
11. MC.END.125 (2.14 ed.) Bordereau Claim Reporting
12. MC.END.143 (2.15 ed.) Tie-In Limits – Erosion Deemed for Purposes of Excess Coverage Attachment
13. MC.END.131 (8.14 ed.) Pro-Rata Cancellation by Named Insured
14. MC.END.141 (2.15 ed.) Premera Blue Cross Amendatory E&O

These Declarations, the completed signed **Application**, and the Policy (together with any and all endorsements thereto) shall constitute the entire agreement between the Underwriter and the **Insured(s)**.

Ironshore Specialty Insurance Company

**BY:** [signature] **DATE:** February 26, 2015

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Insured Name:** Premera
**Policy Number:** 000728305

# MANAGED CARE ERRORS AND OMISSIONS LIABILITY POLICY

**THIS IS A CLAIMS MADE AND REPORTED POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE ENTIRE POLICY CAREFULLY.**

**The insurer identified in the Declarations (the "Underwriter") and the Insureds, subject to all of the terms, conditions and limitations of this Policy and any endorsements thereto, agree as follows:**

## I. INSURING AGREEMENTS

(A) **Managed Care Errors and Omissions Insurance**

The Underwriter will pay on behalf of the **Insured** any **Loss** which the **Insured** is legally obligated to pay as a result of any **Claim** that is first made against the **Insured** during the **Policy Period** and reported to the Underwriter either during the **Policy Period** or in any event within ninety (90) days after the end of the **Policy Period,** in accordance with CONDITION (B) of this Policy.

(B) **Private Information Protection Event Expense Reimbursement Insurance**

Upon satisfactory proof of payment by the **Named Insured,** the Underwriter will reimburse the **Named Insured**, up to the amount set forth in ITEM 3(b) of the Declarations, for **Private Information Protection Event Expenses** actually paid by the **Named Insured** in connection with a **Private Information Protection Event** occurring after the Policy Inception Date but prior to the Policy Expiration Date, provided, that the Underwriter will have no liability whatsoever for fines, penalties, assessments of costs or other financial awards associated with any such **Private Information Protection Event** unless such fines, penalties, assessments of costs or other financial awards would have otherwise been covered under this Policy.

## II. DEFINITIONS

(A) **"Antitrust Activity"** means any actual or alleged: price fixing; restraint of trade; monopolization; or violation of the Federal Trade Commission Act, the Sherman Act, the Clayton Act, or any other federal statute involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, or of any rules or regulations promulgated under or in connection with any of the foregoing statutes, or of any similar provision of any federal, state or local statute, rule or regulation or common law.

(B) **"Application"** means the application attached to and forming part of this Policy, including any materials submitted and statements made in connection therewith, all of which are on file with the Underwriter and are a part of this Policy, as if
physically attached. If the **Application** uses terms or phrases that differ from terms defined in this Policy, no inconsistency between any terms or phrase used in the **Application** and any term defined in this Policy will waive or change any of the terms, conditions and limitations of this Policy.

(C) **"Claim"** means any written notice received by any **Insured** that a person or entity, including but not limited to any federal, state or local government in any capacity, intends to hold an **Insured** responsible for a **Wrongful Act** which was committed or allegedly committed on or after the Retroactive Date listed in ITEM 7 of the Declarations. In clarification and not in limitation of the foregoing, such notice may be in the form of an arbitration, mediation, judicial, declaratory or injunctive proceeding. A **Claim** will be deemed to be made when such written notice is first received by the President, Chief Executive Officer, Chief Financial Officer, member of the legal department, or member of the risk management department of the **Insured**.

(D) **"Class Action Claim"** means any **Claim** brought or filed originally as, or amended at any time seeking certification as, a class action whether or not such action is actually certified; or brought by or on behalf of any association or group, including but not limited to, societies, trade groups, professional groups, consumer advocates or advocacy groups, whether such **Claim** is brought in the name of such association or group or by such association or group on behalf of one or more constituent individual(s) or entity(ies).

(E) **"Defense Expenses"** means reasonable legal fees and expenses incurred in the investigation, adjustment, defense or appeal of a **Claim**; provided, that **Defense Expenses** shall not include remuneration, salaries, overhead, fees or benefit expenses of any **Insured**.

(F) **"Insured"** means any **Insured Entity** and any **Insured Person**.

(G) **"Insured Entity"** means the **Named Insured** and any other entity designated on SCHEDULE A.

(H) **"Insured Person"** means any past, present or future:

(1) employee, director, officer, trustee, member of the board of managers, governor or medical director of, or volunteer for, any **Insured Entity**;

(2) member of, or provider of administrative support to, any review board or committee of any **Insured Entity**; and

(3) any individual duly authorized by an **Insured Entity** to conduct any **Managed Care Service**;

but only while any such person is acting within the scope and capacity of his or her duties for the **Insured Entity**.

Subject to all of its terms, conditions, limitations and exclusions, this Policy will apply to **Loss**, including **Defense Expenses**, from a **Claim** made against a person who, at the time such **Claim** is made, is the lawful spouse or domestic partner of an **Insured Person**, but only if: (1) the **Claim** against such spouse or domestic partner results from a **Wrongful Act** actually or allegedly committed by the **Insured Person** to whom the spouse or domestic partner is related; and (2) such **Insured Person** and his or her spouse or domestic partner are represented by the same counsel in connection with such **Claim**.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** in his or her capacity as such will be deemed to be a **Claim** against such **Insured Person.**

(I) **"Loss"** means any **Private Information Protection Event Expenses, Defense Expenses** and any monetary amount which an **Insured** is legally obligated to pay as a result of a **Claim**.

**Loss** shall include:

(1) a claimant's attorney's fees and court costs, but only in an amount equal to the percentage that the amount of monetary damages covered under this Policy for any settlement or judgment bears to the total amount of such settlement or judgment;

(2) pre- and post-judgment interest awarded or imposed in any judgment, and premiums on appeal bonds required to be furnished with respect to any such judgment; and

(3) punitive, exemplary or multiplied damages where insurable by law; provided, that the law of the jurisdiction most favorable to the insurability of punitive damages shall control the insurability of such punitive damages, so long as such jurisdiction:

(a) is where such punitive damages were awarded or imposed;

(b) is where the act, error or omission giving rise to the liability took place;

(c) is where the **Insured Entity** is incorporated or otherwise organized, or has a place of business;

(d) is where the Underwriter is incorporated or has its principal place of business; or

(e) is where the parent company of the Underwriter is incorporated.

**Loss** shall not include:

(i) fines, penalties or taxes; provided that (A) punitive damages shall not be deemed to constitute fines, penalties or taxes for any purpose herein, and (B) **Loss** shall include fines and penalties imposed under the Health Insurance Portability and Accountability Act or any similar local, state or federal privacy statute or regulation or in **Claims** for **Antitrust Activity**, but only if such fines and penalties are insurable under applicable law most favorable to the insurability of such fines and penalties.

(ii) fees, amounts, benefits, coverage or obligations owed under any contract with any party (including providers of **Medical Services**), health care plan or trust, insurance or workers' compensation policy or plan or program of self-insurance;

(iii) non-monetary or equitable relief or redress in any form, including without limitation the cost of complying with any injunctive, declaratory or administrative relief, or restitution or disgorgement of funds; or

(iv) matters which are uninsurable under applicable law; provided, that with respect to punitive damages, "applicable law" shall be determined according to the standards set forth in clause (I)(3) above.

(J) "**Managed Care Service**" means any services or activities performed in the administration or management of health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, automobile medical payment, or workers' compensation plans, whether provided on paper, in person, electronically, or in any other form and whether performed on behalf of the **Insured** or by the **Insured** for itself or on behalf of any other party for a fee.

(K) **"Medical Services"** means: health care, medical care, or treatment provided to any individual, including medical, surgical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing or other professional health care; the

use, prescription, furnishing or dispensing of medications, drugs, blood, blood products or medical, surgical, dental or psychiatric supplies, equipment or appliances in connection with such care; the furnishing of food or beverages in connection with such care; and the handling of, or the performance of post-mortem examination on human bodies.

(L) **"Named Insured"** means the entity designated in ITEM 1 of the Declarations.

(M) **"Private Information Protection"** means maintaining the confidentiality of information regarding **Medical Services** or information obtained in the provision of **Managed Care Services** and limiting the release or use of such information in conformance with requirements of law.

(N) **"Private Information Protection Event"** means failure to maintain the confidentiality of information regarding **Medical Services** or information obtained in the provision of **Managed Care Services** or unauthorized release or use of such information.

(O) **"Private Information Protection Event Expenses"** means reasonable fees and costs of attorneys, experts and consultants, including third-party media consultants, incurred in the management or investigation of an actual or alleged **Private Information Protection Event. Private Information Protection Event Expenses** include costs incurred in (1) the management of public relations with respect to such **Private Information Protection Event**, (2) notification of affected parties, and (3) credit monitoring if applicable, but does not include any remuneration, salaries or benefit expenses of the **Named Insured** or costs incurred in connection with a **Claim** for **Private Information Protection** under INSURING AGREEMENT (A).

(P) **"Policy Period"** means the period from the Inception Date of this Policy stated in ITEM 2(a) of the Declarations to the Expiration Date of this Policy stated in ITEM 2(b) of the Declarations, or to any earlier cancellation date of this Policy.

(Q) **"Related Claims"** means all **Claims** for **Wrongful Acts** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events, whether related logically, causally or in any other way; provided, however, in no event will (1) a **Class Action Claim** be considered a **Related Claim** to any other **Claim** that is not a **Class Action Claim** and that was made against the **Insured** prior to the Inception Date of this Policy, or (2) any **Claim** be considered to be a **Related Claim** to any other **Claim** that was made against the **Insured** prior to 36 months before the Inception Date of this Policy.

(R) **"Sexual Activity"** means any conduct, physical acts, gestures or spoken or written words of a sexual nature, including without limitation sexual intimacy (even if consensual), sexual molestation, sexual assault, sexual battery, sexual abuse, sexual harassment, sexual exploitation or any sexual act.

(S) **"Subsidiary"** means any entity during any time in which the **Named Insured** owns or controls, directly or through one or more **Subsidiaries**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors or members of the board of managers.

(T) **"Vicarious Liability"** means liability attributed to any **Insured** for the acts of a person or entity other than an **Insured** via a theory of ostensible agency, apparent agency or *respondeat superior*.

(U) **"Wrongful Act"** means:

(1) any actual or alleged act, error or omission in the performance of, or any failure to perform, a **Managed Care Service** by any **Insured Entity** or by any **Insured Person** acting within the scope of his or her duties or capacity as such;

(2) any actual or alleged act, error or omission in the performance of, or any failure to perform, **Private Information Protection** by any **Insured Entity** or by any **Insured Person** acting within the scope of his or

her duties or capacity as such;

(3) any actual or alleged act, error or omission in the voluntary performance of emergency **Medical Services** by an **Insured** without receipt or expectation of remuneration**,** or the provision of flu shots and non-invasive **Medical Services** provided by any **Insured** at health fairs or for health screening purposes; and

(4) any **Vicarious Liability** for:

(a) the performance of, or any failure to perform:

(i) a **Managed Care Service**;

(ii) **Private Information Protection**;

(b) the rendering of, or failure to render, **Medical Services**; provided, that **Wrongful Act** shall not include any **Insured's** actual direct liability for the rendering of, or failure to render, **Medical Services** other than those provided for in section (3) above; or

(c) any actual or alleged **Sexual Activity**; provided, that **Wrongful Act** shall not include any **Insured's** actual or alleged direct liability for any **Sexual Activity.**

## III. EXCLUSIONS

(A) Except for **Defense Expenses**, the Underwriter shall not pay **Loss** from any **Claim** brought about or contributed to by:

(1) any willful misconduct or willfully dishonest, fraudulent, criminal or malicious act, error or omission by any **Insured**;

(2) any willful violation by any **Insured** of any law, statute, ordinance, rule or regulation; or

(3) any **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled.

For the purposes of determining the applicability of this EXCLUSION (A), no **Wrongful Act** of any **Insured** shall be imputed to any other **Insured**. Determination of the applicability of this EXCLUSION (A) may be made by an admission or by a final adjudication in a proceeding constituting the **Claim**, or in a proceeding separate from or collateral to any proceeding constituting the **Claim**.

(B) The Underwriter shall not pay **Loss**, including **Defense Expenses**, from any **Claim** for any actual or alleged act, error or omission by an **Insured** in the rendering of, or failure to render, **Medical Services**; provided, that this EXCLUSION (B) shall not apply to (1) any portion of a **Claim** alleging, under statute, rule, regulation or common law tort, that the performance of any **Managed Care Service** by an **Insured** constitutes the rendering of **Medical Services**, (2) any actual or alleged act, error or omission in the voluntary performance of emergency **Medical Services** by an **Insured** without receipt or expectation of remuneration, or (3) the provision of flu shots and non-invasive **Medical Services** provided by any **Insured** at health fairs or for health screening purposes.

(C) The Underwriter shall not pay **Loss**, including **Defense Expenses**, from any **Claim:**

(1) made by, on behalf of, or in the name or right of, or for the benefit of, any prospective, current or former owner of any legal or equitable interest in an **Insured Entity** in any form, including, but not limited to, stocks, shares, bonds, debentures, options, derivatives, partnership interests, limited liability company interests, any other form of debt or equity instruments or any other form of ownership interests, in connection with such owner's interest therein; provided, that this EXCLUSION (C)(1) shall not apply to any

**Claim** arising out of any **Managed Care Service** which is provided to any such prospective, current or former owner;

(2) made by, on behalf of, or in the name or right of, or for the benefit of, any **Insured**; provided, that this EXCLUSION (C)(2) shall not apply to any **Claim** for **Managed Care Services** or **Private Information Protection** brought and maintained independently by an **Insured** in such **Insured's** capacity as a participant in a health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, automobile medical payment, or workers' compensation plan administered or managed by the **Insured Entity**;

(3) based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event, **Wrongful Act** or series of facts, circumstances, situations, transactions, events or **Wrongful Acts**:

(a) underlying or alleged in any litigation or administrative or regulatory proceeding brought prior to and/or pending as of the Inception Date stated in ITEM 2(a) of the Declarations:

(i) to which any **Insured** is or was a party; or

(ii) with respect to which any **Insured**, as of the Inception Date, knew or should reasonably have known (based on a "reasonable person" standard) that an **Insured** might be made a party hereto; or

(b) which was the subject of any notice given prior to the Inception Date under any other policy of insurance or plan or program of self-insurance.

If, however, this Policy is a renewal of one or more policies previously issued by the Underwriter to the **Insured Entity**, and the coverage provided by the Underwriter to the **Insured Entity** was in effect, without interruption, for the entire time between the Inception Date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (C)(3) to the Inception Date will be deemed to refer instead to the Inception Date of the first policy under which the Underwriter began to provide the **Insured Entity** with the continuous and uninterrupted coverage of which this Policy is a renewal;

(4) against the **Insured** or:

(a) any **Subsidiary**,

(b) any other entity acquired by the **Insured Entity**, whether by merger, consolidation, asset acquisition or otherwise; or

(c) any **Insured Person** of any entity in (a) or (b) above;

for any **Wrongful Act** committed or allegedly committed by any entity or person described in clause (a), (b), or (c) above during any time in which such entity is not a **Subsidiary**, or at any time before any such acquisition by the **Insured Entity**.

## IV. CONDITIONS

(A) **Limit of Liability, Retention:**

(1) The amount stated in:

(a) (i) ITEM 3(a)(i) of the Declarations shall be the maximum aggregate Limit of Liability of the Underwriter for all **Loss**, including **Defense Expenses,** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage;

(ii) ITEM 3(a)(ii) of the Declarations shall be the maximum Limit of Liability of the Underwriter for all **Loss**, including **Defense Expenses,** resulting from each **Claim** or **Related Claim,** for which this Policy provides coverage; and

(b) ITEM 3(b) of the Declarations shall be the maximum aggregate Limit of Liability of the Underwriter for all **Private Information Protection Event Expenses** for which this Policy provides coverage; provided, that the Limit of Liability set forth in ITEM 3(b) shall be in addition to, and not part of, the amount set forth in ITEM 3(a)(i) of the Declarations.

(2) Each Limit of Liability described in paragraph (1) above shall apply regardless of the time of payment by the Underwriter, the number of persons or entities included within the definition of **Insured,** or the number of claimants, and regardless of whether such **Claim** or **Related Claims** is/are first made during the **Policy Period** or during any Extended Reporting Period.

(3) **Defense Expenses** are part of and not in addition to the Underwriter's Limits of Liability, and payment of **Defense Expenses** by the Underwriter will reduce its Limits of Liability.

(4) The obligation of the Underwriter to pay **Loss**, including **Defense Expenses**, will only be in excess of the applicable retention set forth in ITEM 4 of the Declarations. The Underwriter will have no obligation whatsoever, either to the **Insureds** or to any other person or entity, to pay all or any portion of any retention amount on behalf of any **Insured**, although the Underwriter will, at its sole discretion, have the right and option to do so, in which event the **Insureds** agree to repay the Underwriter any amounts so paid.

(B) **Reporting of Claims and Circumstances:**

(1) If, during the **Policy Period** or any applicable Extended Reporting Period, any **Claim**, is first made against any **Insured** (and has been received by the President, Chief Executive Officer, Chief Financial Officer, member of the legal department or, member of the risk management department of the **Insured**), the **Insured** must, as a condition precedent to any right to coverage under this Policy, give the Underwriter written notice of such **Claim** as soon as practicable thereafter and in no event later than:

(a) with respect to a **Claim** made during the **Policy Period**, ninety (90) days after the end of the **Policy Period**; or

(b) with respect to a **Claim** made during an Extended Reporting Period, ninety (90) days after such **Claim** is first made.

(2) If, during the **Policy Period**, an **Insured** first becomes aware of any **Wrongful Act** which may subsequently give rise to a **Claim**, and

(a) gives the Underwriter written notice of such **Wrongful Act** with full particulars as soon as practicable thereafter but in any event before the end of the **Policy Period**; and

(b) requests coverage under this Policy for any **Claim** subsequently arising from such **Wrongful Act** as soon practicable after such **Claim** is made;

then any **Claim** subsequently made against the **Insured** arising out of such **Wrongful Act** shall, subject to CONDITION (C) below, be treated as if it had been first made during the **Policy Period**.

The full particulars required in any notice given under clause (2)(a) above must include, without limitation, a description of the **Wrongful Act**, the identities of the potential claimants and involved **Insureds**, the injury or damages which have resulted and/or may result from such **Wrongful Act**, the manner in which the **Insured** first became aware of such **Wrongful Act**, and the reasons why the **Insured** believes the **Wrongful Act** is likely to result in a **Claim** being made.

(C) **Related Claims Deemed Single Claim; Date Claim Made:**

All **Claims** that constitute **Related Claims** as set forth in Section II DEFINITIONS (Q), whenever made, shall be deemed to be a single **Claim** and shall be deemed to have been first made on the earliest of the following dates:

(1) the date on which the earliest **Claim** within such **Related Claims** was received by the President, Chief Executive Officer, Chief Financial Officer, member of the legal department or, member of the risk management department of the **Insured**; or

(2) the date on which written notice was first given to the Underwriter of a **Wrongful Act** which subsequently gave rise to any of the **Related Claims**, regardless of the number and identity of claimants, the number and identity of the **Insureds** involved, or the number and timing of the **Related Claims**, even if the **Related Claims** comprising such single **Claim** were made in more than one **Policy Period**.

(D) **Defense and Settlement:**

(1) The Underwriter will have no duty under this Policy to defend any **Claim** but, at its option, may associate in the defense or settlement of a **Claim**. The **Insureds** will defend and contest any **Claim** made against them. In conducting a defense, the **Insureds** will retain counsel approved by the Underwriter, such approval not to be unreasonably withheld. No **Defense Expenses** may be incurred, and no settlement or offer of settlement of any **Claim** may be made, without the Underwriter's prior written consent, such consent not to be unreasonably withheld. No coverage is available under this Policy for any **Defense Expenses** incurred, or any settlements or settlement offers made, without the Underwriter's prior written consent.

(2) The Underwriter will have no obligation to pay **Loss**, including **Defense Expenses**, or to defend or continue to defend any **Claim** after the Underwriter's maximum aggregate Limit of Liability, as set forth in ITEM 3(a)(i) of the Declarations, has been exhausted by the payment of **Loss**, including **Defense Expenses**. If the Underwriter's maximum aggregate Limit of Liability, as set forth in ITEM 3(a)(i) of the Declarations, is exhausted by the payment of **Loss**, including **Defense Expenses**, the premium will be fully earned.

(E) **Assistance and Cooperation:**

In the event of a **Claim**, the **Insureds** shall provide the Underwriter with all information, assistance and cooperation that the Underwriter reasonably requests. At the Underwriter's request, the **Insureds** shall assist in investigating, defending and settling **Claims** and in the conduct of actions, suits, appeals or other proceedings, including but not limited to attending trials, hearings and depositions, securing and giving evidence, and obtaining the attendance of witnesses.

(F) **Subrogation:**

In the event of any payment hereunder, the Underwriter shall be subrogated to the extent of any payment to all of the rights of recovery of the **Insureds**. The **Insureds** shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Underwriter to effectively bring suit in their name. The **Insureds** shall do nothing that may prejudice the Underwriter's position or potential or actual rights of recovery. The obligations of the **Insured** under this CONDITION (F) shall survive the cancellation or other termination of this Policy.

(G) **Other Insurance; Other Indemnification:**

(1) This Policy shall be excess of and shall not contribute with:

(a) any other existing insurance or self-insurance (whether collectible or not), unless such other insurance or self-insurance is specifically stated to be in excess of this Policy; and

(b) any indemnification to which an **Insured** is entitled from any entity other than another **Insured**.

This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance.

This CONDITION (G)(1) shall not apply with respect to **Claims** which could be considered for coverage under a prior Managed Care Errors and Omissions Liability policy but for Section II DEFINITIONS (Q) **Related Claims**.

(2) If any other policy or policies, including but not limited to a Directors and Officers Liability policy, issued by the Underwriter or any of its affiliated companies, or by any predecessors or successors of the Underwriter or its affiliated companies, shall apply to any **Claim**, then:

(a) the maximum aggregate Limit of Liability under all policies, including this Policy, for all **Loss**, including **Defense Expenses**, in respect of such **Claim** shall not exceed the largest single available Limit of Liability under any such policy, including this Policy. Notwithstanding the foregoing, nothing herein is intended, nor shall it be construed, to obligate or require any payment of **Loss**, including **Defense Expenses**, under this Policy in respect of such **Claim** in any amount exceeding the available Limit of Liability under this Policy; and

(b) the retention and terms applicable to such **Claim** shall be the applicable retention and terms under the policy having the largest available Limit of Liability.

This CONDITION (G)(2) shall not apply with respect to any other policy which is written only as specific excess insurance over the Limit of Liability of this Policy.

(H) **Mergers, Acquisitions, or Newly Created Entities:**

If during the **Policy Period**, the **Named Insured** or any **Insured Entity** acquires or creates another entity or **Subsidiary** or becomes a member of a joint venture or general partner in a general partnership which is not designated on SCHEDULE A, or if the **Named Insured** or any **Insured Entity** merges or consolidates with another entity which is not designated on SCHEDULE A such that the **Named Insured** or **Insured Entity** is the surviving entity (any such acquired, created, merged or consolidated entity an “Acquired Entity”), then for a period of ninety (90) days after the effective date of the transaction, such Acquired Entity shall be included within the term “**Insured Entity**” with respect to **Wrongful Acts** committed or allegedly committed by the Acquired Entity or its **Insured Persons** after the effective date of the transaction. Upon the expiration of the ninety (90) day period, there will be no coverage under this Policy for **Wrongful Acts** committed or allegedly committed by the Acquired Entity or its **Insured Persons** unless within the ninety (90) day period:

(1) the **Named Insured** gives the Underwriter such information regarding the transaction as the Underwriter requests; and

(2) the Underwriter has specifically agreed by written endorsement to this Policy to provide coverage with respect to such Acquired Entity and its **Insured Persons**, and the **Named Insured** accepts any terms,

conditions, exclusions or limitations, including payment of additional premium, as the Underwriter, in its sole discretion, imposes in connection with the transaction.

(I) **Sales or Dissolution of Insured Entities; Cessation of Business:**

(1) If, during the **Policy Period**:

(a) the **Named Insured** is dissolved, sold, acquired by, merged into or consolidated with another entity such that the **Named Insured** is not the surviving entity, or such that any person, entity or affiliated group of persons or entities obtains:

(i) the right to elect or appoint more than fifty percent (50%) of the **Named Insured's** directors, trustees or member managers, as applicable; or

(ii) more than fifty percent (50%) of the **Named Insured's** equity or assets;

(b) the **Named Insured** ceases to do business for any reason; or

(c) a receiver, liquidator, conservator, trustee, rehabilitator or similar administrator is appointed for the **Named Insured**;

then in any such event (any of which events is referred to in this CONDITION (I) as a "Material Event"), coverage under this Policy for all **Insureds** shall continue in full force and effect until the Expiration Date or any earlier cancellation date, but this Policy shall apply only to **Wrongful Acts** committed or allegedly committed before such Material Event. There will be no coverage under this Policy with respect to any **Claim** against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** committed or allegedly committed on or after the date of such Material Event.

(2) If, during the **Policy Period**, any **Insured Entity** other than the **Named Insured** is involved in a Material Event, coverage under this Policy for **Wrongful Acts** committed or allegedly committed before such Material Event by such **Insured Entity** or its **Insured Persons** shall continue in full force and effect until the Expiration Date or any earlier cancellation date. There will be no coverage under this Policy with respect to any **Claim** against such **Insured Entity** or its **Insured Persons** based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any **Wrongful Act** of such **Insured Entity** or its **Insured Persons** committed or allegedly committed on or after the date of such Material Event. Coverage under this Policy shall continue in full force and effect for all other **Insureds**.

(J) **Cancellation; Non-Renewal:**

(1) The Underwriter may not cancel this Policy except for the **Named Insured's** failure to pay a premium when due, in which case twenty (20) days written notice will be given to the **Named Insured** by the Underwriter.

(2) The **Named Insured** may cancel this Policy prospectively only by mailing the Underwriter written notice stating when thereafter such cancellation shall be effective. In such event, the earned premium shall be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

(3) The Underwriter will not be required to renew this Policy upon its expiration. The Underwriter will provide the **Named Insured** with sixty (60) days notice of any non-renewal.

(K) **Extended Reporting Periods:**

If this Policy is canceled for any reason other than non-payment of premium or is not renewed by the Underwriter or the **Named Insured**, an additional period of time during which **Claims** may be reported under this Policy (an "Extended Reporting Period") shall be made available as described in this CONDITION (K), but any such Extended Reporting Period shall apply only to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such cancellation or non-renewal ("Termination Date"). No Extended Reporting Period shall in any way increase the Underwriter's Limit of Liability as stated in ITEM 3(a)(i) of the Declarations, and the Underwriter's maximum aggregate Limit of Liability for all **Loss** from all **Claims** first made during the **Policy Period** or any Extended Reporting Period shall not exceed the Limit of Liability stated in ITEM 3(a)(i) of the Declarations. The offer of renewal terms, conditions, limits of liability, retentions or premium different from those in effect prior to renewal shall not constitute cancellation or refusal to renew for purposes of this CONDITION (K). The Extended Reporting Period will apply as follows:

(1) An automatic Extended Reporting Period of ninety (90) days, beginning as of the Termination Date, will apply automatically and requires no additional premium; provided, that such Extended Reporting Period will remain in effect only as long as no other policy of insurance is in effect that would apply to any **Claim** made during such Extended Reporting Period; or

(2) An optional Extended Reporting Period for one of the periods of time stated in ITEM 6 of the Declarations may be purchased by the **Named Insured** by notifying the Underwriter in writing of its intention to do so no later than thirty (30) days after the Termination Date. The additional premium for this optional Extended Reporting Period shall be equal to the applicable amount stated in ITEM 6 of the Declarations and must be paid no later than thirty (30) days after the Termination Date.

If no election to purchase an optional Extended Reporting Period is made as described in CONDITION (K)(2) above, or if the additional premium for any such Extended Reporting Period is not paid within thirty (30) days after the
Termination Date, there will be no right to purchase an optional Extended Reporting Period at any later time.

(L) **Representation; Incorporation of Application:**

The **Insureds** represent that the particulars and statements contained in the **Application** attached to this Policy are true, accurate and complete, and agree that:

(1) this Policy is issued and continued in force by the Underwriter in reliance upon the truth of such representation;

(2) those particulars and statements are the basis of this Policy; and

(3) the **Application** and those particulars and statements are incorporated in and form a part of this Policy.

No knowledge or information possessed by any **Insured** shall be imputed to any other **Insured** for the purposes of this CONDITION (L), except for material facts or information known to the person or persons who signed the **Application**. In the event of any material untruth, misrepresentation or omission in connection with any of the particulars or statements in the **Application**, this Policy shall be void with respect to any **Insured** who knew of such untruth, misrepresentation or omission, or to whom such knowledge is imputed.

(M) **Action Against Underwriter:**

(1) No action shall be taken against the Underwriter by any **Insured** unless, as conditions precedent thereto, the **Insureds** have fully complied with all of the terms of this Policy and the amount of the

**Insureds'** obligation to pay has been finally determined either by judgment against the **Insureds** after adjudicatory proceedings, or by written agreement of the **Insureds,** the claimant and the Underwriter.

(2) No individual or entity shall have any right under this Policy to join the Underwriter as a party to any **Claim** to determine the liability of any **Insured**; nor shall the Underwriter be impleaded by an **Insured** or his, her, or its legal representative in any such **Claim**.

(N) **Insolvency of Insured:**

The Underwriter shall not be relieved of any of its obligations under this Policy by the bankruptcy or insolvency of any of the **Insureds** or any of their estates.

(O) **Notice; Named Insured Authorization**

(1) Notice to any **Insured** shall be sent to the **Named Insured** at the address designated in ITEM 1 of the Declarations. The **Insureds** agree that the **Named Insured** shall act on their behalf with respect to receiving any notices and any return premiums from the Underwriter.

(2) Notice to the Underwriter shall be sent to the address designated in ITEM 8 of the Declarations.

(S) **Changes:**

Notice to or knowledge possessed by any agent or other person acting on behalf of the Underwriter shall not effect a waiver or change in any part of this Policy or estop the Underwriter from asserting any right under this Policy. This Policy can be altered, waived or changed only by written endorsement issued to form a part of this Policy.

(T) **Assignment:**

No assignment of interest under this Policy shall bind the Underwriter without its written consent issued as an endorsement to form a part of this Policy.

(R) **Service of Suit:**

The Underwriter hereby designates the Director of the Department of Insurance in the state in which this Policy is issued, and his/her successor(s) in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** arising under or out of this Policy.

(S) **Entire Agreement:**

The **Insureds** agree that this Policy, including the **Application**, Declarations and any endorsements, constitutes the entire agreement between them and the Underwriter or any of the Underwriter's agents relating to this insurance.

(T) **Headings:**

The descriptions in the headings and sub-headings of this Policy are solely for convenience and form no part of the terms and conditions of coverage.

**In witness whereof, the Underwriter has caused this Policy to be executed by its authorized representative.**

Ironshore Specialty Insurance Company by:

Secretary

President

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Endorsement #** 1

**Policy Number:** 000728305
**Insured Name:** Premera

**Effective Date of Endorsement:** October 01, 2014

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SCHEDULE A – ADDITIONAL INSURED ENTITIES

In consideration of the premium charged, the term "**Insured Entity**," as defined in Section II DEFINITIONS of this Policy, shall include the following:

- Academe, Inc. fka Lifewise Health Plans of Arizona, Inc
- Premera Blue Cross; PremeraFirst, Inc
- Washington-Alaska Group Services, Inc
- Lifewise Assurance Company
- Calypso Healthcare Solutions
- Life Wise Administrators, Inc
- Northstar Administrators, Inc
- LifeWise Health Plan of Oregon, Inc
- Premera Blue Cross Blue Shield of Alaska, Corp
- Pacific Northwest Insurance Company
- Premera Health Plus
- MSC Life Insurance Company
- MSC Service Coorporation
- States West Life Insurane Company
- LifeWise, A Premera Health Plan, Inc
- Premera Healthcare
- Quality Solutions
- HealthPlus
- N.C.A.S Northwest
- Premera LifeWise Health Plan
- Washington Hospital Service Association (Inactive)
- Service First Intermediary (Inactive)
- Pacific Health & Life Insurance Company (Inactive)
- Medical Services Corporation of Eastern Washington (Inactive)
- Vivacity, Inc.
- Western Benefit Administrators
- Connexion Insurance Solutions, Inc fka Ucentris Insured Solutions, Inc. fka Washington-Alaska Group Services, Inc.

- Lifewise Health Plan of Washington
- Blue Cross of Washington & Alaska (Inactive)

All other terms, conditions and limitations of this Policy shall remain unchanged.

________________________________________ February 26, 2015
Authorized Representative Date

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Endorsement #** 2

**Policy Number:** 000728305
**Insured Name:** Premera

**Effective Date of Endorsement:** October 01, 2014

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EDP ENDORSEMENT

In consideration of the premium charged:

(1) No coverage will be available under this Policy for **Loss**, including **Defense Expenses**, from any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the design, manufacture, assembly, installation, modification or sale of any computer hardware, software or peripheral equipment or device, in whole or in part, by the **Insured** or by any entity owned by, controlled by of affiliated with the **Insured** through common ownership; provided however, this exclusion shall not apply to:

(a) any **Claim** for **Private Information Protection**, **Provider Selection**, **Utilization Review** or **Claims Services** if performed by or on behalf of an **Insured**, or

(b) any Claim for **Vicarious Liability** for the rendering of or failure to render, **Medical Services**.

(2) The term "**Claim Services"** means the submission, handling, investigation, adjudication, denial, payment or adjustment of claims for benefits or coverages under health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, automobile medical payment, or workers' compensation plans.

(3) The term "**Provider Selection**" means evaluating, selecting, credentialing, contracting with or performing peer review of any provider of **Medical Services**.

(4) The term "**Utilization Review**" means the process of evaluating the appropriateness, necessity or cost of **Medical Services** for purposes of determining whether payment or coverage for such **Medical Services** will be authorized or paid for under any health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, automobile medical payment, or workers' compensation plans. In clarification and not in limitation of the foregoing, **Utilization Review** shall include prospective review of proposed payment or coverage for **Medical Services**; concurrent review of ongoing **Medical Services**; retrospective review of already rendered **Medical Services** or already incurred costs; disease management; case management; and the use of predictive modeling to identify individuals and/or populations for disease management or case management programs.

All other terms, conditions and limitations of this Policy shall remain unchanged.

________________________________________ February 26, 2015

Authorized Representative Date

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Endorsement #** 3

**Policy Number:** 000728305
**Insured Name:** Premera

**Effective Date of Endorsement:** October 01, 2014

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMEND DEFINITION OF INSURED ENDORSEMENT

In consideration of the premium charged, the term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the following person and/or entities (each an "Additional Insured"):

- City & Borough of Juneau

but only with respect to any **Claim** for any actual or alleged act, error or omission in the performance of, or failure to perform, a **Managed Care Service** or **Private Information Protection** by any **Insured**, other than any Additional Insured; provided that such **Claim** is made and continuously maintained against at least one **Insured** exclusive of any Additional Insured.

All other terms, conditions and limitations of this Policy shall remain unchanged.

____________________________________
Authorized Representative

February 26, 2015
Date

IRONSHORE
your safe harbour

**IRONSHORE SPECIALTY INSURANCE COMPANY**

Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Endorsement #** 4

**Policy Number:** 000728305 **Effective Date of Endorsement:** October 01, 2014
**Insured Name:** Premera

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMEND DEFINITION OF MANAGED CARE SERVICE ENDORSEMENT

In consideration of the premium charged, the term "**Managed Care Service**," as defined in Section II DEFINITION (J) of this Policy, is amended to include the following additional services or activities:

- Life or long term care plans, COBRA, HSAs, FSA
- Insurance Agent or Broker Services
- Provider Selection, Utilization Review, Claims Services

All other terms, conditions and limitations of this Policy shall remain unchanged.

________________________________________ February 26, 2015
Authorized Representative Date

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Endorsement #** 5

**Policy Number:** 000728305
**Insured Name:** Premera

**Effective Date of Endorsement:** October 01, 2014

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CLASS ACTION RETENTION ENDORSEMENT

In consideration of the premium charged, solely with respect to **Class Action Claims**, subparagraph (a) of ITEM 4 of the Declarations is amended to read in its entirety as follows:

(a) $1,500,000 Each **Class Action Claim**

All other terms, conditions and limitations of this Policy shall remain unchanged.

________________________________________
Authorized Representative

February 26, 2015
Date

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Endorsement #** 6

**Policy Number:** 000728305
**Insured Name:** Premera

**Effective Date of Endorsement:** October 01, 2014

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMEND DEFINITION OF MANAGED CARE SERVICE

In consideration of the premium charged, it is understood and agreed that the term "**Managed Care Service**," as defined in Section II DEFINITION (J) of this Policy, shall include:

(1) The creation, operation, maintenance and use of the **Insured Entity's** website or network;

(2) The maintenance of security mechanisms which are designed to control or restrict access to a computer network, or parts thereof, in order to prevent a breach of such computer network which results in either:

a. unauthorized access to, use of, or tampering with, a third party's computer network, or

b. the inability of an authorized third party to gain access to the **Insured's** services.

Such security mechanisms include hardware, software and firmware, including but not limited to firewalls, filters, routers, intrusion detection software, antivirus software and automated password management applications; and

(3) The gathering, creation, investigation, compilation and dissemination of promotional, advertising and educational materials.

All other terms, conditions and limitations of this Policy shall remain unchanged.

______________________________________
Authorized Representative

February 26, 2015
Date

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Endorsement #** 7

**Policy Number:** 000728305
**Insured Name:** Premera

**Effective Date of Endorsement:** October 01, 2014

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

# CLARIFICATION ENDORSEMENT

In consideration of the premium charged, with respect to the coverage afforded under Insuring Agreement (A) of this Policy, it is expressly understood and agreed that the term "**Loss**," as defined in **Section II DEFINITIONS**, shall not include the cost of notification of affected parties and/or the cost of credit monitoring incurred by the **Insured** in connection with any **Private Information Protection Event**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_______________________________________
Authorized Representative

February 26, 2015
Date

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Endorsement #** 8

**Policy Number:** 000728305
**Insured Name:** Premera

**Effective Date of Endorsement:** October 01, 2014

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# Washington Service of Suit

In consideration of the premium charged, the Underwriter hereby designates the Insurance Commissioner of the State of Washington, and his/her successor(s) in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** arising under or out of this Policy

All other terms, conditions and limitations of this Policy shall remain unchanged.

_______________________________________
Authorized Representative

February 26, 2015
Date

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Endorsement #** 9

**Policy Number:** 000728305
**Insured Name:** Premera

**Effective Date of Endorsement:** October 01, 2014

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CHARITABLE SERVICES COVERAGE FOR MANAGED CARE ORGANIZATIONS

In consideration of the premium charged,

(1) If, for any reason, coverage is not afforded for any **Charitable Services Claim** (as defined below) under any other policy or policies of insurance issued to the **Insured Entity**, this Policy shall drop down and the **Production Specialist** shall pay on behalf of the **Insured Medical Practitioner** (as defined below) any loss, damages or settlements, including cost and expenses of defense, that the **Insured Medical Practitioner** is legally obligated to pay as a result of such **Charitable Services Claim**, subject to the terms and conditions of this endorsement.

(2) The **Production Specialist's** maximum limit of liability for any **Charitable Services Claim** shall be $1,000,000; the **Production Specialist's** maximum aggregate limit of liability for all **Charitable Services Claims** happening during the **Policy Period** shall be $1,000,000. Such amounts shall be part of, and not in addition to, the **Production Specialist's** maximum aggregate Limit of Liability set forth in ITEM 3(a) of the Declarations. Payment of the **Production Specialist's** maximum aggregate limit of liability shall terminate the **Production Specialist's** obligation to pay any further **Charitable Services Claim(s)** under paragraph (1) above.

(3) The **Production Specialist's** obligation to pay loss, damages or settlements, including costs and expenses of defense, for any **Charitable Services Claim** shall be excess of a self-insured retention of $0 per **Charitable Services Claim**. The **Insured Entity** shall be responsible for payment in full of such self-insured retention.

(4) For purposes of this endorsement, the following terms shall have the meanings ascribed to them below:

(a) "**Charitable Services**" means the voluntary provision of **Medical Services** (as defined below) by an **Insured Medical Practitioner** at the request, or with the permission, of the **Insured Entity**, and without compensation or payment to the **Insured Medical Practitioner** of any kind. **Charitable Services** may be performed anywhere in the world.

(b) "**Charitable Services Claim**" means any written demand received by an **Insured Medical Practitioner** for monetary damages, or any notice of any event reasonably expected to result in such a demand, resulting from a **Charitable Services Wrongful Act** (as defined below) which is first made against such **Insured Medical Practitioner** during the **Policy Period.** All such demands arising out of a single **Charitable Services Wrongful Act** shall be considered one **Charitable Services Claim**.

(c) "**Charitable Services Wrongful Act**" means any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured Medical Practitioner** in rendering, or failing to render, **Charitable**

**Services** on or after the **Retroactive Date** (as defined below).

(d) "**Insured Medical Practitioner**" means any clinical professional – including, without limitation, a physician, surgeon, intern, extern, physician's assistant, licensed or registered nurse, certified nurse's assistant, certified registered nurse anesthetist, osteopathic physician, social worker, podiatrist or dentist – who has an assigned work schedule for, and is on the regular payroll of, the **Insured Entity**, with federal and state taxes withheld. An **Insured Medical Practitioner's** status as such shall be determined as of the date of the **Charitable Services Wrongful Act** upon which a **Charitable Services Claim** involving the **Insured Medical Practitioner** is based.

(e) "**Medical Services**" means health care, medical care or treatment provided to any individual, including without limitation any of the following: medical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing, or other professional health care; the furnishing or dispensing of medications, drugs, blood, blood products, or medical, dental, or psychiatric supplies, equipment, or appliances in connection with such care; the furnishing of food or beverages in connection with such care; the providing of counseling or other social services in connection with such care.

(f) "**Retroactive Date**" means October 1, 2014.

(5) No coverage will be available under this endorsement for:

(a) Punitive or exemplary damages, or the multiplied portion of any multiplied damage award;

(b) Any **Charitable Services Claim** based on or arising out of a **Charitable Services Wrongful Act** committed or allegedly committed prior to the **Retroactive Date**;

(c) Any **Charitable Services Claim** based on or arising out of the rendering, or failure to render, **Medical Services** by someone that is not an **Insured Medical Practitioner**;

(d) Any **Charitable Services Claim** for liability under any contract or agreement;

(e) Any **Charitable Services Claim** for injury to a person which is based on or arises out of employment-related practices, policies, acts or omissions, including the hiring and firing, promotion or demotion, performance evaluation, compensation, discipline, retirement, layoff, transfer, harassment, humiliation or discrimination;

(f) Any **Charitable Services Claim** based on or arising out of defamation, libel, or slander;

(g) Any **Charitable Services Claim** based on or arising out of criminal or fraudulent acts, whether or not related to **Medical Services**;

(h) Any **Charitable Services Claim** based on or arising out of conduct of a sexual nature, whether or not such conduct involves the rendering of **Medical Services**;

(i) Any **Charitable Services Claim** based on or arising out of a **Charitable Services Wrongful Act** committed or allegedly committed while the **Insured Medical Practitioner's** license to practice medicine or license as a health care provider was suspended or revoked;

(j) Any **Charitable Services Claim** based on or arising out of discrimination in providing **Medical Services** to a patient on the basis of religion, race, sex, age, medical condition or any other basis prohibited by law;

(k) Any **Charitable Services Claim** based on or arising out of any **Charitable Services Wrongful Act** in which the **Insured Medical Practitioner**, or someone at the direction of the **Insured Medical Practitioner**, altered, destroyed, or partially altered or destroyed, any medical or other record for the purpose of concealing any injury, act, error, omission or responsibility related to the **Charitable Services Claim**, whether or not any criminal proceedings or penalties result;

(l) Any **Charitable Services Claim** based on or arising out of any oral or written statement or publication, whether by or at the **Insured Medical Practitioner's** direction, with the **Insured Medical Practitioner's** knowledge that it is untrue; or advertising, publishing, broadcasting, or promotion;

(m) Any **Charitable Services Claim** based on or arising out of any ownership, rental, occupancy, maintenance or use of any premises;

(n) Any **Charitable Services Claim** based on or arising out of an **Insured Medical Practitioner's** illegal abuse of alcohol, drugs or other substance.

(6) The **Insured Entity** must notify the **Production Specialist** of (i) a **Charitable Services Claim** as soon as practicable after the **Charitable Services Claim** is first made against an **Insured Medical Practitioner**, and (ii) a **Charitable Services Wrongful Act** that an **Insured Medical Practitioner** reasonably believes could result in a **Charitable Services Claim** as soon as practicable after the **Charitable Services Wrongful Act** first occurs. Such notice shall give full particulars of the **Charitable Services Claim** or **Charitable Services Wrongful Act**, including, but not limited to, a description of the **Charitable Services Wrongful Act**; the identity of the patient, all potential claimants and health care provider(s) and any **Insured Medical Practitioners** involved; a description of the injury or damages that may result from such **Charitable Services Wrongful Act**; information on the time, place and nature of the **Charitable Services Wrongful Act**; the manner in which the **Insured** first became aware of such **Charitable Services Wrongful Act**; and the reasons the **Insured** believes the **Charitable Services Wrongful Act** is likely to result in a **Charitable Services Claim.**

(7) The **Production Specialist** has the right and duty to defend any **Charitable Services Claim**, even if any of the allegations of such **Charitable Services Claim** are groundless, false or fraudulent. No **Insured Medical Practitioner** or other **Insured** under the Policy shall, except at its own cost, incur any expense, make any payment, admit liability for, assume any obligation, or settle any **Charitable Services Claim** without the **Production Specialist's** written consent. With respect to any **Charitable Services Claim,** the **Production Specialist** will have the right to investigate, direct the defense, and conduct settlement negotiations it deems appropriate. The **Production Specialist** may make any settlement of any **Charitable Services Claim** which it deems appropriate.

(8) The **Insured Medical Practitioner(s)** shall cooperate fully with the **Production Specialist**, including providing the **Production Specialist** with all relevant facts that might assist the **Production Specialist** in the investigation and defense of a **Charitable Services Claim**; attending meetings and court-related proceedings; and providing any other assistance reasonably requested by the **Production Specialist**. It is expressly understood and agreed that lack of such full cooperation by the **Insured Medical Practitioner(s)** shall constitute grounds for voidance of the coverage afforded under this endorsement.

(9) Notwithstanding anything to the contrary contained in this endorsement, the **Production Specialist** shall not be liable under this endorsement for any loss, damages or settlements, including cost and expenses of defense, in connection with a **Charitable Services Claim** for which the **Insured Entity** or the **Insured Medical Practitioner** has coverage under any other insurance policy, regardless of whether such policy is stated to be primary, contributory, excess, contingent, or otherwise.

(10) By way of clarification of the coverage afforded under this endorsement, it is the express intention of the Production Specialist that this endorsement shall afford coverage for **Charitable Services** that do *not* constitute "emergency **Medical Services**," as described in Section III, EXCLUSION (B) of the Policy. For purposes of the coverage afforded hereunder, the phrase "emergency **Medical Services"** shall be deemed to mean **Medical Services** that are required to be performed by an **Insured** for the benefit of one or more persons in that **Insured's** immediate vicinity as the direct result an unforeseen combination of circumstances or the resulting state that calls for immediate action.

All other terms and conditions of this Policy remain unchanged.

____________________________________ February 26, 2015

Authorized Representative Date

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Endorsement #** 10

**Policy Number:** 000728305 **Effective Date of Endorsement:** October 01, 2014
**Insured Name:** Premera

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SUBPOENA DEFENSE EXPENSE RECOGNITION ENDORSEMENT

In consideration of the premium charged, it is hereby agreed that:

1. Notwithstanding any terms or conditions to the contrary in this Policy, the Production Specialist will recognize 25% of **Subpoena Defense Expenses** (as hereinafter defined) incurred by the **Insured** in response to a **Subpoena** as eroding the retention set forth in Item 4. of the Declarations, provided that the **Subpoena** (as hereinafter defined):

   a. is issued by a federal or state administrative, governmental, or regulatory agency, body, entity or tribunal; and

   b. is received by any **Insured** during the **Policy Period**; and

   c. arises out of **Managed Care Services** rendered by the **Insured;** and

   d. later results in a covered **Claim** involving those matters that are the subject of the **Subpoena**.

2. The Production Specialist's maximum Limit of Liability for all **Subpoena Defense Expenses** from each **Subpoena** for which this Endorsement provides coverage will not exceed the retention set forth in Item 4 of the Declarations.

3. The **Insured** must give the Production Specialist written notice of such **Subpoena** as soon as practicable, but in no event later than ninety (90) days after the end of the **Policy Period**, to qualify for coverage under this Endorsement. The notice should give full particulars of the **Subpoena**, including but not limited to: information about the **Subpoena,** to the extent such information is known to the **Insured;** a description of the **Wrongful Acts** alleged therein or which are the subject thereof; and the identity of the person or entity issuing the **Subpoena**.

4. Any notice the **Insured** gives the Production Specialist of such **Subpoena** shall be deemed notification of a potential C**laim** under Section III(B) of this Policy. In the event that the matters which are the subject of the **Subpoena** later result in a covered **Claim** against the **Insured**, such **Claim** shall be deemed first made during the **Policy Period**.

5. For purposes of the coverage afforded under this Endorsement:

   "**Subpoena**" means a command issued to the **Insured** to provide testimony or to produce or allow the inspection of documents, records, notes, electronic information, tape recordings, photographs, taped footage or other related materials.

"**Subpoena Defense Expenses**" means reasonable and necessary legal fees and expenses, including but not limited to electronic discovery expenses, incurred by the **Insured** in the course of preparing for, objecting to, or otherwise responding to a **Subpoena**. **Subpoena Defense Expenses** do not include remuneration, salaries, overhead, fees or benefit expenses, computer hardware, software, peripheral equipment or device of any **Insured.**

6. Clause (E) of Section II DEFINITIONS is amended to read in its entirety as follows:

   (E) **"Defense Expenses"** means reasonable legal fees and expenses incurred in the investigation, adjustment, defense or appeal of a **Claim** including but not limited to electronic discovery expenses; provided, that **Defense Expenses** shall not include remuneration, salaries, overhead, fees or benefit expenses, computer hardware, software, peripheral equipment or device of any **Insured** or **Subpoena Defense Expenses**.

7. The opening clause of Section III Exclusions (A) of this Policy is amended to read in its entirety as follows:

   (A) Except for **Defense Expenses** and **Subpoena Defense Expenses**, the Production Specialist shall not pay **Loss** from any **Claim** brought about or contributed to by:

8. Section III Exclusions (B) of this Policy is amended to read in its entirety as follows:

   The Production Specialist shall not pay **Loss**, including **Defense Expenses** or **Subpoena Defense Expenses**, from any **Claim** for any actual or alleged act, error or omission by an **Insured** in the rendering of, or failure to render, **Medical Services**; provided, that this EXCLUSION (B) shall not apply to (1) any portion of a **Claim** alleging, under statute, rule, regulation or common law tort, that the performance of any **Managed Care Service** by an **Insured** constitutes the rendering of **Medical Services**, (2) any actual or alleged act, error or omission in the voluntary performance of emergency **Medical Services** by an **Insured** without receipt or expectation of remuneration, or (3) the provision of flu shots and non-invasive **Medical Services** provided by any **Insured** at health fairs or for health screening purposes.

9. The opening clause of Section III Exclusions (C) of this Policy is amended to read in its entirety as follows:

   (C) The Production Specialist shall not pay **Loss**, including **Defense Expenses** or **Subpoena Defense Expenses**, from any **Claim:**

All other terms and conditions of this Policy remain unchanged.



________________________________________ February 26, 2015

Authorized Representative Date

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Endorsement #** 11

**Policy Number:** 000728305
**Insured Name:** Premera

**Effective Date of Endorsement:** October 01, 2014

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ALLOW BORDEREAU REPORTING

In consideration of the premium charged,

1. Subject to paragraphs (2) and (3) below, Section IV (B) of the Policy, Reporting of Claims and Circumstances, is amended by adding the following subsection (3):

   (3) In lieu of reporting **Claims** individually pursuant to paragraphs (1) and (2) of this Section IV (B), the **Insured** shall provide to the **Underwriter** a Bordereau Report of all **Claims** first made against the **Insured** during the **Policy Period**. Such Bordereau Report shall be provided to the **Underwriter** at quarterly intervals during the **Policy Period,** with the first report being provided ninety (90) days after the Inception Date of the Policy shown in ITEM 2(a) of the Declarations. The last report shall be provided to the **Underwriter** no later than sixty (60) days after the expiration of the **Policy Period** or Extended Reporting Period, if purchased or required by law.

   Bordereau Reporting shall only apply to **Claims** made against the **Insured** during the **Policy Period.** It shall not apply to **Wrongful Acts** which have not yet given rise to a **Claim.**

   The Bordereau Report must provide the following current information for each **Claim** listed thereon:

   (a) Date the **Claim** was first made against the **Insured**;
   (b) Identity/ies of the claimant(s);
   (c) Description of the nature of the **Claim**;
   (d) Amount demanded or the nature of the relief sought;
   (e) Form and forum of the **Claim** (demand, administrative proceeding, lawsuit in state court, lawsuit in federal court, arbitration or other proceeding);
   (f) Identity of any outside counsel retained by the **Insured**;
   (g) Current status of the **Claim** (open, closed, reopened).

2. It is further agreed that, in consideration of amending this Policy to include the Bordereau Reporting provision, the **Insured** shall waive any right to receive a written statement of the **Underwriter's** position with regard to coverage

for any **Claim** reported on the Bordereau Report, unless and until the **Insured**, in addition to the Bordereau Report, is required or elects to report such a **Claim** individually as specified below.

3. The following types of **Claims**, in addition to being included in the Bordereau Report(s), must be individually reported pursuant to clauses (1) and (2) of Section IV (B), Reporting of Claims and Circumstances:

   (a) **Class Action Claims** or **Claims** involving two or more claimants in a single suit or proceeding;
   (b) **Claims** with any allegations of **Antitrust Activity**;
   (c) **Claims** brought by a governmental or quasi-governmental agency or authority, in any capacity, whether directly or as a representative action;
   (d) **Claims** in which the amount of estimated **Loss**, reserved or incurred **Defense Expenses**, settlement amount or other amounts, separately or combined, exceed fifty Percent (50%) of the Retention amount shown in ITEM 4 of the Declarations;
   (e) **Claims,** in which the **Insured** is alleged to be directly or vicariously liable, involving:
      i. unexpected deaths;
      ii. unanticipated neurological, sensory and/or systemic deficits; brain damage; permanent paralysis; including, but not limited to, paraplegia and quadriplegia; partial or complete loss of sight or hearing; kidney failure or sepsis;
      iii. birth related injuries, including, but not limited to, maternal or fetal death; anesthesia related injuries; infant resuscitation, shoulder dystocia; cerebral palsy;
      iv. severe burns, including, but not limited to, thermal, chemical, radiological or electrical burns;
      v. severe internal injuries, including, but not limited to, lacerations of organs; infectious process; foreign body retention; sensory organ injury; reproductive organ injury;
      vi. any sentinel event.

4. At its option, the **Insured** may elect to individually report any **Claim** or circumstance pursuant to the provisions of classes (1) and (2) of Section IV (B), and the **Underwriter**, at its option, may at any time require individual reporting of and/or additional information and documentation with respect to any **Claim** listed on the Bordereau Report.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



________________________________________ February 26, 2015
Authorized Representative Date

IRONSHORE your safe harbour

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Endorsement #** 12

**Policy Number:** 000728305
**Insured Name:** Premera

**Effective Date of Endorsement:** October 01, 2014

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# Tie-In Limits – Erosion Deemed for Purposes of Excess Coverage Attachment

In addition to this Policy, the Insurer or an affiliated company of the Insurer (any such affiliated company being included within the term "Insurer" for the purposes of this endorsement) has also agreed to issue to the entity designated in ITEM 1 of the Declarations the following insurance policy or policies (collectively the "Other Policy(ies)"):

**Other Policy(ies)**:

- Ironshore Managed Care Errors and Omissions Liability Policy Number: 001891401

In consideration of the premium charged, the Insured and the Insurer expressly agree as follows:

(1) In the event that a **Claim** is made for which coverage may be afforded under this Policy and for which coverage is also afforded under any Other Policy(ies) (a "**Subject Claim**"), the coverage afforded under the Other Policy(ies) shall be primary. In the event that the applicable limits of liability under the Other Policy(ies) is/are reduced or exhausted by payment of **Loss** in respect of any **Subject Claim(s),** this Policy shall become primary.

(2) In no event shall the Insurer pay more than ten million ($10,000,000) in total for a single **Subject Claim** under any combination of this Policy and any Other Policy(ies).

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

________________________________________
Authorized Representative

February 26, 2015
Date

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Endorsement #** 13

**Policy Number:** 000728305
**Insured Name:** Premera

**Effective Date of Endorsement:** October 01, 2014

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# Pro-Rata Cancellation by Named Insured

In consideration of the premium charged, clause (2) of section IV. CONDITIONS (J) is amended to read as follows:

(2) The **Named Insured** may cancel this Policy prospectively only by mailing the Insurer written notice stating when thereafter such cancellation shall be effective. In such event, the earned premium shall be computed pro-rata. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

________________________________________
Authorized Representative

February 26, 2015
Date

**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA 02110
Toll Free: (877) IRON411

**Endorsement #** 13

**Policy Number:** 000728305
**Insured Name:** Premera

**Effective Date of Endorsement:** October 01, 2014

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PREMERA BLUE CROSS AMENDATORY E&O

In consideration of the premium charged,

1. Section III. EXCLUSIONS (A) is amended to read in its entirety as follows:

   A. Except for **Defense Expenses**, the **Underwriter** shall not pay **Loss** for any **Claim** brought about or contributed to by:

      (1) any willful misconduct or dishonest, fraudulent, criminal or malicious act, error or omission by any **Insured;**

      (2) any willful violation by any **Insured** of any law, statute, ordinance, rule or regulation; or

      (3) any **Insured** willfully gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled.

   For the purpose of determining the applicability of this EXCLUSION (A); no **Wrongful Act** of any **Insured** may be imputed to any other **Insured**. Determination of the applicability of this EXCLUSION (A) shall be made by a final adjudication in the proceeding constituting the **Claim**, or in a proceeding separate from or collateral to any proceeding constituting the **Claim**; provided, however, that such a separate or collateral proceeding shall not include any action filed by the **Underwriter** or **Insured** to in any way establish whether or not there is coverage for the **Claim.**

2. Paragraph (1) of Section IV. CONDITIONS (D), Defense and Settlement, is amended to read in its entirety as follows:

   (1) The Underwriter will have no duty under this Policy to defend any **Claim** but, at its option, may associate in the defense or settlement of a **Claim**. The **Insureds** may defend and contest any **Claim** made against them. In conducting a defense, the **Insureds** may retain qualified counsel to represent them in the defense or appeal of any **Claim**.

      (a) The **Insured** may incur **Defense Expenses**, in an amount not to exceed $500,000, or fifty percent (50%) of the Retention amount specified in ITEM 4 of the Declarations, in connection with any **Claim** (the "Consent Threshold Amount") without the Underwriter's prior consent. **Defense Expenses** in excess of the Consent Threshold Amount must be consented to by the Underwriter, which consent shall not be untimely or unreasonably withheld.

It shall not be unreasonable for the Underwriter to withhold its consent:

(i) to the representation of any **Insured** by another **Insured**; or

(ii) where more than one **Insured** is involved in the same **Claim**, to separate counsel for one or more of such **Insureds**, unless there is a material reason for separate representation or there is a conflict of interest among such **Insureds**.

(b) The **Insured** may settle any **Claim**, or accept any offer of settlement, in an amount not to exceed the Consent Threshold Amount, without the prior written consent of the Underwriter.

No settlement or offer of settlement of any **Claim** may be made, in excess of the Consent Threshold Amount, without the Underwriter's prior written consent, which consent shall not be untimely or unreasonably withheld.

3. The definition of **"Related Claims"** set forth in Section II. DEFINITIONS is amended to read in its entirety as follows:

**"Related Claims"** means all **Claims** for **Wrongful Acts** which are casually connected and have as a common nexus any fact, situation, circumstance, event or transaction or series of connected facts, situations, circumstances, events or transactions; provided, however, in no event will (1) a **Class Action Claim** be considered a **Related Claim** to any other **Claim** that is not a **Class Action Claim** and that was made against the **Insured** prior to the Inception Date of this Policy, or (2) any **Claim** be considered to be a **Related Claim** to any other **Claim** that was made against the **Insured** prior to 60 months before the Inception Date of this Policy.

4. The definition of **"Managed Care Service"** set forth in Section II. DEFINITIONS is amended to read in its entirety as follows:

**"Managed Care Service**" means any services or activities performed in the administration or management of health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, automobile medical payment, or workers' compensation plans, whether provided on paper, in person, electronically, or in any other form and whether performed on behalf of the Insured or by the Insured for itself or on behalf of any other party for a fee.

It is understood and agreed that the definition of Managed Care Service includes but is not limited to the following services of activities: **Provider Selection; Utilization Review;** advertising, marketing, selling, or enrollment for health care or workers' compensation plans; **Claim Services**; establishing and maintaining health care provider networks; reviewing the quality of **Medical Services** or providing quality assurance; design and/or implementation of financial incentive plans and benefits plans; **Healthcare Consulting;** risk management services; management of independent agents; wellness or health promotion education; development or implementation of clinical guidelines, practice parameters or protocols; and triage for payment of **Medical Services**.

5. Section II DEFINITIONS is amended to include the following additional definitions:

**"Claims Services"** means the following services, but only if performed by an **Insured**: any submission, handling, investigation, payment or adjustment of claims for benefits or coverages under health care or workers' compensation plans.

**"Healthcare Consulting"** means, with regard to healthcare or workers' compensation plans, advising as to the coverage, features or benefits, including comparisons with alternatives, eligibility requirements, processes and procedures for enrollment or changes in status.

**"Provider Selection"** means any of the following, but only if performed by an **Insured**: evaluating, selecting, credentialing, contracting with or performing peer review of any provider of **Medical Services**.

**"Utilization Review"** means the process of evaluating the appropriateness, necessity or cost of **Medical Services**

for purposes of determining whether payment or coverage for such **Medical Services** will be authorized or paid for under any health care plan, but only if performed by an **Insured**. In clarification and not in limitation of the foregoing, **Utilization Review** shall include prospective review of proposed payment or coverage for **Medical Services**, concurrent review of ongoing **Medical Services**, retrospective review of already rendered **Medical Services** or already incurred costs, disease management, and case management.

6. Paragraph (3) of Section (III) EXCLUSIONS (C) is amended to read in its entirety as follows:

(3) based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event, **Wrongful Act** or series of facts, circumstances, situations, transactions, events or **Wrongful Acts**:

(a) underlying or alleged in any litigation or administrative or regulatory proceeding brought prior to and/or pending as of the Inception Date stated in ITEM 2(a) of the Declarations, to which any **Insured** is or was a party; or

(b) which was the subject of any notice given prior to the Inception Date under any other policy of insurance or plan or program of self-insurance.

7. The term "**Insured,**" as defined in Section II DEFINITIONS of the Policy, shall include the Chief Legal Officer, the General Counsel, any In-House Counsel, and any Notary Public, but only while such person is performing **Managed Care Services** for any **Insured**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



________________________________________ February 26, 2015

Authorized Representative Date

## POLICYHOLDER NOTICE

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producercompensation or by calling 1-800-706-3102.

AIG

**Lexington Insurance Company**

A cap ta stock company

POLICY NUMBER: 01 615 04 33 REPLACEMENT OF POLICY NUMBER: 01 425 32 03

**Administrative Offices: 99 High Street, Boston, Massachusetts 02110**
(hereinafter called the "Company")

**MANAGED CARE FOLLOW FORM EXCESS POLICY**

**DECLARATIONS**

**NOTICE: DEFENSE EXPENSES ARE INCLUDED WITHIN AND REDUCE THE LIMITS OF INSURANCE OF THIS POLICY.**

Item 1. Named Insured: PREMERA
Address: 7001 220TH ST SW BLDG 1
MOUNTLAKE TERRACE, WA 98043 2160

Item 2. Policy Period:
From: October 1, 2014 To: October 1, 2015
(At 12:01 A.M. Standard Time at the address of the named insured shown above.)

Item 3. Limits of Insurance:
Aggregate Limit: $10,000,000
Each Claim Limit: $10,000,000

Item 4. Premium:
Total Premium: $216,346
Minimum Earned Premium at Inception: $75,721

Item 5. Retroactive Date: October 1, 1933

Item 6. Followed Policy:
Insurance Company: Ironshore Specialty Insurance Company
Policy Number: 001891400
Policy Period: From: January 1, 2014 To: January 1, 2015



© All rights reserved.

Item 7. **Underlying Limits** of All **Underlying Policies** in excess of which this policy applies:

Total Aggregate Limits of Insurance: $10,000,000
Total Each Claim Limits of Insurance: $10,000,000

( **Underlying Limits** may include additional amounts over which the Company is excess, including self insured retentions, deductibles, and other insurance. See the definition of **Underlying Limits** in the policy form.) (If no amount is indicated above, please see the Schedule of Underlying Insurance.)

Item 8. Endorsements: See Attached Forms Schedule



© All rights reserved.

**IN WITNESS WHEREOF,** the **Insurer** has caused this Policy to be signed by its President, Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the time of issuance by an authorized representative of the insurer.

**PRESIDENT**
**Lexington Insurance Company**

**SECRETARY**
**Lexington Insurance Company**

**AUTHORIZED REPRESENTATIVE**

| **COUNTERSIGNED AT** | **DATE** | **COUNTERSIGNATURE** |
|---|---|---|

*MARSH USA INC.*
*540 WEST MADISON STREET*
*CHICAGO, IL 60661*

*1476122*



© All rights reserved.

# *LEXINGTON* INSURANCE COMPANY
## Administrative Offices: 99 High Street, Boston, MA 02110

## MANAGED CARE FOLLOW FORM EXCESS POLICY

**NOTICE: DEFENSE EXPENSES ARE INCLUDED WITHIN AND REDUCE THE LIMITS OF INSURANCE OF THIS POLICY.**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the word, First Named Insured refers to the Named Insured shown in Item 1. of the Declarations. The word Named Insured includes the First Named Insured and any other person or organization qualifying as a Named Insured under the **Followed Policy**.

The Company refers to the insurance company providing this insurance. Other words and phrases that appear in boldface type have special meaning. Refer to the Section **IV. DEFINITIONS**.

In consideration of the payment of the premium and in reliance upon the applications provided to and the statements made to the Company and the **Underlying Insurers**, the Company and the First Named Insured agree as follows:

**I. INSURING AGREEMENT**

**A.** The Company will pay those sums that the **Insured** becomes legally obligated to pay as damages and/or **Defense Expenses** in excess of the **Underlying Limits** by reason of exhaustion of such limits and to which this insurance applies, subject to:

**1.** the terms and conditions of the **Followed Policy**,

**2.** the Limits of Insurance shown in the Declarations, and

**3.** the Retroactive Date shown in Item 5. of the Declarations

**B.** Except with regard to any terms or conditions of this policy (or any endorsement modifying this policy) inconsistent with the **Followed Policy**, the provisions of the **Followed Policy** are incorporated as part of this policy.

**II. SETTLEMENT AND DEFENSE**

Notwithstanding any provision of the **Underlying Policies** to the contrary, the Company shall not have the duty to defend any **Claim**, suit or proceeding against any **Insured**, whether within or in excess of the **Underlying Limits**. However, the Company shall have the right, at its own expense, to associate with the **Insureds** in the defense, negotiation and settlement of any **Claim**, suit or proceeding that might result in the Company's obligation to pay any amount of damages and/or **Defense Expenses** under this policy. The **Insureds** shall give the Company full cooperation and such information as the Company may reasonably require.

Upon reduction or exhaustion of the **Underlying Limits**, any **Defense Expenses** to be incurred by the **Insured** in the defense of any **Claim**, suit or proceeding shall be subject to the approval of the Company and the Company reserves the right to approve defense counsel, which shall not be unreasonably withheld.

The **Insured** must inform the Company of any offer to settle or compromise any **Claim**, suit or proceeding in excess of the **Underlying Limits**. The Company has a right to approve such settlement or compromise.

 © A r ghts reserved.

## III. LIMITS OF INSURANCE

**A.** The Limits of Insurance shown in Item 3. of the Declarations and the rules below state the most the Company will pay for all damages and/or **Defense Expenses** under this policy regardless of the number of:

1. **Insureds**;

2. **Claims** made or suits brought; or

3. Persons or organizations making **Claims** or bringing suits.

**B.** The Aggregate Limit shown in Item 3. of the Declarations is the most the Company will pay for all damages and/or **Defense Expenses** under this policy.

**C.** Subject to Paragraph **B.** above, the Each Claim Limit shown in Item 3. of the Declarations is the most the Company will pay for the sum of all damages and/or **Defense Expenses** arising out of any one **Claim**.

**D.** In the event of the reduction or exhaustion the **Underlying Limits** under the **Underlying Policies** by reason of actual payment by the **Underlying Insurers** (and the **Insured** has paid the full amount of any applicable deductible or self insured retention), then subject to the Limits of Insurance of this policy, the policy shall:

1. In the event of reduction pay excess of the reduced **Underlying Limits**, or

2. In the event of exhaustion, with respect to any subsequent **Claim** or suit, the policy shall become primary insurance; provided that, this policy shall only pay excess of the applicable Retention or applicable Self Insured Retention of the **Followed Policy** (notwithstanding the exhaustion of the **Followed Policy**).

**E.** The **Underlying Limits** can only be reduced by damages and/or **Defense Expenses** to which this insurance applies. However, the Company will recognize the reduction or exhaustion of the **Underlying Limits** by coverage that is sublimited in the **Followed Policy**. Nevertheless, the Company shall not follow, drop down, or pay any damages and/or **Defense Expenses** for any coverage that is sublimited under any **Underlying Policy**.

**F.** **Defense Expenses** are included within and reduce the Limits of Insurance of this policy.

## IV. DEFINITIONS

**DEFINITIONS** - Any term not defined is this Section IV. or in the preamble to this policy shall have the meaning assigned to such term in the **Followed Policy**.

**A.** **Claim**, if not defined in the **Followed Policy**, means a written demand for monetary damages, including service of suit or institution of arbitration proceedings against the **Insured**.

 © A r ghts reserved.

B. **Defense Expenses** means **Defense Expenses** or Defense Costs as defined in the **Followed Policy.** However, if **Defense Expenses** or Defense Costs are not defined in the **Followed Policy** then **Defense Expenses** means the cost incurred in connection with the investigation and/or defense of any **Claim** including, but not limited to, legal fees and other defense expenses. **Defense Expenses** also include any expenses in the **Followed Policy** which are referred to as Supplementary Payments, Additional Payments, or referred to by a similar term.

C. **Followed Policy** means the policy shown in Item 6. of the Declarations.

D. **Insured** means the First Named Insured and any other person or organization qualifying as a Named Insured or Insured under the **Followed Policy**.

E. **Policy Period** means the period of time beginning with effective date shown in Item 2. of the Declarations and ending on the expiration date shown in Item 2. of the Declarations or earlier termination date.

F. **Underlying Limits** means the sum of:

1. The Aggregate Limits of Insurance of all **Underlying Policies**,

2. All deductibles or self insured retentions applicable to such **Underlying Policies**, and

3. Other insurance (including any self insurance retentions) applicable to any **Claim** that is covered by this policy.

G. **Underlying Policies** means any underlying policies, including the **Followed Policy**.

H. **Underlying Insurer(s)** means the insurer(s) of the **Underlying Policy(ies)**.

## V. EXTENDED REPORTING PERIOD(S)

The Company will follow the terms and conditions of the **Followed Policy** with respect to its Extended Reporting Period(s) provision and reserve the right to negotiate the charge for such Extended Reporting Period(s) with the First Named Insured. Notwithstanding the foregoing sentence, the First Named Insured must pay the additional premium when due for the Extended Reporting Period provided herein and purchase and maintain in full force and effect all Extended Reporting Periods of the **Underlying Policies** in order for the Extended Reporting Period of this policy to apply.

## VI. CONDITIONS

### A. CANCELLATION

1. The First Named Insured shown in the Declarations may cancel this policy by mailing or delivering to the Company advance written notice of cancellation.

 © A r ghts reserved.

**2.** The Company may cancel this policy by mailing or delivering to the First Named Insured written notice of cancellation at least:

**i** 10 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or

**ii** 30 days before the effective date of cancellation if the Company cancels for any other reason.

**3.** The Company will mail or deliver notice to the First Named Insured's last mailing address known to the Company.

**4.** Notice of cancellation will state the effective date of cancellation. The **Policy Period** will end on that date.

**5.** If this policy is canceled, the Company will send the First Named Insured any premium refund due. If the Company cancels, the refund will be pro rata. Subject to the Minimum Earned Premium at Inception shown in Item 4. of the Declarations, if the First Named Insured cancels, earned premium will be calculated short rate. The cancellation will be effective even if the Company has not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. CHANGES IN TERMS OR CONDITIONS OF THE FOLLOWED POLICY**

If during the **Policy Period** or any Extended Reporting Period the terms or conditions of the **Followed Policy** are changed in any manner, the **Insureds** shall as a condition precedent to their rights under this policy give to the Company written notice of the full particulars thereof immediately. If such changes restrict coverage, this policy shall become subject to any such changes upon the effective date of the changes in the **Followed Policy**. If, however, such changes broaden coverage, this policy shall become subject to any such changes upon the effective date of the changes in the **Followed Policy**, but only upon the condition that the Company agrees to follow such changes by written endorsement attached hereto and the First Named Insured agrees to any additional premium and/or amendment of the provisions of this policy required by the Company relating to such changes. Further, such new coverage is conditioned upon the First Named Insured paying when due any additional premium required by the Company relating to such changes.

**C. COVERAGE TERRITORY**

This policy applies to any **Claim** or suit brought within the coverage territory of the **Followed Policy**.

Notwithstanding the foregoing, payment of loss under this policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions,

 © A r ghts reserved.

laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

**D. MAINTENANCE OF UNDERLYING INSURANCE**

It is a condition of this policy that the **Underlying Policies** shall be maintained in full force and effect. Failure to comply with the foregoing shall not invalidate this policy, but in the event of such failure, the Company shall be liable only to the extent that the Company would have been liable had **Insured** complied with this condition.

Further, receivership, insolvency or inability to pay by the **Underlying Insurer(s)** for any reason shall not render the funds which are otherwise available from the **Underlying Insurer(s)** to be unavailable, unrecoverable, reduced or exhausted for the purposes of determining the Company's liability under this policy. The liability of the Company under this policy shall in no way be increased or expanded as a result of such receivership, insolvency or inability to pay by the **Underlying Insurer(s)**.

**E. NOTICE OF CLAIMS, SUITS OR CIRCUMSTANCES**

**1.** Notice of **Claims**, suits or circumstances which may give rise to a **Claim** or suit given to any **Underlying Insurer** in accordance with the terms of any **Underlying Policies**, must also be given in writing as soon as practicable to:

Lexington Insurance Company
99 High Street
Boston, MA 02110
Attention: Professional Liability Claims Department

**2.** Written notice shall include every demand, notice, summons or other process received directly by any **Insured**. Notice of a **Claim**, suit or circumstance which may give rise to a **Claim** or suit to an **Underlying Insurer(s)** shall not be considered written notice to the Company unless the Company has received such written notice.

**F. UNIMPAIRED UNDERLYING LIMITS OF INSURANCE**

The **Insured** warrants that **Underlying Limits** of the **Underlying Policies** shall be unimpaired as of the inception date of this policy. In event such **Underlying Limits** are impaired as of the inception date of this policy, this policy shall apply as if such **Underlying Limits** were unimpaired. In the event of non concurrent policy periods between this policy and **Underlying Policies**, only **Claims** that would be covered during the **Policy Period** of this policy shall be considered in determining the extent of any reduction or exhaustion of the **Underlying Limits**, and the **Insured** shall retain liability for any resulting gap in coverage.

 © A r ghts reserved.

**G. SERVICE OF SUIT**

It is agreed that in the event of the Companys failure to pay any amount claimed to be due hereunder, the Company, at the request of the **Insured**, will submit jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process may be made upon Counsel, Legal Department, Lexington Insurance Company, 99 High Street, Boston, MA 02110, or his or her representative, and that in any suit instituted against the Company, upon this policy, the Company will abide by the final decision of such court or of an appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner, Director of Insurance, or other officer specified for that purpose in the statute, or his or her successor or successors in office as the Company's true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** or any beneficiary hereunder arising out of this contract of insurance, and hereby designate the Counsel, Legal Department, Lexington Insurance Company, 99 High Street, Boston, MA 02110, as the person to whom the said officer is authorized to mail such process or a true copy thereof.

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President, Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the time of issuance by an authorized representative of the insurer.

PRESIDENT

SECRETARY

AUTHORIZED REPRESENTATIVE


© A r ghts reserved.

**ENDORSEMENT#** *1*

This endorsement, effective *12:01 am* *October 1, 2014* forms a part of
policy number *01-615-04-33*
issued to *PREMERA*

by *Lexington Insurance Company*

**DELETION OF CANCELLATION PROVISION ENDORSEMENT**

This endorsement modifies insurance provided by the Policy:

Paragraph **A.**, **CANCELLATION** of **SECTION VI. CONDITIONS** is deleted in its entirety and the Company shall follow the Cancellation/Non Renewal provisions of the **Followed Policy**.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN THE SAME.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

**ENDORSEMENT#** *2*

This endorsement, effective *12:01 am* *October 1, 2014* forms a part of
policy number *01-615-04-33*
issued to *PREMERA*

by *Lexington Insurance Company*

**CHANGES IN TERMS OR CONDITIONS OF FOLLOWED POLICY AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided by the Policy:

Paragraph **B .**, **CHANGES IN TERMS OR CONDITIONS OF THE FOLLOWED POLICY** of **SECTION VI. CONDITIONS** is deleted in its entirety and replaced with the following:

**B. CHANGES IN TERMS OR CONDITIONS OF THE FOLLOWED POLICY**

If during the **Policy Period** or any Extended Reporting Period the terms or conditions of the **Followed Policy** are changed in any manner, the **Insureds** shall as a condition precedent to their rights under this policy give to the Company written notice of the full particulars thereof immediately. If such changes restrict coverage, this policy shall become subject to any such changes upon the effective date of the changes in the **Followed Policy**. If, however, such changes broaden coverage, this policy shall become subject to any such changes upon the effective date of the changes in the **Followed Policy**, but only upon the condition that the Company agrees in writing to such changes and the First Named Insured agrees to any additional premium and/or amendment of the provisions of this policy required by the Company relating to such changes. Further, such new coverage is conditioned upon the First Named Insured paying when due any additional premium required by the Company relating to such changes.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN THE SAME.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

**ENDORSEMENT#** *3*

This endorsement, effective *12:01 am* *October 1, 2014* forms a part of
policy number *01-615-04-33*
issued to *PREMERA*

by *Lexington Insurance Company*

**RECOGNITION OF INSURED'S PAYMENT OF UNDERLYING LIMITS ENDORSEMENT**

In consideration of the premium charged, it is understood and agreed that Paragraph **G**. set forth below is added to **Section III. LIMITS OF INSURANCE**:

**G.** Notwithstanding Paragraph **D**. above, the Company will recognize the reduction or exhaustion of the **Underlying Limits** by the actual payment of such **Underlying Limits** by or on behalf of the **Insured**.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN THE SAME.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

**ENDORSEMENT#** *4*

This endorsement, effective *12:01 am* *October 1, 2014* forms a part of
policy number *01-615-04-33*
issued to *PREMERA*

by *Lexington Insurance Company*

**DEFINITION OF UNDERLYING LIMITS AMENDATORY ENDORSEMENT**

In consideration of the premium charged, it is understood and agreed that **Section IV. DEFINITIONS, F - Underlying Limits,** Part 3. is deleted in its entirety.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN THE SAME.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

ENDORSEMENT# 5

This endorsement, effective 12:01 am October 1, 2014 forms a part of policy number 01-615-04-33 issued to PREMERA

by Lexington Insurance Company

**PROFESSIONAL LIABILITY CRISIS RESPONSE COVERAGE EXTENSION ENDORSEMENT (WITH CRISIS MANAGEMENT LOSS AND CRISIS RESPONSE COSTS)**

This endorsement modifies insurance provided by the policy:

**CRISIS RESPONSE NOTIFICATION TELEPHONE NUMBER: 877-743-7669**

**THIS ENDORSEMENT EXTENDS COVERAGE TO PROVIDE FOR CRISIS RESPONSE COSTS AND CRISIS MANAGEMENT LOSS ARISING OUT OF A CRISIS EVENT BECAUSE OF A WRONGFUL ACT TO WHICH INSURANCE APPLIES. THE LIMITS OF INSURANCE PROVIDED FOR SUCH COVERAGE ARE IN ADDITION TO THE LIMITS OF INSURANCE PROVIDED IN THE DECLARATIONS OF THIS POLICY.**

**SCHEDULE**

| **Crisis Response Coverage Extension** | **Limits of Insurance** | |
|---|---|---|
| Crisis Response Aggregate Limit | **$300,000** | |
| Each Crisis Response Costs Limit | **$250,000** | Each **Crisis Event** |
| Each Crisis Management Loss Limit | **$50,000** | Each **Crisis Event** |

Notwithstanding any provisions to the contrary in the policy to which this endorsement is attached, including the attachment point of any excess professional liability policy, if applicable, subject to the Limits of Insurance as shown in the above Schedule and in accordance with the terms and conditions set forth in this endorsement, this policy is extended to provide **crisis response costs** and **crisis management loss** arising out of a **crisis event** because of a **wrongful act** to which insurance applies.

**SECTION I. - CRISIS RESPONSE COVERAGE EXTENSION**

**A.** We will reimburse you or pay on your behalf reasonable and necessary **crisis response costs** and/or **crisis management loss** arising out of a **crisis event** because of a **wrongful act** to which insurance applies. The amount we will reimburse you or pay on your behalf for such **crisis response costs** and/or **crisis management loss** is limited as described in **SECTION III - CRISIS RESPONSE LIMITS OF INSURANCE**. No self insured retention or deductible shall apply to this coverage extension endorsement.

**B.** We will reimburse you or pay on your behalf **crisis response costs** and/or **crisis management loss** arising out of a **crisis event** only if all of the following conditions are met:

This endorsement, effective 12:01 am October 1, 2014 forms a part of
policy number 01-615-04-33
issued to PREMERA

by Lexington Insurance Company

1. The **crisis event** first occurs during the policy period or extended reporting period, if applicable;

2. The **wrongful act** (or **interrelated wrongful act**, if applicable) that gives rise to the **crisis event** is covered under the policy to which this endorsement is attached;

3. If this endorsement is attached to and made part of a claims made policy or claims made and reported policy:

   a. A **claim** because of such **wrongful act** (or **interrelated wrongful act**, if applicable) must be made against the **insured** during the policy period or extended reporting period, if applicable; or

   b. If a claim has not been made, senior management must reasonably believe that a claim because of such **wrongful act** (or **interrelated wrongful act**, if applicable) will be made against an **insured** during the policy period or extended reporting period, if applicable; and

4. Such **crisis response costs** and/or **crisis management loss** are incurred within thirty (30) days after the commencement date of the **crisis event**. The end of the policy period will not cut short this thirty (30) day period.

**SECTION II. - EXCLUSIONS**

All exclusions of the policy apply to this endorsement, including any exclusion which applies to workers compensation or employer's liability. The following additional exclusion applicable to this endorsement supersede any similar exclusions in the policy.

This insurance does not apply to:

**Newly acquired or merged entities Crisis response costs** or **crisis management loss** resulting from **wrongful act** that occurred prior to the date you acquired or merged with any other entity.

**SECTION III. - CRISIS RESPONSE LIMITS OF INSURANCE**

**A.** The Schedule above and the rules below establish the most we will reimburse or pay on your behalf for **crisis response costs** and **crisis management loss** regardless of the number of **insureds**, **crisis events**, or **affected persons**.

This endorsement, effective *12:01 am* *October 1, 2014* forms a part of
policy number *01-615-04-33*
issued to *PREMERA*

by *Lexington Insurance Company*

**B.** The Crisis Response Aggregate Limit is the most we will reimburse or pay on your behalf for the sum of all **crisis response costs** and **crisis management loss** under this endorsement.

**C.** Subject to Paragraph **B.** above, the Each Crisis Response Costs Limit is the most we will reimburse or pay on your behalf for all **crisis response costs** arising out of any one **crisis event**.

**D.** Subject to Paragraph **B.** above, the Crisis Management Loss Limit is the most we will reimburse or pay on your behalf for all **crisis management loss** arising out of any one **crisis event**.

**E.** All **crisis events** arising out of the same **wrongful act** or related or interrelated **wrongful acts** will be deemed one **crisis event** and shall be deemed to have occurred when the first of such **crisis events** commences to occur.

**SECTION IV. - DEFINITIONS**

The definitions of the policy apply to this endorsement. However, the following additional definitions applicable to this endorsement supersede any similar definitions in the policy.

You and your refer to the Named Insured and we, us and our refer to the Company providing this insurance. Other words and phrases that appear in boldface type have special meaning as follows:

**A. Affected persons** means those individuals who suffer direct **bodily injury** or **property damage**, or directly experience **imminent injury**, including such individuals immediate family members.

**B. Bodily injury** means bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time.

**C. Claim** means a claim as defined by the policy to which endorsement is attached.

**D. Crisis event** means:

1. Significant adverse regional or national news media coverage because of a **wrongful act** or related or interrelated **wrongful acts**; or

This endorsement, effective *12:01 am* *October 1, 2014* forms a part of
policy number *01-615-04-33*
issued to *PREMERA*

by *Lexington Insurance Company*

2. Bodily injury sustained by an affected person(s), property damage to property of an affected **person(s)**, or the direct experience of **imminent injury** by an **affected person(s)** because of a **wrongful act** or related or interrelated **wrongful acts** which results in significant adverse regional or national news media coverage. The **crisis event** as set forth in this Definition **D.2.** will be deemed to occur when the **bodily injury**, **property damage** or **imminent injury** first commences with respect to the first **affected person**.

**E. Crisis management firm** means a public relations firm or crisis management firm, assigned or approved by us in writing, that is hired by you to perform services of the type covered under **crisis management loss** in connection with a **crisis event**.

**F. Crisis management loss** means reasonable and necessary fees and expenses charged by a **crisis management firm** or your employees in providing public relations and media management services for the purpose of maintaining and restoring public confidence in you. These expenses may include printing, advertising, or mailing of materials to manage reputational risk. This does not include the salaries of your employees. **Crisis management loss** shall not include **crisis response costs**.

**G. Crisis response costs** means:

1. reasonable and necessary **emergency transport expenses**, **emergency psychology expenses**, funeral expenses, travel expenses, and temporary living expenses incurred by you to provide relief and/or support to **affected persons**, and

2. **expenses** incurred by you to secure the scene of a **crisis event** (as defined in Definition **D.2.**).

**Crisis response costs** shall not include **crisis management loss**.

**H. Emergency transport expenses** means reasonable and necessary emergency transport expenses, occurring within 24 hours after a **crisis event** (as defined in Definition **D.2.**), to transport an **affected person** sustaining **bodily injury** in such **crisis event** to a medical treatment facility.

**I. Emergency psychology expenses** means reasonable and necessary expenses for psychology or counseling services provided to **affected persons** and incurred within the first fourteen (14) days after a **crisis event** (as defined in Definition **D.2.**). This does not include the costs or expenses of any medications or hospitalizations. Such psychology or counseling services must be approved by the **crisis management firm**.

This endorsement, effective *12:01 am* *October 1, 2014* forms a part of policy number *01-615-04-33*
issued to *PREMERA*

by *Lexington Insurance Company*

**J. Imminent injury** means the actual and immediate threat of **bodily injury** or **property damage**.

**K. Insured** means insured as defined by the policy to which endorsement is attached.

**L. Property damage** means:

1. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **crisis event** (as defined in Definition **D.2.**) that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**M. Wrongful act** or **Interrelated wrongful act** means a wrongful act, interrelated wrongful act, breach of professional duty, media wrongful act and/or technology wrongful act, whichever is/are applicable, as defined by the policy to which endorsement is attached.

**SECTION V. - CONDITIONS**

The conditions of the policy apply to this endorsement. However, the following conditions applicable to this endorsement supersede any similar conditions of the policy to the contrary.

**A. Insured's Duties in the Event of a Crisis Event**

1. You must see to it that we are notified by telephone within twenty four (24) hours of a **crisis event** which may result in **crisis response costs** or **crisis management loss**. The call must be made to 877 743 7669. If necessary, we will provide you with an approved **crisis management firm** unless we agree to accept a **crisis management firm** that you have selected.

This endorsement, effective 12:01 am October 1, 2014 forms a part of
policy number 01-615-04-33
issued to PREMERA

by Lexington Insurance Company

2. Thereafter, you must provide written notice, as soon as practicable. To the extent possible, this written notice should include:

   a. How, when and where the **crisis event** took place;

   b. The names and addresses of any **affected persons** and witnesses; and

   c. The nature and location of any injury or damage arising out of the **crisis event**.

3. If reimbursement is sought directly by you, you must submit a claim for reimbursement of **crisis response costs** and **crisis management loss** within ninety (90) days after incurring such **crisis response costs** or **crisis management loss**. Such claim(s) must include invoices and/or receipts supporting such **crisis response costs** or **crisis management loss** for each and every expense in excess of fifty (50) dollars.

4. Written notice and claim submission as required in Paragraphs **1.** and **2.** of this section, respectively, shall be mailed or delivered to:

   Lexington Insurance Company
   Professional Liability Claim Department
   99 High Street
   Boston, MA 02110

**B. Anti-Stacking Provision**

If **crisis response costs** or **crisis management loss** provided by this coverage extension endorsement are also provided by any other insurance issued to you by us or any of our affiliated companies (whether or not such costs or loss are referred to using these same terms), the maximum limit of insurance under all insurance available shall not exceed the highest applicable limit of insurance available under any one policy or endorsement. This condition does not apply to any other insurance issued by us or any of our affiliated companies specifically intended to apply as excess insurance over this coverage extension endorsement.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN THE SAME.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

**ENDORSEMENT#** 6

This endorsement, effective *12:01 am* *October 1, 2014* forms a part of
policy number *01-615-04-33*
issued to *PREMERA*

by *Lexington Insurance Company*

**FOREIGN TERRORISM EXCLUSION (EXCEPT CANADA)**

This endorsement modifies insurance provided by the policy:

This insurance does not apply to any loss, cost, damage, expense, injury, claim or suit arising out of **Terrorism** that occurs in any country, except **Terrorism** which occurs in the United States of America, its territories and possessions, Puerto Rico and Canada.

**Terrorism** means the use or threatened use of force or violence against person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

**1.** A government;

**2.** The civilian population of a country, state or community; or

**3.** To disrupt the economy of a country, state or community.

So long as the Terrorism Risk Insurance Act of 2002 (the "Act") is in effect, **Terrorism** includes a certified act of terrorism as defined by Section 102. Definitions of the Act and any revisions or amendments thereto.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN THE SAME.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

**ENDORSEMENT#** 7

This endorsement, effective at 12:01 am October 1, 2014 forms a part of
Policy No. 01-615-04-33
Issued to: PREMERA

By: Lexington Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**ECONOMIC SANCTIONS ENDORSEMENT**

*This endorsement modifies insurance provided under the following:*

The Insurer shall not be deemed to provide cover and the Insurer shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the Insurer, its parent company or its ultimate controlling entity to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union or the United States of America.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

**ENDORSEMENT#** *8*

This endorsement, effective *12:01 am* *October 1, 2014* forms a part of
policy number *01-615-04-33*
issued to *PREMERA*

by *Lexington Insurance Company*

FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| LX8657 | 09/10 | MANAGED CARE FOLLOW FORM EXCESS DECLARATIONS |
| LX8658 | 09/10 | MANAGED CARE FOLLOW FORM EXCESS POLICY |
| LX8677 | 09/10 | DELETION OF CANCELLATION PROVISION ENDORSEMENT |
| LX8696 | 05/11 | CHANGES IN TERMS OR CONDITIONS OF FOLLOWED POLICY AMENDATORY ENDORSEMENT |
| MNSCPT | | RECOGNITION OF INSURED'S PAYMENT OF UNDERLYING LIMITS ENDORSEMENT |
| MNSCPT | | DEFINITION OF UNDERLYING LIMITS AMENDATORY ENDORSEMENT |
| LX8704 | 05/11 | PROFESSIONAL LIABILITY CRISIS RESPONSE COVERAGE EXTENSION ENDORSEMENT |
| LX8442 | 01/09 | FOREIGN TERRORISM EXCLUSION (EXCEPT CANADA) |
| 89644 | 06/13 | ECONOMIC SANCTIONS ENDORSEMENT |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

***END 008***

AIG

# CLAIM REPORTING FORM

Issuing Company: *Lexington Insurance Company*

Reported under Policy/Bond Number: 01-615-04-33 Date: ____________

Type of Coverage: D&O ____ E&O ____ Fidelity ____ (complete the Fidelity Supplemental on the next page)

Insured's Name, as given on Policy Declarations (Face Page):

PREMERA

Contact Person: ____________

Title: ____________

Phone: (______) ______ - ______ Ext ______

eMail: ____________ @ ____________

---

Case or Claimant Name: ____________

If the party involved is different from "Insured" Name (as given on Policy Declarations) state relationship:

____________

---

Insurance Broker/Agent: MARSH USA INC.

Address: 540 WEST MADISON STREET, CHICAGO, IL 60661

Address: ____________

Contact: NICOLE FRANCIS Phone: ____________

eMail: nicole.francis@marsh.com

---

Send Notice of Claims to:

AIG
Financial Lines Claims
P.O. Box 25947
Shawnee Mission, KS 66225

Phone: (888) 602-5246
Fax: (866) 227-1750
Email: c-Claim@AIG.com

# CLAIM REPORTING FORM
## FIDELITY SUPPLEMENTAL

**(Only complete this supplemental if the Claim is being reported under Fidelity Coverage)**

Issuing Company: *Lexington Insurance Company*

Reported under Policy/Bond Number: *01-615-04-33*

---

Date of Discovery: ____________________ Estimated Amount of loss: ____________________

Cause of Loss:

| | | | |
|---|---|---|---|
| Employee Dishonesty | ______ | Computer Fraud | ______ |
| Funds Transfer | ______ | Robbery/Burglary | ______ |
| ID Theft | ______ | Forgery | ______ |
| Client Property | ______ | In Transit | ______ |
| ERISA | ______ | Credit Card Forgery | ______ |
| Other | ______ | if Other, describe: | ____________________ |

---

Send Notice Of Claims To:

AIG
Financial Lines Claims
P.O. Box 25947
Shawnee Mission, KS 66225

Phone: (888) 602-5246
Fax: (866) 227-1750
Email: c-Claim@AIG.com

*centralized Customer Link and Information Management*

BCS Insurance Company
2 Mid America Plaza, Suite 200
Oakbrook Terrace, Illinois 60181
800.621.9215
bcsins.com

BCS

March 2, 2015

Nicole Francis
Marsh
Sent via email

Re: Plans' Excess Managed Care Errors & Omissions Liability Insurance Policy
Insured Plan: Premera
Policy No.: MCE4300002
Effective: 10/01/2014 – 10/01/2015

Dear Nicole,

For your records and delivery to the client please find attached the Plans' Excess Managed Care Errors & Omissions Liability Policy together with a copy of the signed application(s) issued to Premera for the 2014-2015 policy period. A hard-copy is available upon request. Please review the policy at your earliest convenience and advise if you have any questions or changes.

We thank you for your business and support of BCS Insurance Company.

Sincerely,
Veronica Guzman
Underwriting Assistant
Professional Liability
T: 630-472-7825
E: vguzman@bcsf.com

**EXHIBIT H**

BCS

**Plans' Excess Managed Care Errors & Omissions Liability Insurance Policy**

BCS Insurance Company
2 Mid America Plaza, Ste 200

**Policy No.:** **MCE4300002**
Renewal of: MCE4300002

(A stock insurance company, herein the "Company")

**POLICY CERTIFICATE DECLARATIONS**

**NOTICE: THIS IS CLAIMS MADE AND REPORTED EXCESS COVERAGE. EXCEPT AS OTHERWISE PROVIDED, COVERAGE APPLIES ONLY TO CLAIMS FIRST MADE DURING THE EXCESS POLICY PERIOD AND REPORTED TO THE COMPANY AS REQUIRED BY THIS EXCESS POLICY.**

**NOTICE: THE LIMIT OF LIABILITY WILL BE REDUCED AND MAY BE COMPLETELY EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES OR LOSS.**

ITEM I. **INSURED PLAN:** **Premera**
Address 7001 220th Street SW
Mountlake Terrace, WA 98043

ITEM II. **EXCESS POLICY PERIOD:** From: 10/1/2014
To: 10/1/2015
(12:01 A.M. local time at the above address)

ITEM III. **LIMIT OF LIABILITY:** **$10,000,000** in the aggregate per coverage period..

ITEM IV. **UNDERLYING LIMITS:** $20,000,000

ITEM V. **PRIMARY INSURER:**

| Company | Policy Period | Policy No. | Limit of Liability | Deductible |
|---|---|---|---|---|
| Ironshore Specialty Insurance Company | From: 10/1/2014 To: 10/1/2015 | 000728305 | $10,000,000 | $ 1,000,000 |

ITEM VI. **UNDERLYING EXCESS INSURERS:**

| Company | Policy Period | Policy No. | Limit of Liability |
|---|---|---|---|
| Lexington Insurance Company | From: 10/1/2014 To: 10/1/2015 | 01-615-04-33 | $10,000,000 excess $10,000,000 |

ITEM VII. **PREMIUM:** $142,505

ITEM VIII. **NOTICE TO COMPANY:**

A. Notice of **Claim** or Potential **Claim**:

Attn: Charles Burke
Claims Manager
BCS Insurance Company
2 Mid America Plaza, Suite 200
Oakbrook Terrace, Illinois 60181
Fax: (630) 472-7765

Attn: Chad Chaffin
Underwriting Manager
BCS Insurance Company
2 Mid America Plaza, Suite 200
Oakbrook Terrace, Illinois 60181
Fax: (630) 472-7765

**This Declarations, together with the Excess Policy (including endorsements), and the completed and signed Application(s) for the Excess Policy constitute the entire contract among the Insured Plan(s), the Insured Persons and the Company.**

**FORM ATTACHED:**
91.318 Plans' Excess Liability Insurance Policy Certificate Declarations
91.721 (9/10) Plans' Excess Liability Insurance Policy

**ENDORSEMENTS ATTACHED:**
This Policy is subject to the terms of the following endorsements attached hereto:

1. 91.1035 (08/09) Reliance on Underlying Application(s) Endorsement
2. 94.120 (05/12) Continuity Credit Renewal Endorsement
3. 91.1046 (10/14) Amendment to the Plans' Excess Liability Insurance Policy, Paragraph 3, Attachment of Liability Endorsement
4. 91.723 (01/14) Defense Endorsement
5. 91.1501 (1114) Providence Health & Services Exclusion Endorsement

Application Dated: September 30, 2014

**BCS Insurance Company**
**2 Mid America Plaza, Suite 200**
**Oakbrook Terrace IL 60181-4712**
**(630) 472-7700**

**PLANS' EXCESS LIABILITY INSURANCE POLICY**

**Issued to the BCS PROFESSIONAL LIABILITY INSURANCE TRUST**
**(BankNewport as Trustee)**

**This is a Claims Made Policy.**

In consideration of the premium paid and subject to the conditions, limitations and other terms of this Excess Policy, and in reliance on the statements made and information furnished by the Insureds in the Application or the underwriting of this Policy, BCS Insurance Company (hereinafter, the Company) agrees as follows:

1. **INSURING CLAUSE:** Subject to the terms and conditions of this Excess Policy, the Company shall provide to the Insureds insurance coverage for Claims first made during the Policy Period, including the Discovery Period if exercised.

2. **FOLLOW FORM COVERAGE:** Except as otherwise stated herein, this Excess Policy is subject to the same conditions, representations, limitations and other terms as are contained in the Primary Policy as of inception of this Excess Policy. In the event of any conflict between the terms, conditions, and limitations of this Excess Policy and any Underlying Policy, the terms, conditions and limitations of this Excess Policy shall control.

   To the extent the terms, conditions or limitations of the Followed Policy are changed to limit or restrict coverage, this Excess Policy shall become subject to such changes upon the effective date of the change in the Followed Policy. To the extent the terms, conditions or limitations of the Followed Policy are changed to expand or broaden coverage, this Excess Policy shall become subject to such changes only if and to the extent the Company agrees to such changes in writing and the Insureds pay any additional premium reasonably required by the Company for such changes.

   If any Underlying Policy(ies) contains a specific grant of coverage that is subject to a sublimit of liability, then coverage under this Excess Policy shall not apply to any Claim which is otherwise subject to such grant of coverage. However, any loss paid under the Underlying Policy(ies) on account of such Claim shall erode or exhaust the Underlying Limit for purposes of this Excess Policy.

3. **ATTACHMENT OF LIABILITY:** The Company's liability to pay under this Excess Policy shall attach only when (i) the insurers of the Underlying Policy(ies), the Insureds, and /or any other party shall have paid in legal currency the full amount of the Underlying Limit as described in Section 5 below, and (ii) the Insureds shall have paid the retention or deductible, if any, applicable under the Primary Policy.

   Notwithstanding any of the terms of this Excess Policy which might be construed otherwise, this Excess Policy shall drop down only in the event of erosion or exhaustion of the Underlying Limit as described in Section 5 below, and shall not drop down for any other reason including, but not limited to, uncollectability (in whole or in part) of any Underlying Policy(ies). The risk of uncollectability of the Underlying Policy(ies) (in whole or in part) whether because of financial impairment or insolvency of an underlying insurer or for any other reason, is expressly retained by the Insureds and is not in any way or under any circumstances insured or assumed by the Company.

Notwithstanding anything in this Policy to the contrary, if with respect to any Claim the Underlying Limit is reduced or exhausted by payments by the Insureds or any party other than the insurers of the Underlying Policy(ies), then:

a. the unexhausted Limit of Liability under this Policy otherwise applicable to such Claim shall be reduced by at least the largest percentage savings of each financially solvent underlying insurer's Limit of Liability applicable to such Claim; and

b. the Insured shall provide to the Company satisfactory evidence of the payments by the Insureds and such other party.

**4. LIMIT OF LIABILITY:** The aggregate Limit of Liability shown in Item III of the Declarations shall be the maximum aggregate liability of the Company under this Excess Policy for all loss, including defense costs and expenses, resulting from all Claims first made during the Policy Period, including the Discovery Period if exercised.

**5. EROSION OF UNDERLYING LIMITS:** Only in the event of erosion or exhaustion of the Underlying Limit by reason of the insurer(s) of the Underlying Policy(ies), the Insureds, and/or any other party paying in legal currency loss covered under the respective Underlying Policy(ies), this Excess Policy shall: (i) in the event of erosion, pay excess of the eroded Underlying Limit, and (ii) in the event of exhaustion, continue in force as primary insurance; provided always that in the latter event this Excess Policy shall only pay excess of the retention or deductible, if any, applicable under the Primary Policy, which retention or deductible shall be applied to any subsequent loss in the same manner as specified in the Primary Policy.

If any Underlying Policy(ies) has a policy period which is different from the Policy Period listed in Item II of the Declarations, and if such Underlying Policy(ies) covers any Claim(s) which shall be deemed to be made outside the Policy Period hereunder, any payment of loss resulting from such Claim(s) shall not erode or exhaust the Underlying Limit for purposes of coverage under this Excess Policy.

**6. NO DUTY TO DEFEND:** The Company shall have no obligation to defend or provide a defense for any Insured under this Excess Policy regardless of the existence of a duty to defend in any Underlying Policy(ies). It shall be the duty and responsibility of such Insured to defend any covered Claim.

**7. NOTICE:** All notices under this Excess Policy shall be in writing and properly addressed to the appropriate party. Notice to the Insureds may be given to the Insured Plan at the address as shown in Item I. of the Declarations. Notice to the Company of any Claim or potential Claim under this Excess Policy shall be given to the Company at the address as shown in Item VIII.A of the Declarations. All other notices to the Company under this Excess Policy shall be given to the Company at the address as shown in Item VIII.B of the Declarations. Any notice to the insurer of an Underlying Policy(ies) shall not constitute notice to the Company unless also given to the Company as provided in this Section 7.

**8. PARTICIPATION IN CLAIMS:** The Company may, at is sole discretion, elect to participate in the investigation, settlement or defense of any Claim or potential Claim reported to the Company under this Excess Policy even if the Underlying Limit has not been exhausted.

No action by any other insurer shall bind the Company under this Excess Policy. The Company shall not be liable under this Excess Policy for any settlements, stipulated judgments or defense costs to which the Company has not consented, which consent shall not be unreasonably withheld.

**9. MAINTENANCE OF UNDERLYING POLICIES:** If any Underlying Policy(ies) is canceled or terminated during the Policy Period including the Discovery Period if exercised, the Company shall not be liable under this Excess Policy to a greater extent than it would have been had such Underlying Policy(ies) been maintained.

**10. DISCOVERY PERIOD:** The Insureds shall have the right to elect a Discovery Period under this Excess Policy as described in, and subject to the terms of, the Followed Policy. The additional premium for the Discovery Period shall be the same percentage of this Excess Policy's annual premium as the percentage stated in the Followed Policy for calculating the Discovery Period premium thereunder. The Discovery Period shall not be available unless the Insured has elected the Discovery Period in all unexhausted Underlying Policies and has provided proof thereof to the Company.

**11. DEFINITIONS:**

Terms defined in the Followed Policy are used herein with the meaning assigned to them in the Followed Policy unless otherwise stated herein. Other capitalized words and phrases are defined below:

A. Followed Policy means the Primary Policy, unless otherwise provided by endorsement to this Excess Policy.

B. Insured(s) means all natural persons and entities insured by the Followed Policy.

C. Insured Plan means the entity named in Item I of the Declarations.

D. Primary Policy means the policy described in Item V of the Declarations.

E. Policy Period means the period of time specified in Item II of the Declarations, subject to prior termination in accordance with the Followed Policy.

F. Underlying Limit means the amount set forth in Item IV of the Declarations, plus the retention or deductible, if any, applicable under the Primary Policy.

G. Underlying Policy(ies) means the Primary Policy and any other policy described in Item VI of the Declarations.

Terry Hackett
SECRETARY

H F Beacham, III
PRESIDENT

**Endorsement No. 1**

**RELIANCE ON UNDERLYING APPLICATION(S)**

Issued to the
BCS PROFESSIONAL LIABILITY INSURANCE TRUST
(BankNewport as Trustee)

This Endorsement, effective at 12:01 a.m. on October 1, 2014, forms part of:

| | |
|---|---|
| Excess Certificate No.: | MCE4300002 |
| Issued to: | Premera |
| Issued by: | BCS Insurance Company |

In consideration of the premium charged, it is acknowledged and agreed that the **Company** will accept one or more Application(s) for the Underlying Insurance in place of the **Company's** Application. The **Insured** represents that the particulars and statements contained in each such Application for the underlying insurance are true, accurate, and complete, and agrees that this **Excess Policy** is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and to constitute a part of this **Excess Policy**, are the basis of this **Excess Policy**.

This endorsement forms a part of this **Excess Policy** to which attached, effective on the inception date of the policy unless otherwise stated herein.

All other terms and conditions of this **Excess Policy** remain unchanged

**BCS Insurance Company**
**2 Mid America Plaza, Ste 200**
**Oakbrook Terrace, IL 60181**

**Endorsement No. 2**

**CONTINUITY CREDIT RENEWAL ENDORSEMENT**

Issued to the
BCS PROFESSIONAL LIABILITY INSURANCE TRUST
(BankNewport as Trustee)

This Endorsement, effective at 12:01 a.m. on October 1, 2014, forms part of:

| | |
|---|---|
| Excess Certificate No.: | MCE4300002 |
| Issued to: | Premera |
| Issued by: | BCS Insurance Company |

Amount of Continuity Credit Balance: $14,463.00

This Policy is eligible to participate in the Continuity Credit Program (the "Program") established by BCS Insurance Company ("Company") to reward the insured Blue Cross and Blue Shield Plan or its affiliate ("Plan") named above for its participation in the professional liability program established by the Company. Each Policy will have its own continuity credit balance.

The Plan is eligible to receive annually a payment up to twenty-five percent (25%) of the amount of the continuity credits in its own continuity credit balance, beginning the effective date of this Endorsement as set forth above. Notwithstanding the above, if any continuity credit balance shall be below $10,000, the Plan is eligible to receive a payment up to one hundred percent (100%) of the balance.

A continuity credit will be paid by check to the Plan within sixty (60) days of the Company's receipt of Plan's current year premium in full, unless within such sixty (60) day period the Company receives the Plan's written request either to not be sent a distribution from its continuity credit balance or to be sent an amount less than the maximum available distribution.

All unused continuity credits carry over to the next Policy year, provided that the Plan continues to be an insured in the professional liability program in the next Policy year. In the event a Plan ceases to be an insured in the professional liability program in the next Policy year, the Plan forfeits the entire amount of its continuity credit balance. In the event a Plan having primary coverage elects to obtain only excess coverage in the next Policy year, the Plan shall forfeit fifty percent (50%) of the amount of its continuity credit balance.

Continuity credits that are forfeited may be redistributed to the continuity credit balances of other Plans at the discretion of Company. Additional contributions may be credited to the continuity credit balance of participating Plans at the discretion of Company. Company may terminate or modify the Program at any time without notice to participating Plans as to any future Policy years. Termination will not affect the continuity credit balance existing at the date of termination, which will be paid out to the Plan over time under the then current terms of the Program.

All other terms and conditions of this Policy shall remain unchanged.

This endorsement forms a part of the Policy to which it is attached, effective on the inception date of the Policy unless otherwise stated herein.

**BCS INSURANCE COMPANY**
2 Mid America Plaza, Suite 200
Oakbrook Terrace, IL 60181-4712
(630) 472-7700

**Endorsement No. 3**

**AMENDMENT TO THE PLANS' EXCESS LIABILITY INSURANCE POLICY, PARAGRAPH 3, ATTACHMENT OF LIABILITY ENDORSEMENT**

Issued to the
BCS PROFESSIONAL LIABILITY INSURANCE TRUST
(BankNewport as Trustee)

This Endorsement, effective at 12:01 a.m. on October 1, 2014, forms part of:

| | |
|---|---|
| Excess Certificate No.: | MCE4300002 |
| Issued to: | Premera |
| Issued By: | BCS Insurance Company |

In consideration of the premium paid, BCS Insurance Company ("Company") and the Insureds agree that paragraph 3, ATTACHMENT OF LIABILITY, of the PLAN'S EXCESS LIABILITY INSURANCE POLICY is hereby deleted and replaced with the following:

**3.** **ATTACHMENT OF LIABILITY:** The Company's liability to pay under this Excess Policy shall attach only when (i) the insurers of the Underlying Policy(ies), the Insureds, and/or any other party shall have paid in legal currency the full amount of the Underlying Limit as described in Section 5 below, and (ii) the Insureds shall have paid in legal currency the full amount of the Underlying Limit as described in Section 5 below and the retention or deductible, if any, applicable under the Primary Policy.

This Excess Policy shall not drop down for any reason, including, but not limited to, uncollectability (in whole or in part) of any Underlying Policy(ies). The risk of uncollectability of the Underlying Polices(ies), whether because of financial impairment or insolvency of an underlying insurer or for any other reason, is expressly retained by the Insureds and is not in any way or under any circumstances insured or assumed by the Company.

Notwithstanding anything in this Excess Policy to the contrary, if with respect to any Claim the Underlying Limit is reduced or exhausted by payments by the Insureds or any party other than the insurers of the Underlying Policy(ies), then the Insured shall provide to the Company satisfactory evidence of the payments by the Insureds and such other party.

This endorsement forms a part of this Excess Policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

All other terms and conditions of this Excess Policy remain unchanged

**BCS Insurance Company**
**2 Mid America Plaza, Ste 200**
**Oakbrook Terrace, IL 60181**

**Endorsement No. 4**

**DEFENSE ENDORSEMENT**

Issued to the
BCS PROFESSIONAL LIABILITY INSURANCE TRUST
(BankNewport as Trustee)

This Endorsement, effective at 12:01 a.m. on October 1, 2014, forms part of:

| | |
|---|---|
| Certificate No.: | MCE4300002 |
| Issued to: | Premera |
| Issued by: | BCS Insurance Company |

It is agreed that Section 6, "NO DUTY TO DEFEND," is deleted in its entirety, and this Excess Policy is subject to the same terms and conditions relating to the defense of any covered Claim as are contained in the Primary Policy, provided this Endorsement does not change the time when liability or any other obligation under this Excess Policy attaches to the Company.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

**BCS INSURANCE COMPANY**
2 Mid America Plaza, Suite 200
Oakbrook Terrace, IL 60181-4712
(630) 472-7700

**Endorsement No. 5**

**PROVIDENCE HEALTH & SERVICES EXCLUSION ENDORSEMENT**

Issued to the
BCS PROFESSIONAL LIABILITY INSURANCE TRUST
(BankNewport as Trustee)

This Endorsement, effective at 12:01 a.m. on October 1, 2014, forms part of:

| | |
|---|---|
| Excess Certificate No.: | MCE4300002 |
| Issued to: | Premera |
| Issued by: | BCS Insurance Company |

In consideration of the premium charged, the Insureds and the Company agree as follows:

1. The Company shall not be liable under this Policy for any Loss resulting from that portion of any Claim which arises from any actual or alleged act, error or omission by Providence Health & Services ("Providence") or any subsidiary, affiliate, director, officer or employee of Providence in their capacity as such.

2. Any payment of Loss which is described in paragraph 1 above and which erodes or exhausts the limit of liability under any Underlying Policies shall also erode or exhaust the Underlying Limit for purposes of this Excess Policy even though such Loss is not covered under this Excess Policy.

This endorsement forms a part of this **Excess Policy** to which attached, effective on the inception date of the policy unless otherwise stated herein.

All other terms and conditions of this **Excess Policy** remain unchanged

Print Form

darwin

# Renewal Application for Managed Care Errors and Omissions Liability

**THIS IS AN APPLICATION FOR A CLAIMS MADE AND REPORTED POLICY. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES.**

## PART I. GENERAL INFORMATION, OPERATIONS, AND STRUCTURE

1. a) Name of Applicant: Premera
(Note: Wherever used, 'Applicant' means this entity and any other entities listed in question 3.)

b) Address: 7001 - 220th Street SW
City: Mountlake Terrace State: WA ZIP: 98043
Website: www.premera.com Telephone Number ( ) 425-918-4000

c) Contact person and title: Tim McMichael, Assistant General Counsel and Director SIU
Email address: Tim.McMichael@Premera Telephone Number ( ) 425-918-4000

d) Name of risk manager (if different than contact person): Quentin Powers
Email address: Quentin.Powers@Premera.com

2. a) Applicant is:
- [x] For-Profit Corp.
- [x] Not-for-Profit Taxable Corp.
- [ ] Partnership
- [ ] Other (describe):
- [ ] Not-for-Profit Tax-Exempt Corp.
- [ ] Limited Liability Company
- [ ] Joint Venture

b) [ ] HMO If so, please indicate: [ ] Staff Model [ ] Network or IPA Model [ ] Combined
[x] PPO [ ] PHO [ ] IPA [ ] MSO [ ] Medical Group or Clinic
[x] Third Party Administrator [ ] Peer Review Organization [ ] Utilization Review Organization
[x] Other (describe): see Attachment 1

c) Does the Applicant have any exclusive agreements with providers? [x] Yes [ ] No

d) Date of incorporation: 10/10/33 (Predecessor) Date operations began: 10/10/33

e) State(s) where Applicant operates:
WA, AK, AZ, CA, CO, ID, KS, MN, MT, ND, NJ, NM, NV, OH, OK, OR, PA, TX, UT, VA, WY

3. If coverage is desired for any other entities (e.g., subsidiaries, joint ventures, or partnerships), please list each such entity below. If required, list additional entities on a separate attachment. Please note that coverage for such entities is not automatically available; the terms and conditions of the policy, if issued, will determine actual coverage.

| Name and Address | Relationship to Applicant | Description of Operations | Tax Status | Percent Owned |
|---|---|---|---|---|
| See Attachment 2 | | | | |

| | | | | |
|---|---|---|---|---|
| | | | | |

4. a) Is the Applicant licensed by federal, state, or local government? ☒ Yes ☐ No
If "Yes," identify the licensing government: Ins. Departments of all states where we're licensed.

b) Is the Applicant accredited or certified by any organization such as the National Committee for Quality Assurance (NCQA), URAC or any state or federal agency? ☒ Yes ☐ No
If "Yes," identify the accrediting or certifying organization(s): NCQA

c) Has the Applicant's license, certification, or accreditation ever been investigated, denied, suspended, revoked, or granted subject to any contingencies or recommendations? ☐ Yes ☒ No
If "Yes," please explain:____________________

| | Last 12 Months | Next 12 months (est.) |
|---|---|---|
| 5. **REVENUES:** | | |
| a) Total Gross Revenues: If this revenue number does not match that in the attached audited financials, please explain:__________ | $3.362 Billion | $3.938 Billion |
| b) Percent of Gross Revenues from "at risk" agreements: (Note: Wherever used, "at risk" means capitation, withhold or bonus.) | N/A | N/A |
| 6. **ENROLLMENT:** | | |
| Total number of enrollees: | 1.827M | 1.940M |

(Note: Wherever used, "enrollees" means covered lives, not just covered employees and not member months.) If enrollees are in more than one state, provide breakdown by state on a separate attachment.

| | | |
|---|---|---|
| 7. **HEALTH CARE PROVIDER**: | | |
| a) Total number of physicians under contract: | 20,811 | 19,978 |
| (1) Number of employed physicians: | 13 | 14 |
| (2) Number of independent contractor physicians: | 20,824 | 19,992 |
| b) Total number of non-physician health care professionals under contract: | 34,102 | 32,413 |
| c) Total number of hospitals under contract: | 190 | 188 |
| d) Total number of other facilities under contract (e.g., clinics, nursing homes, laboratories, pharmacies): | 4,788 | 5,125 |

e) Does Applicant require and verify that all contracted health care providers (physicians, hospitals, and others) maintain medical malpractice insurance? ☒ Yes ☐ No
If No, what are the minimum limits required?________

f) Provide details of the Applicant's compensation or participation arrangements with contracted health care providers or attach copies of sample contracts. See Attachment 3

g) Does Applicant have any provider agreements in which the Applicant assumes responsibility for overseeing the quality of the services provided by the health care providers? ☐ Yes ☐ No

8. Please provide details of insurance/self-insurance/reinsurance currently in force (if none, so state):

| Type of Coverage | Insurance Carrier(s) | Limits | Deductible/ Retention | Premium | Policy Period | If Claims Made, Retroactive Date |
|---|---|---|---|---|---|---|
| **Medical Malpractice** | | | | | | |
| **D&O** | | | | | | |
| **Stop Loss** | | | | | | |
| **Insolvency** | | | | | | |
| **Fidelity** | | | | | | |
| **Fiduciary** | | | | | | |
| **Other** | | | | | | |

9. Does any person or entity own more than 5% of the Applicant's stock? ☐ Yes ☒ No
If yes, please provide the names and ownership percentage:________

10. Have there been any changes in the Applicant's board of directors or senior management within the past two (2) years for reasons other than death or retirement? ☒ Yes ☐ No
If "Yes," please explain: See Attachment 4

11. Number of Applicant's: Full-time employees: 3674
Part-time employees: 54

12. Has the Applicant been involved in within the past 36 months, or does the Applicant contemplate being involved in within the next 12 months, any of the following, whether or not such transactions were or will be completed? ☑ Yes ☐ No
(If "Yes," please describe the essential terms of each such transaction as an attachment to this Application.)

(a) Merger, acquisition, or consolidation with another entity? ☐ Yes ☒ No
(b) Sale, distribution, or divestiture of any assets or stock, other than in the ordinary course of business? ☒ Yes ☐ No
(c) Any registration for a public offering or private placement of securities? ☐ Yes ☒ No
(d) Any joint ventures? ☒ Yes ☐ No
(e) Any new business activities or services? ☒ Yes ☐ No
(f) Any new Medicare or Medicaid contracts? ☒ Yes ☐ No

If "Yes" to any of the above, please explain: See Attachment 5

13. List the primary professional groups or associations to which the Applicant belongs: Blue Cross Blue Shield Association

14. **ANTITRUST MARKET POSITION:**

a) Does the Applicant contract with more than 25% of the physicians in any given field of practice (including without limitation primary care, family practice, or any specialty) within its geographical service area? ☒ Yes ☐ No
If "Yes," please explain: PBC offers contracts to the majority of providers in its service areas.

b) Do the Applicant's members control more than 25% of the hospital beds or specialty services within its geographic service area? ☐ Yes ☒ No
If "Yes," please explain:

c) Does Applicant have exclusive contracts with any hospitals? ☒ Yes ☐ No

d) Has the Applicant obtained advice from antitrust legal counsel (particularly related to mergers, acquisitions and network development)? ☒ Yes ☐ No
If "Yes" please specify firm name Alston & Bird and Lane Powell PC

e) Has the Applicant received an opinion from the Federal Trade Commission (FTC) confirming that their activities (such as developing joint ventures or new plans) will not violate antitrust laws? ☐ Yes ☒ No

f) Does the Applicant have any provider agreements that contain "Most Favored" pricing clauses? ☒ Yes ☐ No

g) Does the Applicant have any provider agreements that contain non-compete clauses? ☐ Yes ☒ No

15. **ACTIVITIES OR SERVICES:**

Please indicate those managed care activities or services which the Applicant performs or subcontracts now or intends to begin performing or subcontracting within the next 12 months (Note: not all checked services may be covered):

| **Activity or Service** | **Yes** | **No** | **Yes, For Others For Fee** |
|---|---|---|---|
| a) Credentialing or peer review of health care providers | ☑ (Complete Part II) | ☐ | ☐ (Complete Part II) |
| b) Utilization review | ☑ (Complete Part III) | ☐ | ☐ (Complete Part III) |
| c) Handling and adjusting of claims for enrollee benefits | ☑ (Complete Part IV) | ☐ | ☐ (Complete Part IV) |
| d) Advertising, marketing, or selling of health care plans/products | ☑ (Complete Part V) | ☐ | ☐ (Complete Part V) |
| e) Drafting practice guidelines/ critical pathways | ☑ | ☐ | ☐ |
| f) Case Management | ☑ | ☐ | ☐ |
| g) Disease Management | ☐ | ☐ | ☑ |
| h) Enrollment processing for enrollees | ☑ | ☐ | ☐ |

| | | | |
|---|---|---|---|
| of health care plans | | | |
| i) Billing/other processing of enrollees' claims under health care plans | ☑ | ☐ | ☑ |
| j) Establishing health care provider networks to provide managed care | ☑ | ☐ | ☑ |
| k) Actuarial services for health care plans | ☑ | ☐ | ☐ |
| l) Assisting customers in securing reinsurance | ☑ | ☐ | ☐ |
| m) Third Party administration (TPA) services for health care plans | ☑ | ☐ | ☑ |

Please describe the services provided: Claims adjudication, enrollment cust. service, COBRA admin, etc.

n) Services for automobile liability or disability plans (please describe): See Attachment 6

o) Employee Assistance Program (EAP) services (please describe): Counseling and referral services.

p) Nurse call line (please describe): CareWise: the 24-hr Nurseline is a toll-free number that members can call to get answers to health related questions for themselves or members of their family.

q) Any additional services provided: N /A

16. **RISK MANAGEMENT**:

a) Does the Applicant have a formal risk management program (i.e, a formal overall approach to avoiding situations that might give rise to a claim)? ☒ Yes ☐ No

b) Have there been any changes made to the program in the past 12 months? ☐ Yes ☒ No
If "Yes," please explain: ______

b) Does the Applicant have someone designated as a "legislative or executive" inquiry ombudsman (i.e., someone who investigates all problems or complaints once they rise to a certain level)? ☐ Yes ☒ No

17. **HIPAA:**

(1) Does the Applicant have a Privacy Officer? ☒ Yes ☐ No
(2) Does the Applicant have a Security Officer? ☒ Yes ☐ No
(3) Has the Applicant established a HIPAA team? ☒ Yes ☐ No
(4) Has the Applicant conducted a HIPAA risk analysis? ☒ Yes ☐ No
(5) Has the Applicant modified its policies and procedures such that they are consistent with the elements of HIPAA? ☒ Yes ☐ No
(6) Has the Applicant conducted HIPAA privacy training? ☒ Yes ☐ No
(7) Is employee and vendor adherence to confidentiality requirements audited? ☒ Yes ☐ No
(8) Does the Applicant have a plan for ongoing HIPAA privacy training? ☒ Yes ☐ No
(9) Does the Applicant have a policy and procedure to address the responsibilities of its "Business Partners" under HIPAA? ☒ Yes ☐ No

18. **COMPLIANCE:**

(1) Does the Applicant have a written Corporate Compliance program? ☒ Yes ☐ No
If "Yes," how long has it been in place? Since 1996

(2) Does the Applicant have an employee hotline as a part of the Compliance program? ☒ Yes ☐ No

If "Yes", what is the average number of calls per month made to the hotline? Two (2)

**APPLICANT: PLEASE COMPLETE THE FOLLOWING SECTIONS WHICH CORRESPOND TO "YES"ANSWERS IN QUESTION 15 ABOVE. IF NO CORRESPONDING SECTIONS ARE INDICATED, PLEASE PROCEED TO PART VI**

**PART II. CREDENTIALING OR PROVIDER SELECTION OF HEALTH CARE PROVIDERS**

14. Total revenue for credentialing/peer review services performed for others for a fee: Last 12 months $ 0 Next 12 months $ 0

15. a) Who does the credentialing of contracted health care providers?
    - Applicant: ☒ Yes ☐ No
    - Subcontractor: ☒ Yes ☐ No
    - Other:________ ☐ Yes ☒ No

    b) If credentialing is subcontracted:
    - (1) Does the Applicant review or audit the process? ☒ Yes ☐ No
    - (2) Is subcontractor required to maintain errors and omissions insurance? ☒ Yes ☐ No
    - (3) What minimum limits are required? $1M / $3M
    - (4) Does the Applicant indemnify the subcontractor? ☐ Yes ☒ No
    - (5) Does the subcontractor indemnify the Applicant? ☐ Yes ☒ No

19. Does the Applicant have written policies and procedures in place for provider selection, credentialing, re-credentialing, and making decisions which adversely affect a provider's credentials? ☒ Yes ☐ No

a) Do the written credentialing procedures follow JCAHO or NCQA standards and comply with all applicable laws? ☒ Yes ☐ No

b) Are the procedures given to health care providers? ☒ Yes ☐ No

c) Is legal counsel consulted before any recommendation or decision which adversely affects a provider's privileges or credentials becomes final? ☒ Yes ☐ No

d) Are all providers offered a hearing or appeal prior to termination? ☒ Yes ☐ No
If "No," please explain:________________

e) What group has the final authority for credentialing or provider selection?
- Board of Directors or Trustees: ☐ Yes ☒ No
- Committees: ☒ Yes ☐ No
- Other:__________ ☐ Yes ☒ No

20. Does the Applicant query the National Practitioner Data Bank, Healthcare Integrity and Protection Data Bank or the Federal or State Medical Boards as part of the credentialing process? ☑ Yes ☐ No

21. How often does the Applicant re-credential contracted health care providers? Every three (3) years.

22. Does the Applicant perform on-site visits of contracted health care providers? ☒ Yes ☐ No
If "Yes," how often? When two (2) member complaints are received.

23. Does the Applicant restrict the practice of any health care provider who has a mental, physical

disorder, or substance abuse problem which may impair his/her ability to practice? ☐ Yes ☒ No
If "Yes," please explain:

24. Have any providers been removed or disqualified from the Applicant's panel in the last 12 months? ☒ Yes ☐ No
If "Yes," a) How many for credentialing or professional conduct reasons? 23
b)How many for reasons other than professional competence? 23
c)Is complete documentation maintained on all terminations? ☒ Yes ☐ No

**PART III. UTILIZATION REVIEW**

25. a) Please specify number or percentage (%) of enrollees by type of payor (Note: Wherever used, "enrollees" means covered lives, not just covered employees and not member months). If utilization review services are performed for others for a fee, indicate amount or percentage (%) of revenue generated by type of payor.

| Type of Payor | % of Enrollees Last 12 Months | % of Enrollees Next 12 Months | % of Revenue Last 12 Months | % of Revenue Next 12 Months |
|---|---|---|---|---|
| Private (non-government) employer plans or trusts | 75.1 | 71.9 | 48.0 | 42.6 |
| Government employer plans | 13.7 | 12.7 | 35.4 | 31.9 |
| Union plans | 2.2 | 2.5 | .1 | .1 |
| Medicare or Medicaid plans | 0 | .5 | 0 | 1.9 |
| Other | 9.0 | 12.4 | 16.5 | 23.5 |

b) Total revenue for utilization review services performed for others for a fee:
(1) Last 12 months: N/A (2) Next 12 months: N/A

26. a) Who does utilization review?
Applicant: ☒ Yes ☐ No
Subcontractor: ☒ Yes ☐ No
Other: ______ ☐ Yes ☐ No

b) Percentage of benefits denied/avoided in the utilization review process (e.g. denial rate): 7.9 %

c) Number of full-time equivalent (FEE) reviewers: 53
Number of part-time equivalent (PTE) reviewers: 4.7

d) If utilization review is subcontracted:
(1) Does the Applicant review or audit the process? ☒ Yes ☐ No
(2) Is the subcontractor required to maintain errors and omissions insurance? ☒ Yes ☐ No
(3) What minimum limits are required?
(4) Does the Applicant indemnify the subcontractor? ☒ Yes ☐ No
(5) Does the subcontractor indemnify the Applicant? ☒ Yes ☐ No

e) Does the Applicant have written policies and procedures for utilization review, including for denials and appeals? ☒ Yes ☐ No
If "Yes," do such policies and procedures follow NCQA or URAC standards and comply with all applicable laws? ☒ Yes ☐ No

f) Does the Applicant use practice guidelines as part of its utilization review procedures? ☒ Yes ☐ No
If "Yes," do guidelines state in writing that physician's judgment may override a guideline? ☑ Yes ☐ No

g) Are claim denial and appeal procedures explained in writing to enrollees, including the identity of the person who makes decisions regarding appeals? ☑ Yes ☐ No

h) Does a physician review all proposed denials of benefits prior to issuance of the

denial? ☒ Yes ☐ No

i) Are external reviewers involved in the final level of review before appeal? ☐ Yes ☒ No

j) What percentage of decisions which go through the external review process are ultimately decided in favor of the enrollee? 15 %

k) Does the Applicant have a "fast track" appeal system regarding denial of benefits or postponement of benefit procedures for organ transplants or any other procedure which may severely impair the quality of life for an enrollee if not performed? ☑ Yes ☐ No

l) Does the Applicant utilize profit sharing, risk sharing or other financial incentives in its compensation arrangements with utilization reviewers? ☐ Yes ☒ No

m) Does the Applicant adhere to government mandated external review requirements in the states where it operates? ☑ Yes ☐ No

n) Does the Applicant have an external review process in those states where external review is not mandated? ☑ Yes ☐ No

27. Attach a sample of a utilization review denial letter (with enrollee identity removed). Attachment 7

**PART IV. HANDLING AND ADJUSTING OF ENROLLEES' HEALTH CARE BENEFIT CLAIMS**

| | Last 12 months | Next 12 months |
|---|---|---|
| 28. Total revenue for claims handling and adjusting services performed for others for a fee: | $203,985,855 | $212,905,616 |
| 29. a) Number of claims processed: | 16,071,160 | 16,795,308 |
| b) Number of FTE claim adjusters: | 359 | 359 |

c) Number or percentage of PTE claim adjusters: 3%

d) Percentage of claims denied: 10 %

e) Who does the handling and adjusting of claims for health care benefits?

| | Yes | No |
|---|---|---|
| Applicant: | ☒ | ☐ |
| Subcontractor: | ☐ | ☒ |
| Other: ______ | ☐ | ☒ |

f) If claim handling and adjusting are subcontracted:

| | Yes | No |
|---|---|---|
| (1) Does the Applicant review or audit the process? | ☐ | ☐ |
| (2) Is the subcontractor required to maintain errors and omissions insurance? | ☐ | ☐ |
| (3) What minimum limits are required? N/A | | |
| (4) Does the Applicant indemnify the subcontractor? | ☐ | ☐ |
| (5) Does the subcontractor indemnify the Applicant? | ☐ | ☐ |

g) Does the Applicant utilize profit sharing, risk sharing, or other financial incentives in its compensation arrangements with claim handlers or adjusters? ☐ Yes ☒ No

## PART V. ADVERTISING/MARKETING/SALES

30. a) Do all contracts, sales literature, and brochures expressly identify covered and non-covered procedures? ☒ Yes ☐ No
   b) Do any contracts, sales literature, or brochures use the term(s) "investigative" or "experimental" procedures? ☒ Yes ☐ No
   If "Yes":
      (1) Do all such materials define what is considered "investigative" or "experimental'? ☒ Yes ☐ No
      (2) Do all such materials clearly state that the Applicant has discretionary authority in the interpretation and administration of the plan's provisions? ☐ Yes ☒ No
   c) Do contracts, sales literature, and brochures expressly refer to all contracted health care providers as independent contractors? ☑ Yes ☐ No
   d) Do any contracts, sales literature, or brochures make statements or warranties as to the quality of health care, breadth of plan, providing all the needed care or being the "best" plan, etc.? ☐ Yes ☒ No
   e) Does the Applicant's legal counsel review and approve all contracts, sales literature, brochures, advertisements, and other marketing materials prior to their use? ☒ Yes ☐ No
   f) Are enrollee satisfaction surveys conducted? ☒ Yes ☐ No
   If "Yes," how often? Annually (Please attach or describe results from the most recent enrollee survey). See Attachment 8

## PART VI. REPRESENTATION APPLICABLE TO INCREASED LIMIT REQUEST

1. If the Insured Entity requests limit(s) of liability for the renewal of its expiring policy with the Insurer that are larger than the limit(s) of such expiring policy, the Insured Entity must complete the following statement, which applies to such larger limit(s) of liability.

   Neither the Insured Entity nor any individual or entity proposed for coverage, is aware of any fact, circumstance, situation, transaction, event, act, error, or omission which they have reason to believe may or could reasonably be foreseen to result in a claim that may fall within the scope of the proposed larger limits of liability, except as follows. If the answer is none, so state:
   None

   **NOTE: WITHOUT PREJUDICE TO ANY OTHER RIGHTS AND REMEDIES OF THE INSURER, IT IS AGREED THAT ANY CLAIM ARISING FROM ANY FACT, CIRCUMSTANCE, SITUATION, TRANSACTION, EVENT, ACT, ERROR, OR OMISSION REQUIRED TO BE DISCLOSED IN QUESTION 1 OF THIS SECTION IS EXCLUDED FROM THE PROPOSED LARGE LIMITS OF LIABILITY.**

## PART VII. ATTACHMENTS

31. Please attach copies of the following documents to this Application. These documents shall be a part of this Application: See Attachments 9-20

   a) Applicant's last 2 audited or accountant-prepared financial statements with notes;
   b) Most recent actuarial report, if applicable; N/A
   And, if any changes since the date of last application:
   c) Current list of Board of Directors;
   e) Applicant's by-laws;
   d) Applicant's organization chart;

e) Written utilization review procedures, including procedures for denials of benefits and appeals;
f) Written credentialing and peer review procedures;
g) Sample contract(s) with health care providers (physicians, hospitals, and others);
h) Sample contract(s) with enrollee(s) or membership handbook;
i) Sample contracts with vendors;
j) Sample TPA or ASO contract(s);
k) Sample sales literature, brochures, advertisements, and other marketing materials (including enrollee packet);
l) Privacy policies and procedures; and
m) Sample consent forms.

**PART VIII. SIGNATURES**

The undersigned, as authorized agent of all individuals and entities proposed for this insurance, declares that, to the best of his/her knowledge and belief, after diligent inquiry, the statements in this Application and any attachments or information submitted to or obtained by the Underwriter in connection with this Application (together referred to as the "Application") are true and complete.

The information in this Application is material to the risk accepted by the Underwriter. If a policy is issued it will be in reliance by the Underwriter upon the Application, and the Application will be the basis of the contract. The Application is on file with the Underwriter, and will be considered physically attached to, part of, and incorporated into the policy, if issued.

The Underwriter is authorized to make any inquiry in connection with this Application. The Underwriter's acceptance of this Application or the making of any subsequent inquiry does not bind the Applicant or the Underwriter to complete the insurance or issue a policy.
If the information in this Application materially changes prior to the effective date of the policy, the Applicant will immediately notify the Underwriter, and the Underwriter may modify or withdraw any quotation or agreement to bind insurance.

The undersigned declares that all individuals and entities proposed for this insurance understand:

a) the policy, if issued, shall apply only to "Claims" that are first made against the "Insured" during the "Policy Period" and are reported to the Underwriter in writing during the "Policy Period" or within the time period set forth in the policy or to "Claims" that are first made against the "Insured" during the Extended Reporting Period, if applicable and reported to the Underwriter in writing during the Extended Reporting Period or within the time period set forth in the policy; and

b) the limit of liability available under the policy, if issued, to pay damages, settlements, or judgments shall be reduced, and may be exhausted, by payment of 'Defense Expenses," and "Defense Expenses" also shall be applied against the retention.

**NOTICE TO ARKANSAS, MINNESOTA, AND OHIO APPLICANTS: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD, WHICH IS A CRIME.**

**NOTICE TO COLORADO APPLICANTS: IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICY HOLDER OR CLAIMANT**

FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICY HOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

NOTICE TO DISTRICT OF COLUMBIA, MAINE, TENNESSEE, AND VIRGINIA APPLICANTS: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, OR A DENIAL OF INSURANCE BENEFITS.

NOTICE TO FLORIDA APPLICANTS: ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY EMPLOYER OR EMPLOYEE, INSURANCE COMPANY, OR SELF-INSURED PROGRAM, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE.

NOTICE TO KENTUCKY APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

NOTICE TO LOUISIANA AND NEW MEXICO APPLICANTS: ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.

NOTICE TO MARYLAND APPLICANTS: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT MAY BE GUILTY OF INSURANCE FRAUD.

NOTICE TO NEW JERSEY APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR SUCH VIOLATION.

NOTICE TO OKLAHOMA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

NOTICE TO OREGON AND TEXAS APPLICANTS: ANY PERSON WHO MAKES AN INTENTIONAL MISSTATEMENT THAT IS MATERIAL TO THE RISK MAY BE FOUND GUILTY OF INSURANCE FRAUD BY A COURT OF LAW.

NOTICE TO PENNSYLVANIA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

**NOTICE TO WASHINGTON APPLICANTS: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES, AND DENIAL OF INSURANCE BENEFITS.**

**A POLICY CANNOT BE ISSUED UNLESS THIS APPLICATION IS PROPERLY SIGNED AND DATED.**

Signature of Applicant: [signature]
(MUST be signed by an Owner, Partner, Director, or Officer of the Named Insured. It is agreed the signer has authority to act on behalf of all insureds.)

Printed Name of Applicant: Jeffrey Roe Title President + CEO

Date: 9/30/14